UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
                                          :

FOOTBRIDGE LIMITED TRUST and OHP OPPORTUNITY :
LIMITED TRUST,                                                              :
                                                                           :        09 CIV 4050 (PKC)
                   Plaintiffs,                                    :
                                                                           :
                   v.                                             :
                                                                           :
COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE :
HOME LOANS SERVICING LP, COUNTRYWIDE                       :
FINANCIAL CORP., COUNTRYWIDE SECURITIES                    :
CORP., CWABS, INC., CWABS ASSET-BACKED                     :
CERTIFICATES TRUST 2006-SPS1, CWABS ASSET-                :
BACKED CERTIFICATES TRUST 2006-SPS2, ANGELO R. :
MOZILO, DAVID SAMBOL, BANK OF AMERICA CORP., :
and BAC HOME LOANS SERVICING, LP,                          :
                                                                           :
                   Defendants.                                    :
                                                                           :
-------------------------------------------------------------------------X

**DEFENDANTS' JOINT MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ....................................................................................... ii

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND....................................................................................... 2

ARGUMENT............................................................................................................... 5

1.     THERE WAS NO FRAUD IN THE SALE OF THE TRUSTS'
      CERTIFICATES................................................................................................ 5

     A.    The Offering Documents Contained No Material Misstatements .............. 5

          1.    The Percentage of Owner-Occupied Properties............................. 7

          2.    Countrywide's Adherence to Its Underwriting Guidelines ............ 9

          3.    The Processing of Supposedly Fraudulent Applications ................ 13

          4.    The Alleged "Adverse Effect" on Investors' Interests ................... 16

          5.    The Servicing of Mortgage Loans .................................................. 19

     B.    No Particularized Facts Giving Rise to a Strong Inference of Scienter....... 19

     C.    Plaintiffs Improperly Invent Torts Out of a Contract ................................. 22

     D.    The Amended Complaint Fails to Allege Loss Causation........................... 24

CONCLUSION............................................................................................................ 26

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 78cc(a) ..................................................................................... 24

15 U.S.C. § 78u-4(b)(1)(B) .......................................................................... 6

15 U.S.C. § 78u-4(b)(2) ............................................................................... 19

15 U.S.C. § 78u-4(b)(4) ............................................................................... 24

17 C.F.R. § 229.1111 ................................................................................... 11

Fed. R. Civ. P. 8 .......................................................................................... 14

Fed. R. Civ. P. 9(b) ..................................................................................... passim

Fed. R. Civ. P. 12(b)(6) ............................................................................... 26

Fed. R. Civ. P. 12(f) .................................................................................... passim

**Cases**

AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC,
254 F. Supp. 2d 373 (S.D.N.Y. 2003) ......................................................... 5, 19

Ashcroft v. Iqbal,
129 S. Ct. 1937 (2009) ................................................................................. 9, 14

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,
493 F.3d 87 (2d Cir. 2007) .......................................................................... 6, 19

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,
394 F.3d 126 (3d Cir. 2004) ........................................................................ 21

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005) ..................................................................................... 25

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009) ........................................................................ 7, 9, 20

Feasby v. Industri-Matematic Int'l Corp.,
No. 99 Civ. 8761 (HB), 2000 WL 977673 (S.D.N.Y. July 17, 2000) .............. 8

Geinko v. Padda,
No. 00 C 5070, 2002 WL 276236 (N.D. Ill. Feb. 27, 2002) ........................... 6

Hampshire Equity Partners II L.P. v. Teradyne, Inc.,
No. 04 Civ. 3318 (LAP), 2005 WL 736217 (S.D.N.Y Mar. 30, 2005) ............................. 7

Hoffman v. UBS-AG,
591 F. Supp. 2d 522 (S.D.N.Y. 2008).................................................................................. 20

In re American Express Co. Sec. Litig.,
No. 02 Civ. 5533 (WHP), 2004 WL 632750 (S.D.N.Y. Mar. 31, 2004), reversed on other
grounds, Slayton v. American Express Co., 460 F.3d 215 (2d Cir. 2006) ........................ 18

In re Bristol-Myers Squibb Sec. Litig.,
312 F. Supp. 2d 549 (S.D.N.Y. 2004).................................................................................. 20

In re Citigroup Inc. Sec. Litig.,
330 F. Supp. 2d 367 (S.D.N.Y. 2004).................................................................................. 10

In re Countrywide Fin. Corp. Sec. Litig.,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) .............................................................................. 6

In re Donald J. Trump Casino Sec. Litig.,
7 F.3d 357 (3d Cir. 1993) ................................................................................................... 14

In re Donna Karan Int'l Sec. Litig.,
No 97-cv- F2011, 1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) ........................................ 16

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
218 F.R.D. 76 (S.D.N.Y. 2003) .......................................................................................... 6

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
568 F. Supp. 2d 349 (S.D.N.Y. 2008).................................................................................. 25

In re Moody's Corp. Sec. Litig.,
599 F. Supp. 2d 493 (S.D.N.Y. 2009).................................................................................. 20

In re Polaroid Corp. Sec. Litig.,
465 F. Supp. 2d 232 (S.D.N.Y. 2006).................................................................................. 20

In re PXRE Group, Ltd., Sec. Litig.,
600 F. Supp. 2d 510 (S.D.N.Y. 2009).................................................................................. 22

In re Scholastic Corp. Sec. Litig.,
252 F.3d 63 (2d Cir. 2001)................................................................................................... 9

In re Sierra Wireless, Inc. Sec. Litig.,
482 F. Supp. 2d 365 (S.D.N.Y. Apr. 18, 2007) ................................................................. 21

In re WRT Energy Sec. Litig.,
No. 96 Civ. 3610 (JFK), 1999 WL 178749 (S.D.N.Y. Mar. 31, 1999) ............................. 8

JHW Greentree Capital, L.P. v. Whittier Trust Co.,
No. 05 Civ. 2985 (HB), 2005 WL 3008452 (S.D.N.Y. Nov. 10, 2005) ............................ 5

Klamberg v. Roth,
473 F. Supp. 544 (S.D.N.Y. 1979)......................................................................... 15

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005)................................................................................ 25

Leykin v. AT & T Corp.,
423 F. Supp. 2d 229 (S.D.N.Y. 2006).................................................................... 25

Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,
No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008)............................ 23-24

Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.,
No. 07-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) ......................................... 25

Mills v. Polar Molecular Corp.,
12 F.3d 1170 (2d Cir. 1993).............................................................................. 19, 24

Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)..................................................................... 8

Rothman v. Gregor,
220 F.3d 81 (2d Cir. 2000)................................................................................. 2

RSM Prod. Corp. v. Fridman,
No. 06-cv-11512 (EJW), 2009 WL 424540 (S.D.N.Y. Feb. 19, 2009) ............................ 6

Sheppard v. TCW/DW Term Trust 2000,
938 F. Supp. 171 (S.D.N.Y. 1996)....................................................................... 15

Shields v. Citytrust Bancorp, Inc.,
25 F.3d 1124 (2d Cir. 1994)............................................................................... 7-8

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
127 S. Ct. 2499 (2007)...................................................................................... 20

Three Crown Ltd. P'ship v. Caxton Corp.,
817 F. Supp. 1033 (S.D.N.Y. 1993)...................................................................... 6

Xue Lian Lin v. Comprehensive Health Mgmt., Inc.,
No. 08 Civ 6519 (PKC), 2009 WL 976835 (S.D.N.Y. Apr. 9, 2009) (Castel, J.) .............. 14

**<u>Other Authorities</u>**

Edmund L. Andrews, <u>Loose Reins on Galloping Loans</u>, N. Y. TIMES, Jul. 15, 2005 ........     14

James R. Hagerty & Ruth Simon, <u>Is Getting a Home Loan Becoming Too Easy?</u>, WALL ST. J., Nov. 16, 2005 ........................................................................................................     14

Defendants[1] submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint ("SAC") and to strike certain allegations in it.

## PRELIMINARY STATEMENT

Plaintiffs, global hedge funds, bought mortgage backed securities ("MBS") in two offerings (the "Offerings").  The relevant offering documents ("Offering Documents") make clear that the mortgage loans underlying the securities were — <u>solely</u> — subprime second-lien loans made to borrowers with blemished credit histories, including prior bankruptcies; contained granular, loan-level disclosures about each mortgage loan included in the two trusts ("SPS-1 and SPS-2" or collectively, the "Trusts") in connection with which the MBS Plaintiffs bought were issued; and included pointed warnings about the high risk that an investment in the MBS presented.  Plaintiffs not only accepted the risks inherent in such an investment (and those bluntly disclosed in the Offering Documents), but doubled down by purchasing some of the riskiest tranches of the MBS offered, betting on the higher returns that came with those risks.

The SAC is Plaintiffs' third attempt at pleading, and it follows detailed pre-motion letters outlining the deficiencies in its predecessor (the "AC").  It asserts fraud claims that turn on whether the Offering Documents contained fraudulent statements about the quality and servicing of the loans held by the Trusts.  They did not.  To the contrary, the Offering Documents contained detailed disclosures about the underlying loans.  Not surprisingly, the SAC largely ignores these granular disclosures and next to nothing is actually said about the securities Plaintiffs bought in either Offering or any particular loan included in either Trust, much less a

---

[1] The "Defendants" herein consist of the Countrywide Defendants, the Individual Defendants, the Bank of America Defendants and the Trust Defendants (all as defined in the accompanying Notice of Motion).  To the extent applicable, the Countrywide Defendants join in the briefs filed by the Individual Defendants, the Bank of America Defendants, and the Trust Defendants.

material number of them.  Instead, the SAC largely consists of explicit and uncredited[2] excerpts

from other litigations or proceedings and press coverage — none of which even mention either

Offering.  Plaintiffs must plead and prove — with the particularity demanded by both Rule 9(b)

and the Private Securities Litigation Reform Act (the "PSLRA") — that these Offering

Documents were fraudulent.  They have not done so.

As explained more fully below, the SAC should be dismissed.

## FACTUAL BACKGROUND

At all relevant times, CFC, CHL and CHLS originated, purchased, serviced and sold

mortgages, or traded and underwrote MBS.  SAC ¶¶ 12-15.  During 2006 alone, CFC entities

produced more than $421 billion in mortgages, the overwhelming majority of which were

conventional loans.  CFC 2007 10-K[3] at 28-29 (Ex. 1).[4]  A tiny fraction of those loans —

roughly 0.16% of CFC's total 2006 mortgage production — are at issue here.  SPS-1 Term Sheet

("TS") at 2 (Ex. 2); SPS-2 TS at 2 (Ex. 3).

Both Trusts held only credit-blemished fixed rate loans secured by second liens on

residential properties (SAC ¶¶ 2, 56); loans that even Plaintiffs admit were among the "riskier

lines of products" Countrywide originated.  Id. ¶ 39.[5]  Each Trust consisted of three tranches of

---

[2]     At the pre-motion conference, the Court questioned the AC's repeated reference to press reports and allegations made in other proceedings.  The SAC repeats many of the same allegations, but just omits where they come from.  See Annex B.  This tactic of redacting the source of an allegation does not avoid the consequences mandated by Rule 12(f).  See infra note 10.

[3]     On a motion to dismiss, the court may consider documents that are integral to Plaintiffs' claims, including the complaint and attached exhibits, statements and documents incorporated by reference, legally required public disclosure documents filed with the Securities Exchange Commission ("SEC"), documents possessed by or known to Plaintiffs and upon which they relied, and matters subject to judicial notice.  See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000).

[4]     Unless otherwise noted, all exhibits are attached to the Declaration of Victor L. Hou, dated September 18, 2009.

[5]     A second lien mortgage is subordinate to a first mortgage, meaning that "in the case of default, it is repaid only after the first mortgage is repaid," and as a result, the holder of the second mortgage bears most of the default

securities of varying investment grades: Class A, Mezzanine, and Class B. See SPS-1 TS at 3 (Ex. 2); SPS-2 TS at 3 (Ex. 3). Plaintiffs purchased in the Mezzanine tranche (ranging from M-3 Class to M-7 Class) which were some of the lowest grade tranches of these already risky investments. See SPS-1 TS at 3 (Ex. 2); SPS-2 TS at 3 (Ex. 3); SAC ¶¶ 59-60. Such lower tranches were subordinated to the higher tranches, meaning that investors in these lower grade tranches did not receive any return on their investment until investors in the higher grade tranches were paid See SPS-1 PSA at 97 (Ex. 6); SPS-2 PSA at 96 (Ex. 7).

Both Offerings had the same structure. Mortgage loans were placed in each Trust pursuant to a separate Pooling and Servicing Agreement (the "PSA"). Each PSA constituted a contract (for the benefit of the MBS owners) between a depositor (here, CWABS), a seller (CHL), a master servicer (CHLS) and a trustee (the Bank of New York), and contained detailed representations and warranties that included procedures for addressing any non-compliance therewith. Each PSA structured the securitization as follows:

- The sellers: (1) agreed to sell mortgage loans they originated or acquired to the depositor, and (2) made a series of representations and warranties regarding the characteristics of those mortgages. If one of the representations were breached, the PSAs required the seller to cure the breach, or to repurchase or replace any non-conforming loans. This obligation to cure, repurchase or replace was "the sole remedy" for the breach available to the certificateholders, depositor, or trustee against the seller. SPS-1 PSA at 42, 56-69, 71 (Ex. 6); SPS-2 PSA at 41-42, 55-69, 70-71 (Ex. 7).

- The depositor then transferred the mortgage loans to a trust, which exchanged the loans for certificates that were registered with the SEC and sold in public offerings. SPS-1 PSA at 43, 73 (Ex. 6); SPS-2 PSA at 42-43, 73 (Ex. 7).

- The master servicer covenanted that it would service the loans on behalf of the certificateholders. SPS-1 PSA at 74 (Ex. 6); SPS-2 PSA at 74 (Ex. 7). The PSAs provided that the trustee, sellers, certificateholders, and depositor were not

---

risk. See Daniel J. McDonald & Daniel L. Thornton, A Primer on the Mortgage Market & Finance, Review — Federal Reserve Bank of St. Louis (Jan./Feb. 2008), available at http://research.stlouisfed.org/publications/review /08/01/McDonald.pdf.

obligated to supervise the master servicer's performance and were not responsible for the actions of the master servicer.  SPS-1 PSA at 76 (Ex. 6); SPS-2 PSA at 76 (Ex. 7).

- When the master servicer collected monthly payments from the mortgage borrowers, these funds were distributed by the trustee to the certificateholders according to a "waterfall" priority that was detailed in the transaction documents. Under this waterfall, interest was distributed first to the Class A certificates and then sequentially to each class of subordinated certificates.  SPS-1 PSA at 97 (Ex. 6); SPS-2 PSA at 96 (Ex. 7).

Potential investors in the Certificates had access to at least three publicly filed Offering Documents:  (1) a final term sheet; (2) a prospectus and prospectus supplement; and (3) a PSA.  SAC ¶¶ 63-64.  The Offering Documents disclosed in detail the credit quality and characteristics of each of the approximately 15,000 underlying credit-blemished, subprime mortgage loans held by the Trusts.  For example, these documents disclosed:

- Tables detailing loan-level data about the underlying mortgage loans, including over a dozen characteristics such as average principal loan balance, loan-to-value ratios, loan program, loan documentation program (i.e., Stated Income Program), state of residence, type of property, purpose of loan, and borrower credit score. SPS-1 TS at 11-17 (Ex. 2); SPS-2 TS at A-1-A-7 (Ex. 3).

- Loans could receive the highest credit grade of "A" even if a borrower had a loan-to-value ratio of 100%, a credit bureau risk score of 560, a mortgage delinquency within the previous year, a previous bankruptcy filing, and an earlier foreclosure. SPS-1 PS at S-34 (Ex. 4); SPS-2 PS at S-34 (Ex. 5).[6]

Investors were explicitly told that the Trusts' assets were credit blemished and warned about the attendant risks.  In pointed language, Plaintiffs were told that the borrowers "have impaired credit histories," which include "a record of major derogatory credit items such as outstanding judgments or prior bankruptcies," and may not otherwise qualify for loans under Countrywide's "otherwise applicable" underwriting guidelines.  SPS-1 PS at S-14 (Ex. 4); SPS-2

---

[6]     In addition, investors in the SPS-2 Offering had access to a separate chart listing the characteristics of each individual mortgage loan, on a loan by loan basis, which was filed publicly by the trust as a free writing prospectus on August 21, 2006.  See http://idea.sec.gov/Archives/edgar/data/1372621/000119312506176855/dfwp.htm.

at S-14 (Ex. 5).  Not only did the Offering Documents make clear that "a significant number of the mortgage loans will have been originated based on an underwriting exception" to even these flexible credit blemished underwriting guidelines, but warned that as a result the loans "WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS[.]"  Id. (all capitals in original).[7]

## ARGUMENT

**I.    THERE WAS NO FRAUD IN THE SALE OF THE TRUSTS' CERTIFICATES**

### A.    The Offering Documents Contained No Material Misstatements

The SAC stakes out five categories of purported misrepresentations,[8] but none survive scrutiny.  At the outset, Plaintiffs fail to provide the requisite specificity that any representations were false or misleading <u>when</u> <u>made</u>.  The SAC contains virtually no reference to any document or person supporting any challenge to either Offering, let alone showing they were fraudulent.  Instead, the SAC heavily relies on explicit or unattributed references to other lawsuits and investigations or press reports, as detailed in Annexes A and B.[9]  "Plaintiffs cannot be permitted

---

[7]    Plaintiffs were also warned that the subordinated Mezzanine level Certificates they bought "have a greater risk of loss because of the subordination features, [and the] credit enhancement may not be sufficient to protect [even] more senior classes of certificates from losses."  SPS-1 PS at S-15 (Ex. 4); SPS-2 PS at S-14 (Ex. 5).  More generally, the Offering Documents contained warnings that adverse economic conditions, even those that did not directly affect real property values, could increase the rate of mortgage delinquencies, foreclosures and losses, SPS-1 Pro. at 19 (Ex. 4); SPS-2 Pro. at 19 (Ex. 5), and that "[t]he secondary markets for asset backed securities have experienced periods of illiquidity and can be expected to do so in the future."  SPS-1 Pro. at 11 (Ex. 4); SPS-2 Pro. at 11 (Ex. 5).

[8]    For both securities fraud and common law fraud, Plaintiffs must prove a material misrepresentation or omission, scienter, reasonable reliance, and that the alleged misrepresentation/omission was the proximate cause for their loss.  Fraud allegations must be pleaded with particularity under Rule 9(b) and under the PSLRA.  See JHW Greentree Capital, L.P. v. Whittier Trust Co., No. 05 Civ. 2985 (HB), 2005 WL 3008452, at *9 (S.D.N.Y. Nov. 10, 2005) ("The requirements for pleading common law fraud . . . are essentially identical to the standards for pleading violations of section 10(b) and Rule 10b-5."); AIG Global Sec. Lending Corp. v. Banc of Am. Sec. LLC, 254 F. Supp. 2d 373 (S.D.N.Y. 2003) (dismissing 10(b) and common law fraud claims for failing to meet 9(b)).

[9]    As a result, the SAC cobbles together irrelevant allegations about Countrywide's business judgments that — at best — concern only investors in Countrywide common stock or debt.  See, e.g., SAC ¶¶ 156-57 (risk management); 158-63 (product lines and strategies).  But this case is not about equity or debt securities issued by Countrywide; Plaintiffs allege they bought MBS issued by two Trusts.  As such, prior rulings in other cases

to free ride off the press or the complaints of other parties filing similar lawsuits, rather they must prove to the court that their complaint is backed by specific facts supporting a 'strong inference' of fraud."  Three Crown Ltd. P'ship v. Caxton Corp., 817 F. Supp. 1033, 1040 n.11 (S.D.N.Y. 1993).  Under Rule 12(f) all such allegations should be stricken.[10]  Equally improper are the numerous allegations scattered throughout the SAC that are expressly or implicitly pleaded solely on information and belief[11] — none of which provide any factual basis for the "belief" despite the PSLRA's mandate that plaintiffs allege "all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B) (emphasis added); see ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (requiring securities fraud plaintiff to "provide the grounds upon which his claim rests through factual allegations sufficient to raise a right to relief above the speculative level").

That which remains fails to state a claim as a matter of law.

---

regarding the general effect of MBS disclosures as a counterweight to alleged misrepresentations to investors of equity/debt securities of Countrywide are not relevant to this case, which turns entirely on the specific MBS disclosures actually made to MBS investors in the Offering Documents — offerings and disclosures that were not at issue in other equity/debt securities cases.  See, e.g., In re Countrywide Fin. Corp. Sec. Litig., 588 F. Supp. 2d 1132, 1153 n.16, 1160 (C.D. Cal. 2008) (rejecting "truth on market" reliance argument at pleadings stage as to "very large" MBS disclosures in case involving alleged misrepresentations to equity/debt investors (as opposed to MBS investors) but noting that it "may have been possible to piece together a rough picture" of Countrywide's practices by analyzing such extensive MBS disclosures).

[10]    See RSM Prod. Corp. v. Fridman, No. 06-cv-11512 (EJW), 2009 WL 424540, at *12 (S.D.N.Y. Feb. 19, 2009) (striking entire paragraphs from complaint because "Second Circuit case law is clear that paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial"); In re Merrill Lynch & Co. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking references to SEC and NASD complaints in securities action); Geinko v. Padda, No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 27, 2002) (noting that "if this Court were to accept Plaintiffs' view of pleading fraud, two plaintiffs could file separate actions each relying on the allegations in the other's complaint and both would state a claim for fraud.  Clearly, Rule 11's requirements do not allow this type of pleading loophole.").

[11]    See SAC ¶¶ 30, 38-39, 48, 50, 53, 55, 57, 76, 80, 82-83, 88, 93, 97-98, 101-03, 106-07, 114-15, 120, 123, 177, 179-81, 190, 223, 253 (underwriting standards); 38-39, 48, 50, 53, 55, 88, 92-93, 98, 101, 115, 119, 123, 177, 179, 184, 190 (corporate culture and profit motive); 50, 52, 54, 91 (predatory lending); 48, 76, 80, 97, 101, 119-20, 177, 224, 253 (knowledge of borrower fraud); 88, 109 (credit ratings); 90 (appraisals); 52, 117-20, 182 (reduced-documentation programs); 123, 129-30 (selection of loans in securitizations); 134-35 (servicing); 82, 128, 173-82, 184, 188, 190-91 (scienter); 139-42, 184, 188, 190-91, 243-44, 246-47 (knowledge and involvement of individual defendants); 193-202, 204-06 (stock sales); 223-25 (loss causation); 259, 266, 273 (merger); Annex C.

1.      **The Percentage of Owner-Occupied Properties**.  Plaintiffs first assert — in what they call "the most glaring example of Countrywide's fraud," SAC ¶ 67 — that the Offering Documents misrepresented the percentage and number of the mortgaged properties that would be owner-occupied.  The SAC nevertheless alleges no facts showing, as the law requires to state a fraud claim, that the Defendants knew, or were reckless in not knowing, that borrowers lied to them about the nature of their property ownership.[12]

First, the SAC distorts the representation actually made about occupancy status, by omitting a critical caveat.  In the nearly two dozen paragraphs supposedly "supporting" this allegation (SAC ¶¶ 3, 67-83), the SAC never mentions that the Offering Documents cautioned the "occupancy type" disclosures were "[b]ased upon representations of the related borrowers at the time of origination."  SPS-1 TS at 15 (Ex. 2); SPS-2 TS at A-5 (Ex. 3).  Plaintiffs make no allegation — because they cannot — that the Offering Documents falsely described the information borrowers actually reported to Countrywide.

Second, the SAC pleads no facts (much less particularized ones) that the Defendants knew that some borrowers lied about the owner-occupied status of specific properties underlying mortgage loans held by either Trust at the time of the Offerings.[13]  Instead, the SAC alleges that some seven months after Plaintiffs' last purchase Countrywide learned that approximately 15% of the loans appeared to have been investment properties, not owner-occupied, and that borrowers had falsely stated otherwise on their applications.  SAC ¶¶ 73-79.  At most, this is impermissible "fraud by hindsight" pleading.  Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124,

---

[12]      See ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198-203 (2d Cir. 2009) (noting PSLRA's "more stringent" rule requiring complaint to state with particularity facts giving "strong inference" of scienter).

[13]      See Hampshire Equity Partners II L.P. v. Teradyne, Inc., No. 04 Civ. 3318 (LAP), 2005 WL 736217, at *4 (S.D.N.Y Mar. 30, 2005) (dismissing complaint for (among other reasons) failure to plead "any specific facts giving rise to a strong inference that any challenged statement was knowingly false when made").

1129 (2d Cir. 1994).[14]

Third, Plaintiffs' claims are not saved by their supposition that, as a "sophisticated loan originator," CHL "knew" that these borrower representations were false when made. SAC ¶ 76. This is but one of the SAC's many "information and belief" allegations and, like the others, no facts are alleged to support the belief (despite the explicit PSLRA obligation to allege them). At best, it is an allegation based on mere status: that the Defendants "should have known" the truth simply because of the roles that they played. Such cursory pleading is insufficient under Rule 9(b) and the PSLRA.[15]

Finally, while the SAC provides no contemporaneous evidence that Countrywide knew that any borrower with loans included in either Trust had made misrepresentations in their applications about the occupancy type, Plaintiffs cite to e-mail communications between Countrywide executives on June 1, 2006, including Mozilo and Sambol, in which they allegedly discuss data suggesting that "borrowers were lying about their incomes in applying for Pay-Option ARMs." SAC ¶ 77. But the loans held by both Trusts were solely "fixed-rate loans" — not Pay-Option Adjustable Rate Mortgages ("P-O ARMs"). SAC ¶ 2. The SAC alleges no facts that the P-O ARM default risk discussed in these e-mails stemmed from any of the "origination policies" that apply to the underwriting of fixed rate loans that the Trusts exclusively held. Indeed, the risk issue in the P-O ARM e-mails — irrelevant here — is "payment shock" to

_____

[14]     See Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (dismissing allegations that have "been craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendant] far earlier in time, well before the confirming event occurred or other evidence came to light").

[15]     See In re WRT Energy Sec. Litig., No. 96 Civ. 3610 (JFK), 1999 WL 178749, at *10 (S.D.N.Y. Mar. 31, 1999) (dismissing argument that underwriters' due diligence investigation "should have turned up asserted improprieties" as insufficient); see also Feasby v. Industri-Matematic Int'l Corp., No. 99 Civ. 8761 (HB), 2000 WL 977673, at *7 (S.D.N.Y. July 17, 2000) (rejecting argument that "the underlying adverse conditions must have been obvious to the defendants" as "speculation" and "intuition" insufficient under Rule 9(b) and PSLRA).

borrowers when such loans re-set at higher rates.  See SAC ¶¶ 151-52.  Thus, the SAC's repeated references to Mozilo's alleged opinions about risks of P-O ARMs (SAC ¶¶ 39, 151-53, 155, 170-71) are irrelevant and the SAC does not (and cannot) explain how concerns about the income reported by P-O ARM borrowers bears on occupancy status reported by fixed rate borrowers.[16]

      **2.**      **Countrywide's Adherence to Its Underwriting Guidelines**.  Next, the SAC charges that Countrywide represented that it originated loans in accordance with what the SAC characterizes as "strict" underwriting guidelines when Countrywide had allegedly "abandoned" them.  See SAC ¶¶ 47-57, 83-115.[17]  Unable to tether the underwriting allegations to any mortgage loan included in the Trusts, the SAC resorts to rhetoric and wholesale attacks against Countrywide's alleged business practices, SAC ¶¶ 55, 65, 83, 136, 142, 221, and its purported corporate "culture" of "pervasive fraud," "greed," and "profit-obsess[ion]."  ¶¶ 97, 115, 123, 142.  Even if these allegations were true, the securities laws do not require issuers to engage in

---

[16]      Similarly, the SAC alleges that Sambol received an e-mail noting that an audit of stated-income loans originated by "a Countrywide subsidiary" suggested that some borrowers listed a higher income than they reported to the IRS.  That allegation has no bearing on whether they falsely described occupancy status, much less whether any borrowers under loans held by either Trust did so.  SAC ¶ 77.  It would be impermissible speculation to conclude that any loan discussed in the e-mail made it into either Trust.  See Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully" and complaint that pleads facts that are merely consistent with defendant's liability is insufficient); In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72-73 (2d Cir. 2001) (plaintiff relying on internal reports must "specify the internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them").  The e-mail concerned a quality control audit of an unspecified number of loans of an unspecified Countrywide entity without reference to when the loans were underwritten, what types of loans they were, and the guidelines used.  In contrast, the SAC notes that the credit blemished second lien loans in the Trusts were underwritten by a "specialized group of underwriters" familiar with the unique characteristics of these loans.  SAC ¶ 104.

[17]      The SAC also cites Countrywide's public filings, including its 10-K forms for 2005, 2006 and 2007, about general credit policies and underwriting standards (SAC ¶¶ 33-36) and then brands these "public representations" as "false and misleading" while also alleging that Plaintiffs "relied upon such public representations and were induced to purchase the Securities" by them.  Id. ¶ 36.  First, no representation in either Form 10-K for 2006 or 2007 could have defrauded Plaintiffs, because both were only issued long after Plaintiffs made their investments.  Second, the only "representation" Plaintiffs identify from the 2005 Form 10-K said — in total — that "[w]le ensure our ongoing access to the secondary mortgage market by consistently producing quality mortgages . . . . We are focused on 'ensuring the quality of our mortgage production.'"  SAC ¶ 33.  At most, these statements are inactionable puffery, not actionable misstatements of fact.  See ECA, 553 F.3d at 206 (statements touting "financial discipline" are "immaterial" as a matter of law and are "no more than 'puffery'").

self-flagellation.[18]  Indeed, the only specific allegation that the SAC makes with respect to the underwriting standards used for the loans placed in the Trusts is that Countrywide made statements about "its rigorous underwriting standards" to "reassure them about their investments" during a conference call in May 2007 and told Plaintiffs that it had raised the minimum FICO scores of its borrowers in 2006.  SAC ¶ 99.  But Plaintiffs do not contest the accuracy of these alleged statements and even more critically, Plaintiffs' purchases were between June and October 2006 (¶ 2).  Thus, even if the alleged statements made seven months later were untrue, Plaintiffs could not have relied upon them to make their purchases.

Here, Plaintiffs knew precisely how the underwriting guidelines were applied to the particular mortgage loans included in each Trust, because the Offering Documents disclosed granular information about each loan and borrower — the specific product of those guidelines as actually applied.  Among dozens of detailed metrics, Plaintiffs were told the length of each mortgage, principal balance, interest rates, property types, geographic location, loan-to-value ratio, borrower credit ("FICO") score and loan grades.  See SPS-1 PS at A-1-A-7 (Ex. 4); SPS-2 PS at A-1-A-7 (Ex. 5).  Given these specific disclosures about the actual loans underlying their investments, there is no basis to conclude — and the SAC pleads no facts to support — that Plaintiffs, two hedge funds, reasonably relied instead on more general comments allegedly made by Countrywide employees during analyst calls or in other filings (e.g., SAC ¶¶ 100-102) about Countrywide's general underwriting practices.  Other than the SAC's fraud by hindsight charge that some borrowers misstated the occupancy type of the property, the SAC mentions no other metric as being misrepresented for even a single loan, much less a material number of them.  See SAC ¶¶ 84-115.  Even if the SAC had sufficiently pleaded that the Defendants had "abandoned"

---

[18]     See In re Citigroup Inc. Sec. Litig., 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004) ("[T]he federal securities laws do not require a company to accuse itself of wrongdoing.").

underwriting guidelines for both Trusts, Plaintiffs knew what standards had been applied because they were told — accurately — the specific terms of the loans that had been underwritten, and all relevant details about the borrowers — precisely as required by SEC Regulation AB. See 17 C.F.R. § 229.1111.

Plaintiffs' wholesale allegations about Countrywide's alleged practices, structure, and environment are also "backed" by overt and covert references to newspaper articles and charges or pronouncements in other lawsuits, see SAC ¶¶ 5, 6, 19-20, 49, 122, 203, 211-221; Annex B, that (as noted above) should be stricken under Rule 12(f). Further, none of these "sources" speaks to either Trust, or their underlying mortgages. By way of just one example, while Plaintiffs reference the creation of an Exception Processing System and the Structured Loan Desk, see SAC ¶¶ 51, 113, they proffer no facts tying them to any of the mortgages in either Trust, and proffer no facts to suggest that their existence rendered any statement in the Offering Documents false or misleading — especially in light of the Offering Documents' unequivocal disclosure, as set forth below, that many of the specific loans in the Trusts would be originated pursuant to "exceptions" to stated underwriting guidelines. SPS-1 PS at S-14 (Ex. 4); SPS-2 PS at S-14 (Ex. 5).

Significantly, although the SAC repeatedly asserts that Countrywide "abandoned" its "stated guidelines" (e.g., SAC ¶ 2), Plaintiffs do not identify a single mortgage loan deposited in either Trust that would not have been issued had Defendants abided by even Plaintiffs' own interpretation of Countrywide's guidelines. This is not surprising, given that the Offering Documents fully disclosed Countrywide's flexible underwriting approach for credit-blemished, second-lien mortgage loans. Specifically, the Offering Documents disclosed that

- the mortgage loan underwriting standards used were "more flexible than the standards generally used by banks for borrowers with non-blemished credit

histories with regard to the borrower's credit standing and repayment ability." SPS-1 PS at S-14 (Ex. 4); SPS-2 PS at S-14 (Ex. 5).

- CHL could determine that, based upon "compensating factors, a prospective borrower not strictly qualifying under its applicable underwriting risk category guidelines warrants an underwriting exception." SPS-1 PS at S-14, S-33 (Ex. 4); SPS-2 PS at S-14, S-33 (Ex. 5).

Again, they both pointedly disclosed that "[i]t is expected that <u>a significant number</u> of the mortgage loans <u>will</u> have been originated based on <u>underwriting of exceptions</u> of these types," SPS-1 PS at S-14 (Ex. 4); SPS-2 PS at S-14 (Ex. 5) (emphasis added), and warned potential investors that these were risky investments because, among a host of other reasons, the Certificates were backed by mortgage loans that "<u>WILL</u> EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN BY MORE TRADITIONAL STANDARDS." <u>Id.</u> (all capitals in original).[19]

The SAC's attempt to identify specific misrepresentations or omissions about Countrywide's adherence to underwriting guidelines fares no better. Plaintiffs complain that the Offering Documents failed to disclose that the mortgage loans were "characterized by high interest rates," SAC ¶ 101, and were issued to "borrowers with low FICO scores." SAC ¶ 103. These assertions ring hollow given the detailed loan level disclosures in the Offering Documents noted above, which specifically included both the interest rates on the loans <u>and</u> the borrowers' FICO scores. <u>See</u> SPS-1 PS at A-4, A-6 (Ex. 4); SPS-2 PS at A-4, A-6 (Ex. 5). Tellingly, the SAC does not allege a single inaccuracy in the listing of interest rates for each loan or the borrower FICO scores — a credit risk assessment supplied by third parties, which are derived

---

[19]     The Offering Documents also warned investors of many other risks. <u>See, e.g.</u>, SPS-1 Pro. at 10 (Ex. 4) and SPS-2 Pro. at 10 (Ex. 5) ("ratings of the securities do not assure their payment"); SPS-1 PS at S-15 (Ex. 4) and SPS-2 PS at S-14 (Ex. 5) (risks of subordinated securities); SPS-1 PS at S-16 (Ex. 4) and SPS-2 PS at S-15 (Ex. 5) ("You should fully consider the risks of investing in a subordinated certificate, including the risk that you may not fully recover your initial investment as a result of realized losses."); SPS-1 PS at S-20 (Ex. 4) and SPS-2 PS at S-19 (Ex. 5) (Certificates "may not be an appropriate investment for investors who do not have sufficient resources or expertise to evaluate the particular characteristics of each applicable class of offered certificates.").

from analyses of consumer data to establish the borrower's probability of default.  See SPS-1 PS at S-35 (Ex. 4).  On these metrics touted as significant by Plaintiffs, the SAC contains no allegation even suggesting that investors did not get precisely what they were told.[20]

Plaintiffs also point to the representation that "over 90 percent of the Mortgages Loans were 'Grade A'" and allege in conclusory fashion that this statement was false and misleading because the loans did not "conform to the grades given" and further suppose that "it is likely that a far smaller percentage" of loans should have been classified as Grade A.  SAC ¶ 88.  But the Offering Documents explained the standards required for loans to receive this grade, SPS-1 PS at S-34 (Ex. 4); SPS-2 PS at S-34 (Ex. 5), and the SAC alleges no facts showing that these standards were improperly applied to any (let alone a material number of) mortgage loans held by either Trust.  Most incredibly, Plaintiffs — sophisticated hedge funds — feign surprise that Countrywide "issu[ed] loans to borrowers with poor credit histories," SAC ¶ 103, when they admit the loans underlying the MBS Plaintiffs purchased were exclusively composed of loans made to credit-blemished borrowers that were secured by second liens.  SAC ¶ 2.

**3.      The Processing of Supposedly Fraudulent Applications**.  The SAC then charges that Countrywide omitted material facts about the extent to which supposedly fraudulent applications were processed through the Stated Income loan program, which was a reduced documentation application program.  SAC ¶ 116-22.  However, as the very name of the program makes clear — and the Offering Documents spelled out — "the borrower's income as stated on the application [i]s not independently verified."  SPS-1 PS at S-34 (Ex. 4).  Indeed, Plaintiffs

---

[20]      In fact, the Offering Documents disclosed that the FICO scores for loans in the Trusts originated under the Stated Income program were <u>higher</u> than the scores for loans originated under the Full Documentation program.  <u>See</u> SPS-1 PS at A-6 (Ex. 4) (weighted average credit bureau risk score for Stated Income is 667 and 622 for Full); SPS-2 PS at A-6 (Ex. 5) (weighted average for Stated Income is 663 and 620 for Full).  Plaintiffs do not challenge the accuracy of such disclosures, which demonstrate that Countrywide did not "abandon" its guidelines but applied them to offset the inherent risk that low documentation loans could lead to higher rates of default.

admit they understood this meant borrowers were "excused" from "submitting documents to confirm their income and assets." SAC ¶ 116. The risks inherent in such an approach are clear, and the securities laws do not require investors to be spoon-fed obvious information. See In re Donald J. Trump Casino Sec. Litig., 7 F.3d 357, 377 (3d Cir. 1993) ("The federal securities laws, in a word, do not compel the Partnership to state the obvious.").[21]

The SAC contains no allegation that any borrower receiving a stated income loan held by either Trust falsely reported his income, much less that a material number did so. Instead virtually all of the allegations in this section of the SAC couple (i) an unparticularized "factual" allegation based entirely on information and belief without providing any source for that belief, with (ii) a conclusory legal statement. See Annex C. Courts have not hesitated to dismiss such allegations under Rule 9(b) and the PSLRA.[22]

The remaining allegations lack the substance required to state a claim. While the SAC refers to "internal Countrywide e-mails cited herein," SAC ¶ 121, it quotes from just one (from Mr. Mozilo) in this section. Yet the SAC does not allege that Mr. Mozilo was even referring to the Stated Income program in that e-mail, much less borrower fraud under it. Rather, the full quote from the SAC is that Mozilo had "personally observed a serious lack of compliance within our origination system as it related to documentation." Id. This was not a comment on borrower practices; rather, it was a comment addressed to loan file documentation delivered to HSBC,

---

[21]     Indeed, the higher default risk associated with low documentation loans and the risk that borrowers might make misrepresentations under such programs was already well known to the industry. See, e.g., James R. Hagerty & Ruth Simon, Is Getting a Home Loan Becoming Too Easy?, WALL ST. J., Nov. 16, 2005, at C1 (noting that there is "good reason" why no documentation loans are called "liars' mortgages" and risk that "many low-doc loans will go bad" as housing market cools, and referencing Countrywide's low documentation programs); Edmund L. Andrews, Loose Reins on Galloping Loans, N. Y. TIMES, Jul. 15, 2005, at C1 (same).

[22]     See Iqbal, 129 S. Ct. at 1949 (even under Rule 8, "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); Xue Lian Lin v. Comprehensive Health Mgmt., Inc., No. 08 Civ 6519 (PKC), 2009 WL 976835, at *1 (S.D.N.Y. Apr. 9, 2009) (same) (Castel, J.).

which had purchased whole loans (not loans securitized in Trusts, like Plaintiffs) and the

inadequate documentation allowed HSBC to put certain of them back to Countrywide.[23]

The SAC's scienter section refers to e-mails by Countrywide employees that raise

concerns about (1) P-O ARMs, including the re-set feature and potential borrower fraud

associated with the stated income program (see pp. 8-9 supra) and (2) the desirability of holding

second lien mortgages.  See SAC ¶¶ 148-50, 151-53.[24]  None of these e-mails shows fraudulent

loan application were processed under the Stated Income program categories.  As noted, there

were no P-O ARMs in either Trust and none of the allegations establish facts showing that even

one borrower on a loan included in either Trust falsely stated his income, much less that any

Defendant was aware the borrower had done so.  With respect to second lien mortgages, there

was no material fact about such an investment that was required to have been disclosed in the

Offering Documents that was not.  There was no duty by any Defendant to disclose their own

---

[23]     The SAC also alleges that unidentified Countrywide employees encouraged loan officers to "flip" applications from full documentation to reduced documentation, SAC ¶ 122, but makes no effort to link these allegations to any loan officer involved with the origination of loans included in either Trust, much less to any loan actually held by either Trust.  See id.  Indeed, Plaintiffs do not even allege facts indicating the extent of this "practice," or where and when it purportedly occurred.  See id.

[24]     In a series of e-mails, Mozilo expresses concerns about second lien mortgages sold to HSBC and uses colorful terms ("toxic" and "poison") to describe them because they are "subordinated to the first" lien and because the FICO scores are "below 600, below 500 and some below 400."  SAC ¶ 149.  But there are no allegations in the SAC tying concerns about those particular loans to the loans underlying either Trust — there is no allegation about when those loans were originated and under what standards.  In any event, the Offering Documents here clearly disclosed the subordination risk and the "subprime" credits of the borrowers.  They also noted that the weighted average FICO scores for the loans in the Trusts was above 630.  SPS-1 PS at S-3 (Ex. 4); SPS-2 PS at S-3 (Ex. 5), and of the over 15,000 loans in both Trusts, only 6 borrowers had FICO scores below 500.  See id. at A-6 (Ex. 4) and A-6 (Ex. 5).  Thus, it is not plausible that Mozilo was discussing the mortgages relevant here.

Further, the SAC concedes that the "vast majority" of the underlying loans (SAC ¶ 150) for both of the Trusts were for purchase (as opposed to refinancing or cash outs) and that the weighted average of the original loan-to-value ratio of these purchase loans was approximately 99.7% to 99.8%.  See SPS1 PS at A-5 (Ex. 4); SPS2 PS at A-5 (Ex. 5).  Thus, Plaintiffs were advised that owners of the properties had very little equity in them and that there would be an increased default risk for these loans, which would only be exacerbated in the event of a downturn. Countrywide was not then obligated to characterize "those facts with pejorative nouns and adjectives" or to "verbalize all adverse inferences expressly."  Klamberg v. Roth, 473 F. Supp. 544, 551 (S.D.N.Y. 1979) (citations and quotations omitted); see also Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 175 (S.D.N.Y. 1996) ("Defendants were not obligated to describe in pejorative terms the types of mortgage-backed securities in which the Trusts invested.").

opinions or characterizations about the disclosed risks of these MBS.[25]  The only issue is

whether the disclosures in the Offering Documents were adequate, and they were.  Indeed, the

specific concern about second lien mortgages the SAC says Countrywide employees highlighted

was the increased possibility of default — but in all capital letters the Offering Documents

warned investors in these Trusts that the loans they held "WILL EXPERIENCE HIGHER

RATES OF DELINQUENCY AND LOSS[.]"  SPS-1 PS at S-14 (Ex. 4); SPS-2 PS at S-14 (Ex.

5).  Armed with the detailed disclosures in the Offering Documents, Plaintiffs were able to and

did make their own investment decisions.

      Even if Plaintiffs' allegations about the Stated Income program were not otherwise fatally

defective, they would still fail to state a claim.  Plaintiffs proffer no facts showing that their

wholesale allegations about a reduced documentation program had any impact on their particular

investments in the two Offerings.

      **4.**      **The Alleged "Adverse Effect" on Investors' Interests**.  The SAC next

challenges the PSA's representation that Countrywide would not select mortgage loans for

inclusion in the securitizations in a manner that would "adversely affect" the interests of

investors.  SAC ¶¶ 123-32.  According to Plaintiffs, CHL knew that it was issuing loans to

borrowers with lower creditworthiness and incomes, and that it thereby "increased the likelihood

that borrowers would default on their loans."  SAC ¶ 123.  But the Offering Documents, as

Plaintiffs admit, made clear that the underlying loans included only credit-blemished, second lien

mortgage loans — and nothing else.  In this context, the representation that CHL would not

select loans from within this risky category which would "adversely affect" investors was not

---

[25]     See In re Donna Karan Int'l Sec. Litig., No 97-cv- F2011, 1998 WL 637547, at *13 (E.D.N.Y. Aug. 14, 1998) ("A company has no duty to disparage its own competitive position in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's condition and the value of its stock.") (quotations omitted).

(and could not have reasonably have been understood to be) a general representation to investors at large that CHL would not securitize risky loans.  SAC ¶ 123.  There is no allegation that any mortgage loan (let alone a material number of them) was placed into either of the Trusts in violation of this representation and warranty.[26]

Plaintiffs also complain that Countrywide misrepresented the circumstances under which it selected the mortgages loans ultimately included in the Trusts.  SAC ¶ 124.  They allege that a former Countrywide employee, Nancy Deliban, told an Old Hill representative on an unspecified date that Countrywide had originally sought to sell some underlying mortgage loans as "whole loans," but was "forced" to securitize them due to the low market bids.  Id.  Even if true, Plaintiffs identify no rule or legal duty that required Countrywide to have disclosed that it had first sought to sell them as whole loans.  This is not a securitization in which subprime mortgages were secretly blended into pools of prime mortgages without investors' knowledge.  There could be no confusion here:  the Trusts <u>solely</u> included credit-blemished, second lien subprime mortgage loans.  And while Plaintiffs complain that Countrywide "transferred" the loans' risk of loss through the securitization process, SAC ¶ 129, the transfer of risk is the essence of securitizations,[27] as the Offering Documents explained.  SPS-1 PS at S-14-S-26 (Ex. 4); SPS-2

---

[26]     The SAC also makes the conclusory allegation that ratings issued by independent credit ratings agencies for the MBS "disguised the poor quality of the underlying Loans."  SAC ¶ 110.  But there is no allegation that Countrywide described the loans in terms other than what they were: "credit-blemished, closed-end, fixed rate loans that are secured by second liens" (SPS-1 TS at 2 (Ex. 2) and SPS-2 TS at 2 (Ex. 3)) and there is no allegation that the Offering Documents inaccurately described the ratings that were actually issued or even that the ratings agencies gave improper ratings based upon their own assessment of the credit enhancement features, which, to be sure, resulted in less protection to the lower rated, Mezzanine level tranches in which Plaintiffs purchased because those tranches were subordinated to the other more senior classes, as the Offering Documents fully disclosed.  <u>See</u> SPS-1 PS at S-15-S-16 (Ex. 4) and SPS-2 PS at S-14-S-16 (Ex. 5) (describing risks that credit enhancement features may be insufficient, especially for subordinated certificates).

[27]     While the SAC complains that Countrywide improperly "offloaded" the risk of mortgage loans to "unsuspecting investors" in the form of securities rather than whole loans (SAC ¶¶ 125, 129), Countrywide repeatedly disclosed in the Offering Documents and in other SEC filings that it sold the overwhelming majority of the mortgage loans it originated into the secondary mortgage market.  <u>See</u>, <u>e.g.</u>, SPS-2 PS at S-37 (Ex. 5) (disclosing that CHL has "historically sold substantially all the mortgage loans that it has originated and purchased, generally

PS at S-14-S-25 (Ex. 5).[28]

The SAC's allegation that Countrywide was able to "disguise" the underlying mortgages'
poor performance by securitizing them is belied by the monthly reports given to investors by
each Trust.  SAC ¶ 132.  Following their purchases, investors received monthly detailed
remittances from the trustees for each Trust,[29] giving specific loan-level servicing data regarding
payments, delinquencies, and other performance metrics.  <u>See</u> Sample SPS-1 Monthly Investor
Reports (Ex. 8).  Critically, there is no allegation in the SAC that these monthly reports were
inaccurate, so it is not plausible that Countrywide knew of defaulting loans in the Trusts that
investors did not.[30]  Given the detailed investor reports, there is no basis for the SAC's allegation
that the performance of any of the underlying mortgages were hidden in any way.

---

through securitizations").  No reasonable investor could have been "duped" that Countrywide was improperly
transferring risk when Countrywide disclosed that securitization was its primary business.  The SAC's related
allegation that Countrywide "knew that certain Loans were already defaulting" when the pools were created does
not state a claim either.  SAC ¶ 129.  Nowhere does the SAC cite any facts or evidence of such knowledge or
identify a material number (or any number of loans for that matter) that were allegedly in default or at a special risk
of default.  Further, as noted above, the Offering Documents specifically warned that these loans would default at a
higher rate and as specified in Annex D, to the extent that any of the loans in either of the Trusts were actually in
default at the applicable cut-off date, as specified in the PSAs, holders were entitled to the repurchase of those non-
compliant loans.  <u>See</u> SPS-1/SPS-2 PSA § 2.03(b)(9) (Exs. 6 & 7).

[28]  Equally irrelevant is Ms. Deliban's supposed statement, "[l]ong after" the Plaintiffs' purchases (SAC
¶ 124), and once the delinquencies began to mount as the economy worsened, that she wished Countrywide had
been able to sell the Mortgage Loans as whole loans because "everyone would have been better off" that way.  SAC
¶ 126.  This statement is devoid of content other than the SAC's spin that it was "essentially" a confession.  <u>See</u> <u>In
re American Express Co. Sec. Litig.</u>, No. 02 Civ. 5533 (WHP), 2004 WL 422750, at *14 (S.D.N.Y. Mar. 31, 2004)
("Rule 9(b) and the PSLRA entail consideration of the <u>statements</u> that a plaintiff contends were false, not plaintiff's
interpretation of those statements."), <u>reversed on other grounds</u>, <u>Slayton v. American Express Co.</u>, 460 F.3d 215 (2d
Cir. 2006).

[29]  All monthly reports are available at the website of the Trustee:
H<u>https://gctinvestorreporting.bnymellon.com</u>H.  Such reports were also filed with the SEC as required by
Regulation AB.

[30]  While conveniently omitted from the SAC, in their prior pleading Plaintiffs admitted that they received
these reports, but inexplicably did not "closely monitor" (<u>i.e.</u>, timely read) them.  AC ¶ 142.  It is puzzling that
Plaintiffs admit they did not "closely monitor" monthly reports providing detailed metrics regarding the actual loans
underlying their investments, but still claim to have scrutinized and actually relied on statements made by
Countrywide about its underwriting and documentation standards generally.

5.    **The Servicing of Mortgage Loans**.  Finally, the SAC challenges the PSAs'
representation that "the Master Servicer shall service and administer the Mortgage Loans in
accordance with customary and usual standards of practice of prudent mortgage loan lenders."
SAC ¶¶ 133-35.  Plaintiffs assert that Countrywide "failed to allocate sufficient resources . . .
such as personnel to address customer inquiries[,] . . . conduct follow-up efforts with delinquent
borrowers[,] . . . [or provide] for work-out plans."  Id. ¶ 134.

Plaintiffs' broad allegations again fail to provide the requisite particularized facts to state
a fraud claim.  The SAC does not cite a single fact indicating Defendants' supposed failure to
comply with industry servicing standards for the mortgage loans at issue here.  Again, there is
not one document, or witness, or detail about any loan (let alone a material number of them) that
was inadequately serviced.  See AIG, 254 F. Supp. 2d at 382-84 (alleged misrepresentations
about servicing practices were too conclusory to satisfy Rule 9(b)).  Instead, Plaintiffs rely on
unsubstantiated "information and belief," and "stories" of "Countrywide customers . . . posted
. . . on the Internet."  SAC ¶ 135.  More importantly, even if the SAC provided the required
specifics, any improper servicing of the loans would not, as a matter of law, constitute fraud.
Plaintiffs have not pled, nor can they prove, that Defendants made the servicing promises with
no intent to perform.  This pleading defect is fatal.  See Mills v. Polar Molecular Corp., 12 F.3d
1170, 1176 (2d Cir. 1993); AIG, 254 F. Supp. 2d at 385; discussion infra Section I.C.

B.    **No Particularized Facts Giving Rise to a Strong Inference of Scienter**

The PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong
inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).
The requisite state of mind is an "'intent to deceive, manipulate or defraud,' or reckless
conduct."  ATSI, 493 F.3d at 99 (citation omitted).  "To qualify as 'strong' . . . an inference of

scienter must be more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499, 2502 (2007). To survive a motion to dismiss, a fraud complaint must allege either: (1) facts to show that defendants had both motive and opportunity to commit fraud; or (2) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. In re Polaroid Corp. Sec. Litig., 465 F. Supp. 2d 232, 246 (S.D.N.Y. 2006).

Plaintiffs' main scienter allegation against the Defendants, repeated throughout the SAC, is that they engaged in fraud to generate increased profits.[31] However, it is well established that the desire to increase profits and individual compensation does not give rise to a strong inference of scienter. See ECA, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep the stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); In re Moody's Corp. Sec. Litig., 599 F. Supp. 2d 493, 514 (S.D.N.Y. 2009) ("Courts in this District have specifically rejected profit as a motive for fraud."). The allegation that Countrywide established a commission structure to incentivize the underwriting of profitable loans, SAC ¶¶ 49, 101, 119, is likewise insufficient to establish a strong inference of scienter.[32] And conclusory allegations about Countrywide's "corrupt culture," SAC ¶¶ 48, 55, 97-98, 115, 179, amount to no more than ad hominem attacks and say nothing about the 2006 underwriting — expressly disclosed as "flexible" and subject to "significant number" of exceptions — of loans held by either Trust (.16% of the loans CHL underwrote in 2006).

---

[31]     See, e.g., SAC ¶¶ 2, 39, 49, 93, 123, 183, 181.

[32]     See Hoffman v. UBS-AG, 591 F. Supp. 2d 522, 533 (S.D.N.Y. 2008) ("There is no duty to disclose the incentives that a company provides its own employees to encourage those employees to sell specific products"); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 566 (S.D.N.Y. 2004) ("the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness").

In only three instances does the SAC attempt to link a scienter allegation to the Offerings in which Plaintiffs participated.[33] All fail. None of them includes particularized facts that create a strong inference that any Defendant acted with the requisite scienter.

1.     The SAC asserts that a former employee wrote a memorandum "stat[ing] his belief that Countrywide had misled Plaintiffs by inducing them" to invest in the Certificates. SAC ¶ 127; see id. ¶ 4. There is no more detail than that — not *when* it was written, *to whom* it was sent, or most critically *how* "Countrywide misled the Plaintiffs." This description flunks the most basic of the "who, what, when, where and how" facts required by Rule 9(b), much less the PSLRA requirement of particularized "facts giving rise to a strong inference" of scienter.[34]

2.     Countrywide employees are alleged to have made "admissions" to Plaintiffs during a May 2007 conference call and in an undated "separate conversation" about the percent of owner occupied properties in the Trusts. SAC ¶¶ 73-74, 176-77. Even accepting these allegations as true, Defendants' description of what they then thought the case to be during an alleged subsequent conversation provides no inference, let alone a "strong" one, of previous knowing or reckless misconduct. Tellingly, Plaintiffs do not allege that any of the participants admitted during these conversations that they (or anyone else) knew at the time of the Offerings that the percentage of owner-occupied properties, or any statement in the Offering Documents,

---

[33]     The SAC alleges that the Individual Defendants acted with scienter, though not once in connection with these Offerings. In any event, those allegations fail for the reasons expressed by the Individual Defendants in their motions.

[34]     See In re Sierra Wireless, Inc. Sec. Litig., 482 F. Supp. 2d 365, 372-73 (S.D.N.Y. Apr. 18, 2007) (to satisfy 9(b) and PSLRA, complaint cannot simply allege that sales reports contradicted contemporaneous public statements, it must specify "internal reports, who prepared them and when, how firm the numbers were or which company officers reviewed them") (quotations and citations omitted); Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 147 (3d Cir. 2004) ("Plaintiffs fail to identify . . . when [memorandum] was authored, who reviewed the report, and what data its conclusions were based upon").

was false.[35]  Instead, Plaintiffs only baldly assert that "Countrywide did not retrospectively learn that its owner-occupancy rates were false . . . because it knew or should have known, based on professional experience as a leader in the mortgage industry, that the incomes stated by borrowers were exaggerated."  SAC ¶¶ 177-78.  This is no different than alleging that, because an underwriter performed due diligence, it knew or should have known that statements in an offering were false.  Courts have long rejected such allegations as inadequate.  See supra note 15.

3.      Finally, the SAC alleges that Countrywide demonstrated "conscious misbehavior or recklessness" because it did not say in the Offering Documents that it "had unsuccessfully sought to market the Loans as whole loans."  SAC ¶ 178.  Plaintiffs cannot credibly suggest that they did not know they were buying securities, not whole loans, and there is no allegation, nor could there be, that Countrywide had any obligation to disclose that it had previously attempted to sell the loans other than through a securitization (assuming for the sake of argument that was the case).  Plaintiffs' real allegation is bootstrap:  that Countrywide could sell the loans at a better price through a securitization because of undisclosed defects in them.  But for that allegation to satisfy the requisite standards, the SAC needs particularized allegations showing that Defendants knew, at the time of the Offerings, of undisclosed material facts.  Simply alleging that Countrywide had previously tried to sell the loans in some other form says nothing about whether any statements in the Offering Documents were knowingly false.

C.      **Plaintiffs Improperly Invent Torts Out of a Contract**

The crux of many of the SAC's misrepresentation allegations are alleged breaches of loan level representations made in the Offering Documents; all are contained in § 2.03 of each PSA.

---

[35]      See In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("to establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made") (internal quotation marks and citation omitted).

<u>See</u> Annex D.  Such loan-level representations and warranties were made by the loan seller

(CHL) to the depositor (CWABS) in contracts — the PSAs, and the rights and obligations

flowing from such representations and warranties were transferred to the Trusts for the benefit of

Plaintiffs and other investors.  Each contractual term was cabined by explicit statements

representing that CHL would cure, or otherwise substitute or repurchase, non-compliant loans,

and that these steps would constitute the "sole remedy . . . available to Certificateholders."  SPS-

1 PSA § 2.03(f) (Ex. 6); SPS-2 PSA § 2.03(f) (Ex. 7).[36]  The same point was repeated in the

prospectuses:  referring to the PSA, "[t]his repurchase or substitution obligation will constitute

the sole remedy available to holders of securities or the trustee for any breach of representation

by a seller."  SPS-1 Pro. at 30 (Ex. 4); SPS-2 Pro. at 30 (Ex. 5).  Thus, when the provisions of the

PSA as a whole are taken together, investors would have the economic benefit of Trusts

consisting only of compliant loans.

In short, investors were told they were beneficiaries of a contract under whose terms each

Trusts' mortgage loans were — or would be made — compliant, and there is no contention (nor

could there be) that the Offering Documents did not accurately set forth these PSA terms.

Professional investors like Plaintiffs, therefore, well understood (as Annex D shows) that

representations about the mortgage loans came from the PSAs, and purchased Certificates based

upon the total mix of the disclosure in the Offering Documents, including the PSAs.  SAC ¶ 163.

Plaintiffs are thus bound by

> the scope limitations of the representations.  Defendants' argument that they have
> only represented that the loans are — or will be made — compliant is persuasive
> given the structure of the Prospectus Supplements, which set out certain
> representations and warranties for the mortgage loans that will be pooled, and

---

[36]     <u>See also, e.g.</u>, SPS-1 PS at S-11 (Ex. 4) and SPS-2 PS at S-11 (Ex. 5) (discussing repurchase or substitution remedy for breach).

> then contain language that makes clear that specific actions will be taken if there
> are delinquent loans.

Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC, No. 3:08-CV-0261-L, 2008 WL 4449508,

at *10 (N.D. Tex. Sept. 30, 2008).

Plaintiffs have not alleged that they ever employed the specific procedures required to

invoke the cure, replacement or repurchase remedies (see, e.g., SPS-1 PSA § 8.13 (Ex. 6) and

SPS-2 PSA § 8.13 (Ex. 7)), let alone that Defendants did not honor any such request. Even if so,

that would sound in contract, not tort. Rather than even plead a contract claim, Plaintiffs try to

create torts out of contractual terms. Yet, although essential to any fraud claim, the SAC also

contains no allegation that Defendants "secretly intended not to perform or knew [they] could not

perform" the contractual obligations to cure, substitute or repurchase any noncompliant mortgage

loans. Mills, 12 F.3d at 1176; see also Lone Star, 2008 WL 4449508, at * 11 (dismissing claims

where plaintiffs did not allege that defendants failed to repurchase loans as required).[37]

### D.  The Amended Complaint Fails to Allege Loss Causation

Under the PSLRA, Plaintiffs have "the burden of proving that the act or omission of the

defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover

damages." 15 U.S.C. § 78u-4(b)(4). The SAC fails to meet this burden.

As an initial matter, other than the defective misrepresentation about owner-occupied

properties, the SAC does not plead that any challenge to the Offering Documents is linked to

loans included in either Trust, or to any losses. Plaintiffs plead no facts establishing that any of

---

[37]     Plaintiffs' pre-motion conference letter to the Court failed to mention Lone Star but nevertheless argued
that giving the PSA provisions their plain meaning would violate the anti-waiver provision of the Securities
Exchange Act, 15 U.S.C. § 78cc(a). But as Lone Star specifically held, because the 'repurchase or substitute'
language [is] part of the representation[]," defendants "have not offended the anti-waiver statutes of federal or state
law because [defendants] have not made any misrepresentation." 2008 WL 4449508, at * 11. Here, as in Lone Star,
the total mix constituting the representations was that "(1) the loans were or (2) would be made to be" compliant
with the Offering Documents' descriptions. Id. at *10. Thus, "the 'sole remedy' language was part and parcel of
the warranties and representations," id. at *9, and not a waiver of any disclosure violation.

the other four alleged categories of misrepresentations resulted in any loan defaults or delinquencies. See Leykin v. AT & T Corp., 423 F. Supp. 2d 229, 240 (S.D.N.Y. 2006) ("if the plaintiff fails to demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered, a fraud claim will not lie").

Moreover, Plaintiffs have failed to demonstrate loss causation even as to the owner-occupied — as well as the other — allegations because they have failed to establish that their losses were the result of the alleged misrepresentations, not the collapse of the real estate market. Even Plaintiffs concede (albeit in gross understatement) that the American housing market and MBS markets suffered a "recent decline." SAC ¶ 223. In the face of the epic collapse of these markets, of which judicial notice can be taken, it is Plaintiffs' burden to plead that their losses were caused by the alleged misrepresentations and not these greater market forces.[38] See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co., No. 07-5423, 2009 WL 2590087, at *15-16 (E.D. Pa. Aug. 20, 2009) (failure to plead loss causation where plaintiffs made "no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations" and significant MBS market declines). Plaintiffs' empty assertion that the greater market declines occurred "long after" the securities began to default (SAC ¶ 223) without any specificity as to when, how, and to what extent losses were attributable to the alleged misrepresentations is insufficient as a matter of law.[39]

---

[38]    See Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 343 (2005) (when value of plaintiff's security decreases, "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price"); In re Merrill Lynch & Co. Research Reports Sec. Litig., 568 F. Supp. 2d 349, 363 (S.D.N.Y. 2008) (dismissing claims where plaintiff "failed to allege facts to show that [his loss] was attributable to the [concealed] risk's materialization, rather than to the bursting of the Internet bubble").

[39]    See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) (when "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events") (internal quotation marks and citation omitted).

## CONCLUSION

For the foregoing reasons, the SAC should be dismissed with prejudice in its entirety
under Fed. R. Civ. P. 8, 9(b), 12(b)(6), Rule 12(f), and the PSLRA.

Dated: September 18, 2009

O'MELVENY & MYERS LLP

By: *Bradley J. Butwin* / us
    Bradley J. Butwin (bbutwin@omm.com)
    Jonathan Rosenberg
    (jrosenberg@omm.com)
    William Sushon (wsushon@omm.com)
    Times Square Tower
    7 Times Square
    New York, NY 10036
    Tel: (212) 326-2000
    Fax: (212) 326-2061

*Attorneys for Defendants Bank of America*
*Corporation and BAC Home Loans Servicing,*
*LP*

COVINGTON & BURLING LLP

By: *C. William Phillips* / us
    C. William Phillips (cphillips@cov.com)
    David Zorian Pinsky (dpinsky@cov.com)
    620 Eighth Avenue
    New York, NY 10018-1405
    Tel: (212) 841-1000
    Fax: (212) 841-1010

*Attorneys for CWABS Asset-Backed*
*Certificates Trust 2006-SPS1 and CWABS*
*Asset-Backed Certificates Trust 2006-SPS2*

CLEARY GOTTLIEB STEEN &
HAMILTON LLP

By: *Mitchell A. Lowenthal* / us
    Mitchell A. Lowenthal
    (mlowenthal@cgsh.com)
    Meredith Kotler (mkotler@cgsh.com)
    Victor L. Hou (vhou@cgsh.com)
    One Liberty Plaza
    New York, NY 10006
    Tel: (212) 225-2000
    Fax: (212) 225-3999

*Attorneys for Defendants Countrywide Home*
*Loans, Inc., Countrywide Home Loans*
*Servicing LP, Countrywide Financial Corp.,*
*Countrywide Securities Corp., and CWABS,*
*Inc.*

IRELL & MANELLA LLP

By: *David Siegel / ws*

    David Siegel (*pro hac vice*)
    (dsiegel@irell.com)
    A. Matthew Ashley (*pro hac vice*)
    (mashley@irell.com)
    Shaunt T. Arevian (*pro hac vice*)
    (sarevian@irell.com)
    Holly Gershow (*pro hac vice*)
    (hgershow@irell.com)
    1800 Avenue of the Stars
    Suite 900
    Los Angeles, CA 90067
    Tel: (310) 277-1010
    Fax: (310) 203-7199

*Attorneys for Defendant Angelo Mozilo*

SPEARS & IMES LLP

By: *David Spears / ws*

    David Spears (dspears@spearsimes.com)
    51 Madison Avenue
    New York, NY 10010
    Tel:  (212) 213-6996
    Fax: (212) 213-0849

*Attorneys for Defendant Angelo Mozilo*

ORRICK, HERRINGTON & SUTCLIFFE LLP

By: *Lori Lynn Phillips / ws*

    Lori Lynn Phillips (*pro hac vice*)
    (lphillips@orrick.com)
    701 5th Avenue, Suite 5700
    Seattle, WA 98104-7097
    Tel: (206)-839-4300
    Fax: (206)-839-4301

    Michael D. Torpey (mtorpey@orrick.com)
    Penelope A. Graboys
    (pgraboysblair@orrick.com)
    405 Howard Street
    San Francisco, CA 94105-2669
    Tel: (415) 773-5700
    Fax: (415) 773-5759

*Attorneys for Defendant David Sambol*

# Annex A

**Annex A:**

**References in SAC to Impertinent Material**

| Paragraphs in SAC | Source |
|---|---|
| **Pleadings in other cases** | |
| ¶¶ 5, 113 | Complaint in People v. Countrywide Fin. Corp., Case No. LC081846 (Super. Ct. Cal. filed June 24, 2008) (alleging state law fraud and unfair business practices claims) (dismissed on settlement as to corporate defendants, Dec. 16, 2008) |
| ¶¶ 6, 19, 20 | SEC v. Mozilo, Case No. CV-09-03994 (C.D. Cal. filed June 4, 2009) |
| ¶ 49 | Complaint in Office of the Att'y General v. Countrywide Fin. Corp., Case No. 08-30105 (Cir. Ct. 17th Judicial Cir., Broward County, Fla. filed June 30, 2008) (state law deceptive and unfair practices) (settled) |
| ¶¶ 122 | Complaint in Zachary v. Countrywide Fin. Corp., Case No. H-08-0214 (S.D. Tex. filed Jan. 17, 2008) (stayed pending arbitration) |
| **Government investigations** | |
| ¶ 214 | Federal Bureau of Investigation ("FBI") investigation |
| ¶ 216(a) | People v. Countrywide Fin. Corp., Case No. LC081846 (Super. Ct. Cal. Complaint filed June 24, 2008) (dismissed on settlement as to corporate defendants, Dec. 16, 2008) |
| ¶ 216(b) | People v. Countrywide Fin. Corp., Case No. 08CH22994 (Cir. Ct. Cook County, Ill., Ch. Div. Complaint filed June 25, 2008) (settled) |
| ¶ 216(c) | Connecticut v. Countrywide Fin. Corp. (Super. Ct. Hartford Judicial Dist. Complaint filed July 28, 2008) (settled Oct. 6, 2008, and dismissed Feb. 25, 2009, pursuant to joint motion to dismiss) |
| ¶ 216(d) | Office of the Att'y General v. Countrywide Fin. Corp., Case No. 08-30105 (Cir. Ct. 17th Judicial Cir., Broward County, Fla. Complaint filed June 30, 2008) (settled) |
| ¶ 216(e) | In re Countrywide Home Loans Inc., No. C-08-030-08-SC01 (Wash. Dep't of Fin. Insts., Div. of Consumer Servs. filed Jun 23, 2008) (settled Oct. 2008) |
| ¶ 216(f) | Indiana v. Countrywide Fin. Corp., Case No. 76C01-0808-PL-0652 (Ind. Steuben Cir. Ct. filed Aug. 22, 2008) (joint motion to dismiss April 21, 2009) |
| ¶ 216(g) | West Virginia ex rel. McGraw v. Countrywide Fin. Corp., No. 08-C-268 (Cir. Ct. Putnam County, W. Va. complaint filed Aug. 12, 2008) (judgment by consent decree Feb. 3, 2009) |

| Paragraphs in SAC | Source |
|---|---|
| ¶ 216(h) | <u>City of Cleveland v. Deutsche Bank Trust Co.</u>, Case No. CV-08-646970 (Ct. Com. Pl. Cuyahoga County) (dismissed May 15, 2009; appeal pending) |
| ¶ 216(i) | <u>People of California v. Countrywide Fin. Corp.</u>, 37-2008-00088176-CU-BT-CTL (Super. Ct. Cal. San Diego County) (settled and dismissed, Dec. 12, 2008) |
| ¶ 220 | United States Department of Justice investigation |
| ¶ 220 | U.S. Trustee investigations in federal bankruptcy court in R.I., W. Pa., Tex., Fla., Ga. |
| **State Lawsuit Settlements** | |
| ¶ 217 | California, Illinois, Florida settlements |
| ¶ 218 | Illinois settlement |
| ¶ 219 | New Jersey settlement |
| **News articles and other reports by "industry observers"** | |
| ¶ 40 | undated report from the Center for Public Integrity |
| ¶ 203 | October 2007 article from The Los Angeles Times |
| ¶ 267 | May 2009 issue of Housing Wire magazine |

# Annex B

# Annex B:

## SAC Allegations Drawn from Improper Materials Without Attribution

| Amended Complaint Paragraph | Second Amended Complaint Paragraph |
|---|---|
| ¶ 69 – **The *New York Times* reported in an August 2007 expose** titled **"Inside the Countrywide Lending Spree,"** based on conversations with former Countrywide employees, **that Countrywide offered mortgages to borrowers with little or no regard for their creditworthiness because the loans "were so lucrative—to Countrywide.** The company harvested a steady stream of fees or payments on [risky] loans and busily repackaged them as securities to sell to investors" such as Plaintiffs. Loaning to borrowers with poor credit was highly profitable to Countrywide because of the high interest and fees generated by such loans, which increased Countrywide's incentive to originate these lesser-quality loans. | ¶ 50 – In abandoning its loan-origination standards and facilitating fraud in the origination process, Countrywide's intent was to issue mortgages to a broader population of would-be homeowners and profit from them in creative new ways. **Countrywide offered mortgages to borrowers with little or no regard for their creditworthiness precisely because the loans were lucrative for the Company.** Many of Countrywide's new non-traditional mortgage offerings, such as Pay Option ARMs, were characterized by hidden fees and misleading rates, which increased Countrywide's revenue while increasing its pool of loans to resell to investors such as Plaintiffs. For example, Countrywide lured many borrowers to take out mortgages by offering mortgage loans that featured "teaser rates" with interest as low as one percent, without disclosing to the borrowers that those rates would reset within a few months to a much higher rate. |
| ¶ 111 – **As explained by the *New York Times*, Countrywide regularly steered borrowers to more expensive mortgage products in order to increase its profits**: "[P]otential borrowers were often led to high-cost and sometimes unfavorable loans that resulted in richer commissions for Countrywide's smooth-talking sales force, outsize fees to company affiliates providing services on the loans, and a roaring stock price that made Countrywide executives [such as Mozilo and Sambol] among the highest paid in America." By directing borrowers to more expensive products, Countrywide considered its interests—it was maximizing its own revenue and profit— at the expense of its borrowers and investors such as Plaintiffs. Borrowers who incurred higher fees and were burdened with unfavorable mortgage loans were more likely to default on those loans, which increased the risk of the securities backing those loans and also decreased their value. | ¶ 92 – **Countrywide regularly steered borrowers to more expensive mortgage products in order to increase its profits.** By directing borrowers to more expensive products, Countrywide maximized its own revenue and profit at the expense of borrowers and investors such as Plaintiffs. Borrowers who were burdened with unfavorable mortgage loans and exorbitant fees were more likely to default on their loans, which increased the risk of the securities backing those loans and also decreased their value. |

| Amended Complaint Paragraph | Second Amended Complaint Paragraph |
|---|---|
| ¶ 148 – Countrywide provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and in some cases acting against its customers' interests by steering borrowers into plans that worsened their financial problems and increased their indebtedness to the company. **As alleged by the Attorney General of Illinois, when borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure.** Dozens of Countrywide customers have posted stories on the Internet regarding their dealings with Countrywide's unhelpful, unprofessional, and harassing bureaucracy. The stories describe false allegations of overdue payments and resulting foreclosure notices, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records. | ¶ 135 – Countrywide provided poor customer service to its borrowers, often proving unhelpful in resolving customers' problems and in frequently acting against its customers' interests by steering borrowers into repayment plans that worsened their financial problems and increased their indebtedness to the Company. **When borrowers contacted Countrywide seeking help to avoid foreclosure proceedings, Countrywide frequently offered repayment plans that actually *increased* the borrowers' monthly mortgage payments, which thereby further increased the risk of default and foreclosure.** Dozens of Countrywide customers have posted stories on the Internet regarding their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy. The stories describe false allegations of overdue payments and resulting foreclosure notices by the Company, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records. |
| ¶ 167 – Mozilo and Sambol were closely involved in the daily management of all aspects of Countrywide's core operations, as indicated by Mozilo's statement during a conference call with analysts in 2005 that "I do participate every day in originations myself, and it keeps me apprised of what's happening." Mozilo and Sambol were involved with Countrywide's management committees and Board of Directors, which kept them apprised of developments in Countrywide's business practices and the mortgage industry. **As plaintiffs summarized in *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Financial Corp.*, a securities-fraud action against Countrywide, Mozilo, Sambol, and others, Mozilo and Sambol were "very hands- on in managing all aspects of Countrywide's core business operations, including: (i) setting the Company's loan origination guidelines, lending and underwriting practices; (ii) managing Countrywide's credit and liquidity risk; (iii) setting reserves for loan losses; and (iv) ensuring adequate internal controls . . ."** | ¶ 185 – Mozilo and Sambol were closely involved in the daily management of all aspects of Countrywide's core operations, as indicated by Mozilo's statement during a conference call with analysts in 2005 that "I do participate every day in originations myself, and it keeps me apprised of what's happening." Mozilo and Sambol were involved with Countrywide's management committees and its Board of Directors, which kept them apprised of developments in Countrywide's business practices and the mortgage industry. For example, Sambol was a member of Countrywide's credit risk committee and attended quarterly committee meetings at which he received detailed presentations about Countrywide's increased credit risk from origination of riskier loans. **Mozilo and Sambol were hands-on in managing all aspects of Countrywide's core business operations, including setting the Company's loan origination guidelines, lending and underwriting practices; managing Countrywide's credit and liquidity risk; setting reserves for loan losses; and ensuring adequate internal controls.** |

| Amended Complaint Paragraph | Second Amended Complaint Paragraph |
|---|---|
| ¶ 170 – **The *Wall Street Journal* reported in February 2008 that Sambol "spearheaded the company's lunge for growth," "embrac[ing] Countrywide's pursuit of subprime and other risky loans, which helped turn the Calabasas, Calif., company into the nation's largest mortgage lender in terms of volume." The article cited current and former employees who said that Sambol "brushed aside warnings from risk-control managers at Countrywide that the company's lending standards were too lax" because "[b]eing too cautious would turn Countrywide into a 'nice, little boutique' . . . ." The article reported that "In late 2003, tensions between Mr. Sambol and Countrywide's risk managers boiled over at a meeting of dozens of executives in the company's headquarters," during which Countrywide's chief investment officer, who was responsible for pricing loans and managing risks, "uttered a loud profanity and walked out of the meeting to protest what he saw as imprudent lending." In another meeting, according to the article, Sambol was "livid" because Countrywide's call-center employees were not selling enough adjustable-rate mortgages.** | ¶ 188 – **Sambol spearheaded the Company's lunge for growth, leading Countrywide's pursuit of subprime and other risky loans, which helped turn Countrywide into the nation's largest mortgage lender in terms of volume. Current and former employees have stated that Sambol ignored warnings from risk-control managers at Countrywide that the Company's lending standards were too lax. For example, a former employee reported that in late 2003, tensions between Mr. Sambol and Countrywide's risk managers boiled over at a meeting of dozens of executives in the Company's headquarters," during which Countrywide's chief investment officer, who was responsible for pricing loans and managing risks, "uttered a loud profanity and walked out of the meeting to protest what he saw as imprudent lending." In another meeting, Sambol was reportedly "livid" because Countrywide's call-center employees were not selling enough adjustable-rate mortgages.** |
| ¶ 171 – Sambol was particularly involved in the abandonment of Countrywide's underwriting guidelines as the President and COO of CHL, the Countrywide entity that was responsible for originating loans. **In that role, as alleged in the *In re CFC Securities Litigation* complaint, Sambol "sent a clear message to loan origination and underwriting employees that issuing loans was far more important than determining whether or not the loans should be made because of borrower creditworthiness."** | ¶ 190 – Sambol was particularly involved in the abandonment of Countrywide's underwriting guidelines as the President and COO of CHL, the Countrywide entity that was responsible for originating loans. In that role, for example, Sambol oversaw the creation of the Exception Processing System, a software program that allowed Countrywide to override its lending criteria—as applied to credit scores, for example—in order to approve riskier loans. In that role, Sambol also oversaw or knew of the incentive system whereby Countrywide loan officers were given bonuses in exchange for originating large volumes of risky but profitable loans. **In so doing, Sambol sent a clear message to underwriting employees that issuing loans was far more important than determining whether or not the loans should be made because of borrower creditworthiness.** |

| Amended Complaint Paragraph | Second Amended Complaint Paragraph |
|---|---|
| ¶ 174 – In *In re CFC Securities Litigation*, the court concluded that "Some of [Mozilo's] public statements appear to demonstrate that he knew others of his statements were false when made." The court **highlighted many examples in which Mozilo offered upbeat analyses of Countrywide's business practices despite his apparent knowledge that Countrywide was abandoning its loan-origination standards.** For example,<br><br>**In April 2004, Mozilo distinguished Countrywide's "very, very good solid subprime business" from the "frothy business [in which lenders] are taking 400 FICOs with no documentation." Mozilo declared Countrywide's "very strong disciplines in the origination of sub-prime loans" and assured the market that "maintaining that discipline is critically important to" Countrywide. Mozilo concluded, "[W]hen you look at sub-prime, you have to look at it in tranches, and we are at the high end of that tranche." The [complaint's] timeline of continually deteriorating underwriting standards— especially when coupled with exception processing and reckless documentation practices—gives rise to a strong inference that, by April 2004 Countrywide was already in the "frothy" subprime business that Mozilo derided.** | ¶ 192 – **Mozilo frequently offered upbeat analyses of Countrywide's business practices despite his apparent knowledge that Countrywide was abandoning its loan-origination standards. For example, in April 2004, Mozilo distinguished Countrywide's "very, very good solid subprime business" from the "frothy business [in which lenders] are taking 400 FICOs with no documentation." Mozilo declared Countrywide's "very strong disciplines in the origination of sub-prime loans" and assured the market that "maintaining that discipline is critically important to" Countrywide. Mozilo concluded, "[W]hen you look at sub-prime, you have to look at it in tranches, and we are at the high end of that tranche."** |

# Annex C

**Annex C:**

**Unparticularized Factual Allegations Regarding Stated Income Loan Program**

| SAC ¶ | Allegation | Source of Belief | Conclusion |
|---|---|---|---|
| 117 | Countrywide "claimed that reduced-documentation applications were designed for self-employed professionals and business owners with high credit scores" | None | "Countrywide failed to adequately control its issuance of reduced documentation loans." |
| 117 | Countrywide "made its reduced-documentation applications widely available to consumers without careful oversight" | None | This "was a material risk that [Countrywide] failed to disclose" |
| 118 | "Countrywide failed to obtain independent verification of borrowers' income at a far greater rate than it represented" | None | Representation that "'employment verification is obtained' . . . was false and misleading and omitted material facts" |
| 119 | "Countrywide's underwriters abused their discretion by abandoning Countrywide's stated loan-origination standards and knowingly approving loans for borrowers whose representations about their income . . . were unreasonable on their face and could not have been accurately reported, based on realistic estimates of salary for given employment" | None | Representation that "'borrowers income as stated must be reasonable' . . . was also false and misleading and omitted material facts" |
| 119 | "The underwriters failed to exercise proper discretion in judging borrowers' statements on their applications because Countrywide encouraged underwriters to abandon the stated loan-origination guidelines with commissions that rewarded them for increased loan originations and for originations of riskier, more profitable loans" | None | |
| 120 | "Countrywide failed to take sufficient, if any, action to correct borrowers' suspicious statements" | None | "Countrywide . . . failed to disclose [borrowers' misrepresentations] in the SPS1 and SPS2 offering documents" |
| 120 | "Countrywide overlooked or even encouraged such misrepresentations [by borrowers]" | None | |

| SAC ¶ | Allegation | Source of Belief | Conclusion |
|---|---|---|---|
| 122 | "Countrywide loan officers engaged in a practice known within Countrywide as 'flipping' an application" | Zachary v. Countrywide Financial Corp., No. 4:08-CV-00214 (S.D. Tex.) (stayed pending arbitration) | Zachary "complained to Countrywide's regional management about these deceptive practices but his complaints were ignored" |
| 122 | "[L]oan officers would coach potential homeowners on the income levels needed to qualify for a given mortgage loan and would then accept revised loan applications from those borrowers which contained an inflated reported income" | | |

# Annex D

## Annex D:

## Alleged Misstatements/Omissions and Corresponding PSA Provisions

| Alleged Misstatements and Omissions | Representations Contained in PSAs |
|---|---|
| **Percentage of Owner-Occupied Properties** | |
| Countrywide's "representation . . . that the Mortgage Loans to be included in the Securitizations were made on properties that were *over 99 percent owner-occupied* – was false and misleading and omitted material facts necessary to make the statements not misleading[.]" ¶ 67; <u>id.</u> ¶¶ 68-83.[1] | § 2.03(b)(36):[2] "On the basis of representations made by the Mortgagors in their loan applications, no more than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans, respectively, are secured by investor properties, and no less than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans respectively, are secured by owner-occupied Mortgaged Properties that are primary residences." |
| **Deviation from Underwriting Guidelines** | |
| Countrywide "<u>represented in the PSAs</u> that its 'origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage lending and servicing business.'" ¶ 85 (emphasis added); <u>id.</u> ¶¶ 86-115. | § 2.03(b)(28): "The origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent, and customary in the mortgage lending and servicing business, <u>as conducted by prudent lending institutions which service mortgage loans of the same type [i.e., credit-blemished, second lien] in the jurisdiction in which the Mortgaged Property is located.</u>" (emphasis added) <br><br> § 2.03(b)(45): "The Mortgage Loans originated by CHL were underwritten in all material respects in accordance with CHL's underwriting guidelines for credit-blemished, closed-end, second lien mortgage loans or, with respect to Mortgage Loans purchased by CHL were underwritten in all material respects in accordance with customary and prudent underwriting guidelines generally used by originators of credit-blemished, closed-end second lien mortgage loans." |

---

[1] All references are to paragraphs in the Second Amended Complaint ("SAC").

[2] All references are to sections in the SPS-1 and SPS-2 Pooling and Servicing Agreements, which in all relevant respects were materially identical for both Trusts.

| Alleged Misstatements and Omissions | Representations Contained in PSAs |
|---|---|
| Misrepresented that "over 90 percent of the Mortgage Loans were 'Grade A.'" ¶ 88.<br><br>Misrepresented that its underwriting guidelines "place primary reliance on a borrower's ability to repay" when the standards "actually *ignored* a borrower's ability to repay." ¶ 93. | § 2.03(b)(45):<br><br>"The Mortgage Loans originated by CHL were underwritten in all material respects in accordance with CHL's underwriting guidelines for credit-blemished, closed-end, second lien mortgage loans or, with respect to Mortgage Loans purchased by CHL were underwritten in all material respects in accordance with customary and prudent underwriting guidelines generally used by originators of credit-blemished, closed-end second lien mortgage loans." |
| Misrepresented that "it required independent appraisals of the properties on which the Mortgage Loans were issued." ¶¶ 89-90. | § 2.03(b)(46):<br><br>"Prior to the approval of the Mortgage Loan application, an appraisal of the related Mortgaged Property was obtained from a qualified appraiser, duly appointed by originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan[.]" |
| Misrepresented that "underwriting standards 'are applied in accordance with applicable federal and state laws and regulations.'" ¶¶ 91-92. | § 2.03(b)(57):<br><br>"Each Mortgage Loan, at the time it was originated and as of the Closing date…complied in all material respects with applicable local, state and federal laws, including, but not limited to, all predatory and abusive lending laws." |
| **Number of Fraudulent Applications** ||
| Misrepresented "its practices with regard to its frequent failure to obtain employment and current salary information from loan applicants before approving a Mortgage Loan" by representing that "in most cases, 'employment verification is obtained from an independent source . . .' [and] '[t]he borrower's income as stated must be reasonable for the related occupation and the determination as to the reasonableness is subject to the loan underwriter's discretion." ¶¶ 118-19. | § 2.03(b)(28):<br><br>"The origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all material respects legal, proper, prudent, and customary in the mortgage lending and servicing business, <u>as conducted by prudent lending institutions which service mortgage loans of the same type [i.e., credit-blemished, second lien]</u> in the jurisdiction in which the Mortgaged Property is located."  (Emphasis added)<br><br>§ 2.03(b)(45):<br><br>"The Mortgage Loans originated by CHL were underwritten in all material respects in accordance with CHL's underwriting guidelines for credit-blemished, closed-end, second lien mortgage loans, or with respect to Mortgage Loans purchased by |

| Alleged Misstatements and Omissions | Representations Contained in PSAs |
|---|---|
| | CHL were underwritten in all material respects in accordance with customary and prudent underwriting guidelines generally used by originators of credit-blemished, closed-end second lien mortgage loans." |

<table>
<tr><td colspan="2" align="center"><strong><u>Selection of Loans in Securitizations</u></strong></td></tr>
<tr>
<td>Countrywide "<u>represented in the PSAs</u> and Prospectus Supplements that 'the Mortgage Loans in the Securitizations were not selected 'in a manner that would adversely affect the interests of Certificateholders.'" ¶ 123 (emphasis added); <u>id.</u> ¶¶ 124-132.</td>
<td>§ 2.03(b)(49):<br><br>"The Mortgage Loans were selected among the outstanding one-to-four family mortgage loans in the applicable Seller's portfolio at the Closing Date as to which the representations and warranties made as to the Mortgage Loans set forth in this Section [ ] can be made.  No selection was made in a manner that would adversely affect the interests of Certificateholders."</td>
</tr>
<tr>
<td>Countrywide "had payment histories on some of the Mortgage Loans that it added to the Securitizations' pools, in its role as servicer of the Loans, so it knew that certain Loans were already defaulting[.]" ¶ 129-32.</td>
<td>§ 2.03(b)(9):<br><br>"No Mortgage Loan is one payment or more delinquent as of the applicable Cut-off Date."</td>
</tr>
<tr><td colspan="2" align="center"><strong><u>Loan Servicing</u></strong></td></tr>
<tr>
<td>Countrywide "<u>represented in the PSAs</u> that '[f]or and on behalf of the Certificateholders, the Master Servicer shall service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders in the respective states in which the Mortgaged Properties are located.'" ¶ 133 (emphasis added); <u>id.</u> ¶¶ 134-135.</td>
<td>§ 2.03(b)(28):<br><br>"The origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all material respects legal, proper, prudent, and customary in the mortgage lending and servicing business, <u>as conducted by prudent lending institutions which service mortgage loans of the same type [i.e., credit-blemished, second lien]</u> in the jurisdiction in which the Mortgaged Property is located."  (emphasis added)</td>
</tr>
</table>