UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOOTBRIDGE LIMITED TRUST AND OHP OPPORTUNITY LIMITED TRUST,<br><br>   Plaintiffs,<br><br>    v.<br><br>COUNTRYWIDE HOME LOANS, INC., et al.<br><br>   Defendants. | Case No. 09 Civ. 4050 (PKC)<br><br>ECF CASE<br><br>ORAL ARGUMENT REQUESTED |

**DEFENDANT ANGELO MOZILO'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS**

Dated: September 18, 2009

David Spears
Monica Folch
Spears & Imes LLP
51 Madison Avenue
New York, New York
(212) 213-6991

David Siegel, *pro hac vice*
A. Matthew Ashley, *pro hac vice*
Shaunt T. Arevian, *pro hac vice*
Holly Gershow, *pro hac vice*
Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
(310) 277-1010

Attorneys for Defendant Angelo Mozilo

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................... 1

II. ARGUMENT ...................................................................................................... 2

    A.    Hedge Funds Have Alleged No Actionable Misrepresentations By
        Mr. Mozilo ................................................................................................... 2

        1.    Mr. Mozilo Made No Representations At All In Connection
               With The Offerings .................................................................................. 2

        2.    Mr. Mozilo's Alleged General Statements About Countrywide
               Are Not Actionable .................................................................................. 4

               a.    Mr. Mozilo's General Statements About Countrywide
                      Are Immaterial To The Offerings At Issue In This Case ............ 4

               b.    Mr. Mozilo's General Statements About Countrywide
                      Are Irrelevant, Outdated And Inactionable Puffery .................... 5

    B.    Hedge Funds Have Not Alleged The Requisite Strong Inference Of
        Scienter ....................................................................................................... 8

        1.    Mr. Mozilo's Complete Lack Of Involvement In The Offerings
               Rebuts Any Inference Of Scienter ........................................................... 8

        2.    In Light Of The Compelling Inference Rebutting Scienter,
               Hedge Funds' Remaining Allegations Fail As A Matter Of Law ........... 9

    C.    None Of Mr. Mozilo's Statements Were The Proximate Cause Of
        Hedge Funds' Alleged Loss ..................................................................... 11

    D.    The Control Person Claim Also Fails ...................................................... 12

III. CONCLUSION ................................................................................................ 12

Page(s)

**Cases**

*Acito v. Imcera Group,*
    47 F.3d 47 (2d Cir. 1995) ....................................................................10

*Ashcroft v. Iqbal,*
    129 S.Ct. 1937 (2009) ...........................................................................5

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87 (2d Cir. 2007) ...................................................................3

*Bond Opportunity Fund v. Unilab Corp.,*
    2003 WL 21058251 (S.D.N.Y. May 9, 2003) .........................................4

*Central Bank v. First Interstate Bank,*
    511 U.S. 164 (1994) ..........................................................................2, 3

*City of Sterling Heights v. Vodafone,*
    2009 WL 1456846 (S.D.N.Y. 2009) ..................................................2, 12

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005) ............................................................................2

*ECA v. JP Morgan Chase,*
    553 F.3d 187 (2d Cir. 2009) .............................................................5, 6, 7

*Ferber v. Travelers Corp.,*
    802 F. Supp. 698 (D. Conn. 1992)........................................................9

*Fezzani v. Bear Stearns,*
    592 F. Supp. 2d 410 (S.D.N.Y. 2008) ...................................................2

*Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.,*
    2007 WL 2077153 (S.D.N.Y. July 19, 2007).........................................3

*In re Am. Bus. Fin. Serv. Sec. Lit.,*
    2007 WL 81937 (E. D. Pa. Jan. 9, 2007)...............................................6

*In re Bausch & Lomb, Inc. Sec. Litig.,*
    2008 WL 4911796 (W.D.N.Y. Nov. 13, 2008) .......................................4

*In re Gildan Activewear, Inc. Sec. Lit.,*
    2009 WL 1919618 (S.D.N.Y. July 01, 2009).........................................10

*In re JP Morgan Chase Sec. Litig.,*
    363 F. Supp. 2d 595 (S.D.N.Y. 2005) .............................................................6

*In re N.Y. Comm. Bancorp,*
    448 F. Supp. 2d 466 (E.D.N.Y. 2006) ...........................................................7

*In re One Commc'ns Corp.,*
    2009 WL 857535 (S.D.N.Y. March 31, 2009) ...............................................7

*In re PXRE Group Sec. Litig.,*
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) .............................................................8

*In re Time Warner Inc. Sec. Litig.,*
    794 F. Supp. 1252 (S.D.N.Y. 1992) ...............................................................6

*Kalnit v. Eichler,*
    264 F.3d 131 (2d Cir. 2001) .........................................................................10

*Kramer v. Time Warner, Inc.,*
    937 F.2d 767 (2d Cir. 1991) ...........................................................................9

*Lentell v. Merrill Lynch,*
    396 F.3d 161 (2d Cir. 2005) .........................................................................11

*Leykin v. AT&T Corp.,*
    423 F. Supp. 2d 229 (S.D.N.Y. 2006) ...........................................................11

*Luminent Mortgage Capital v. Merrill Lynch,*
    2009 WL 2590087 (E. D. Penn. Aug. 20, 2009) ...................................11, 12

*Mills v. Polar Molecular Corp.,*
    12 F.3d 1170 (2d Cir. 1993) ........................................................................2, 6

*Olkey v. Hyperion 1999 Term Trust,*
    98 F.3d 2 (2d Cir. 1996) .................................................................................5

*SEC v. PIMCO Advisors Fund Mgmt. LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004) .............................................................4

*Shapiro v. Cantor,*
    123 F.3d 717 (2d Cir. 1997) ...........................................................................3

*Tellabs, Inc. v. Makor Issues & Rights,*
    127 S. Ct. 2499 (2007)....................................................................................8

Page(s)

**Statutes**

15 U.S.C. § 78u-4(b) ..................................................................8, 11

28 U.S.C. § 1367(c)(3) ...................................................................2

**Rules**

Fed. R. Civ. P. 9(b)........................................................................2

## I.    **INTRODUCTION**

This case is a classic example of buyer's remorse masquerading as a securities fraud suit. In order to obtain high returns, Plaintiffs, sophisticated Bermuda hedge funds ("Hedge Funds"), knowingly gambled on mortgage-backed securities ("MBS") backed by risky subprime, second lien loans to "credit-blemished" borrowers. In fact, Hedge Funds bought some of the riskiest tranches of securities (*i.e.* the lower Mezzanine tranches) in the two offerings they challenge. Now that the market for such securities has collapsed, Hedge Funds claim they were not aware of the risks associated with their investment. Nonsense. The precise nature of the loans underlying the MBS was described in excruciating detail in the Term Sheets, Prospectuses/Prospectus Supplements, and Pooling and Servicing Agreements (collectively, the "Offering Documents"). Indeed, the Offering Documents explicitly warned that all of the underlying loans were subprime second lien loans with a weighted average loan-to-value ratio of 97%, and were made to "credit-blemished" borrowers with recent bankruptcy or other severe credit troubles. Having set forth these risk factors, the Offering Documents further emphasized in all capital letters: "THE CERTIFICATES ARE BACKED BY MORTGAGE LOANS THAT WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS." Defendants' Joint Motion to Dismiss (the "Joint Brief") at 5.

As demonstrated in the Joint Brief, the Offering Documents contained no misrepresentations.[1] Moreover, even if the Offering Documents were inaccurate (and they were not), Mr. Mozilo had nothing to do with them. **Mr. Mozilo is not alleged to have had any involvement in the offerings or to have made any statement, let alone a knowingly false statement, regarding the securities purchased by Hedge Funds**. And while Hedge Funds attempt to implicate Mr. Mozilo by pointing to a hodgepodge of comments he made over the years about Countrywide's business in general (wholly unrelated to the securities at issue here), Hedge Funds have not properly pled any actionable misrepresentations, reasonable reliance,

---

[1] Mr. Mozilo joins in and incorporates by reference defendants' Joint Brief and, to the extent applicable, the supplemental briefs filed by defendants David Sambol, Bank of America, and the Trusts.

scienter, or loss causation. Put simply, Mr. Mozilo's general comments about Countrywide cannot support a fraud claim in connection with the securities at issue in this case.

## II.    ARGUMENT

Section 10(b) requires a plaintiff to allege in connection with the purchase or sale of a security: (1) a material misrepresentation; (2) scienter; (3) reasonable reliance; (4) economic loss; and (5) loss causation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005). Under Federal Rule of Civil Procedure 9(b) and the PSLRA, securities fraud must be pled with specificity and particularity. *City of Sterling Heights v. Vodafone*, No. 07 Civ. 9921 (PKC), 2009 WL 1456846, at *3 (S.D.N.Y. May 20, 2009). The claims against Mr. Mozilo should be dismissed, because Hedge Funds have failed to allege any actionable misrepresentations, reasonable reliance, scienter, or loss causation.[2]

### A.    Hedge Funds Have Alleged No Actionable Misrepresentations By Mr. Mozilo

Hedge Funds have not identified a single representation by Mr. Mozilo with respect to the credit-blemished securities Hedge Funds purchased. This fact alone compels dismissal. Moreover, Hedge Funds' invocation of statements made by Mr. Mozilo about Countrywide in general misses the mark, as these generalizations had no bearing on Hedge Funds' purchases.

#### 1.    Mr. Mozilo Made No Representations At All In Connection With The Offerings

A defendant must have *personally* made a misrepresentation in order to face civil liability in a Section 10(b) claim. *Central Bank v. First Interstate Bank*, 511 U.S. 164, 191 (1994); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993) (individual must have "*personally* knew of, or participated in, the fraud." (emphasis in original)).

The gravamen of the SAC is that Hedge Funds were misled regarding the true risk of the loans underlying the securities they purchased. *See, e.g.,* SAC ¶¶ 3-4, 58-64, 67-72, 84-93, 96,

---

[2] The common law fraud claim against Mr. Mozilo arises from the same nucleus of facts as the Section 10(b) claim. It must be dismissed for the same reasons. *See Fezzani v. Bear Stearns*, 592 F. Supp. 2d 410, 426-427 (S.D.N.Y. 2008) ("Since the pleading standards for Section 10(b) and Rule 10b-5 are the same as common law fraud standards, it follows that if one is dismissed, the other should be as well."). Alternatively, if the federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over the state law fraud claim. *See* 28 U.S.C. § 1367(c)(3).

104-109, 111, 114, 118-119, 123, 133. However, Hedge Funds fail to allege any involvement by Mr. Mozilo in connection with the securities Hedge Funds purchased. Mr. Mozilo made no statements at all to Hedge Funds. He made no statements about the credit-blemished securities Hedge Funds purchased. He did not draft or sign the Offering Documents. There is no particularized allegation that Mr. Mozilo wrote, read, or even received the Offering Documents. *See* SAC, ¶ 244 (alleging alternatively that Mr. Mozilo "reviewed or had the opportunity to review" the Offering Documents). Further, Mr. Mozilo was not an employee, officer, or director of any of the Countrywide entities involved in the offerings.[3] Under these facts, to hold Mr. Mozilo liable for statements made in these offerings would run afoul of *Central Bank*:

> If *Central Bank* is to have any real meaning, a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b). Anything short of such conduct is merely aiding and abetting, and no matter how substantial that aid may be, it is not enough to trigger liability under Section 10(b).

*Shapiro v. Cantor*, 123 F.3d 717, 720 (2d Cir. 1997) (citations omitted).[4]

To mask this fundamental defect, Hedge Funds try to rope Mr. Mozilo into these securitizations by making wholly conclusory allegations of agency and authority based on his position at the parent corporation level. *See, e.g.*, SAC ¶ 23 (agency allegations); ¶¶ 139-141, 185 ("senior management" and "core operations" allegations); ¶ 244 ("had the authority to control" and "could have reviewed" allegations). But, being an officer or director of a parent corporation is nowhere near enough to satisfy the *Central Bank* standard. Mr. Mozilo is required to have personally made misrepresentations. *SEC v. PIMCO Advisors Fund Mgmt. LLC*, 341 F.

---

[3] Mr. Mozilo was CEO and Chairman of Countrywide Financial Corporation, not of any of the subsidiaries and related entities involved in the offerings at issue in this case. *See* Declaration of David Spears ("Spears Decl."), Ex. A at 8.

On a motion to dismiss, the Court may consider documents incorporated into the complaint by reference, filed with the SEC, or possessed by or known to Plaintiffs and upon which they relied in bringing suit. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). For ease of reference, all such additional documents cited herein are attached as exhibits to the Spears Declaration.

[4] Additionally, Mr. Mozilo cannot be liable for any alleged omissions in the Offering Documents because Hedge Funds have failed to allege particularized facts detailing a duty to disclose. *Global Master Fund, Ltd. v. Ikon Office Solutions, Inc.*, No. 06 Civ. 5383(JGK), 2007 WL 2077153, at *4 (S.D.N.Y. July 19, 2007) ("Where a complaint does not allege any basis for a duty to disclose, a claim based upon nondisclosure of material information cannot be sustained.")

Supp. 2d 454, 467 (S.D.N.Y. 2004) (holding that "it would overstep the limitations imposed by [the Second Circuit] to charge [corporate officer] with primary liability for statements the Complaint does not allege he personally drafted or communicated to others").[5]

In light of Mr. Mozilo's lack of personal involvement, there is no basis to hold him responsible for any alleged misrepresentations in connection with the offerings at issue here.

### 2. Mr. Mozilo's Alleged General Statements About Countrywide Are Not Actionable

Unable to allege that Mr. Mozilo had any connection with the securities they purchased, Hedge Funds point to a hodgepodge of statements Mr. Mozilo allegedly made regarding Countrywide's business generally. But, such general statements cannot support a securities fraud claim against Mr. Mozilo with respect to the credit-blemished securities Hedge Funds purchased.

### a. Mr. Mozilo's General Statements About Countrywide Are Immaterial To The Offerings At Issue In This Case

All of Mr. Mozilo's alleged statements are comprised of immaterial general comments regarding Countrywide's business. *See, e.g.,* SAC ¶¶ 35, 171 (September 2006 statement that Countywide "engage[s] in prudent underwriting guidelines" generally for pay option loans); ¶ 38 (January 2004 statement regarding effect of gaining market share on quality of loans generally); ¶ 44 (March 2005 statement regarding effect of gaining market share on quality of loans generally); ¶¶ 169, 186 (July 2005 statement regarding changes in underwriting standards and noting "quality" of "underwriting regimen"); ¶ 169 (January 2006 statement generally describing Countrywide's loan quality as "extremely high"); ¶ 170 (April 2006 statement characterizing Countrywide's pay option loan quality as "extremely high"); ¶ 192 (April 2004 statement

---

[5] Similarly, the conclusory allegations about agency and authority do not satisfy the requirement of "a strong inference of scienter" (discussed more *infra*). *See Bond Opportunity Fund v. Unilab Corp.*, No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *4 (S.D.N.Y. May 9, 2003) ("Plaintiffs may not impute knowledge to the individual Defendants solely on the basis of the positions they held."); *In re Bausch & Lomb, Inc. Sec. Litig.*, No. 06-CV-6294, 2008 WL 4911796, at *11 (W.D.N.Y. Nov. 13, 2008) ("It is well established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter.").

generally describing Countrywide's subprime business as having "strong disciplines in the origination" and being "at the high end").

Critically, none of Mr. Mozilo's alleged statements related to the credit-blemished securities Hedge Funds purchased. Thus, they are simply immaterial to the offerings at issue in this case. *See Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2, 9 (2d Cir. 1996) (holding that defendants' statements made at roadshows <u>directly to plaintiffs and meant to encourage their investment</u> were immaterial, reasoning that "[s]ince the plaintiffs' claims are contradicted by the disclosure of risk made on the face of each prospectus, no set of additional facts could prove the plaintiffs' claims").

Put another way, it is simply not plausible that general statements made about Countrywide "significantly altered the total mix of information made available" about the unique securities that Hedge Funds purchased. *ECA v. JP Morgan Chase*, 553 F.3d 187, 197 (2d Cir. 2009) (stating materiality standard); *see also Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (to state a claim, allegation must be "plausible on its face").

**b.**     <u>**Mr. Mozilo's General Statements About Countrywide Are Irrelevant, Outdated And Inactionable Puffery**</u>

In an effort to obfuscate, Hedge Funds scatter Mr. Mozilo's alleged statements throughout the SAC and unfairly excerpt their quotations of Mr. Mozilo, apparently hoping that the immateriality of these statements will be lost in the shuffle. As demonstrated below, Mr. Mozilo's alleged statements were not about any loans in the offerings, were either well before or well after Hedge Funds' purchases, and are inactionable puffery.

***Irrelevant.*** At least two of the seven alleged statements by Mr. Mozilo relate to Countrywide's underwriting for pay option adjustable rate mortgages ("P-O ARMS"). *See* SAC ¶ 35, 171; ¶ 170; Spears Decl., Ex. B at 6. Because Hedge Funds purchased securities underlain

by "credit-blemished, closed end, <u>fixed-rate loans</u>," Mr. Mozilo's alleged statements regarding adjustable rate mortgages are irrelevant. SAC ¶ 2 (emphasis added).[6]

*Outdated.* Four of the alleged statements by Mr. Mozilo were made in early 2004 through mid-2005 and were thus between one year and two and a half years old by the time Hedge Funds purchased their securities. SAC ¶¶ 38, 192, 44, 169, 186. In addition to being superseded by the Offering Documents, such outdated statements are immaterial. *See In re Time Warner Inc. Sec. Litig.*, 794 F. Supp. 1252, 1260 (S.D.N.Y. 1992) (holding alleged misstatement made ten months before class period began, "cannot have formed a basis for plaintiffs' expectations when they purchased shares ten or more months later; innumerable intervening factors could have changed the company's value" since statement was made), *aff'd in part and rev'd in part on other grounds*, 9 F.3d 259 (2d Cir. 1993).

*Inactionable Puffery.* All of the alleged statements by Mr. Mozilo are inactionable for the additional reason that they are simply general accounts of Countrywide's business practices and culture. Under the law of this circuit, generalizations regarding a company's business practices, culture and risk are inactionable puffery. *ECA,* 553 F.3d at 206; *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595 (S.D.N.Y. 2005) (dismissing statements that company was a "low-risk company" with "sound risk-management procedures" as inactionable puffery); *In re Am. Bus. Fin. Serv. Sec. Lit.*, No. 05-232, 2007 WL 81937, at *8 (E. D. Pa. Jan. 9, 2007) (dismissing claims against officers of mortgage backed securities issuer, finding "[t]he phrases 'a strong credit culture' and 'quality performance loans' are the type of vague statements that fall squarely under the definition of puffery").

---

[6] In their excerpt from the September 2006 Investor Forum, Hedge Funds neglect to mention that the few lines they quoted by Mr. Mozilo were about P-O ARMS, and did not include a discussion of the fixed rate "credit blemished" loans underlying the securities at issue here. Spears Decl., Ex. B at 6. And Hedge Funds could not have relied on the alleged misrepresentation at the September 2006 Investor Forum in any event as it was actually made on September 13, 2006, after the vast majority of Hedge Funds' purchases. *See* SAC, ¶¶ 59-60 (alleging June 27, 2006, August 29, 2006 and September 12, 2006 purchases that made up $40,125,000 of total alleged $43,375,000 investment). By definition, Hedge Funds could not have relied upon a misrepresentation made after their purchases. *Mills*, 12 F.3d at 1175 (holding inactionable allegedly fraudulent statement made after purchase of securities).

*ECA* is instructive. There, plaintiffs challenged a bank's statements that it had "highly disciplined risk management processes" and that it "set the standard for integrity," arguing that the statements were false because the bank nonetheless ended up embroiled in the WorldCom and Enron scandals. *ECA*, 553 F.3d at 205-206. The Second Circuit rejected the argument:

> The statements are too general to cause a reasonable investor to rely upon them. . . . [T]hese statements did not, and could not, amount to a guarantee that its choices would prevent failures in its risk management practices. . . . [The] statements were merely generalizations regarding [defendant's] business practices. Such generalizations are precisely the type of puffery that this and other circuits have consistently held to be inactionable.

*Id.* at 206.

So too here. As in *ECA*, Mr. Mozilo's alleged statements are all generalizations regarding Countrywide's business practices. Quintessential puffery, Mr. Mozilo's alleged statements characterize Countrywide's loan quality generally as "extremely high," its business overall as a "role model" of responsible lending, its underwriting guidelines generally as "prudent," its subprime business generally as having "strong disciplines in the origination," its subprime loans generally as "at the high end," and that it will not compromise "quality" as it grows market share. *See* SAC ¶¶ 35, 38, 44, 169-171, 186, 192. When juxtaposed with the detailed disclosures in the Offering Documents disclosing the high risk associated with the credit-blemished loans, it is clear no reasonable investor would have relied on this puffery. *See In re N.Y. Comm. Bancorp*, 448 F. Supp. 2d 466, 478-799 (E.D.N.Y. 2006) ("[G]eneralizations regarding integrity, fiscal discipline, and risk management[] amount to no more than inactionable puffery. No reasonable investor would not [sic] have relied on such statements if they had examined the numerous disclosures [the bank] made regarding the magnitude of its investment in mortgage-backed securities and the risk associated with such investments."); *see also In re One Commc'ns Corp.*, No. 07 Civ. 3905 (LTS), 2009 WL 857535, at *9 (S.D.N.Y. March 31, 2009) (to allege a Section 10(b) claim, "Plaintiff must also put forth allegations that support the reasonableness of the reliance").

Finally, it bears noting that Hedge Funds apparently ignored the monthly reports sent to them about the performance of the loans in the Trusts. *See* Am. Cmplt. ¶ 142 (conceding Hedge Funds did not "closely monitor" the monthly reports). It is neither plausible nor reasonable that sophisticated investors like Hedge Funds would have ignored the Offering Documents' extensive risk disclosures and ignored the monthly reports with loan-level detail about the credit-blemished loans in the offerings, yet relied upon Mr. Mozilo's unrelated puffery regarding Countrywide's business generally.

**B.     Hedge Funds Have Not Alleged The Requisite Strong Inference Of Scienter**

A plaintiff must "state with particularity facts giving rise to a strong inference" of scienter. 15 U.S.C. § 78u-4(b)(2). A "strong inference" is "more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights*, 127 S. Ct. 2499, 2504-05 (2007). And in determining whether plaintiffs have established this heightened standard, the Supreme Court explained that courts may not determine "the strength of an inference ... in a vacuum," but must also "consider plausible nonculpable explanations for the defendant's conduct." *Id.* at 2510 (emphasis added). Hedge Funds have not met this heightened pleading standard.

**1.     Mr. Mozilo's Complete Lack Of Involvement In The Offerings Rebuts Any Inference Of Scienter**

Mr. Mozilo's alleged statements regarding Countrywide's business generally do not raise a plausible – let alone compelling – inference that he intended to defraud a small group of investors who bought securities backed by a relatively tiny pool of some of Countrywide's riskiest loans. Rather, given Mr. Mozilo's complete lack of involvement in the offerings, it is far more plausible that he had no intention to mislead purchasers of the credit-blemished securities. *See In re PXRE Group Sec. Litig.*, 600 F. Supp. 2d 510, 536 (S.D.N.Y. 2009) ("to establish scienter in misrepresentation cases, facts must be alleged which particularize how and why each defendant actually knew, or was reckless in not knowing, that the statements were false at the time made").

### 2. In Light Of The Compelling Inference Rebutting Scienter, Hedge Funds' Remaining Allegations Fail As A Matter Of Law

Unable to allege that Mr. Mozilo had any role in the offerings, Hedge Funds are reduced to trotting out selectively excerpted documents unrelated to the securities they purchased and pointing to certain of Mr. Mozilo's stock sales in isolation in an attempt to establish an intent to defraud. Neither of these tactics, however, comes close to establishing the requisite strong inference of scienter.

The e-mails and internal documents that Hedge Funds reference in order to allege Mr. Mozilo's contemporaneous knowledge of falsity are deceptively excerpted quotes from documents that are actually unrelated to the securities at issue here. Indeed, the majority of these documents relate to concerns about the re-set feature for P-O ARMS. SAC ¶¶ 77, 151-53, 155, 170-71. However, because the loans underlying the securities at issue in this case were composed entirely of fixed-rate loans (SAC ¶ 2), concerns about P-O ARMS are irrelevant.

Mr. Mozilo's e-mails purportedly raising concerns with loans sold to HSBC are also irrelevant. SAC ¶¶ 150; 121, 148, 168. These e-mails address an issue relating to loan file documentation which allowed HSBC (which had purchased whole loans from Countrywide) to force Countrywide to buy back certain of the sold loans. Hedge Funds make no allegation that any of the repurchased loans (much less a material number) were included in the securitizations at issue in this case.

Hedge Funds do cite to two e-mails discussing the risks associated with second lien subprime mortgages (SAC ¶¶ 121,148; 149). The securitizations were in fact backed by second lien subprime mortgages (albeit "credit blemished" ones). However, the extensive risks associated with those types of loans were explicitly disclosed in the Offering Documents, with the further caution in all capital letters that as a result the loans "WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS." Joint Brief at 5. Given these explicit risk disclosures, there can be no strong inference of scienter. *See, e.g., Kramer v. Time Warner, Inc.,* 937 F.2d 767, 778 (2d Cir. 1991) (where defendants made thorough disclosures, "there is no hint of any intent to deceive"); *Ferber v. Travelers Corp.,* 802 F. Supp. 698, 714 (D. Conn. 1992)

("defendants' provision of adverse information to [the public by way of disclosures] negates an inference that [they] acted with an inten[t] to defraud").

As for Mr. Mozilo's alleged stock sales, Hedge Funds improperly present them in isolation. But, as courts in this circuit have routinely held, stock sales are only relevant to the question of scienter where plaintiffs make particularized allegations that the sales were "unusual" or "suspicious." *See, e.g., Acito v. Imcera Group*, 47 F.3d 47, 54 (2d Cir. 1995). Here, Hedge Funds have fallen far short of alleging particularized facts meeting this test.

As an initial matter, the notion that Mr. Mozilo's sale <u>of Countrywide stock</u> is somehow evidence of his scienter <u>with respect to the Hedge Funds' investments in mortgage-backed securities</u> is, at best, far-fetched. The argument, apparently, is that Mr. Mozilo misrepresented the risk of the loans underlying the offerings so that: (i) Countrywide would profit from the securitization; and (ii) then Mr. Mozilo, through his ownership of Countrywide shares, would profit from the increased value in Countrywide due to the profitable securitization. However, given that the Hedge Funds' securitizations were a miniscule 0.16% of Countrywide's 2006 total loan production, to call this scienter theory attenuated is to put it mildly. *See Kalnit v. Eichler*, 264 F.3d 131, 140-41 (2d Cir. 2001) ("Where plaintiff's view of the facts defies economic reason, it does not yield a reasonable inference of fraudulent intent.").

Even if there could be some plausible connection between Mr. Mozilo's stock sales and the securitizations at issue here (and there is not), Mr. Mozilo's Countrywide stock sales in relation to the securitizations at issue in this case were not unusual or suspicious. Indeed, Mr. Mozilo's historical stock sales demonstrate that he sold more shares in the year and a half prior to the securitizations (approximately 5.75 million shares, *see* Spears Decl., Exs. A at 29, C) than Hedge Funds allege he sold at any time after the securitizations. SAC ¶ 199. This does not give rise to any inference of scienter, much less the requisite strong inference. *See In re Gildan Activewear, Inc. Sec. Lit.*, No. 08 Civ. 5048 (HB), 2009 WL 1919618, at *6 (S.D.N.Y. July 01, 2009) ("Insider trading is suspicious only when it is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit.").

**C.    None Of Mr. Mozilo's Statements Were The Proximate Cause Of Hedge Funds' Alleged Loss**

Under the PSLRA, plaintiffs have "the burden of proving that the act or omission of the defendant ... caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4). In circumstances such as this – where a plaintiff was warned of the risks associated with its purchase of the securities in question and there is subsequently a major market downturn– the loss causation hurdle is high:

> [W]hen the plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors, the prospect that plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged mis-statements as opposed to intervening events.

*Lentell v. Merrill Lynch*, 396 F.3d 161, 174, 177 (2d Cir. 2005) (affirming dismissal for failure to allege loss causation); *see also Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 246 (S.D.N.Y. 2006) (dismissing case because allegations did not apportion losses between the alleged undisclosed risk and the market-wide Internet stock collapse).

The very recent decision in *Luminent v. Merrill Lynch* applied the rule in *Lentell* to a nearly identical claim brought by a similar purchaser of lower-level tranches of MBS. *Luminent Mortgage Capital v. Merrill Lynch*, No. 07-5423, 2009 WL 2590087 (E. D. Penn. Aug. 20, 2009). After recognizing the highly-publicized real estate market downturn, *Luminent* dismissed the MBS purchasers' complaint for lack of loss causation, because "plaintiffs make no allegations that would allow the Court to apportion any losses between Defendants' misrepresentations and the 'significant declines in market value' for mortgage-backed securities." *Id.* at *14-16.[7]

The same result should apply here, particularly given that the mortgage loans in question were indisputably "credit blemished" subprime loans with a weighted average loan-to-value ratio

---

[7] The SAC alleges in conclusory fashion that the broader market declines occurred "long after the Securities began to experience high rates of delinquency and default." SAC, ¶ 223. Even assuming this allegation to be true, it is a *non sequitur*. The fact that the market continued to decline after Hedge Funds' purchase does not prove that the market decline had no effect on the MBS – indeed, it would be ludicrous to conclude that the worldwide collapse of the MBS market had no effect on the MBS at issue in this case.

of nearly 100% and that Hedge Funds bought the highly risky lower level mezzanine tranches. *See* Spears Decl., Exs. D at 2; E at 2. Indeed, the grounds for dismissal are even greater with respect to Mr. Mozilo. Hedge Funds have not alleged (and could never prove) that Mr. Mozilo's comments describing Countrywide's general business practices caused the losses on these credit blemished securities, nor can Hedge Funds "apportion any losses between Defendants' misrepresentations and the significant declines in market value for mortgage-backed securities." *Luminent,* 2009 WL 2590087 at *16 (citations omitted).

> **D.      The Control Person Claim Also Fails**

The Section 20(a) claim fails for at least two reasons. First, because the primary violation fails, the control person claim fails along with it. *City of Sterling Heights*, 2009 WL 1456846, at *10. Second, because Mr. Mozilo had absolutely no personal involvement in the offerings at issue here, Hedge Funds cannot make the required showing that Mr. Mozilo was a "culpable participant in the primary violation." *Id.*

**III.     CONCLUSION**

For all of the foregoing reasons, Mr. Mozilo respectfully requests that the Court dismiss with prejudice all claims asserted against him.

DATED this 18th day of September, 2009.


                        SPEARS & IMES LLP


                        By: _David Spears_____
                            David Spears
                            dspears@spearsimes.com
                            Monica Folch
                            mfolch@spearsimes.com
                            51 Madison Avenue
                            New York, New York
                            Tel: 212-213-6996
                            Fax: 212-213-0849

and

David Siegel, *pro hac vice*
dsiegel@irell.com
Matthew A. Ashley, *pro hac vice*
mashley@irell.com
Shaunt T. Arevian, *pro hac vice*
sarevian@irell.com
Holly Gershow, *pro hac vice*
hgershaw@irell.com
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Tel: (310) 277-1010
Fax: (310) 203-7199


Attorneys for Defendant Angelo Mozilo