UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| FOOTBRIDGE LIMITED TRUST AND OHP OPPORTUNITY LIMITED TRUST, | 09 CIV 4050 (PKC) |
| | ECF CASE |
| Plaintiffs, | |
| -against- | |
| COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE HOME LOANS SERVICING LP, COUNTRYWIDE FINANCIAL CORP., COUNTRYWIDE SECURITIES CORP., CWABS, INC., CWABS ASSET-BACKED CERTIFICATES TRUST 2006-SPS1, CWABS ASSET-BACKED CERTIFICATES TRUST 2006-SPS2, ANGELO R. MOZILO, DAVID SAMBOL, BANK OF AMERICA CORP. AND BAC HOME LOANS SERVICING, LP, | |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS THE SECOND AMENDED COMPLAINT

QUINN EMANUEL URQUHART OLIVER &
  HEDGES, LLP
Daniel L. Brockett
Jake M. Shields
David D. Burnett
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
(212) 849-7000

Marshall M. Searcy III (admitted pro hac vice)
Scott R. Commerson (admitted pro hac vice)
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100

*Attorneys for Plaintiffs Footbridge Limited Trust
and OHP Opportunity Limited Trust*

# <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ..................................................................................1

SUMMARY OF THE OFFERINGS ...........................................................................5

LEGAL STANDARD....................................................................................................6

ARGUMENT ..................................................................................................................8

I.     THE COUNTRYWIDE DEFENDANTS COMMITTED ACTIONABLE
FRAUD IN THE SALE OF MORTGAGED-BACKED CERTIFICATES TO
PLAINTIFFS .........................................................................................................8

    A.    The Offering Documents Contained Material Misstatements and
Omissions....................................................................................................9

    B.    Misrepresentations Regarding Percentage of Owner-Occupied Properties..........11

    C.    Misrepresentations Regarding Countrywide's Adherence to Its
Underwriting Guidelines........................................................................18

        1.    Countrywide Falsely Represented That It Placed Primary Reliance
On A Borrower's Ability To Repay.........................................19

        2.    Countrywide Falsely Represented That It Made Underwriting
Exceptions On A "Case By Case Basis" After Considering
"Compensating Factors" ...........................................................20

        3.    Countrywide Falsely Represented That It Required "Independent"
Appraisals of Mortgaged Properties ........................................23

        4.    Countrywide Falsely Represented That It Used Quality Control
Processes to Detect Fraud .........................................................23

        5.    Countrywide Falsely Represented That Its Origination and
Underwriting Standards Were Proper And Customary in the
Industry and Applied in Accordance With Federal and State Laws..........24

    D.    Defendants Omitted Material Facts Concerning the Extent to Which
Fraudulent Applications Were Processed Through Reduced-
Documentation Application Programs..................................................26

    E.    Countrywide Misrepresented the Adverse Effects on Investors' Interests............28

II.     PLAINTIFFS ADEQUATELY PLED FACTS GIVING RISE TO A STRONG
        INFERENCE OF SCIENTER ..........................................................................30

        A.      Internal Countrywide Emails Demonstrate the Defendants' Scienter ..................32

        B.      Additional Factual Allegations Support Countrywide's Scienter.........................37

III.    DEFENDANTS CANNOT CONTRACTUALLY INSULATE THEMSELVES
        FROM LIABILITY FOR THEIR FRAUD ......................................................40

        A.      The PSAs' Remedial Limitations Do Not Apply To Fraud...................................41

        B.      Plaintiffs Cannot be Forced to Waive Their Fraud Claims Under the
                Securities Act or Common Law................................................................................44

IV.     PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION......................................45

V.      DEFENDANTS DO NOT DENY THAT PLAINTIFFS HAVE SUFFICIENTLY
        ALLEGED COMMON-LAW FRAUD..............................................................................47

VI.     PLAINTIFFS HAVE STATED A CLAIM AGAINST MOZILO FOR
        VIOLATION OF SECTION 10(B) AND RULE 10B-5 ...................................................48

        A.      Plaintiffs Have Adequately Alleged Actionable Misrepresentations
                Against Mozilo.........................................................................................................48

                1.      Mozilo is Liable for Misrepresentations in the Offering Materials
                        Under the Group Pleading Doctrine .........................................................48

                2.      Mozilo is Liable for His Own Misrepresentations....................................51

        B.      Plaintiffs Have Adequately Alleged that Mozilo Acted With Scienter ................53

        C.      Plaintiffs Have Adequately Alleged Loss Causation.............................................56

VII.    PLAINTIFFS HAVE STATED A SECTION 20(A) CONTROL-PERSON
        CLAIM AGAINST MOZILO.............................................................................................56

VIII.   PLAINTIFFS HAVE STATED A CLAIM AGAINST SAMBOL FOR
        VIOLATION OF SECTION 10(B) AND RULE 10B-5 ...................................................58

        A.      Plaintiffs Have Adequately Alleged Actionable Misrepresentations
                Against Sambol........................................................................................................58

                1.      Sambol Is Liable for Misrepresentations in the Offering Materials
                        Under the Group Pleading Doctrine .........................................................58

                2.      Sambol is Liable for His Direct Misrepresentations.................................59

  B. Plaintiffs Have Adequately Alleged that Sambol Acted With Scienter ...............59

IX. PLAINTIFFS HAVE STATED A SECTION 20(A) CONTROL-PERSON CLAIM AGAINST SAMBOL ........................................................................62

X. PLAINTIFFS SUFFICIENTLY ALLEGE SUCCESSOR LIABILITY AGAINST BANK OF AMERICA.................................................................................63

  A. BofA Bears Successor Liability Under The Common Law...................................63

    1. The SAC Sufficiently Alleges That BofA Assumed Countrywide's Liabilities ...............................................................................................63

    2. The SAC Sufficiently Alleges A *De Facto* Merger of Countrywide and BofA.................................................................................................65

      (a) Continuity of Ownership....................................................................67

      (b) Cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible................67

      (c) Assumption by successor of liabilities ordinarily necessary for the uninterrupted continuation of predecessor's business........67

      (d) Continuity of management, personnel, physical location, assets, and general business operation ...........................................68

  B. BofA's Reliance On *Argent* Is Misplaced ..........................................................69

XI. DEFENDANTS' REQUEST TO STRIKE CERTAIN ALLEGATIONS IN THE SECOND AMENDED COMPLAINT SHOULD BE DENIED .....................................71

  A. Motions To Strike Are Disfavored ......................................................................71

  B. Defendants Have Not Shown That The Challenged Material Is Irrelevant And Prejudicial ...................................................................................................72

CONCLUSION..................................................................................................................75

# TABLE OF AUTHORITIES

*380544 Canada, Inc. v. Aspen Tech. Inc.*,
  544 F. Supp. 2d 199 (S.D.N.Y. 2008) ..........................................................................8, 31, 49

*In re Asbestos Litigation*,
  517 A.2d 288 (Del. 1986) ...................................................................................................63

*In re Asbestos Litigation*,
  No. 92C-10-100, 1994 WL 89643 (Del. Super. Ct. Feb. 4, 1994)........................................69

*AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.*,
  22 A.D. 3d 750, 752 (2d Dep't 2005) ..................................................................................66

*In re BISYS Sec. Litig.*,
  397 F. Supp. 2d 430 (S.D.N.Y. 2005)................................................48, 49, 57, 58, 59, 62, 63

*BT Americas Inc. v. ProntoCom Marketing, Inc.*,
  859 N.Y.S.2d 893, No. 602014/07, 2008 WL 565496 (N.Y. Sup. Ct. [N.Y. Cty] Feb. 14,
  2008) ................................................................................................................................65, 69

*Bell Atlantic Corp. v Twombly*,
  550 U.S. 544 (2007)..............................................................................................................7

*Binder v. Bristol-Myers Squibb Co.*,
  184 F. Supp. 2d 762 (N.D. Ill. 2001) ...................................................................................71

*Bouley v. American Cyanamid Co.*,
  No. Civ. A. No. 85-4368-Z, 1987 WL 18738 (D. Mass 1987)..............................................64

*Cabble v. Rollieson*,
  2006 WL 464078 (S.D.N.Y. Feb. 27, 2006)....................................................................72, 73

*Cargo Partner AG v. Albatrans, Inc.*,
  352 F.3d 41 (2d Cir. 2003) ...................................................................................................67

*Carmona v. Spanish Broad. Sys., Inc.*,
  No. 08 Civ. 4475(LAK), 2009 WL 890054 (S.D.N.Y. Mar. 30, 2009)...................................9

*Central Bank v. First Interstate Bank*,
  511 U.S. 164 (1994)...........................................................................................................51

*Chill v. Gen. Elec. Co.*,
  101 F.3d 263 (2d Cir. 1996).................................................................................................33

*Chosun Intern., Inc. v. Chrisha Creations, Ltd.*,
  413 F.3d 324 (2d Cir. 2005).................................................................................................66

*Citibank, N.A. v. Itochu Int'l Inc.*,
  No. 01 Civ. 6007(GBD), 2003 WL 1797847 (S.D.N.Y. Apr. 4, 2003)...................................45

*In re Comverse Tech., Inc. Sec. Litig.*,
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) ..................................................................................32

*In re Countrywide Fin. Corp. Derivative Litig. ("In re Countrywide Derivative Litigation"),*
   554 F. Supp. 2d 1044 (C.D. Cal. 2008) ............................................................36, 54, 56, 61

*In re Countrywide Fin. Corp. Sec. Litig. ("In re Countrywide Securities Litigation"),*
   588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................4, 46, 47, 53

*Dresner v. Utility.com, Inc.,*
   371 F. Supp. 2d 476 (S.D.N.Y. 2005)......................................................................................44

*Dura Pharm., Inc. v. Broudo,*
   544 U.S. 336 (2005)................................................................................................................45, 47

*Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (Am.) Corp. Creditor Trust v. Daewoo Eng'g &
   Constr. Co., Ltd.,*
   375 F. Supp. 2d 257 (S.D.N.Y. 2005).......................................................................................63

*Edwards v. N. Am. Van Lines,*
   513 N.Y.S.2d 895 (3d Dep't 1987) ..........................................................................................45

*Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co.,*
   375 F.3d 168 (2d Cir. 2004).....................................................................................................31

*First Bank of Americas v. Motor Car Funding, Inc.,*
   257 A.D.2d 287 (1st Dep't 1999) .............................................................................................41

*Fishoff v. Coty Inc.,*
   No. 09 Civ. 628(SAS), 2009 WL 1585769 (S.D.N.Y. June 8, 2009).......................................7

*Fitzgerald v. Fahnestock & Co., Inc.,*
   730 N.Y.S.2d 70 (1st Dep't 2001)............................................................................................66

*Fletcher v. Atex, Inc.,*
   68 F.3d 1451 (2d Cir. 1995).....................................................................................................65

*Fountain v. Colonial Chevrolet Co.,*
   C.A. Nos. 86C-JA-117, 85C-DE-88, 1988 WL 40019 (Del. Super. Apr. 13, 1998)...............65

*Geinko v. Padda,*
   No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 27, 2002)....................................76

*Global Crossing,*
   322 F. Supp. 2d at 346 .............................................................................................................60

*In re Initial Public Offering Sec. Litig.,*
   241 F. Supp. 2d 281 (S.D.N.Y. 2003).........................................................................10, 72, 74

*Kalb, Voorhis & Co. v. Am. Fin. Corp.,*
   8 F.3d 130 (2d Cir. 1993) .........................................................................................................65

*Kalnit v. Eichler,*
   264 F.3d 131 (2d Cir. 2001).....................................................................................................60

*Knapp v. N. Am. Rockwell Corp.,*
   506 F.2d 361 (3d Cir. 1974)......................................................................................................66

*Kramer v. Time Warner Inc.*,
   937 F.2d 767 (2d Cir. 1991) ........................................................................................70

*Lentell v. Merrill Lynch & Co., Inc.*,
   396 F.3d 161 (2d Cir. 2005) ........................................................................................45

*Liberty Ridge LLC v. RealTech Sys. Corp.*,
   173 F. Supp. 2d 129 (S.D.N.Y. 2001) ..........................................................................8

*Lipsky v. Commonwealth United Corp.*,
   551 F.2d 887 (2d Cir. 1976) ........................................................................................72

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008) ....................44

*Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*,
   2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) .............................................................46

*Marenyi v. Packard Press Corp.*,
   No. 90-CV-4439 (CSH), 1994 WL 16000129 (S.D.N.Y. June 9, 1994) ..................65

*In re McKesson*,
   126 F. Supp. 2d 1248 (N.D. Cal. 2000) .....................................................................70

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
   65 F.3d 1044 (2d Cir. 1995) ........................................................................................44

*Metrokane, Inc. v. The Wine Enthusiast*,
   160 F. Supp. 2d 633 (S.D.N.Y. 2001) ..................................................................71, 72

*Mills v. Polar Molecular Corp.*,
   12 F.3d 1170 (2d Cir. 1993) ..................................................................................44, 50

*In re Moody's*,
   599 F. Supp. 2d at 508 .................................................................................................72

*In re Nortel Networks Corp. Sec. Litig.*,
   238 F. Supp. 2d 613 (S.D.N.Y. 2003) ..........................................................................8

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ..........................7, 8, 10, 17, 24, 32, 53, 54, 59, 60, 61, 73

*Olkey v. Hyperion 1999 Term Trust*,
   98 F.3d 2 (2d Cir. 1996) ..............................................................................................52

*In re Openwave Sys. Sec. Lit.*,
   528 F. Supp. 2d 236 (S.D.N.Y. 2007) ..........................................................................7

*People of the State of Illinois v. Countrywide Financial Corp.*,
   No. 08CH22994 (Cir. Ct. Chancery Div. June 25, 2008) ..........................................10

*In re Pfizer Inc. Securities Litigation*,
   584 F. Supp. 2d 621 (S.D.N.Y. 2008) ........................................................................48

*Rohn Industries, Inc. v. Platinum Equity LLC,*
    887 A.2d 983 (Del. Super. Ct. 2005), *rev'd on other grounds*, 911 A.2d 379 (Del. 2006) .....63

*Rolf v. Blyth, Eastman Dillon & Co., Inc.,*
    570 F.2d 38 (2d Cir. 1978)........................................................................................32, 35, 37

*S. Cherry Street, LLC v. Hennessee Group LLC,*
    573 F.3d 98 (2d Cir. 2009)........................................................17, 18, 31, 32, 35

*S.E.C. v. Espuelas,*
    579 F. Supp. 2d 461 (S.D.N.Y. 2008)........................................................48, 50

*S.E.C. v. First Jersey Sec., Inc.,*
    101 F.3d 1450 (2d Cir. 1996)........................................................................57-58

*S.E.C. v. PIMCO Advisors Fund Management, LLC,*
    341 F. Supp. 2d 454 (S.D.N.Y. 2004).....................................................................50

*Scarola v. Atlantic Welding Supply Corp.,*
    No. 01-201, 2001 WL 1682723 (1st Dep't Oct. 26, 2001) ....................................69

*Schumacher v. Richards Shear Co., Inc.,*
    59 N.Y.2d 239 (N.Y. 1983) ..................................................................................63

*Shapiro v. Cantor,*
    123 F.3d 717 (2d Cir. 1997)..................................................................................50

*Skolnick v. Goldberg,*
    746 N.Y.S.2d 296 (1st Dep't 2002) .......................................................................45

*Sloman v. Presstek, Inc.,*
    No. 06 CV 377, 2007 WL 2740047 (D.N.H. Sept. 18, 2007) .........................15, 31

*State Street Bank & Trust Co. v. Inversiones Errazuriz, Limitada,*
    230 F. Supp. 2d 313 (S.D.N.Y. 2002)...................................................................45

*Sweatland v. Park,*
    181 A.D.2d 243 (4th Dep't 1992) ....................................................................66, 69

*TSC Indus., Inc. v. Northway, Inc.,*
    426 U.S. 438 (1976)...............................................................................................52

*In re Take-Two Interactive Sec. Litig.,*
    551 F. Supp. 2d 247 (S.D.N.Y. 2008)...................................................................45

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,*
    531 F.3d 190 (2d Cir. 2008)..................................................................................40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
    551 U.S. 308 (2007)..................................................6, 7, 8, 15, 31, 32, 36

*Three Crown Ltd. P'ship v. Caxton Corp.,*
    817 F. Supp. 1033 (S.D.N.Y. 1993)......................................................................75

*In re Time Warner Inc. Sec. Litig.*,
   794 F. Supp. 1252 (S.D.N.Y. 1992)........................................................................52

*U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobas*,
   No. 98 Civ. 3099 (THK), 2005 WL 289575 (S.D.N.Y. Feb. 4, 2005) ...................65

*United States v. Partow*,
   No. 06-CR-00104.........................................................................................................22

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)..............................................................49, 59

*Wexner v. First Manhattan Co.*,
   902 F.2d 169 (2d Cir. 1990).........................................................................................8

## Statutes

15 U.S.C. § 78cc(a).............................................................................................................44

15 U.S.C. §78u-4 ..................................................................................................................7

15 U.S.C. §78u-4(b)(2) .......................................................................................................31

Fed. R. Civ. P. 9(b) .........................................................................................................7, 8

Fed. R. Civ. P. 11 ..............................................................................................................75

Ref. R. Civ. P. 12(b)(6).......................................................................................................6

Fed. R. Civ. P. 12(f) ....................................................................................................71, 72

Private Securities Litigation Reform Act of 1995 ("PSLRA").......................................7

## Other Authorities

Alan Wright & Arthur R. Miller, *Fed. Prac. and Procedure* § 1382 (2009) ...............72

## PRELIMINARY STATEMENT

Plaintiffs Footbridge and Opportunity are investment funds that purchased $43 million in mortgage-backed securities from two Countrywide offerings. The offerings occurred in June and September 2006, during the heyday of Countrywide's lending and securitization spree, in which Countrywide transformed itself into a mass-production loan factory set up to process an ever-increasing stream of loans without regard to borrowers' ability to repay.[1] Countrywide originated and sold pools of mortgage loans to trusts, which in turn "securitized" the loan pools and issued residential mortgage-backed securities (called "Certificates") to Plaintiffs and other investors.

The relevant offering documents, the Prospectuses and Prospectus Supplements, falsely represented to investors that Countrywide had originated the underlying mortgages in strict compliance with underwriting standards and guidelines. Countrywide had supposedly developed its underwriting guidelines over time to screen the creditworthiness of borrowers and to increase the likelihood that the mortgages would be repaid. In reality, however, Countrywide had completely abandoned any reasonable and prudent underwriting standards.

Driven by its single-minded quest to dominate the nation's mortgage market, Countrywide—under the direction of its former Chief Executive Officer, Angelo Mozilo, and former President and Chief Operating Officer, David Sambol—developed an "originate-to-distribute" model under which Countrywide relaxed its own underwriting guidelines in order to process and sell more and more loans for the secondary market. Countrywide viewed borrowers as nothing more than pawns in a deceptive game to produce and sell risky and unaffordable

---

[1]  The two Countrywide Securitizations were CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization") and the CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization").

home loans so it could satisfy its obligations to Wall Street investors. As a consequence, Countrywide knowingly loaned billions of dollars to borrowers who could not afford to repay the loans, or who committed fraud in their loan applications (often with the encouragement and assistance of Countrywide's employees and brokers), or who otherwise did not satisfy the basic risk criteria for prudent and responsible lending that Countrywide claimed to use.

Countrywide's failure to abide by its much-touted underwriting guidelines fundamentally changed the risk profile of the Certificates purchased by Plaintiffs. Even though the mortgage loans in the SPS1 and SPS2 Securitizations were credit-blemished, second-lien loans, Countrywide's abandonment of its stated underwriting guidelines dramatically increased the risk of default associated with these loans. The number of delinquencies and defaults in these loan pools skyrocketed within months after the closing and within a year, the Certificates were completely worthless, prompting the Trustee to inform the Plaintiffs that they should not expect any further distributions of interest or principal. Almost overnight, Plaintiffs lost their entire investment in Countrywide.

In the years since Plaintiffs purchased the Certificates, a flood of public disclosures has come to light revealing that Countrywide was permeated by fraud. Most damning are internal emails among Defendants Mozilo and Sambol that were recently published by the Securities and Exchange Commission in its civil fraud complaint against the officers. These emails show the officers acknowledging the abandonment of Countrywide's origination guidelines during the same period in which Plaintiffs purchased the Certificates and, in many cases, with regard to the same types of Certificates.

For example, in April 2006, Mozilo declared to Sambol that subprime, second-lien loans—the very loans that backed Plaintiffs' Certificates—had been originated "***with disregard***

*for process [and] compliance with guidelines*." Mozilo wrote that he had "***personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated*** versus the pricing of those loan [sic]." The emails also show that Mozilo, Sambol, and others were warned that the Company was abandoning its underwriting guidelines, yet they did nothing at the time to correct Countrywide's business practices or its misrepresentations.

The internal emails present the rare circumstance where, before discovery has even commenced, Plaintiffs possess documented, incontrovertible evidence—***in the senior officers' own words***—of conscious misbehavior and recklessness at the highest levels of the Company. Internal Countrywide documents and statements by former Countrywide employees and customers also show that Countrywide made material misrepresentations to Plaintiffs and other investors.

Plaintiffs knew, and do not deny, that the loans they purchased were risky—Defendants miss the mark in implying otherwise. But there is a difference between *risky* securities and *fraudulent* securities. What Plaintiffs did not know at the time they purchased the Certificates, and what they allege in great detail in their Second Amended Complaint ("SAC"), is that the Loans were issued to borrowers in violation of Countrywide's underwriting standards and that Countrywide knew of the fraud when it sold the Certificates to Plaintiffs.

Other Countrywide mortgage-backed securities investors have advanced similar claims in California federal court and elsewhere. Countrywide's motions to dismiss have been emphatically rejected in every investor securities-fraud case in which the pleadings have been considered. For example, the Central District of California stated in one case that "Plaintiffs have created a cogent and compelling inference of a company obsessed with loan production and

market share with little regard for the attendant risks, despite the company's repeated assurances to the market." *In re Countrywide Fin. Corp. Sec. Litig.* ("*In re Countrywide Securities Litigation*"), 588 F. Supp. 2d 1132, 1186 (C.D. Cal. 2008). The same opinion concluded that scienter was sufficiently established where Plaintiffs alleged that "Countrywide's operations so diverged from soundness that Countrywide's repeated assurances of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false." *Id.* at 1174.

As explained herein, the SAC sets forth detailed allegations demonstrating, *inter alia*, that Countrywide materially misrepresented its underwriting standards and misrepresented key statistics including the percentage of mortgaged properties that were owner-occupied. The SAC also sets forth detailed allegations supporting a strong inference of scienter, including the officers' internal emails, internal Countrywide documents, statements by former employees and customers, and other sources.

Defendants place great emphasis on the assertion that Plaintiffs have not "tethered" their allegations to the specific loan pools or Certificates that they purchased. But Plaintiffs were not entitled to inspect the mortgage loans prior to purchasing their Certificates; they had to rely exclusively upon Countrywide's representations. It would impose an impossibly high burden on Plaintiffs to require them to make specific allegations about specific mortgage loans in these two Securitizations.

Even under the higher pleading standards applied to a Section 10(b) claim, Plaintiffs are not required to provide the degree of specificity demanded by Defendants in this initial pleading. Detailed evidence of fraud with regard to each mortgage loan in the Securitizations will be revealed in the course of discovery. The SAC is more than adequate to satisfy Plaintiffs' pleading burden under federal and state law.

## SUMMARY OF THE OFFERINGS

Plaintiffs purchased approximately $43,375,000 in residential mortgage-backed securities from Countrywide between June and October 2006 through two public offerings issued by Countrywide. The Securitizations were the CWABS Asset-Backed Certificates, Series 2006-SPS1 and the CWABS Asset-Backed Certificates, Series 2006-SPS2. The Securities were identified by Countrywide as "Certificates." Both of the Securitizations were structured through a similar set of agreements.

Countrywide acted in several capacities on the Securitizations, in each of which it stood to profit. Countrywide issued mortgage loans to individuals to purchase or refinance residential properties. Through its CHL subsidiary and other Sellers, Countrywide then sold, transferred, or otherwise conveyed title to those Mortgage Loans to the Depositor, CWABS, pursuant to a Pooling and Servicing Agreement ("PSA"). CWABS then sold, transferred, or otherwise conveyed the Mortgage Loans to the Trustee, The Bank of New York, which held the Loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders. The SPS1 and SPS2 Trusts acted as Issuing Entities in selling the Certificates to Plaintiffs and other investors. The Securities were sold in subgroups, or "Classes," according to the Classes' expected credit ratings, and were intended to provide interest on the income stream generated by the Mortgage Loans in the Trusts.

The SPS1 and SPS2 Securitizations contained Mortgage Loans with a total face value of approximately $230,875,000 and $426,500,000, respectively. The majority of the Certificates in each Securitization were contained in the "A" Class, with an expected credit rating of AAA/Aaa (S&P/Moody's). The remaining Certificates were issued in the M-1 through M-9 Classes and the B Class, and carried lower credit ratings. The latter Classes were subordinate to the A Class, with a corresponding priority of distribution of income to the Certificates.

5

The Securitizations included at least three principal offering documents:  First, the Pooling and Servicing Agreement, entered into by certain Countrywide entities and the Trustee, provided for the conveyance and servicing of the Mortgage Loans.  The PSAs were entered into by the Depositor, CWABS, Inc.; the Sellers, CHL and three other Countrywide subsidiaries; the Master Servicer, CHLS; and the Trustee, The Bank of New York.  The SPS1 and SPS2 PSAs were dated June 1, 2006 and August 1, 2006, respectively.  They were filed with the SEC on July 12, 2006 and September 12, 2006, respectively.

Second, a Preliminary Term Sheet provided summary information about the Securitizations, including a description of the parties, the Classes of Certificates and their credit ratings, the Certificates' credit enhancement provisions, and the characteristics of the pool of Mortgage Loans.  Third, a bundled Prospectus and Prospectus Supplement provided further detail about the Securitizations, including a detailed description of the Mortgage Loans, the Certificates, and the procedures for servicing the loans.  The Prospectuses were filed with the SEC and their Registration Statements were signed by three Countrywide executives:  Stanford L. Kurland, Chairman of the Board, President, and Director; Eric P. Sieracki, Executive Vice President and Chief Financial Officer; and David A. Spector, Vice President and Director.

## LEGAL STANDARD

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must accept all factual allegations as true, consider all facts in the complaint as well as documents incorporated into the complaint by reference, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *In re Openwave Sys. Sec. Lit.*, 528 F. Supp. 2d 236, 248 (S.D.N.Y. 2007) ("When considering a motion to dismiss under Rule 12(b)(6), a trial court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-

moving party") (quotation omitted). *See also Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 570 (2007) (complaint must contain sufficient factual matter to state a claim for relief that is *plausible on its face*).

To survive a motion to dismiss in a securities fraud case, a plaintiff must also satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4. A plaintiff must allege with "particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Fishoff v. Coty Inc.*, No. 09 Civ. 628(SAS), 2009 WL 1585769, at *3 (S.D.N.Y. June 8, 2009) (quotation omitted). Specifically, "the complaint shall specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." *Novak v. Kasaks,* 216 F.3d 300, 307 (2d Cir. 2000) (quotation omitted); *see also Fishoff*, 2009 WL 158769, at *3. ("[A] plaintiff must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.") (quotation omitted).

Plaintiffs must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id*. "The inference need not, however, be 'irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences.'" *Id.* (quoting *Tellabs*, 551 U.S. at 324). As a case in this District has put it, "[t]he inquiry on a motion to dismiss is [whether] a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* (quotation omitted); *see also Tellabs*, 551 U.S. at 322-23 ("The inquiry . . . is whether *all* of the facts alleged, *taken collectively*, give rise to a strong inference of scienter . . . .") (emphasis added).

The PSLRA did not alter the time-honored tenet that the "motion to dismiss for failure to state a claim is disfavored and is seldom granted." *In re Nortel Networks Corp. Sec. Litig.*, 238 F. Supp. 2d 613, 621 (S.D.N.Y. 2003). Courts do not demand "a level of specificity in fraud pleadings *that can only be achieved through discovery*." *Liberty Ridge LLC v. RealTech Sys. Corp.*, 173 F. Supp. 2d 129, 137 (S.D.N.Y. 2001) (emphasis added). Rather, plaintiffs need only plead with particularity facts sufficient "to afford defendant fair notice of the plaintiff's claim and the factual ground upon which it is based." *Novak*, 216 F.3d at 314 (quotation omitted).

The pleading standard for common-law fraud is lower than that for securities fraud because Plaintiffs are not subject to the PSLRA. *See 380544 Canada, Inc. v. Aspen Tech., Inc.*, 633 F. Supp. 2d 15, 29 (S.D.N.Y. 2009) (distinguishing between fraud under the PSLRA and common-law fraud). For common-law fraud, while a plaintiff must satisfy Rule 9(b)'s particularity requirement, the Rule provides that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b).* And while a plaintiff must show facts supporting the defendant's scienter, "scienter need not be alleged with great specificity." *Carmona v. Spanish Broad. Sys., Inc.*, No. 08 Civ. 4475(LAK), 2009 WL 890054, at *5 (S.D.N.Y. Mar. 30, 2009) (citing *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

## ARGUMENT

### I.   THE COUNTRYWIDE DEFENDANTS COMMITTED ACTIONABLE FRAUD IN THE SALE OF MORTGAGED-BACKED CERTIFICATES TO PLAINTIFFS

Defendants' Joint Memorandum of Law in Support of their Motion to Dismiss the Second Amended Complaint ("Joint Mem.") seeks dismissal of Plaintiffs' SAC (attached as Exhibit A to Declaration of David D. Burnett ("Burnett Decl.")) on four grounds: (1) the offering documents allegedly contained no material misstatements or omissions (Joint Mem. 5-

19); (2) the SAC purportedly fails to pled facts giving rise to a strong inference of scienter (Joint Mem. 19-22); (3) Plaintiffs' federal securities and common-law fraud claims are purportedly barred under the Pooling and Service Agreements (Joint Mem. 22-24); and (4) the SAC allegedly fails to plead loss causation (Joint Mem. 24-25). These arguments must fail for the reasons stated below.[2]

A.      **The Offering Documents Contained Material Misstatements and Omissions**

The SAC alleges five separate categories of fraudulent statements and omissions; all are pled with the requisite specificity. Defendants broadly assert that these misrepresentations are not pled with the requisite specificity because Plaintiffs' allegations rely in part on references to other lawsuits and press articles and because there is purportedly no reference to any document or person showing the statements were fraudulent. Joint Mem. 5-6. But this is nonsense. Defendants cherry-pick and distort Plaintiffs' allegations while glossing over the vast majority of misrepresentations alleged in the SAC. Defendants relegate their discussion of the most damaging facts to footnotes, to the extent they address those facts at all.

The SAC provides the requisite specificity to pass muster under Rule 9(b) and the PSLRA. The SAC specifies each statement that is alleged to have been false and misleading and the reason or reasons why the statement is false and misleading. SAC ¶¶ 65-135. It also supports each allegation of falsity with references to specific documents and people, including critical conversations between Countrywide employees and Plaintiffs, *id.* ¶¶ 73-75, 79, 124, 126; statements by former Countrywide employees, *id.* ¶¶ 49, 113, 122, 127, 188; internal emails among Countrywide's senior management, *id.* ¶¶ 77, 146-65; internal Countrywide documents, *id.* ¶¶ 51-52, 94, 127, 154-56, 164, 191; statements by former Countrywide customers, *id.* ¶ 135;

---

[2]    Pursuant to this Court's order of October 20, 2009, Plaintiffs on October 30, 2009 will be filing a motion for leave to file a Third Amended Complaint.

records for the Mortgage Loans that Countrywide possessed, *id.* ¶ 129-30; and other confidential

and public information regarding Countrywide's wrongdoing.  *See, e.g., id.* ¶¶ 91.

Some of the allegations in the SAC are further supported by evidence contained in the

June 4, 2009 Securities and Exchange Commission complaint against Mozilo and Sambol ("SEC

Complaint") and other state attorneys general's complaints against Countrywide.[3]  But there is

nothing improper about using those complaints, newspaper articles, media reports, or

investigative reports as a basis for the plaintiffs' belief in a federal court complaint.  *See Novak*,

216 F.3d at 313-14 (permitting information and belief pleading based on confidential sources and

"other facts"); *In re Initial Public Offering Sec. Litig.*, 241 F. Supp. 2d 281, 355, 355 n.89

(S.D.N.Y. 2003) (citing *Novak* for the proposition that "press releases[,] media resources,

including newspapers, magazines, Internet sources, and books . . . can plainly form a basis for

Plaintiff's beliefs"); *see also* Section XI, *infra*.  In any event, there is ample back-up material for

each allegation of falsity even apart from the other lawsuits and press reports.

Defendants also advance the general argument that "numerous allegations" in the SAC

are pled "expressly or implicitly" on information and belief.  Joint Mem. 6.  But this is a gross

distortion of the facts.  Of the 81 paragraphs to which Defendants cite for this point, Joint Mem.

6 n.11, only *two paragraphs* allege facts based on information and belief.[4]  Defendants

---

[3]  *Securities and Exchange Commission v. Angelo Mozilo, David Sambol, and Eric Sieracki*, CV 09-03994 (VBF) (C.D. Cal. June 4, 2009) (complaint) (Burnett Decl. Ex. B); *see also, e.g., People of the State of California v. Countrywide Financial Corp.*, No. LC081846 (Super. Ct. Cal. July 17, 2008) (first amended complaint) (Burnett Decl. Ex. C); *People of the State of Illinois v. Countrywide Financial Corp.*, No. 08CH22994 (Cir. Ct. Chancery Div. June 25, 2008) (complaint) (Burnett Decl. Ex. D).

[4]  *See id.* ¶ 80 (belief that "Countrywide's estimate that 15 percent of the Mortgage Loans were applied to investor properties still vastly understated the actual percentage of such properties in the Securitizations"); *id.* ¶ 118 (belief that "Countrywide failed to obtain independent verification of borrowers' income at a far greater rate than it represented");

There are a total of four paragraphs in the SAC that are based upon information and belief. Defendants do not mention the other two in their brief.  Joint Mem. 6. n. 11; SAC ¶ 22 (belief that BAC

apparently contend that the other 79 paragraphs were "impliedly" based on information and belief, but there is no such concept as an allegation made on "implied" information and belief. In any event, in the few instances in which Plaintiffs do make an allegation on information and belief, they also state all of the facts on which that belief is based, contrary to Defendants' argument.  Joint Mem. 6.[5]

In short, Defendants' general attacks on the specificity of the SAC are utterly lacking in any merit.

### B.    <u>Misrepresentations Regarding Percentage of Owner-Occupied Properties</u>

The offering documents contained statistics showing that the percentage and number of mortgaged properties that would be owner occupied.  Specifically, of the 3,489 Mortgage Loans included in the SPS1 Securitization, 3,485 Loans—*99.88 percent*—were reportedly issued to owner-occupied properties.  SAC ¶ 69.  Only *four Loans* were identified as secondary residences and *none* of the Loans were purportedly for investment properties.  *Id*.  Similarly, of the 11,559 Loans included in the SPS2 Securitization, 11,503 Loans—*99.53 percent*—were reportedly issued to owner-occupied properties.  *Id*. ¶ 70.  Only *31 Loans* were reportedly issued to secondary residences; and *only 25 loans* to investment properties.  *Id*.  These impressive figures were repeated in the Prospectus Supplements.  *Id.* ¶ 72.  Plaintiffs reasonably believed that the securities were safer investments because homeowners who reside in mortgaged properties are

---

Home Loans Servicing is a subsidiary of Bank of America ("BofA"); *id.* ¶ 268 (belief that Countrywide's property "has been transferred or assumed by the Bank of America Defendants").

[5]   *See, e.g.,* SAC ¶ 80 (stating belief that Countrywide underestimated the percentage of Mortgage Loans applied to investor properties, based on Countrywide's confession that the "primary driver" of Loan defaults was real-estate speculators, Countrywide's failure to investigate borrowers' mortgage histories, and Countrywide's knowledge that "a sizeable percentage of borrowers were investors, not homeowners occupying their homes").

less likely to default than owners who purchase the homes as investments and live elsewhere.  *Id.* ¶ 71.

Defendants do not deny, nor could they, that these statistics were false and misleading. Indeed, the SAC specifically alleges telephone conversations in the summer of 2007 in which Countrywide ***admitted*** that its disclosures regarding owner occupancy were false by as much as 15 percent.  SAC  ¶¶ 73-75; 78-79.  Thus, per Countrywide's admission, there were *at least 523* investment properties in the SPS1 Securitization, versus the *zero* that had been represented to Plaintiffs, and there were *at least 1,700* more investment properties in the SPS2 Securitization than had been represented.[6]  This was not the case of a few rogue borrowers lying on their applications; this was fraud on a massive scale.

Unable to refute the falsity of these statistics, Defendants challenge the owner occupancy representations on other grounds.  Specifically, Defendants contend the SAC is insufficient because it purportedly alleges "no facts" that Countrywide knew, or was reckless in not knowing, about these misrepresentations *at the time* of the offerings.[7]  Joint Mem. 7-9.  But Defendants can make this statement only by ignoring the particularized allegations of the SAC, which make it manifestly clear that Countrywide "knew that its representations regarding owner occupancy were false and misleading ***at the time the representations were made*** . . . ."  SAC ¶ 76 (emphasis added).  Defendants are simply wrong in their assertion that the SAC does not allege Countrywide's contemporaneous knowledge of the owner occupancy disclosures.  Joint Mem. 7-8.  The SAC makes that explicit allegation repeatedly.  SAC ¶¶ 4, 67, 76.

---

[6]  Countrywide's estimate that 15 percent of the loans applied to investor properties is still a vast understatement of the truth.  *Id.* ¶ 80.

[7]  Notably, Defendants concede that facts alleging that Defendants were "knew, or were reckless in not knowing" that borrowers lied to them on their applications would be sufficient to state a fraud claim.  Joint Mem. 7.

The SAC is also bristling with detailed and particularized allegations to support the scienter allegation. Indeed, one need look no further than Countrywide's own admissions to reach this conclusion. The SAC alleges that in May 2007, Plaintiffs asked Countrywide to explain why the loan pool was experiencing a higher rate of default than similarly situated bonds in the market. *Id.* ¶¶ 73-75.[8] Countrywide claimed that real estate speculators had lied to the Company about their intentions to occupy the mortgaged properties, when in reality they hoped quickly to "flip" the homes for a profit without ever occupying them. In a later conversation, Countrywide admitted to John Howe, the President of Old Hill (which acted as investment advisor to the Plaintiff funds), that approximately *15 percent* of the Mortgage Loans were used to purchase investment properties, as compared to owner-occupied properties. *Id.* ¶ 79.

The SAC does not allege that Countrywide only learned this information seven months later. Countrywide did not say that it had done a subsequent study of the number of owner occupied properties in the SPS1 and SPS2 securitizations. The SAC alleges only that Countrywide first ***admitted*** the misrepresentations seven months later, but that it knew of the facts much earlier. *Id.* ¶¶ 73, 76, 176. Nor does the SAC allege that Countrywide volunteered this information—it was only when Plaintiffs specifically asked for an explanation that Countrywide admitted the 15 percent figure. *Id.* ¶ 79. If Countrywide knew in May 2007 that at least 15 percent of borrowers had lied about their intentions to occupy the mortgaged properties, it is a fair inference that Countrywide also knew these facts in March and September 2006.

---

[8]  The SAC identifies all of the conference call's participants: On behalf of Old Hill, there was John Howe, President; Mark Samuel, Chief Operating Officer; Hahn Kang, Portfolio Manager; and Gary Effman, Portfolio Manager. On behalf of Countrywide were senior employees, including Scott Kurzban, the Executive Vice President of Mortgage Finance for CHL, and Frank Aguilera, who was responsible for risk management. Randy Petsoff, a Countrywide employee who brokered Plaintiffs' purchase of the Securities, also participated in the call. SAC ¶ 73.

Countrywide never explicitly said in these conversations "we knew all this when you bought your securities."  But the inference is still powerful that Countrywide knew these facts at the time of the offerings, or at least turned a blind eye to them.  Countrywide's admissions about the 15 percent occupancy rate directly contradicted the disclosures in the Prospectuses, and the huge difference between the occupancy rates as represented and the percentages later admitted are too vast to be dismissed as an innocent mistake that only came to light seven months later.

Countrywide is a sophisticated loan originator, one of the largest issuers of residential home mortgages in the Country.  *Id.* ¶ 76.  In 2006 alone, Countrywide originated over $421 billion in mortgage loans.  Joint Mem. 2.  Countrywide knows its business and it surely knew from experience that a sizeable percentage of its borrowers were investors who did not intend to occupy the mortgaged properties.  Indeed, the SAC alleges that Countrywide, in order to encourage borrower fraud, neglected its promise to check borrowers' mortgage histories (which would have detected real estate speculators).  SAC ¶¶ 76–80.  In short, it is not plausible to argue that a mortgage lender with Countrywide's experience and sophistication was blindsided by real estate speculators who allegedly lied on their loan applications.  *Id.* ¶ 76.  It was Countrywide's duty to monitor and investigate this very type of borrower fraud.

Countrywide's admissions alone provide strong circumstantial evidence of scienter.  The Supreme Court in *Tellabs* stated that the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposite inference of nonfraudulent intent."  *Tellabs*, 551 U.S. at 314.

In this case, Defendants admitted the fraud seven months after Plaintiffs' last purchase.  One might infer from this that the Defendants only learned the information after the fact.  On the other hand, it is equally "cogent and plausible" to infer that the Defendants had actual knowledge

of the admitted information at the time of the events in question.  Countrywide's admissions thus give rise to at least a 50 percent inference that Countrywide had actual knowledge of the occupancy type misrepresentations.  As one district court has put it, "a tie now goes to the plaintiff."  *Sloman v. Presstek, Inc.*, No. 06-cv-0377-JD, 2007 WL 2740047, at *7 (D.N.H. Sept. 18, 2007).

If this point needs strengthening—which it does not—ample support is found in the numerous internal emails authored by the Countrywide Defendants in which the Company's senior executive effectively admitted that Countrywide was not adhering to its underwriting standards.  SAC ¶¶ 146-165.  These e-mails irrefutably demonstrate knowledge at the Company's highest levels that a significant percentage of borrowers were engaged in mortgage fraud.  *See, e.g., id.* ¶¶ 151, 183, 186.  These emails—sent *prior to and during* the time of Plaintiffs' investments, in 2006—provide critical support that Defendants knew that the loan-level statistics regarding the percentage of owner occupied properties were false and misleading.

For example, in an April 13, 2006 email, Mozilo wrote to Sambol and others about his concern that certain subprime, second-lien loans—the very loans underlying the Securitizations at issue here—had been originated "with disregard for process [and] compliance with guidelines."  *Id.* ¶ 148.  He wrote that he had "***personally observed a serious lack of compliance within our origination system as it relates to documentation and generally deterioration in the quality of loans originated versus the pricing of those loan*** [sic]."  *Id.* (emphasis added).[9]  On June 2, 2006, Sambol received an e-mail about an internal quality control audit that showed Mozilo's concerns were well-placed.  The report advised that *50 percent* of the stated-income

---

[9]  He also noted that "[i]n my conversations with Sambol he calls the 100% sub prime seconds [second-lien mortgage loans with 100% financing] as the 'milk' of the business [sic].  ***Frankly, I consider that product line to be the poison of ours***."  *Id.* ¶ 148 (emphasis added).

loans originated by a Countrywide subsidiary showed a variance in income from those borrowers' IRS filings of greater than 10 percent, of which an astounding *69 percent* had an income variance *greater than 50 percent*.  *Id.* ¶ 77.

The officers' emails show additional red flags.  On June 1, 2006, the day before Sambol received the results of the quality control audit, Mozilo had warned Sambol in an email that borrowers were lying about their incomes in applying for Pay-Option ARMs as well.  *Id.*[10]  Thus, the Company's senior officers had reason to believe that the Company's publicly-extolled fraud detection mechanisms were not working, and that fraud among mortgage borrowers was a significant problem.  If the Company's officers knew that a significant percentage of borrowers were lying about their incomes, it certainly had grounds to suspect that those borrowers were lying about the nature of their property ownership well.

Numerous other facts pled in the SAC corroborate the inference of scienter relating to the owner occupancy statistics.  Indeed, Defendants conveniently ignore the ***documented*** knowledge of senior Countrywide officials ***at the time of the offering*** that (i) a significant degree of fraud had been detected internally with regard to stated-income loans (*id.* ¶¶ 77, 116, 121, 127, 146-164), (ii) loan officers routinely *encouraged* borrowers to submit applications with fraudulent information, such as inflated income data (*id.* ¶¶ 52, 121, 179); (iii) a "lack of compliance" and "deterioration in the quality of loans originated" was observed with regard to certain subprime, second-lien loans (*id.* ¶¶ 121, 148, 153, 168, 171); and (iv) the guidelines for generating the 100% financed subprime, second-lien loans—which constituted the vast majority of mortgage

---

[10]   Defendants contend that the email regarding the Pay-Option ARMs is not relevant because only fixed-rate mortgages were included in the SPS1 or SPS2 Securitization.  Joint Mem. 8-9.  However, the SAC alleges a systemic, company-wide abandonment of origination standards.  The fact that Countrywide's officers knew that such problems extended throughout Countrywide's line of mortgage products shows the pervasiveness of the Company's corrupt culture and is supportive of scienter.

loans backing Plaintiffs' Securities—had degenerated so much that Mozilo, Countrywide's own CEO, characterized the entire product line as "toxic." *Id.* ¶¶ 149-50.

The Second Circuit recently held that a plaintiff may show conscious recklessness where the complaint sufficiently alleges that the defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *S. Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 110 (2d Cir. 2009) (quotation omitted).  Countywide clearly had a duty to monitor and investigate borrower fraud on mortgage applications, including fraud about the owner occupancy status of the property, a critical piece of investor information. The SAC specifically alleges that Countrywide failed to follow its stated procedures for investigating borrowers' mortgage histories, which would have alerted Countrywide to the fact that a greater number of borrowers were speculators who had no intention to occupy the mortgaged properties.  SAC ¶80.

The SEC emails also plainly show that Countrywide ignored obvious signs of fraud and hence "should have known that they were misrepresenting material facts . . . ."  *Novak*, 216 F.3d at 308.  The emails are outright admissions by Countrywide's senior management that not only was the Company failing to follow its stated underwriting guidelines, but that borrowers were submitting fraudulent mortgage applications and Countrywide was turning a blind eye to this fraud, or even encouraging it.  These emails, when combined with Countrywide's admissions in May 2007 that 15 percent of borrowers had lied about their intentions to occupy the mortgaged properties, are sufficient to carry the day on the issue of scienter.

In short, on the owner occupancy allegation, (a) the factual allegations in the SAC are sufficient to give rise to a strong inference of either fraudulent intent or consciousness recklessness, and (b) the competing inferences advocated by Defendants are not as compelling as

the inference of intent urged by Plaintiffs.  Accordingly, on either ground, Plaintiffs' claims

under Section 10b and Rule 10b-5 concerning the particular misrepresentations properly contain

plausible and cogent allegations of scienter and therefore survive a pleading motion under the

PSLRA.[11]

      **C.**      **<u>Misrepresentations Regarding Countrywide's Adherence to Its Underwriting</u>**
            **<u>Guidelines</u>**

      The SAC identifies specific material misrepresentations in the offering documents

regarding the Company's underwriting practices, and explains why each of those statements was

false and misleading.  The SAC alleges a number of misrepresentations by Countrywide that the

Company followed prudent underwriting guidelines, *id.* ¶ 85; that over 90 percent of the

Mortgage Loans were "Grade A," *id.* ¶ 87-88; that the Company required independent appraisals

of mortgaged properties, *id.* ¶ 89-90; that it followed applicable laws and regulations, *id.* ¶ 91;

and that it placed primary reliance on borrowers' ability to repay, *id.* ¶ 93.  These allegations are

amply supported by factual pleadings in the SAC.  *See generally id.* ¶¶ 84-115.

      Defendants fail to address the vast majority of these misrepresentations, instead lumping

allegations together and focusing on disclosures in the offering documents pertaining to the more

flexible standards employed for the credit-blemished, second-lien mortgage loans underlying the

Securitizations.  Joint Mem. 11-12.  Contrary to Defendants' suggestion, *id.*, Plaintiffs

understood—and the SAC explicitly acknowledges—that Countrywide's origination standards

for the Mortgage Loans were more "flexible" than the standards for non-credit-blemished loans.

---

[11] Defendants assert that the SAC "distorts" the representations made about occupancy status because these disclosures were "[b]ased upon representations of the related borrowers at the time of origination."  Joint Mem. 7.  But, if the alleged facts show that Defendants knew or were "reckless in not knowing" that borrowers were lying about the nature of the property ownership, it is still actionable for Defendants to include such information in a Prospectus—even if Defendants accurately described the information borrowers reported to Countrywide.  *See S. Cherry Street*, 573 F.3d at 109.

SAC ¶ 107.  Plaintiffs were nonetheless defrauded by Countrywide because the Company *failed to adhere even to the lowered underwriting standards* described in the offering documents.  *Id.*  Countrywide never told Plaintiffs that it intended to *abandon* its stated underwriting guidelines and to issue loans "*with disregard for process [and] compliance with guidelines.*"  *Id.* ¶ 148.

### 1.  Countrywide Falsely Represented That It Placed Primary Reliance On A Borrower's Ability To Repay

Countrywide represented in the SPS1 and SPS2 Prospectus Supplements that "[w]hile more flexible" than underwriting guidelines for traditional loans, "Countrywide Home Loans' underwriting guidelines *still place primary reliance on a borrower's ability to repay* . . . ."  SAC ¶ 93 (emphasis added).  However, as Plaintiffs have subsequently learned—and did not know at the time they purchased the Securities—Countrywide's underwriting standards actually *ignored* a borrower's ability to repay and even encouraged fraud in borrower applications.  Contrary to Defendants' assertions (Joint Mem. 8, 10-11, 19), the facts supporting the falsity of this representation are well-pled and numerous.

The SAC alleges that a former Countrywide executive, Mark Zachary, reported that in and around 2006, Countrywide loan officers engaged in a practice known as "flipping" an application.  SAC ¶ 122.  Loan officers who knew that a loan application submitted under the full-documentation program was unlikely to be approved would "flip" the application for consideration under the reduced-documentation application program.  *Id.*  They would then coach the applicant on the income level needed to qualify for a given mortgage loan, and encourage them to submit a "revised" loan application containing an inflated reported income.  *Id.*  The loan officer would submit the revised loan application under a reduced-documentation program for consideration by the subprime mortgage loan operations unit in Plano, Texas.  *Id.*  Zachary complained to Countrywide's regional management about these deceptive practices but

his complaints were ignored. *Id.* Thus, far from placing "primary reliance" on borrowers'

ability to repay, the Company actually incentivized loan officers to conceal or ignore this factor

altogether.

Mozilo and other senior officers were repeatedly advised that Countrywide's lending

practices were increasing the risk that borrowers would be unable to repay their loans. *Id.* ¶ 94.

A June 1, 2006 email to Sambol reported that an internal audit showed that borrowers in stated-

income loans had misstated their income by an astonishing degree. *Id.* ¶ 77. Also, in a

December 13, 2007 memorandum that was sent to Mozilo and others, Countrywide's enterprise

risk assessment officer reported on an audit of Countrywide mortgages. He found that "borrower

repayment capacity was not adequately assessed by the bank during the underwriting process for

home equity loans." *Id.* ¶ 94.

Contrary to its representations, Countrywide was not concerned with borrowers' ability to

repay because it had transferred much of its financial exposure to investors such as Plaintiffs by

reselling the mortgages as whole loans or packaging them as mortgage-backed securities. *Id.* ¶

95. The facts pled in the SAC amply support the allegation that Countrywide ignored borrowers'

ability to repay and falsely stated otherwise in the offering documents.

> **2.**   **Countrywide Falsely Represented That It Made Underwriting
> Exceptions On A "Case By Case Basis" After Considering
> "Compensating Factors"**

The offering materials represented that "***On a case by case basis***, [CHL] may determine

that, based upon compensating factors, a prospective borrower not strictly qualifying under the

underwriting risk category guidelines described below warrants an underwriting exception."

SAC ¶ 96 (emphasis added). The offering materials also assured investors that Countrywide

carefully considered each applicant's suitability for a loan, regardless of its loosened standards

for credit-blemished, second-lien loans, and of the thorough procedures it used to verify applicants' information. *Id.* ¶ 104.[12]

The SAC alleges specific facts showing that, contrary to these representations, Countrywide's exceptions were granted abundantly and without restraint in order to increase Countrywide's profits and meet targeted objectives for market growth. *Id.* ¶ 97. Loan officers facilitated fraud with grossly inadequate due diligence in examining borrowers' loan applications, because they were incentivized by bonuses and the threat of termination to grant loans quickly and via more profitable alternative types of mortgages, such as stated-documentation loans. *Id.* ¶¶ 49, 97, 101, 216(b). Countrywide supervisors pushed their employees to maximize volume and lower underwriting standards to approve loans. *Id.*

Loans that were initially rejected by underwriters were automatically passed to supervisors for a second review, and under Sambol's management, a special Structured Loan Desk was established for the sole purpose of reviewing risky loans and approving them outside the normal underwriting criteria, via an Exception Processing System. *Id.* ¶ 51. The goal of second-guessing and approving risky loans was laid bare by an internal Countrywide document,[13] which described the objectives of the Exception Processing System to include "Approv[ing] virtually every borrower and loan profile," with extra fees if necessary to offset the

---

[12]    Countrywide stated that its credit-blemished, second-lien loans were handled by "a specialized group of underwriters who are familiar with the unique characteristics" of these loans; that it required a credit history for each loan applicant from an independent credit bureau; that it gathered information about an applicant's "assets, liabilities, income and employment history;" and that it used a debt-to-income ratio "to assist in determining whether the prospective borrower has sufficient monthly income available to support the payments of principal and interest on the mortgage loan in addition to other monthly credit obligations." *Id.* ¶ 104.

[13]    The document was made public in *United States v. Partow*, No. 06-CR-00104 HRH (D. Alaska), a criminal proceeding against a former Countrywide employee. SAC ¶ 51.

risk, and providing "Process and price exceptions on standard products for high risk borrowers." *Id.*

Countrywide's highest management ignored warnings that exceptions were being granted recklessly. For example, in May 22, 2005, the Chief Compliance Officer warned Sambol that loans which were originated as exceptions to Countrywide's stated origination guidelines would likely experience higher default rates. He wrote that "***exceptions are generally done at terms more aggressive than our guidelines***" and said that "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions." *Id.* ¶ 157 (emphasis added).

Defendants contend that their misrepresentations are immunized by a disclosure in the offering materials stating that "it is expected that a significant number of the mortgage loans will have been originated based on underwriting of exceptions of these types." Joint Mem. 12. But this is different from saying that "***we approve virtually every borrower and loan profile***." *Id.* ¶ 51. Countrywide's disclosures said that Countrywide would make exceptions on a "case by case basis" where compensating factors existed and it would exercise judgment about a borrower's ability to re-pay. *Id.* ¶¶ 96, 104. But the reality was that Countrywide was a fraudulent organization which found a way to approve every borrower who walked through the door and which encouraged fraud on borrowers' applications. *Id.* ¶¶ 48-55, 76, 97-98.

Defendants' disclosures were not sufficient because nowhere did Countrywide disclose that it intended to abandon its stated guidelines to such a degree that the so-called "exceptions" became the rule. Nor did Countrywide warn that important guidelines such as borrowers' debt-to-income ratios and credit histories would be disregarded altogether in favor of an "anything goes" approach aimed at granting as many loans as possible. Instead, the Company continued to

22

reassure Plaintiffs and other investors that it employed underwriting exceptions on a "case by case" basis, and that it considered factors such as credit histories and debt-to-income ratios in processing applications. *Id.* ¶¶ 96, 104. The SAC adequately alleges that these representations were false and misleading.

### 3. Countrywide Falsely Represented That It Required "Independent" Appraisals of Mortgaged Properties

The SAC identifies Countrywide's representation in the Prospectus Supplements that the Company "required independent appraisals of the properties on which the Mortgage Loans were issued." SAC ¶ 89. To support the falsity of this statement, the SAC alleges that the Company pressured appraisers to give inflated assessments of property values, threatening to blacklist them if they did not do so. *Id.* ¶ 90. The SAC explained that inflated appraisals increased the likelihood of borrowers' default and thus directly affected the value of the Securities purchased by Plaintiffs. *Id.*

Defendants do not address this allegation at all, and it is properly pled with ample facts to back up the assertions of falsity. Plaintiffs plead what specific statements are false and why they are false. Plaintiffs are required to do no more. *See Novak*, 216 F.3d at 306 (describing the requirements of a well-pleaded securities fraud complaint).

### 4. Countrywide Falsely Represented That It Used Quality Control Processes to Detect Fraud

Countrywide publicly touted its ongoing quality-control measures, "which it said included random audits of its loan origination for regulatory purposes as well as targeted audits of risky loans to root out internal corruption." SAC ¶ 100. In its 2005 10-K, Countrywide explained that its quality-control process "help[ed] to identify fraud and poor performance of individuals and business entities associated with the origination of our loans" and stated that the quality control allowed the Company "to evaluate and measure adherence to prescribed

underwriting guidelines and compliance with laws and regulations." *Id.* The SAC alleges that Plaintiffs were induced to invest in the Securitizations based in part on these representations. *Id.*

Plaintiffs allege specific facts to support the falsity of these assurances. As described in the foregoing sections, the SAC details specific examples of Company-wide practices that actually *encouraged* and facilitated borrower fraud. *See, e.g., id.* ¶¶ 48-55, 76, 97-98. Internal documents show that Countrywide's management knew that assurances of fraud detection mechanisms were specious.

For example, Mozilo recognized in an email dated April 13, 2006—only one month after the above 10-K was issued—that Countrywide was originating loans "with disregard for process [and] compliance with guidelines," and stated that he had "personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated versus the pricing of those loan [sic]." SAC ¶ 168. As another example, on September 13, 2006, Mozilo claimed that Countrywide was a "role model to others in terms of responsible lending," yet several months earlier Mozilo had told Sambol and others that he observed deterioration in the quality of loans versus their pricing. SAC ¶ 171.

> **5.** **Countrywide Falsely Represented That Its Origination and Underwriting Standards Were Proper And Customary in the Industry and Applied in Accordance With Federal and State Laws**

Countrywide represented that its underwriting standards "are applied in accordance with applicable federal and state laws and regulations," SAC ¶ 91, and that its "origination, underwriting, servicing and collection practices with respect to each Mortgage Loan have been in all respects legal, proper, prudent and customary in the mortgage lending and servicing business." *Id.* ¶ 85. Plaintiffs allege in the SAC that Countrywide abandoned its underwriting guideline and industry guidelines "in order to maximize its revenue from the origination,

servicing, and securitization of mortgage loans." *Id.* Plaintiffs further allege that Countrywide "regularly engaged in predatory lending practices in violation of federal or state laws and regulations." *Id.* ¶ 91.

The SAC extensively alleges the various ways in which Countrywide abandoned prudent and customary underwriting guidelines in the industry in order to maximize its revenues and expand its market share, *see, e.g., id.* ¶¶ 48-55, and violated prudent industry guidelines in approving mortgage loans, *see, e.g., id.* ¶ 120.

Plaintiffs allege in detail how Countrywide's corporate culture "emphasized profits above all else and tolerated fraud, or indeed encouraged it, to that end." *Id.* ¶ 48. The SAC describes how Countrywide incentivized and pressured its loan officers to process loans, regardless of borrowers' compliance with origination guidelines, *id.* ¶ 49, 101, 190. The SAC describes how Countrywide created a "Structured Loan Desk" to process loans via an "Exception Processing System," *id.* ¶¶ 51, 113, and cites to a former employee who unsuccessfully complained within Countrywide about the Company's practice of granting exceptions to risky loans, *id.* ¶ 122. The SAC also cites an internal Countrywide document which explicitly set forth the Company's policy of "Approv[ing] virtually every borrower and loan profile" and providing "Process and price exceptions on standard products for high risk borrowers." *Id.* ¶ 51.

To support Plaintiffs' allegations of predatory lending, the SAC notes that "Countrywide has been sued dozens of times for its lending practices," and that the lawsuits have set forth "detailed allegations ranging from federal securities-law violations to violations of state consumer-protection laws." *Id.* ¶ 91*; see also id.* ¶ 216 (noting that San Diego sued Countrywide

for predatory lending); *id.* ¶¶ 216, 273 (noting predatory-lending settlement with state Attorneys General).[14]

**D.      Defendants Omitted Material Facts Concerning the Extent to Which Fraudulent Applications Were Processed Through Reduced-Documentation Application Programs**

Countrywide adopted reduced-documentation application programs, or "Stated Income" programs, which excused borrowers from the general requirement of submitting documentation to confirm their income and assets. SAC ¶ 116. In the Prospectus, Countrywide represented that, in most cases, "employment verification is obtained from an independent source (typically the borrower's employer) which verification reports, among other things, the length of employment with that organization and the borrower's current salary." *Id.* ¶ 118. Countrywide also represented in the Prospectus Supplements that "[t]he borrower's income as stated must be reasonable for the related occupation and the determination as to reasonableness is subject to the loan underwriter's discretion." *Id.* ¶ 119.

The SAC alleges detailed facts demonstrating the falsity of those representations. Countrywide's underwriters abused their discretion by abandoning Countrywide's stated loan-origination standards and knowingly approving loans for borrowers whose representations about their income—and other material information regarding their ability to repay the loans—were

---

[14]    For example, the Attorney General of California alleged in a lawsuit against Countrywide that the Company violated California law by making untrue or misleading statements to borrowers about the terms and payment obligations of its mortgage loans. The complaint details how certain types of Countrywide loans, such as Pay Option ARMs, are designed to reset at a drastically higher interest rate, causing borrowers great financial hardship, which Countrywide failed to disclose to borrowers or failed to adequately explain to them. *See* Burnett Decl. Ex. C.

Similarly, the Attorney General of Illinois alleged in a suit against Countrywide that the Company violated the state's consumer-fraud and fairness-in-lending laws. Echoing similar allegations in other lawsuits, the complaint explains how Countrywide misled borrowers into accepting unduly risky, costly mortgages by means of unfair and deceptive marketing and sales. Among other sources, the complaint refers to testimonials by former Countrywide employees who recounted that Countrywide approved virtually any mortgage loan and was "aggressive" in granting loans pursuant to underwriting exceptions. Burnett Decl. Ex. D.

unreasonable on their face and could not have been accurately reported, based on realistic estimates of salary for given employment. *Id.* ¶ 119. Countrywide encouraged underwriters to abandon the stated loan-origination guidelines with commissions that rewarded them for increased loan originations and for originations of riskier, more profitable loans. *Id.* As previously discussed, loan officers regularly encouraged borrowers to inflate their incomes when it appeared their initial mortgage applications would be denied. *Id.* ¶ 122. These practices were plainly incompatible with any requirement that the borrower's income be "reasonable," and the loan officers' facilitation of borrowers' fraud was a gross abuse of discretion. Defendants gloss over all these allegations.

Countrywide's senior management was also aware that Countrywide loan officers were participating in submitting fraudulent applications through the Company's reduced-documentation application programs, as evidenced by the internal Countrywide emails cited in the SAC. In an April 13, 2006 email, Mozilo informed Sambol (and others) that there were numerous issues they must address relating to the 100% subprime second business in light of the losses associated with the HSBC buyback. Mozilo stated that the loans had been *originated* "with disregard for process [and] compliance with guidelines" and then went on to say that he had "personally observed a serious lack of compliance within our *origination system* as it relates to documentation and generally a deterioration in the quality of loans *originated* versus the pricing of those loans." SAC ¶ 148 (emphasis added). Defendants implausibly contend that Mozilo's statement regarding a breakdown in the origination process was "not a comment on borrower practices," but related instead to loan file documentation from a certain purchaser of Countrywide home loans (HSBC) that had demanded that Countrywide buyback a certain number of the loans based on inadequate documentation. Joint Mem. 15.

27

Defendants' self-serving factual interpretation is improper on a motion to dismiss. More to the point, it is belied by the email itself. On their face, Mozilo's comments are directed to the problems in the *origination* of loans that caused a *deterioration* in the loans' quality—not some subsequent failure by Countrywide to properly "document" particular loans for resale to purchasers such as HSBC. In the same email, Mozilo characterizes as "toxic" the 100% financed, credit-blemished, second-lien mortgages—the majority of loans in the SPS1 and SPS2 Securitizations—acknowledging that the origination problems with respect to such loans were widespread.[15] Notably, Mozilo's email was sent prior to and during the period in which Plaintiffs purchased the Securities (Plaintiffs' purchases occurred between June and October 2006).

In short, Defendants were well aware that rampant fraud permeated the reduced-documentation loan process and that even the "more flexible" standards for such loans had gone by the wayside. Defendants' failure to disclose such material information to investors is actionable.

### E.    Countrywide Misrepresented the Adverse Effects on Investors' Interests

Countrywide represented in the PSAs and Prospectus Supplements that the Mortgage Loans in the Securitizations were not selected "in a manner that would adversely affect the interests of Certificateholders." SAC ¶ 123. As summarized above, Countrywide was well aware that the loans it was offloading onto unsuspecting investors such as Plaintiffs—loans that

---

[15]    Defendants' response is to downplay what they characterize as Mozilo's "colorful" language and imply that Mozilo was only talking about a batch of loans underlying securities sold to HSBC, when in fact Mozilo was referring to "the 100% loan-to-value (also known as 80/20) subprime product" as a whole. Joint Mem. 15 n. 24; SEC Complaint ¶ 48; *cf.* Sambol Mem. ¶ 11 (implausibly arguing that the emails among Mozilo, Sambol, and other officers merely showed "showed a healthy discussion amongst the executives within Countrywide regarding the different loan programs").

had been originated without regard for even the "more flexible" standards represented in the offering materials—were ticking time bombs.

Contrary to Defendants' distortion, Plaintiffs are not contending that their interests were harmed merely because the loans were issued to borrowers with lower creditworthiness. As acknowledged over and over again in the SAC, Plaintiffs understood the loans were for borrowers with credit-blemished histories. Rather, Plaintiffs were harmed because Defendants were giving loans to borrowers who could not afford to repay them, almost guaranteeing the likelihood of default.

Defendants also miss the point when they contend that Plaintiffs should have noticed loan deficiencies earlier based on monthly reports. The monthly reports were not sent to Plaintiffs until after their investment decisions were made. The monthly reports thus did not provide any information to Plaintiffs in connection with their initial investment decision. By contrast, the SAC alleges that certain of the loans were "seasoned loans" that Countrywide had been servicing prior to the time they were transferred to the securitization. SAC ¶¶ 129-130. Countrywide therefore had payment histories on SPS1 and SPS2 loans and similar loans and it knew that certain of these loans were already defaulting when the collateral pools were created. *Id.* Yet Countrywide allowed these loans to be transferred to the SPS1 and SPS2 Securitizations without alerting investors that some of the loans were already in default.

Further support for the falsity of this representation are two separate admissions by Countrywide representatives that the transaction was structured to harm Plaintiffs. Long after Plaintiffs had purchased their Securities, Nancy Deliban, a senior Countrywide manager, spoke with John Howe, Old Hill's President, regarding the poor performance of the SPS1 and SPS2 Securitizations. SAC ¶ 178.

At the time, Countrywide was seeking additional monies from Plaintiffs to meet margin calls on the Securities, which had already steeply declined in value. Deliban told Howe that Countrywide had originally sought to sell the Mortgage Loans as whole loans, but the market bids for whole loans were too low and Countrywide was "forced" to market the Mortgage Loans as mortgage-backed securities. *Id.* ¶ 124. Deliban essentially confessed that the loans had been securitized to hide the risks and induce investors to buy them. *Id.* ¶ 126.

Yet Countrywide was able to sell the Loans to unsuspecting investors such as Plaintiffs in the form of mortgage-backed securities rather than whole loans, because the securitization process made the loans more attractive investments. *Id.* ¶ 125. Although risky, the Loans appeared safer through the securitization process, since the Loans were given investment-grade credit ratings and appeared to be protected by credit enhancements such as subordination. *Id.*

Deliban was not the only Countrywide employee to admit the Company's wrongdoing toward Plaintiffs. Randy Petsoff, the Countrywide employee who brokered Plaintiffs' purchases of the Securities and acted as Countrywide's primary liaison to Plaintiffs, wrote an internal Countrywide memorandum in which he stated his belief that Countrywide *had misled Plaintiffs by inducing them to invest in the SPS1 and SPS2 Securitizations. Id.* ¶ 127. He suggested that Countrywide take action to redress its wrongdoing toward Plaintiffs. *Id.* Rather than follow Petsoff's suggestion and address the harm that it had caused Plaintiffs, Countrywide terminated Petsoff's employment. *Id.* ¶ 128.

## II.    PLAINTIFFS ADEQUATELY PLED FACTS GIVING RISE TO A STRONG INFERENCE OF SCIENTER

Pursuant to the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required [scienter]." 15 U.S.C. §78u-4(b)(2).

30

This means that the facts alleged in complaint must demonstrate "the defendant's intention to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 313.

In the Second Circuit, a strong inference of fraudulent intent may be established by alleging either (a) facts to show that defendants had both motive and opportunity to commit fraud, ***or*** (b) facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *S. Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009); *see also 380544 Canada, Inc. v. Aspen Tech. Inc.*, 544 F. Supp. 2d 199, 217 (S.D.N.Y. 2008); *Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co.*, 375 F.3d 168, 187 (2d Cir. 2004).

The "inference of scienter must be . . . cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, 551 U.S.* at 314. However, "the inference that the defendant acted with scienter need not be . . . the most plausible of competing inferences." *Id.* at 324. "A complaint will survive . . . if a reasonable person would deem the inference of scienter . . . as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 310. "In other words, a tie now goes to the plaintiff." *Sloman*, 2007 WL 2740047, at *7. *See also S. Cherry St.*, 573 F.3d at 110-11.

In determining whether a complaint has sufficiently alleged scienter under the PSLRA, the Supreme Court has explained that "courts must consider the complaint in its entirety, as well as other sources [of information including] . . . documents incorporated into the complaint by references and matters which a court may take judicial notice." *Tellabs*, 551 U.S. at 322. "The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Id.* at 322-23 (emphasis in original).

Recklessness is "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir. 1978).  "[A]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness."  *Novak*, 216 F.3d at 308.  Consequently, the Second Circuit has "found allegations of recklessness to be sufficient where plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud."  *Id.*; *see also S. Cherry St.*, 573 F.3d at 109.  "An *egregious* refusal to see the *obvious*, or to investigate the *doubtful*, may in some cases give rise to an inference of  . . . recklessness."  *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996) (emphasis added).

The SAC easily satisfies the heightened pleading requirements of the PSLRA.  Not only does it allege facts that provide a "strong inference" of scienter; it provides overwhelming *evidence* of the Defendants' recklessness as to the "red flags" that were "so obvious" that Defendants must have "noticed that something was amiss."  *See In re Comverse Tech., Inc. Sec. Litig.*, 543 F. Supp. 2d 134, 142-45 (E.D.N.Y. 2008).

### A.    Internal Countrywide Emails Demonstrate the Defendants' Scienter

The SAC goes far beyond alleging facts that would support an inference that the Defendants had an intention to defraud or were reckless; it specifically identifies and quotes internal Countrywide emails—from the time that Countrywide was marketing and selling the Certificates to Plaintiffs—where the Defendants themselves make clear that they knew they had misled the Plaintiffs and other investors regarding Countrywide's underwriting standards and abandoned their own stated policy and practices regarding the origination of mortgage loans.

The SAC identifies a number of emails where Countrywide executives—including Defendants Mozilo and Sambol—admit that Countrywide had abandoned its historically strict underwriting standards.  For example, the SAC identifies an April 13, 2006 email from Mozilo to Sambol and others where Mozilo expresses a concern that certain subprime, second-lien loans— such as the loans that Plaintiffs purchased—had been originated "***with disregard for process [and] compliance with guidelines***."  SAC ¶ 148 (emphasis added).  Mozilo wrote that he had "***personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated*** versus the pricing of those loan [sic]."  *Id.* (emphasis added).

Long before this email, John P. McMurray, Countrywide's then-Chief Risk Officer, had been ringing alarm bells to, among others, Mozilo and Sambol about the consequence of Countrywide abandoning its underwriting standards.  For example, in a May 22, 2005 email, McMurray explained that "exceptions are generally done at terms *more aggressive than our guidelines*" and "[g]iven the expansion in guidelines and the growing likelihood that the real estate market will cool, this seems like an appropriate juncture to revisit our approach to exceptions."  *Id.* ¶ 157 (emphasis added).

In a June 25, 2005 email to Sambol, McMurray explained, "as a consequence of [Countrywide's] strategy to have the widest product line in the industry, we are clearly out on the 'frontier' in many areas," adding that that "frontier" had "*high expected default rates and losses*."  *Id.* ¶ 158 (emphasis added).  According to McMurray, Countrywide was adopting the "*outer boundaries*" of the mortgage market's offerings, making its lending policies "among the most aggressive in the industry."  *Id.* ¶ 159 (emphasis added).

McMurray reiterated his concerns about Countrywide's strategy of matching any type of loan product offered by its competitors, which he said could expose the Company to the riskiest offerings in the market. "I doubt this approach would play well with regulators, investors, rating agencies, etc," he wrote. "To some, this approach might seem like we've *simply ceded our risk standards and balance sheet to whoever has the most liberal guidelines*." *Id.* ¶ 161 (emphasis added).

Other emails from Mozilo and Sambol demonstrate their knowledge that Countrywide's origination policies would lead to high rates of default, which in turn would cause enormous losses for investors such as Plaintiffs. For example, in a March 28, 2006 email to Sambol and others, Mozilo recognized that subprime mortgage loans that provide 100 percent financing, which constituted the vast majority of Mortgage Loans that backed Plaintiffs' Securities, are "*the most dangerous product in existence* and there can be *nothing more toxic and therefore requires that no deviation from guidelines be permitted irrespective of the circumstances*." *Id.* ¶ 150 (emphasis added).

Mozilo reiterated this sentiment a few weeks later in an April 2006 email to Sambol, in which Mozilo stated that "[i]n all my years in the business I have never seen a more toxic pr[o]duct [sic]" than subprime loans that provide 100% financing. "It's not only subordinated to the first, but the first is subprime. In addition, the FICOs are below 600, below 500 and some below 400[.] *With real estate values coming down . . . the product will become increasingly worse. There has [sic] to be major changes in this program*, including substantial increases in the minimum FICO . . . ." *Id.* ¶ 149 (emphasis added)).

Mozilo's e-mails also reflect his awareness that Countrywide needed to sell its toxic mortgage loans to unsuspecting investors in order to take those assets off its books. For

example, in a September 26, 2006 e-mail to Sambol, Mozilo stated that *"[w]e have no way, with any reasonable certainty, to assess the real risk of holding these loans on our balance sheet* . . . . The bottom line is that *we are flying blind* on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales." Mozilo further stated that "pay options are currently mispriced in the secondary market . . . ." *Id.* ¶ 153 (emphasis added).

These concerns were also expressed in a November 2, 2006 email from McMurray to Countrywide's chief investment officer (later forwarded to Sambol) in which McMurray asked whether Countrywide "want[s] to effectively cede" its underwriting policies to the market. He inquired whether the Company's matching strategy is "'saleable' from a risk perspective to those constituents who may worry about our risk profile[.]" *Id.* ¶ 160. Those "constituents" included Plaintiffs, who did not know and were not told by Countrywide that the Company was abandoning its stated underwriting guidelines, thereby drastically increasing the risk of default of Countrywide's investments.

These emails demonstrate that the Defendants engaged in reckless—and in reality, intentional—"conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *Rolf*, 570 F.2d at 47. At the very least, the emails show that Countrywide recklessly failed to check information that it had a duty to monitor and investigate. *S. Cherry St.,* 573 F.3d at 110. As early as May and June 2005, a year before Plaintiffs purchased any securities from Countrywide, McMurray was raising "red flags" to Mozilo, Sambol and others about Countrywide's lax underwriting standards and the potential consequences of "high expected default rates and losses."

35

In April 2006, still months before Plaintiffs purchased their first security from Countrywide, Mozilo was stating in emails that he had "personally observed a serious lack of compliance within our origination system." SAC ¶ 168. And a month before that, Mozilo had concluded that the same type of loans that were to be included in the Securitizations from which the Plaintiffs purchased securities were "the most dangerous product in existence." *Id.* ¶ 168.

Given the Defendants' established knowledge regarding Countrywide's lax underwriting standards and the inevitable defaults and investor loses that would result from those lax standards, "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. In fact, one court has already found such a reasonable inference. Even without the benefit of the damning internal emails outlined above, the Central District of California found "a cogent and compelling inference that the [senior officers] misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation—even as they realized that Countrywide had virtually abandoned its own loan underwriting practices." *In re Countrywide Fin. Corp. Derivative Litig.* ("*In re Countrywide Derivative Litigation*"), 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008).

Defendants do not suggest any benign inference that could be taken from these emails. Rather, they contend that because the statements in the emails were not specifically about the securitizations at issue in this action, they therefore do not evidence scienter on the Defendants' part. But, while the emails do not reference specific securitizations, they plainly relate to the basic underwriting standards that Countrywide was following (or in reality not following) for the origination of mortgage loans that were to be included in securitizations like the ones from which the Plaintiffs purchased Certificates. In fact, Mozilo's April 13, 2006 email specifically states

that Countrywide had abandoned its underwriting guidelines for the exact type of mortgage loans—subprime, second-lien loans—that served as collateral for the securitizations in which the Plaintiffs invested.

The emails make clear that lax underwriting was a widespread problem—one that was well-known at Countrywide, and particularly to Mozilo and Sambol. Thus, the "danger" that these lax underwriting standards would affect the securitizations at issue here "was either known to the defendant[s] or so obvious that the defendant must have been aware of it." *Rolf*, 570 F.2d at 47.

### B.    Additional Factual Allegations Support Countrywide's Scienter

Apart from the internal emails discussed above, the SAC includes an overwhelming amount of additional, detailed factual allegations that provide further evidence of Countrywide's scienter.

The SAC describes conversations between Plaintiffs and Countrywide in which Countrywide confessed facts that give rise to a strong inference of scienter. The SAC cites a conference call between Plaintiffs and Countrywide in which Countrywide admitted that the percentage of owner-occupied properties in the Securitizations was inaccurate, SAC ¶¶ 73-78, and a subsequent conversation in which a Countrywide executive admitted that the percentage of investment properties in the Securitizations may have been *15 percent* (at least) instead of less than one percent. SAC ¶¶ 79-80, 177. The SAC also cites a conversation between Plaintiffs and Nancy Deliban, a Countrywide executive, in which she admitted that Countrywide had tried to sell the Mortgage Loans as whole loans before securitizing them and selling the Certificates to Plaintiffs and other investors. SAC ¶¶ 124-26, 178.

The SAC also cites to statements by former Countrywide employees which support Plaintiffs' allegations that Countrywide had abandoned its underwriting guidelines. For

example, a former employee estimated that "approximately 90 percent of all reduced-documentation loans sold out of the Countrywide branch where he worked had inflated incomes." SAC ¶ 49. Another employee described the enormous volume of loans that were processed through Countrywide's Exception Processing System via the Company's Structured Loan Desk, which was established to grant exceptions for risky loans. *Id.* ¶ 113. An internal Countrywide document, cited in the SAC, explains that the goal of the Exception Processing System was to provide loans to virtually any applicant. *Id.* ¶ 51.

Another former employee, Mark Zachary, described how Countrywide's loan officers would "coach" borrowers on how to inflate their income on loan applications; Zachary also further described the exception system. *Id.* ¶ 122. The SAC also describes a former Countrywide employee, Randy Petsoff, who advocated on the Plaintiffs' behalf in a memorandum to his superiors, for which he was fired. *Id.* ¶ 127. Yet another former employee described tension between Sambol and other employees who sought to impose restraints on the Company's abandonment of its underwriting guidelines. *Id.* ¶ 188.

The SAC also refers to Countrywide customers who reported poor experiences with the Company's servicing of their mortgage loans. SAC ¶ 135. For example, hundreds of Countrywide customers have posted stories on Internet websites such as the consumer-protection website ConsumerAffairs.com, at http://www.consumeraffairs.com/finance/countrywide_mortgage.html (last accessed October 28, 2009), describing their personal experiences with Countrywide's neglectful servicing practices. The ConsumerAffairs.com website alone lists hundreds of testimonials by borrowers who complain of their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy. The stories describe false allegations of overdue payments and resulting

foreclosure notices by the Company, dozens of phone calls to resolve simple problems, uninformed employees, and mishandled records.

The SAC also cites to internal Countrywide documents that support a strong inference of the Company's scienter. For example, the SAC alleges that Mozilo and Sambol, the Company's chief executives, received "Exception Reports" and other internal reports that advised them of the volume of loans being granted in violation of the Company's underwriting guidelines. SAC ¶¶ 77, 94, 154-56, 163-64, 191. The SAC refers to internal studies by Countrywide's Risk Management Department—to which Plaintiffs were not privy—"which showed that loans with lower documentation were more likely to default." *Id.* ¶ 52.

The SAC also notes that Countrywide had access to payment records for the Mortgage Loans and comparable loans—which Plaintiffs did not have access to—and therefore Defendants knew or should have known how poorly the Loans were going to perform. *Id.* ¶¶ 129-30. The SAC also includes other facts tending to show that Countrywide intended to harm plaintiffs, including the fact that Countrywide has been sued dozens of times for predatory lending. *Id.* SAC ¶¶ 91.

Defendants argue that Plaintiffs' scienter allegations are insufficient because they focus on profit motive, Joint Mem. 20, but Defendants overlook the voluminous breadth of information that Plaintiffs have alleged in support of scienter, as discussed herein. Plaintiffs' scienter allegations are also detailed and specific, including with regard to Defendants' motive and opportunity. SAC ¶ 173-192; *see, e.g., id.* ¶ 178 (identifying specific conversation between John Howe, President of Old Hill, and Nancy Deliban, a senior manager of Countrywide, where Deliban admitted that "the Company had unsuccessfully sought to market the Loans as whole loans and instead securitized the Loans in order to sell them").

These allegations plainly show that Countrywide failed to take obvious investigative steps and ignored clear red flags.  More basically, they show knowledge of the fraud at the highest levels of the Company, or, at the least, that the danger of the fraud was so obvious that Countrywide must have been aware of it.  The inference of Countrywide's scienter is cogent and compelling on this record.  *See Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008) ("When the defendant is a corporate entity, [the scienter pleading standard under the PSLRA] means that the pleaded facts must create a strong inference that someone whose intent could be imputed to the corporation [i.e. Mozilo and Sambol] acted with the requisite scienter.  [I]t is possible to raise the required inference with regard to a corporate defendant without doing so with regard to a specific individual defendant.").

## III.    DEFENDANTS CANNOT CONTRACTUALLY INSULATE THEMSELVES FROM LIABILITY FOR THEIR FRAUD

Defendants contend that the "crux" of "many" of the SAC's misrepresentation allegations are essentially breaches of loan level representations that are set forth in § 2.03 of the PSA.  Joint Mem. 22.  Defendants further contend that each "contractual term was cabined by explicit statements representing that CHL would cure, or otherwise substitute or repurchase, non-compliant loans" and that a request to cure or repurchase "would constitute the 'sole remedy . . . available to Certificateholders."  *Id.* 23.  Defendants have buried their "sole remedy" argument at the end of their brief following their discussion of Plaintiffs' fraud claims, and for good reason.  Defendants distort the PSAs' provisions, misconstrue Plaintiffs' allegations, and ignore the law.

A.    __The PSAs' Remedial Limitations Do Not Apply To Fraud__

*First*, the remedial limitations set forth in the PSAs and Prospectus Supplements only apply to claims for breach of representations and warranties.[16]  Plaintiffs' claims here sound in fraud, not contract.[17]  The New York Appellate Division has recognized in a case with similar facts, *First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dep't 1999), that "[t]he core of plaintiff's claim is that defendants intentionally misrepresented material facts about various individual loans so that they would appear to satisfy these warranties, because otherwise plaintiff would have neither the obligation nor the desire to purchase them.  *This is fraud, not breach of contract.*" (emphasis added).[18]

In fact, Plaintiffs were not even parties to the PSAs.  SAC ¶ 63 (listing the parties to the PSAs, which do not include Plaintiffs).  As Certificateholders, Plaintiffs relied in part on the PSA's representations when they decided to purchase the Securities.  But Plaintiffs also relied upon representations elsewhere, including the Prospectus Supplements and Countrywide's annual reports and public filings, as well as public statements by its officers.  *See, e.g., id.* ¶¶ 31-36.  Plaintiffs also relied upon overwhelmingly high statistics regarding owner-occupancy rates—data that was not included in the PSAs and which Countrywide subsequently admitted

---

[16]    *See, e.g.,* SPS1 PSA § 8.13 (Declaration of Victor Hou ("Hou Decl."), Ex. 6) and SPS2 PSA § 8.13 (Hou Decl., Ex. 7).

[17]    *See* SAC ¶ 82 ("Countrywide knew that its representation about owner occupancy, and similar representations and reassurances about the Mortgage Loans and its lending practices, were relevant to Plaintiffs' decision to invest in the Securitizations. Countrywide knew that its representation would induce Plaintiffs to purchase the Securities.").

[18]    Pursuant to Section 10.03 of the PSAs, New York law applies to the rights of Certificateholders such as Plaintiffs.

41

was false. *Id.* ¶¶ 67-83. Thus, contrary to Defendants' assertion, the facts underlying the fraud

claim are not co-extensive with representations and warranties in the PSAs.[19]

*Second*, the PSA explicitly distinguishes between claims for breach of warranty and

claims sounding in tort, demonstrating that the claims are not interchangeable:

> Limitation on Liability of the Depositor, the Sellers, the Master Servicer, the NIM
> Insurer and Others. None of the Depositor, the Sellers, the NIM Insurer or the
> Master Servicer . . . shall be under any liability to . . . the Certificateholders for
> any action taken or for refraining from the taking of any action in good faith . . .;
> *provided that this provision shall not protect* the Depositor, the Sellers, the Master
> Servicer or any such Person against *any breach of representations or warranties
> made by it herein or* protect the Depositor, the Sellers, the Master Servicer or any
> such Person *from any liability that would otherwise be imposed by reasons of
> willful misfeasance, bad faith or gross negligence in the performance of duties or
> by reason of reckless disregard of obligations and duties hereunder.*

SPS1 PSA (Hou Decl., ex. 6) § 6.03, SPS2 PSA (Hou Decl., ex. 7) § 6.03 (emphasis added).

Here, Plaintiffs are not alleging that a few stray loans failed to meet the criteria specified

in the PSAs. Instead, the SAC alleges that *all* the loans were permeated by fraud because

Countrywide abandoned their origination practices and encouraged fraud by its employees and

borrowers, despite false assurances to the contrary. SAC ¶ 97. Ample facts are alleged to

demonstrate Defendants' conscious misbehavior or, at the very least, reckless disregard for their

obligations. In short, Plaintiffs have alleged precisely the "willful misfeasance, bad faith . . . or

reckless disregard" that is recognized as a *separate* ground for liability from "breach of

representations or warranties" under the PSA.

---

[19] Defendants argue that the "crux" of the SAC's misrepresentation allegations are breaches of
representations made in § 2.03 of the PSAs. Joint Mem. 22-23. However, Annex D, which Defendants
compiled in an attempt to substantiate this unsupportable claim, completely ignores Annex A to the
Prospectus Supplements, which contains detailed (and fraudulent) representations about the Mortgage
Loans. SAC ¶ 72 specifically references Annex A. Moreover, Plaintiffs did not sign the PSAs, and the
Prospectus Supplement was not a contract to which the Plaintiffs were a party. Plaintiffs never expressed
an intent to be bound by the remedial provisions of their document. For these reasons, Defendants'
argument that the SAC should be dismissed based upon non-binding provisions in the PSA must fail.

*Third*, even assuming *arguendo* that Plaintiffs were required to attempt to cure, the individualized, loan-by-loan remedy contemplated by the PSAs would be futile where the underlying fraud is systemic and pervasive. The damage would simply be too widespread to be "cured."[20] It is disingenuous for Defendants to argue that the remedial provisions were intended to cure fraud—much less fraud on such a massive scale.

*Fourth*, any "remedy" that Defendants claim would be available to Plaintiffs pursuant to the PSA would be illusory. Had the Defendants refused to cure the literally thousands of loans that are alleged to be deficient, Plaintiffs would have no right to sue under the PSAs because § 2.03—which Defendants erroneously contend covers all of Plaintiffs' claims—does not give Certificateholders a right to sue. The only right to sue provided by the PSA arises from an Event of Default, as specifically defined therein. But no Event of Default would apply here, nor do Defendants identify one.

Even assuming an Event of Default existed on these facts, Plaintiffs would be required to provide written notice to the Trustee, and show that "not less than 25% of the Voting Rights shall also have made written request to the Trustee." Only after doing so, and waiting 60 days for the Trustee to take action, could Plaintiffs file suit.[21] Here, Plaintiffs do not own 25% of the voting rights in the Securitizations at issue. Thus, if Plaintiffs requested a cure or repurchase and Countrywide refused, Plaintiffs would have no recourse whatsoever unless other investors joined in the suit.

---

[20] By way of example, Countrywide has admitted that, at the very minimum, 15 percent of the Mortgage Loans in the Securitizations were applied to investor properties, as compared to the zero percent and 0.21 percent which Countrywide represented were investor properties in the SPS1 and SPS2 Securitizations, respectively. SAC ¶ 79. The encouragement of fraudulent submissions via reduced-documentation programs was also widespread. SAC ¶¶ 116-122.

[21] SPS1 Prospectus Supplement at S-66 (Hou Decl., Ex. 4); SPS2 Prospectus at S-67 (Hou Decl., Ex. 5). The PSAs contain similar language. SPS1 PSA at § 10.08 (Hou Decl., Ex. 6); SPS2 PSA at § 10.08 (Hou Decl., Ex. 7).

B.    **Plaintiffs Cannot be Forced to Waive Their Fraud Claims Under the Securities Act or Common Law**

Defendants'' argument, at bottom, is the assertion that Plaintiffs agreed to waive their rights to bring federal securities and common-law fraud claims and to limit their remedies to the cure and repurchase rights in the PSAs.  Such an agreement, however, would violate the anti-waiver provisions of the Securities Exchange Act of 1934, under which Plaintiffs sue, which provide that "[a]ny condition, stipulation, or provision binding any person to waive compliance with any provision of [the Act] . . . shall be void."  15 U.S.C. § 78cc(a).  "The statutory framework of the 1934 Act compels the conclusion that individual securityholders may not be forced to forego their rights under the federal securities laws due to a contract provision." *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1051 (2d Cir. 1995) (quotation omitted).[22]

Under Defendants' reasoning, not only have Plaintiffs waived the right to sue under the securities laws without first obtaining the agreement of 25% of the holders of voting rights, they have also completely waived their right to sue for any activity other than that specified as an Event of Default in the PSA.  By stating the "sole remedy" available to Plaintiffs, Defendants seek precisely to force Plaintiffs to forego their rights under the substantive securities laws.[23]

Such a bar to a fraud claim would violate the common law as well, because Plaintiffs have alleged that the PSAs were "entered into under circumstances evidencing fraud or

[22]    *See also Dresner v. Utility.com, Inc.*, 371 F. Supp. 2d 476, 490 (S.D.N.Y. 2005) (finding that no-action clause like that in *McMahan* could not bar federal securities claims); *Citibank, N.A. v. Itochu Int'l Inc.*, No. 01 Civ. 6007(GBD), 2003 WL 1797847, *2-3 (S.D.N.Y. Apr. 4, 2003) (following *McMahan* to find that no-action clause could not bar federal securities claims).

[23]    Defendants cite *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1176 (2d Cir. 1993), but that case is distinguishable based on the fraudulent intent which Plaintiffs have pled in great particularity. Defendants also cite *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008).  That decision is an outlier from the Northern District of Texas and is currently on appeal.  Burnett Decl., Ex. E.  Furthermore, *Lone Star* is in conflict with the holding of *McMahan*, as described above.

44

unconscionability." *Edwards v. N. Am. Van Lines*, 513 N.Y.S.2d 895, 897 (3d Dep't 1987).

"New York law does not permit a party to invoke . . . waiver provisions to shield its malicious or

fraudulent conduct." *State Street Bank & Trust Co. v. Inversiones Errazuriz, Limitada*, 230 F.

Supp. 2d 313, 323 (S.D.N.Y. 2002) (same); *see also Skolnick v. Goldberg*, 746 N.Y.S.2d 296,

298 (1st Dep't 2002) ("A party to a contract cannot, merely by manipulation of its terms, deprive

the courts of the powers derived from common law to exercise oversight for the purpose of

preventing abuse.").

## IV.    PLAINTIFFS ADEQUATELY ALLEGE LOSS CAUSATION

Defendants contend that Plaintiffs have not alleged loss causation.  Joint Mem. 24-25;

Mozilo Mem. 11-12.  Their arguments are belied by the specific allegations in the SAC that the

Defendants' fraudulent conduct, both individually and collectively, caused the value of the

Plaintiffs' securities to significantly and instantly decrease in value after the Plaintiffs purchased

the Certificates.

As the Supreme Court has held, to allege loss causation adequately, a plaintiff need only

allege that the defendant's fraudulent conduct was the proximate cause of its injuries.  *See Dura

Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("The statute thereby makes clear Congress'

intent to permit private securities fraud actions for recovery where . . . plaintiffs adequately

allege and prove the traditional elements of causation and loss."); *see also Lentell v. Merrill

Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005); *In re Take-Two Interactive Sec. Litig.*, 551

F. Supp. 2d 247, 260 (S.D.N.Y. 2008).  Plaintiffs have done so with respect to each defendant.

With respect to the Countrywide entities, Plaintiffs allege that "[a]s a direct result of

Countrywide's fraud, thousands of the Mortgage Loans underlying Plaintiffs' Securities are in

default and/or foreclosure."  SAC ¶ 7.  The SAC makes clear that Plaintiffs' drastic losses were

caused "primarily and proximately" by Defendants' wrongdoing, ***not*** by wider market losses,

since "[t]hose broader market declines occurred long after the Securities began to experience high rates of delinquency and default." SAC ¶ 223. The SAC also specifically alleges that Plaintiffs' losses were caused by Countrywide's misrepresentations and omissions, such as the inflated owner occupancy rate. SAC ¶ 224 ("Owners who do not occupy their properties are more likely to default on their loans, which made the Securities that Plaintiffs purchased poorer investments, accelerated the Securities' decline in value, and greatly worsened Plaintiffs' losses.").

Additionally, the SAC alleges that Mozilo and Sambol were primarily responsible for Countrywide's abandonment of prudent underwriting guidelines and, thus, the losses suffered by Plaintiffs. *See* SAC ¶¶ 98, 113, 121, 139-141, 146-165. The Central District of California has already held that this is sufficient "to invite the cogent and compelling inference that Countrywide's deteriorating lending standards were causally linked to at least some of the macroeconomic shifts of the past year." *In re Countrywide Financial Litigation*, 588 F. Supp. 2d at 1174. This includes the losses that the Plaintiffs have suffered in the value of their securities.

The Eastern District of Pennsylvania's decision in *Luminent Mortg. Capital, Inc. v. Merrill Lynch & Co.*, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009), does not suggest a different conclusion. In *Luminent*, the Court concluded that the alleged misrepresentations by Merrill Lynch regarding "prepayment penalties" could not have been the cause of the loss in value of the plaintiff's mortgage-backed securities in light of the disruption in the real estate market in 2007. *Id.* at *15-16. This was particularly true for Merrill Lynch because it did not originate the mortgage loans at issue in that case (or any mortgage loans for that matter). *See id.* at *1.

But the same cannot be said of Countrywide's fraudulent conduct. That is because "Countrywide's operations so diverged from soundness that Countrywide's repeated assurances

46

of good practices, quality loan origination, and consistently prudent underwriting guidelines were rendered false . . . [and thus] triggered a sharp decline in the value of Countrywide-related securities as the truth emerged." *In re Countrywide Financial Litigation*, 588 F. Supp. 2d at 1174-75. As the Central District of California concluded, "this turbulence wasn't precipitated by problems in the real economy . . . [t]his came about as a result of some bad lending practices."

Accordingly, "the issue [here] is whether the alleged securities violations caused a loss. Not how much of the loss the alleged violations proximately caused." *Id.* As Plaintiffs have alleged, they have suffered tens of millions of dollars in losses that were proximately caused by Defendants. SAC ¶¶ 222-227. Under *Dura*, nothing more is required. *See Dura*, 544 U.S. at 346.

## V.    DEFENDANTS DO NOT DENY THAT PLAINTIFFS HAVE SUFFICIENTLY ALLEGED COMMON-LAW FRAUD

Defendants attempt to glaze over the difference in pleading standards between securities fraud under Section 10(b) and common-law fraud, which—contrary to Defendants' suggestion— is based on a much more lenient pleading standard. Defendants make only passing reference to common-law fraud; it is telling that their discussion of this claim, one of only four causes of action in the entire SAC, is limited to two footnotes. *See* Joint Mem. 5 n.8; Mozilo Mem. 2 n.2. Defendants ***do not deny*** in these footnotes, and they cannot, that Plaintiffs have satisfied the more liberal pleading standard for common-law fraud. Rather, Defendants incorrectly suggest that the pleading standards are the same.

47

## VI.  PLAINTIFFS HAVE STATED A CLAIM AGAINST MOZILO FOR VIOLATION OF SECTION 10(B) AND RULE 10B-5

### A.  Plaintiffs Have Adequately Alleged Actionable Misrepresentations Against Mozilo

Plaintiffs allege two separate categories of misrepresentations against Mozilo:  (i) misrepresentations made in the offering materials for which Mozilo is liable under the group pleading doctrine; and (ii) public misrepresentations made directly by Mozilo on which Plaintiffs relied in making their investment decisions.

### 1.  Mozilo is Liable for Misrepresentations in the Offering Materials Under the Group Pleading Doctrine

Mozilo argues that he cannot be liable for misrepresentations made in the offering materials because he did not personally participate in the drafting of the prospectus or supplemental prospectus.  Mozilo Mem. 2-4.  But Mozilo completely ignores the group pleading doctrine, which allows a plaintiff to attribute statements in corporate documents to a defendant if the plaintiff "has alleged facts indicating that the defendant was a corporate insider or affiliate with direct involvement in the daily affairs of the company."  *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 440-41 (S.D.N.Y. 2005).[24]

The group pleading doctrine "[r]ecogniz[es] that plaintiffs . . . seldom have access, prior to the commencement of discovery, to information permitting identification of the particular officers, directors and employees who bear personal responsibility for the utterances in question."  *Id.* at 438.  It therefore allows plaintiffs to "rely on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or other group-published

---

[24]    *See also S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 473 (S.D.N.Y. 2008) ("the Second Circuit and courts in this District appear to have permitted application of the [group pleading] doctrine against corporate insiders while rejecting it as against outside professionals who provided services to the fraudsters."); *In re Pfizer Inc. Securities Litigation*, 584 F. Supp. 2d 621, 638 (S.D.N.Y. 2008) ("Moreover . . . the majority of courts in this district have found that the PSLRA does not abrogate group pleading.") (internal citation and quotations omitted).

information, are the collective work of those individuals with direct involvement in the everyday

business of the company." *In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388,

398 (S.D.N.Y. 2005) (internal quotations omitted). As a result, plaintiffs may "circumvent the

general pleading rule that fraudulent statements must be linked directly to the party accused of

the fraudulent intent." *BISYS*, 397 F. Supp. 2d at 438 (internal citation omitted).

    The SAC alleges ample facts to attribute the misrepresentations made in the offering

materials to Mozilo. Plaintiffs allege that Mozilo was the founder of Countrywide and the

Chairman of the Board and Chief Executive Officer of Countrywide Financial Corporation

("CFC"), a holding company that conducted all of Countrywide's mortgage business through

wholly-owned subsidiaries. SAC ¶ 19; Countrywide Financial Corporation 10-K for fiscal year

ended December 31, 2006 (Burnett Decl. Ex. J) at 1, 150. The offering materials were CFC's

corporate documents, identifying CWABS, Inc. ("CWABS"), a limited purpose finance

subsidiary of CFC, as the depositor of the underlying mortgage loans, and Countrywide Home

Loans, Inc. ("CHL"), another subsidiary of CFC, as the sponsor of the securitization. SPS1

Prospectus Supplement (Hou Decl., Ex. 4) at S-26; SPS2 Prospectus (Hou Decl., Ex. 5) at S-26.

    By virtue of Mozilo's high-level executive position at CFC, he is presumed to be a

corporate insider with direct daily involvement in CFC's businesses, including its CWABS and

CHL businesses. *BISYS*, 397 F. Supp. 2d at 433-34, 441 (court was "bound to infer" under the

group pleading doctrine that chief executive officer of a company was an insider with direct

involvement in the daily affairs of a business group charged with fraud); *see also 380544

Canada, Inc. v. Aspen Tech, Inc.*, 544 F. Supp. 2d 199, 218-219 (S.D.N.Y. 2008) (citing *BISYS*

and finding that individual defendants in the case, the CEO, CFO, and Executive Vice-President

49

of Worldwide Sales and Marketing (as well as Co-Chief Operating Officers) "were clearly 'corporate insiders with active daily roles'" in the defendant's operations).

But the Court need not presume direct daily involvement by Mozilo.  Plaintiffs have also alleged facts showing that Mozilo was a corporate insider directly involved in the day-to-day affairs of CFC's businesses, including its mortgage lending business conducted through CHL. *See* SAC ¶¶ 77, 113, 121, 139, 154.  Indeed, Mozilo himself stated during a conference call with analysts in 2005 that "I do participate everyday in originations myself, and it keeps me apprised of what's happening."  SAC ¶ 185.  These allegations are sufficient to attribute the misrepresentations in the offering materials to Mozilo under the group pleading doctrine.[25]

Mozilo does not cite a single case that contradicts—or even discusses—the group pleading doctrine.  Instead, he cites two cases, *Central Bank v. First Interstate Bank*, 511 U.S. 164 (1994) and *Shapiro v. Cantor*, 123 F.3d 717 (2d Cir. 1997), both of which address the liability of secondary actors, such as accounting firms and law firms that assist a company in preparing its public statements—not the liability of corporate insiders.  Another case, *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993), addresses only the liability of corporate insiders when no group-published statements are made.  Mozilo's final case, *S.E.C. v. PIMCO Advisors Fund Management, LLC*, 341 F. Supp. 2d 454 (S.D.N.Y. 2004), an SEC enforcement action in which a defendant can still be held secondarily liable as an aider and abettor, recognizes that courts no longer follow the rule that the defendant "must actually make a false or misleading statement" to be held primarily liable under Section 10(b) and Rule 10b-5.  *Id.* at 466.

---

[25]   *BISYS*, 397 F. Supp. 2d at 441, 451 (the group pleading doctrine applied to high-level officers, including those who were not alleged to have signed the financial statements containing the misrepresentations); *S.E.C. v. Espuelas*, 579 F. Supp. 2d 461, 473 (S.D.N.Y. 2008) (finding that company's founders and another executive who reported to them qualified as "corporate insiders" with direct involvement in the everyday business of the company, and attributing alleged misstatements in company's financial reports to those individuals).

The group pleading doctrine applies here and makes Mozilo liable for statements in the offering materials.

## 2.    Mozilo is Liable for His Own Misrepresentations

Even if the misrepresentations contained in the offering materials were not attributable to Mozilo (which they are under the group pleading doctrine), he would still be liable for the misrepresentations he made directly, including statements in the Form 10-Ks, which he personally signed.  Plaintiffs allege that Mozilo repeatedly touted Countrywide's underwriting guidelines, its management of credit risk, and the quality of its mortgage loans.  For example, Mozilo represented that Countrywide (i) "manage[d] credit risk through credit policy, underwriting, quality control and surveillance activities; (ii) engaged in "prudent underwriting guidelines;" (iii) would not "compromise [its underwriting standards] as we grow market share;" (iv) under "no circumstances will . . . ever sacrifice sound lending and margins for the sake of getting to that 30 percent market share;" (v) had not experienced any loosening of underwriting standards that create[d] less of a quality loan than [Countrywide] did in the past;" and (vi) kept "loan quality . . . extremely high."  SAC ¶¶ 33, 35, 38, 44, 169, 186.

Mozilo argues that these statements are immaterial as a matter of law because they did not relate specifically to the securities that Plaintiffs purchased.  Mozilo Mem. 5-6.  However, the SAC alleges that these representations were part of the total mix of information on which Plaintiffs relied in buying the Certificates from Countrywide.  *See, e.g.,* SAC ¶¶ 31-32 (referring to CFC's 2004 10-K, which Mozilo signed (Burnett Decl. Ex. H at 107); *id.* ¶¶ 33-34 (referring to CFC's 2005 10-K, which Mozilo signed (Burnett Decl. Ex. I at 130); *id.* ¶ 35 (referring to Mozilo comments at an investor presentation in September 2006, prior to Plaintiffs' purchases of certain of the Certificates).  Plaintiffs specifically allege that Mozilo's statements gave them comfort that the certificates were sound investments because Countrywide rigorously followed

the underwriting standards it established for all types of loans and had quality-control procedures in place to ensure that the standards were met and fraud was detected.  SAC ¶¶ 100, 107, 114.

Rather than contradict the statements in the offering materials, as Mozilo contends, Mozilo Mem. 5 (citing *Olkey v. Hyperion 1999 Term Trust*, 98 F.3d 2 (2d Cir. 1996)), these direct statements supplemented the information in the offering materials.  Especially at the pleading stage, the Court cannot determine that these representations were immaterial as a matter of law.  *See TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (determination of materiality "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact").

Mozilo also arbitrarily selects mid-2005 as a cut-off date and claims that any statements made before that time are immaterial as a matter of law because they are outdated.  Mozilo Mem. 6.  But these earlier statements were consistent with the statements made after mid-2005 and gave Plaintiffs confidence that Countrywide was maintaining and refining its underwriting guidelines and quality-control procedures throughout the years.  Under *In re Time Warner Inc. Sec. Litig.*, 794 F. Supp. 1252 (S.D.N.Y. 1992), which Mozilo cites, these earlier representations were material and gave rise to an obligation to correct them when the circumstances changed and Countrywide radically departed from its publicly disclosed guidelines and procedures.

Finally, Mozilo contends that all of his statements at issue are "inactionable puffery." Mozilo Mem. 6-7.  But it is not puffery for a corporate CEO to represent that it has a rigorous quality control process to root out borrower fraud, when in truth its practices actually encourage borrower fraud.  Nor is it puffery to claim that underwriting standards have not been loosened when the Company was a top provider of risky loans prior to the mortgage crisis, as part of a

"lust for high yields and high profits," as determined for by the Center for Public Integrity. SAC ¶ 40. Mozilo's representations in the Form 10-K filed in March 2006 were not puffery, but specific misrepresentations about procedures that Countrywide had allegedly put in place to detect fraud. *See* SAC ¶ 100.

It merits mention that the Central District of California has already considered—and rejected—the very argument advanced by Mozilo. *See In re Countrywide Financial Litigation*, 588 F. Supp. 2d at 1153. In *In re Countrywide Financial Litigation*, the Court acknowledged that "in the vast majority of cases such statements would be nonactionable puffery," but with Countrywide, where the Company "systematically departed so far from any reasonable interpretation of 'quality' and 'standards' . . . such statements could be materially false or misleading." *Id.*; *see also Novak*, 216 F.3d at 315 (statements that the company's inventory status was "in good shape" or "under control" when defendants knew the contrary was true were false and misleading, not inactionable puffery).

**B.**     **Plaintiffs Have Adequately Alleged that Mozilo Acted With Scienter**

Mozilo's challenge to Plaintiffs' scienter allegations rests almost exclusively on his assertion that he had no involvement in the offerings. *See* Mozilo Mem. 8-10. Mozilo improperly conflates the conduct element of a Rule 10b-5 claim with the scienter element. In any event, as set forth above, Mozilo was plainly involved in the offerings. He was the Chief Executive Officer of CFC, which formed CWABS, a limited purpose finance subsidiary, to sell the fraudulent mortgage loans to trusts for securitization. SAC ¶¶ 16, 19, 61. The securitizations at issue here were part of a larger scheme by CFC to issue a large volume of fraudulent loans at significant profit and transfer the risk of default on those loans to Plaintiffs and other innocent investors. *Id.* ¶ 136(c); *see generally* ¶¶ 95, 173, 178 (discussing transfer of risk by Countrywide).

53

Indeed, Mozilo does not even discuss the two ways in which a plaintiff can plead a strong inference of scienter: (i) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (ii) by alleging facts to show that a defendant had both motive and opportunity to commit fraud. *See Novak*, 216 F.3d at 307, 311; Mozilo Mem. 8-10. Plaintiffs have sufficiently pled Mozilo's scienter by alleging facts that constitute strong circumstantial evidence of recklessness *and* facts that show motive and opportunity to commit fraud.

The SAC quotes emails in which Mozilo, in his own words, told Sambol and other Countrywide executives that the Company was abandoning its underwriting guidelines, including, for example, his statement that he "***personally observed a serious lack of compliance within our origination system as it relates to documentation and generally a deterioration in the quality of loans originated.***" *Id.* ¶ 148. The SAC also alleges that Mozilo was deeply involved in the daily operation of Countrywide's businesses, including the Company's lending practices and credit risk management; indeed, the SAC quotes Mozilo's public statement that "I do participate every day in originations . . . ." *Id.* ¶ 185; *see generally id.* ¶¶ 185-191. The Central District of California held, based on similar allegations, that the inference of scienter was especially strong as to senior executives such as Mozilo and Sambol because they "were involved in the day-to-day operation of the company and would have been even more aware of a 'culture' of undisciplined loan origination" than outside directors. *In re Countrywide Derivative Litigation*, 554 F. Supp. 2d at 1066.

The SAC also alleges that Mozilo had a motive to perpetuate Countrywide's fraud because he personally benefitted from the wrongdoing. During the period in which Plaintiffs invested in the Securitizations, Mozilo was aggressively liquidating his stock holdings at an

enormous personal profit because he knew that the Company was headed for collapse as a result of its reckless lending practices. During the last quarter of 2006 alone, Mozilo sold Countrywide stock worth $33.5 million. SAC ¶ 193. Mozilo repeatedly modified his stock-sale plans, exercising over five million stock options of over $139 million from November 2006 through October 2007. *Id.* ¶ 199. Having misled Plaintiffs and other investors about the state of Countrywide's origination practices throughout 2006, he began aggressively liquidating his holdings at the end of the year, making himself absurdly rich before the Company's reckless lending destroyed its stock value and damaged its bondholders. *Id.* ¶ 197.

At the same time that Mozilo was aggressively selling his stock, the Company was repurchasing millions of shares of Countrywide stock. In October 2006, Countrywide's Board of Directors authorized a share repurchase program of up to $2.5 billion, signaling to the market that the Board believed Countrywide's shares to be underpriced. The market reaction to this announcement was swift. From November 2006 to February 2007, Countrywide's share price rose, and it reached an all-time high on February 2, 2007. SAC ¶ 194. In the fourth quarter of 2006 alone, Countrywide spent $1.5 billion repurchasing over 38 million shares with an average price of $38.83 per share. At the same time, Mozilo sold nearly a million shares of Countrywide stock to correspond with the repurchase program and increased share price, reaping proceeds of over $33 million. *Id.* ¶ 195.

In effect, Countrywide was supporting its stock price while allowing insiders such as Mozilo and Sambol to sell their personal Countrywide stock holdings at inflated prices. Considering the same allegations regarding insider sales related to the repurchase, the Central District of California found that "Defendants' massive sales between November 2006 and May 2007 are entirely consistent" with the conclusion that Countrywide was trying to "keep the ball

rolling—*i.e.,* to propel the Company forward (steadying the stock price, or sending it upward)" by repurchasing stock during the same period, "before the weight of the loan origination practices began taking its toll on the Company's operations and the value of its stock." *In re Countrywide Derivative Litigation*, 554 F. Supp. 2d at 1068. Accordingly, the court found that the allegations provided "some support" in favor of scienter. *Id.*

Defendants complain that Plaintiffs have failed to tie these stock trades precisely to the timing of the Securitizations at issue. But the time period of October 2006 through February 2007 overlaps with and immediately follows the sale of the Certificates to Plaintiffs, which was completed in October 2006—the very same period when warning bells were being rung internally regarding "toxic" mortgage products, "deterioration" in standards, and a "lack of compliance with guidelines." *See supra* Section I(B). The suspicious timing and circumstances of Mozilo's stock sales—the fact that he was aggressively unloading his stock at a time when he knew the Company was on the road to implosion—is highly probative of scienter.

### C.    Plaintiffs Have Adequately Alleged Loss Causation

As explained above, the Plaintiffs have sufficiently alleged that the actions of Mozilo and Sambol are the proximate cause of their injuries. *See supra* Section IV.

## VII.    PLAINTIFFS HAVE STATED A SECTION 20(A) CONTROL-PERSON CLAIM AGAINST MOZILO

In a single paragraph, Mozilo dismisses the control-person claim under Section 20(a), asserting that there is no primary violation and that Plaintiffs cannot make the required showing that Mozilo was a "culpable participant in the primary violation." Mozilo Mem. 12. But Plaintiffs need not plead facts showing that Mozilo was a culpable participant to state a control-person claim under Section 20(a). Because "the lack of culpable participation is an affirmative defense to be plead and proved by defendant, not an essential element of plaintiff's *prima facie*

case," a plaintiff must allege only "a primary violation and control over the primary violator" to state a claim under Section 20(a). *BISYS*, 397 F. Supp. 2d at 450-51.[26]

"To plead control over a primary violator, a plaintiff must allege that the defendant possessed the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Id.* at 451 (internal quotations omitted). "Allegations of control are not averments of fraud and therefore need not be plead with particularity under Rule 9(b) or the PSLRA." *Id.*

Plaintiffs have stated a claim under Section 20(a) against Mozilo. Plaintiffs allege a primary violation of Section 10(b) and Rule 10b-5 against CFC, CHL, and CWABS, among others. Plaintiffs also allege that Mozilo, by virtue of his high-ranking executive position at CFC, had control over CFC and over CHL and CWABS, CFC's wholly-owned subsidiaries. SAC ¶¶ 19, 259. *See BISYS*, 397 F. Supp. 2d at 451 (alleging a high-level executive position is sufficient to allege control). Plaintiffs also allege that Mozilo was directly involved in the day-to-day mortgage lending operations of CFC and CHL, which is also sufficient to allege control. SAC ¶ 247; *BISYS*, 397 F. Supp. 2d at 452.

Under established case law in this Circuit, these allegations adequately allege control person liability. *See, e.g., S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1473, 1455 (2d Cir. 1996) (finding control person liability for director and owner of company which engaged in fraudulent practices while director and owner was "at the helm").

---

[26] The court in *BISYS* recognized that "courts both inside and outside the Second Circuit have disagreed" on whether a plaintiff must allege culpable participation by the control person, but held that "this Court previously has ruled that culpable participation is not required." *BISYS*, 397 F. Supp. 2d at 450-51. Even if it were required, however, Plaintiffs have sufficiently alleged facts showing Mozilo's culpable participation in the fraudulent statements and in the scheme to defraud. *See supra* Section IX.

## VIII.  PLAINTIFFS HAVE STATED A CLAIM AGAINST SAMBOL FOR VIOLATION OF SECTION 10(B) AND RULE 10B-5

### A.  Plaintiffs Have Adequately Alleged Actionable Misrepresentations Against Sambol

As with Mozilo, Plaintiffs allege two separate categories of actionable misrepresentations against Sambol:  (i) misrepresentations made in the offering materials for which Sambol is liable under the group pleading doctrine; and (ii) public misrepresentations made directly by Sambol on which Plaintiffs relied in making their investment decisions.

#### 1.  Sambol Is Liable for Misrepresentations in the Offering Materials Under the Group Pleading Doctrine

Sambol simply assumes that he cannot be liable for misrepresentations contained in the offering materials.  Sambol Mem. 2-4.  Sambol is wrong.  The group pleading doctrine allows Plaintiffs to attribute the misrepresentations in the offering materials to Sambol as a corporate insider with direct involvement in the daily affairs of the Company.  *See supra* Section VI(A)(1); *BISYS*, 397 F. Supp. 2d at 440-41.

The offering materials were published by, among others, Countrywide Home Loans, Inc. ("CHL"), which was identified in the materials as the sponsor of the securitizations and the seller of a portion of the underlying mortgage loans.  SPS1 Prospectus Supplement (Hou Decl., Ex. 4) at S-32-33; SPS2 Prospectus Supplement (Hou Decl., Ex. 5) at S-32-33.  At the time the offering materials were published, Sambol was the President and COO of CHL.  SAC ¶ 20.  By virtue of his high-level executive position, he is presumed to be a corporate insider of CHL with direct involvement in its daily affairs.  *See BISYS*, 397 F. Supp. 2d at 440-441, 433-34.  Plaintiffs also allege facts showing that Sambol was a corporate insider of CHL and closely involved with every aspect of its business.  SAC ¶¶ 113, 139-140, 185.  As a corporate insider with direct involvement in daily affairs, Sambol is liable for the misrepresentations contained in the offering

materials published by CHL under the group pleading doctrine. *See BISYS*, 397 F. Supp. 2d at
440-41.

Sambol addresses the group pleading doctrine only in a footnote, arguing that it did not
survive the passage of the PSLRA. Sambol Mem. n.7. But as this Court has already held, "the
majority of courts in this and other jurisdictions have found that the doctrine is alive and well."
*BISYS*, 397 F. Supp. 2d at 439; *see also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F.
Supp. 2d 388, 399 (S.D.N.Y. 2005) ("The majority rule in this district is that the group pleading
doctrine has survived the PSLRA"). Indeed, the Fifth Circuit authority cited by Sambol in
support of his argument has already been rejected by a Court in this District as "unpersuasive."
*BISYS*, 397 F. Supp. 2d at 439-40.

### 2.    Sambol is Liable for His Direct Misrepresentations

Sambol does not dispute that he is liable for misrepresentations he made directly, but
argues that his direct misrepresentations are not actionable. Sambol Mem. 2-4. To the contrary,
Sambol represented to investors that Countrywide was not sacrificing its internal controls to
grow its market share when he knew the opposite was true. SAC ¶¶ 35-36. Such statements
about a company practice knowing that the complete opposite is true are actionable
misrepresentations, not inactionable puffery. *See Novak*, 216 F.3d at 315 (statements that the
inventory situation was "in good shape" or "under control" when defendants knew the contrary
was true were false and misleading, not inactionable puffery).

### B.    Plaintiffs Have Adequately Alleged that Sambol Acted With Scienter

Sambol devotes the majority of his brief to arguing that Plaintiffs have not alleged facts
sufficient to give rise to a strong inference of scienter. Sambol Mem. 4-11. But Plaintiffs have
plainly alleged facts that constitute strong circumstantial evidence of recklessness, which

establishes the required strong inference of scienter.[27]  *See supra* Section II; *Novak*, 216 F.3d at

307-308.  As the Second Circuit has held, allegations that "defendants' knowledge of facts or

access to information contradict[ed] their public statements" or that defendants "ignored obvious

signs of fraud" are sufficient to show recklessness.  *Novak*, 216 F.3d at 308.

Plaintiffs allege that Sambol knew facts that contradicted his public statements.  Sambol

made misrepresentations in both the offering materials published by CHL (for which he is liable

as CHL's President and COO under the group pleading doctrine) and directly to investors that

Countrywide was adhering to its underwriting guidelines.  At the time that Sambol made these

public statements, he knew that Countrywide was abandoning its guidelines, including through

the Exception Processing System that he created.  SAC ¶¶ 51, 113, 121, 148, 157-160, 162.

Plaintiffs have also alleged facts showing that Sambol ignored obvious signs of fraud.

For example, Sambol was told that there was massive fraud in stated-income loans and that

second-lien loans were being issued that did not comply with Countrywide's guidelines.  SAC ¶

77 provides detailed allegations regarding a June 1, 2006 email from Mozilo to Sambol which

warned Sambol about mortgage fraud and a June 2, 2006 email Sambol received which advised

him that 50 percent of the stated-income loans originated by a Countrywide subsidiary contained

misrepresentations in the loan applications.  SAC ¶ 121 alleges that Sambol received an email

from Mozilo in which Mozilo stated that he had "personally observed a serious lack of

---

[27]  Scienter can be shown either by alleging facts that show that a defendant had both motive and opportunity to commit fraud or by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.  *Novak*, 216 F.3d at 307.  Sambol argues that if a plaintiff fails to allege facts showing motive, "the strength of the circumstantial allegations [of conscious misbehavior] must be correspondingly greater."  Sambol Motion at 7 (quoting *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).  But this rule was articulated for  RICO claim requiring a showing of intentional fraud.  *See Kalnit*, 264 F.3d at 142 (quoting the rule from *Beck v. Mfg'rs Hanover Trust Co.*, 820 F.2d 46, 49-50 (2d Cir. 1987), which addresses a RICO claim).  In 10b-5 cases, pleading facts constituting reckless is an alternative to pleading motive and opportunity.  *Novak*, 216 F.3d at 307; *Global Crossing*, 322 F. Supp. 2d at 346 ("[a]lternatively, plaintiffs can plead scienter by showing strong circumstantial evidence of conscious misbehavior or recklessness").

compliance within our organization as it relates to documentation."  SAC ¶¶ 148 alleges that Sambol received an email from Mozilo stating that Mozilo was concerned with certain loans had been originated "with disregard for process [and] compliance with guidelines."

The SAC alleges that Sambol did not just ignore these signs of fraud, but actively encouraged the fraud, including through his Exception Processing Systems, to grow Countrywide's market share.  *See id.* ¶¶ 51, 113, 190.  These allegations are sufficient to allege scienter.  *See Novak*, 216 F.3d at 311-12 (allegations that executives knowingly sanctioned procedures that violated the company's own internal policies in order to protect the company's financial prospects were sufficient to allege scienter).  Sambol's involvement in Countrywide's daily operations also supports his scienter.  SAC ¶¶ 183-191; *see In re Countrywide Derivative Litigation*, 554 F. Supp. 2d at 1066 (inference of scienter was especially strong as to senior executives such as Mozilo and Sambol because they "were involved in the day-to-day operation of the company and would have been even more aware of a 'culture' of undisciplined loan origination" than outside directors).

The suspicious timing and circumstances surrounding Sambol's sale of $6.6 million in Countrywide stock during the last quarter of 2006 alone further illustrate his scienter.  SAC ¶¶ 193-97.  As noted above with regard to Mozilo, who also profited enormously from the sale of Countrywide stock, the Company was aggressively repurchasing its own stock during the same period, in late 2006 and early 2007.  *Id.* ¶ 194.  The fact that Sambol was unloading his stock at an elevated price when he knew, based on his knowledge of Countrywide's underwriting practices, that the Company would soon collapse, underscores the personal benefit that Sambol gained from hiding the Company's fraud from Plaintiffs and other investors.  Sambol was stoking Countrywide's profit—and thus his own—by encouraging the abandonment of its

61

underwriting practices and ignoring warnings about undue risks that the Company was taking. Indeed, Sambol encouraged and perpetuated those harmful policies through policies that he implemented, including the Exception Processing System, and his failure to address the abandonment of Countrywide's underwriting guidelines even after he was warned of it. *See generally id.* ¶¶ 146-55.

## IX. PLAINTIFFS HAVE STATED A SECTION 20(A) CONTROL-PERSON CLAIM AGAINST SAMBOL

Like Mozilo, Sambol discusses the control-person claim under Section 20(a) in a single paragraph, asserting that there is no primary violation of Section 10(b) and Rule 10b-5 and that Plaintiffs have not alleged facts showing that Sambol was a "culpable participant" in the fraud. Sambol Mem. 12. Because culpable participation is an affirmative defense to be plead and proved by Sambol, however, Plaintiffs need not allege facts showing that Sambol was a culpable participant to state a control-person claim under Section 20(a). *See supra* Section VIII; *BISYS*, 397 F. Supp. 2d at 450-51 ("lack of culpable participation is an affirmative defense to be pleaded and proved by defendants"). Even if culpable participation were required, Plaintiffs have alleged it with regard to Sambol. *See supra* section VIII(A) (discussing Sambol's misrepresentations in the offering materials and his creation of the Exception Processing System); SAC ¶¶ 35-36, 51, 113, 121, 148, 157-160, 162.

Plaintiffs have also alleged a primary violation of Section 10(b) and Rule 10b-5 by CHL, among others. *See supra* Section I. Because Sambol was a control person of CHL by virtue of his position as President and COO of CHL, Plaintiffs have stated a Section 20(a) control-person claim against him. *See BISYS*, 397 F. Supp. 2d at 451 ("plaintiffs allege that each of the Individual Defendants held a high level executive position with the Company . . . [t]his would suffice to establish control at the pleading stage").

X.   **PLAINTIFFS SUFFICIENTLY ALLEGE SUCCESSOR LIABILITY AGAINST BANK OF AMERICA**

Pursuant to both its merger with Countrywide and its assumption of the Countrywide Defendants' preexisting liabilities, Bank of America is subject to successor liability for Plaintiffs' claims.

A.   **BofA Bears Successor Liability Under The Common Law**

1.   **The SAC Sufficiently Alleges That BofA Assumed Countrywide's Liabilities**

Under both New York and Delaware successor liability law, successor liability exists where there is an express or implied assumption of the acquired entity's liabilities by the acquiring company. *Schumacher v. Richards Shear Co.*, *Inc.*, 59 N.Y.2d 239, 245 (N.Y. 1983); *In re Asbestos Litigation*, 517 A.2d 288, 291 (Del. 1986).[28]  BofA contends that the "SAC does not allege that BofA expressly assumed Countrywide's liabilities . . . ."  BofA Mem. 8.  This is not the case.  The SAC cites an article in which a BofA spokesperson expressly acknowledged that BofA had "bought all of [Countrywide's] assets *and liabilities*" and had factored in the "claims and potential claims" against the Company in making the purchase:

> Handling all this litigation won't be cheap, even for Bank of America, the soon-to-be largest mortgage lender in the country.  Nevertheless, the banking giant says that Countrywide's legal expenses were not overlooked during negotiations.  *"We bought the company and all of its assets and liabilities," spokesman Scott*

---

[28]   Because there is no conflict between New York and Delaware successor liability law, and New York is the forum sate, New York law governs the question of BofA's liability.  *See Eclaire Advisor Ltd. as Trustee to Daewoo Int'l (America) Corp. Creditor Trust v. Daewoo Eng'g & Constr. Co., Ltd.*, 375 F. Supp. 2d 257, 267 (S.D.N.Y. 2005) ("Since there is no conflict [of] law on this claim, New York applies to the successor liability claim."); *see also Bouley v. Am. Cyanamid Co.*, No. Civ. A. No. 85-4368-Z, 1987 WL 18738, at *3 (D. Mass 1987) (noting that the "four well-recognized" exceptions are the same in New York, Delaware, and several other states). *Compare Schumacher,* 59 N.Y.2d at 245 (identifying the four exceptions recognized under New York law); *with Rohn Indus., Inc. v. Platinum Equity LLC*, 887 A.2d 983, 996 (Del. Super. Ct. 2005), *rev'd on other grounds*, 911 A.2d 379 (Del. 2006) (identifying same four exceptions under Delaware law).

> *Silvestri says. "**We are aware of the claims and potential claims against the company and have factored these into the purchase.**"[29]*

BofA does not address this outright admission by a BofA spokesperson. It similarly glosses over other statements in the SAC that are suggestive of BofA's intention to assume Countrywide's liabilities. In a press release announcing the merger, then-BofA CEO and Chairman Kenneth D. Lewis stated that he was aware of the "issues within the housing and mortgage industries" and said that "the transaction [with Countrywide] reflects those challenges." SAC ¶ 271. Similarly, Mr. Lewis was quoted in an article reporting on the acquisition of Countrywide: "We did extensive due diligence . . .We looked at every aspect of the deal, *from their assets to potential lawsuits* and we think we have a price that is a good price." *Id.* ¶ 272.

Consistent with these statements, BofA has taken actions following the merger to pay Countrywide's debts and liabilities. For example, in a settlement valued at up to *$8.4 billion*, BofA agreed to modify up to 390,000 Countrywide loans in settlement of eleven predatory lending lawsuits by states' attorney generals against Countrywide. SAC ¶ 273. BofA also restructured 300,000 home loans in 2008, of which 87% had been made or serviced by Countrywide. *Id.* BofA summarily asserts that the "mere fact" of voluntary payment by BofA of some Countrywide debts cannot prove that BofA intended to pay all of Countrywide's debts.[30]

---

[29]    SAC ¶ 270 (emphasis added). The statement was published in the February 22, 2008 legal publication *Corporate Counsel.* Indeed, BofA purchased Countrywide for only 27% of its book value at the time, further suggesting that the claims and potential claims against the Company were considered in making the purchase. SAC ¶ 210.

[30]    BofA cites an inapposite decision, *Marenyi v. Packard Press Corp.*, No. 90–CV-4439 (CSH), 1994 WL 16000129 (S.D.N.Y. June 9, 1994), in which the court considered the evidence supporting a default judgment against a company's successor. Such evidentiary findings are impossible at the pleading stage, and demonstrate the need for discovery here. The court also held that its finding against successor liability was based "particularly in the *absence of any evidence of any representations by [the alleged successor's] officers or spokespeople suggestive of such an intention* [to assume liability] . . . ." *Id.* at *7 (emphasis added). In contrast, here Plaintiffs allege multiple statements by BofA officers and

BofA Mem. 8.  Yet BofA's conduct in making a ***multi-billion dollar*** settlement on Countrywide's behalf, following publicized statements by BofA that it had purchased all of the Company's "assets *and liabilities*," are powerful facts supporting the proposition that Countrywide's liabilities were assumed.

The Court's role on a motion to dismiss is not to weigh the evidence, but merely to determine whether the allegations in the complaint are sufficient to state a claim.  *See Chosun Intern., Inc. v. Chrisha Creations, Ltd.*, 413 F.3d 324, 327 (2d Cir. 2005) ("At this stage of the proceedings . . . our charge is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient.") (internal quotation omitted); *BT Americas Inc. v. ProntoCom Marketing, Inc.*, 859 N.Y.S.2d 893, No. 602014/07, 2008 WL 565496 at *5-6 (N.Y. Sup. Ct. [N.Y. Cty] Feb. 14, 2008) (allegations of successor liability sufficient to survive motion to dismiss "particularly at this early stage of the action, prior to any discovery").

As Plaintiffs have satisfied their pleading burden, they are entitled to discovery.

### 2.    The SAC Sufficiently Alleges A *De Facto* Merger of Countrywide and BofA

A separate and independent basis for successor liability is the *de facto* merger doctrine. The doctrine is "analyzed in a flexible manner that *disregards mere questions of form* and asks whether, in substance, it was the intent of the successor to absorb and continue the operation of

---

spokespeople indicative of BofA's intention to assume all "claims and potential claims" against Countrywide.  SAC ¶¶ 270-272.  Similarly unavailing is BofA's citation to *Fountain v. Colonial Chevrolet Co.*, C.A. Nos. 86C-JA-117, 85C-DE-88, 1988 WL 40019, at *7-8 (Del. Super. Apr. 13, 1998), which was decided on summary judgment.  And in *U.S. Fidelity & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobas*, No. 98 Civ. 3099 (THK), 2005 WL 289575, at *5 (S.D.N.Y. Feb. 4, 2005), the parties demonstrated implied consent to the application of Brazilian law; no such implied consent is present in this case.  Both *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) and *Kalb, Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) discuss piercing the corporate veil, not the successor liability that is at issue in this case.

the predecessor." *AT&S Transp., LLC v. Odyssey Logistics & Tech. Corp.*, 22 A.D. 3d 750, 752 (2d Dep't 2005) (emphasis added); *see also Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 (2d Cir. 2003) ("New York recognizes . . . exceptions to the rule that an asset purchaser is not liable for the seller's debts, . . . [including for] a buyer who *de facto* merged with a seller . . . . A *de facto* merger occurs when a transaction, although not in form a merger, is in substance 'a consolidation or merger of seller and purchaser.'").[31]

New York courts analyze the following factors to determine whether a *de facto* merger has occurred: "continuity of ownership; cessation of ordinary business and dissolution of the acquired corporation as soon as possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the acquired corporation; and a continuity of management, personnel, physical location, assets, and general business operation." *Fitzgerald v. Fahnestock & Co., Inc.*, 730 N.Y.S.2d 70, 71 (1st Dep't 2001) (quoting *Sweatland v. Park*, 181 A.D.2d 243, 245-46 (4th Dep't 1992)). However, "[n]ot all of these factors are needed to demonstrate a merger; rather, these factors are only indicators that tend to show a *de facto* merger." *Sweatland*, 181 A.D.2d at 246 (quotation omitted).

The SAC sets forth detailed factual allegations supporting each factor of the *de facto* merger doctrine. Taken collectively, these facts demonstrate that BofA is in the final stages of absorbing Countrywide's operations.

---

[31]  *See also Knapp v. N. Am. Rockwell Corp.*, 506 F.2d 361, 367 (3d Cir. 1974) (determining that the public policy considerations served by imposing liability on the purchasing corporation outweighed formal or technical requirements for consolidation, merger, or continuation under Pennsylvania law).

(a)     **Continuity of Ownership**

Under the terms of the merger, "shareholders of Countrywide [] receive[d] .1822 of a share of Bank of America stock in exchange for each share of Countrywide."[32]  CFC's shares were subsequently delisted on the New York Stock Exchange.  SAC ¶ 259.  Former Countrywide shareholders became BofA shareholders as the result of the merger, evidencing a clear continuity of ownership.

(b)     **Cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible**

A BofA press release announced that the Countrywide Home Loans brand was being retired, and that BofA was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans ("BofA Home Loans").  *Id.* ¶ 265.  It stated that "the full systems conversion" to BofA Home Loans would occur later in 2009.  *Id.*  BofA announced that it was retiring the "toxic" Countrywide name.  *Id.* ¶ 268.  Countrywide's former web address, www.countrywide.com, now takes users to BofA's website.  *Id.* ¶ 261.  A May 2009 article in which Desoer was interviewed reported that "the move to shutter the Countrywide name is essentially complete."  SAC ¶ 267.

(c)     **Assumption by successor of liabilities ordinarily necessary for the uninterrupted continuation of predecessor's business**

BofA has assumed all of Countrywide's contracts, including its customer service contracts.  SAC ¶ 268.  As discussed in section X(A)(1), *supra*, BofA has expressly and impliedly assumed Countrywide's liabilities, including the settlement of numerous predatory lending lawsuits against Countrywide and the restructuring of Countrywide loans.

---

[32]   January 11, 2008 press release "Bank of America Agrees To Purchase Countrywide Financial Corporation," attached as Burnett Decl. Ex. F; *see also* SAC ¶ 263.

      **(d)**      <u>**Continuity of management, personnel, physical location, assets,**</u>
<u>**and general business operation**</u>

Although BofA claims that Countrywide has remained a "separate" subsidiary (BofA

Mem. 12), BofA's repeated public comments suggest that the mortgage operations and related

operations of both companies are being combined into a single business. BofA announced that

the companies merged in a press release and Countrywide linked to the release on its website

following the merger. SAC ¶ 262. BofA stated on its website that it was "combining the

valuable resources and extensive product lines of both companies." *Id*. ¶ 261. In its July 1, 2008

annual report, BofA referred to BofA and Countrywide as a "*combined* company." *Id*. ¶ 262. In

a Countrywide press release issued the same day, Mozilo stated that "the *combination* of

Countrywide and Bank of America will create one of the most powerful franchises in the world."

*Id.*

In a July 2008 BofA press release, Barbara Desoer, identified as the president of the

"combined mortgage, home equity and insurance businesses" of BofA and Countrywide, said

"Now we begin to combine the two companies and prepare to introduce our new way and way of

operating." *Id.* ¶ 264. The press release stated that the bank "anticipates substantial cost savings

from combining the two companies. Cost reductions will come from a range of sources,

including the elimination of positions . . . and the reduction of overlapping technology, vendor

and marketing expenses. In addition, the company is expected to benefit by leveraging its broad

product set to deepen relationships with existing Countrywide customers." *Id.*

Following the merger, Countrywide's real property was transferred to BofA, and BofA

employs Countrywide's former employees and management personnel. *Id.* ¶ 268. But Desoer

confirmed in a May 2009 interview that "the operational effort to integrate across two

completely distinct lending and service systems is just getting under way." *Id.* ¶ 267. These

68

statements suggest that BofA has extinguished the former Countrywide entities and is in the process of merging them completely into BofA's business.

In summary, the SAC alleges all the factors supporting a *de facto* merger. At the very least, enough is alleged to preclude resolution of the issue on a motion to dismiss.[33] Under such circumstances, Plaintiffs "should be allowed to conduct further discovery to determine whether the transaction constituted a *de facto* merger." *Sweatland*, 181 A.D.2d at 245.

### B.    BofA's Reliance On *Argent* Is Misplaced

In support of its position, BofA relies on an opinion from the Central District of California, *Argent Classic Convertible Arbitrage Fund L.P. v. Countrywide Fin. Corp.*, No. CV 07-07097 MRP (MANx) (C.D. Cal. Mar. 19, 2009), involving claims of securities fraud against Countrywide and successor liability against BofA. BofA Mem. 1-3. In this decision, the Central District of California dismissed Countrywide's motion to dismiss a class-action complaint brought by Countrywide investors but upheld Bank of America's motion to dismiss, based on a passing reference to Bank of America in the complaint. Declaration of Jonathan Rosenberg ("Rosenberg Decl."), Ex. D; *Argent* complaint, Rosenberg Decl., Ex. A at ¶¶ 24-25 (entirety of

---

[33]    *See, e.g., BT Americas Inc.*, 859 N.Y.S.2d at 893 (denying motion to dismiss on successor liability claim; "[t]he essence of this claim is that ProntoCom's business at the premises ceased, and was taken over by World Routes, including ProntoCom's assets, liabilities for continuity of its voice services business, management, ownership, physical space and personnel, leaving ProntoCom an empty, judgment-proof shell. *This is sufficient to state a claim against World Routes under the continuity of business or de facto merger doctrine, particularly at this early stage of the action, prior to any discovery.*") (emphasis added)*; Scarola v. Atlantic Welding Supply Corp.*, No. 01-201, 2001 WL 1682723, at *1 (1st Dep't Oct. 26, 2001) (denying motion to dismiss on successor liability claim where the facts to justify opposition were "exclusively within the knowledge and control of the defendants…and only discovery can answer the open questions as to the relationships between the three entities"); (emphasis added and internal citation omitted)); *In re Asbestos Litigation*, No. 92C-10-100, 1994 WL 89643 (Del. Super. Ct. Feb. 4, 1994) (denying motion to dismiss where there was issue of fact as to what liabilities were assumed by successor); *Sweatland*, 181 A.D.2d at 246 (denying summary judgment on successor liability claim because there were issues of material fact; "It is apparent from the nature of the inquiry required that the court is to make, on a *case-by-case basis*, an analysis of the weight and impact of a multitude of factors that relate to the corporate creation, succession, dissolution, and successorship") (emphasis added and quotation omitted).

allegations against BofA).  Unlike the allegations here, the *only* basis the plaintiffs argued for successor liability in *Argent* was that "BofA assumed obligations of Countrywide under the Debentures."[34]  The court there found that the plaintiffs had not sufficiently alleged that BofA was liable for the pre-merger debts of Countrywide.[35]

Plaintiffs' successor liability theory here does not rest upon the structure of the so-called "triangular merger."  (BofA Mem. 6).[36]  Rather, the SAC alleges successor liability on two independent bases:  (i) specific statements and actions by BofA following the transaction demonstrating its assumption of Countrywide's liabilities, and (ii) detailed allegations of conduct by Countrywide and BofA following the transaction demonstrating all the hallmarks of a *de facto*

---

[34]    *See Argent* Plaintiffs' Opposition to Defendants' Motion to Dismiss at 2, attached as Ex. B to Rosenberg Decl., concurrently filed with BofA's Motion.  Although other bases for successor liability were mentioned in passing in the *Argent* plaintiffs' papers opposing the motion to dismiss and were addressed by the court in its order, the plaintiffs did not set forth specific allegations supporting the exceptions.  *See also* BofA's motion to dismiss in *Argent*, dated Jan. 6, 2009, at 1, attached as Ex. G to Burnett Decl. ("Apart from allegations concerning the merger and a passing reference to [Bank of America's] relationship to Banc of America Securities, LLC, the [complaint] is silent as to [Bank of America].").  The Court may take judicial notice of such filings.  *See, e.g. Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

[35]    *Argent* order at 8-9.

[36]    BofA misstates the holding in *Binder v. Bristol-Myers Squibb Co.*, 184 F. Supp. 2d 762 (N.D. Ill. 2001).  The court there, applying Delaware law, did not hold that a reverse triangular merger could never constitute a *de facto* merger, nor did it limit *de facto* mergers to asset purchases, as BofA contends.  Instead, the court expressly declined to find whether a reverse triangular merger had occurred in that case. *Id.* at 771. Successor liability was resolved after a trial, whereas Defendants are improperly asking this Court to make factual findings and draw legal conclusions at the pleading stage.  *Id.* at 764.  Here a BofA spokesperson has publicly characterized the transaction as a "purchase of [Countrywide's] assets and liabilities," SAC ¶ 270, so there is an issue of fact as to what liabilities BofA was "purchasing" or "assuming" in the transaction.  *In re McKesson,* 126 F. Supp. 2d 1248 (N.D. Cal. 2000), also cited by BofA, is distinguishable because here it is alleged—based on public statements made by Bank of America—that Bank of America has combined its operations with Countrywide.  Consequently, Plaintiffs are harmed to the extent that Bank of America is able to benefit from combining its preexisting mortgage business with that of Countrywide without assuming Countrywide's liability for Plaintiff's claims.

merger.  As none of the SAC's detailed allegations in support of either these bases were before the *Argent* court, *Argent*'s ruling dismissing the successor liability claim has no bearing here.[37]

Because the SAC sufficiently alleges successor liability on two separate grounds under the common law, BofA's motion to dismiss should be denied.

## XI.   DEFENDANTS' REQUEST TO STRIKE CERTAIN ALLEGATIONS IN THE SECOND AMENDED COMPLAINT SHOULD BE DENIED

### A.   Motions To Strike Are Disfavored

Annexes A and B to Defendants' Joint Memorandum list various paragraphs in the SAC that Defendants contend should be stricken pursuant to F.R.C.P. 12(f).  Annex A contains references to pleadings in other cases, government investigations, state lawsuit settlements, and news articles.  Annex B contains allegations that do not reference external materials but which Defendants contend are "drawn from improper materials without attribution."  Defendants fail to state a sufficient basis to strike either group of allegations.

Rule 12(f) provides that the court may "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent,[38] or scandalous[39] matter."  "Generally, motions to strike are disfavored and usually granted only for scandalous material."  *See Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 641-42 (S.D.N.Y. 2001).  And "the Second Circuit has cautioned that a motion to strike should not be granted unless there is a 'strong reason for doing

---

[37]    Indeed, a number of the statements and actions alleged in the SAC occurred *after* the filing of the complaint in *Argent* and could not have been considered by the court in that case.

[38]    Matter that is immaterial or impertinent within the meaning of Rule 12(f) is that which is "neither responsive nor relevant to the issues involved in the action."  *See Cabble v. Rollieson*, 2006 WL 464078, at *10 (S.D.N.Y. Feb. 27, 2006) (*quoting* 2 Moore's *Federal Practice* § 12.37[3] (2009)).

[39]    "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court."  *Cabble*, 2006 WL 464078 at *11 (citation omitted).

so.'" *Cabble v. Rollieson*, 2006 WL 464078, at *10 (S.D.N.Y. Feb. 27, 2006) (quoting *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976)).

To prevail on a Rule 12(f) motion, "the defendant must demonstrate that no evidence in support of the allegation would be admissible, that the allegations have no bearing on the issues in the case, and that to permit the allegations to stand would result in prejudice to the movant." *Metrokane*, 160 F. Supp. 2d at 642 (quotation omitted). Defendants make no such showing. They do not discuss the admissibility of any of the challenged material, they do not show why the allegations have no bearing on the issues charged in the SAC, and they do not demonstrate how any prejudice would result from inclusion of the challenged material.[40] Like most Rule 12(f) motions at the pleading stage, Defendants' argument is little more than a "time waster." *See* 5C Charles Alan Wright & Arthur R. Miller, *Fed. Prac. and Procedure* § 1382 (2009).

## B.    Defendants Have Not Shown That The Challenged Material Is Irrelevant And Prejudicial

In Annex A, Defendants move to strike explicit references to other complaints and media resources as "immaterial." However, "media resources, including newspapers, magazines, Internet sources, and books . . . can plainly form a basis for Plaintiff's beliefs" under the PSLRA. *In re Initial Public Offering*, 241 F. Supp. 2d at 355 & n.89. Even cases cited by Defendants recognize this. *See* Joint Mem. 20 (citing *In re Moody's*, 599 F. Supp. 2d at 508, 512 (holding that the complaint's citation to articles, including from the *Wall Street Journal* and *Financial Times*, supported the plaintiff's claims that certain representations were false)).

In Annex B, Defendants do not even specify a 12(f) ground for striking the allegations that they allege have been "drawn from improper materials without attribution," nor is there any.

---

[40]    Such prejudice would be especially difficult to show in a case such as this where the pleading would not be shown to a jury. Moreover, Countrywide's alleged fraud in connection with its sale of certain residential mortgage-backed securities has already received widespread attention in the media.

The Second Circuit has held that the PSLRA "does not require that plaintiffs plead with particularity every single fact upon which their beliefs concerning false or misleading statements are based." *Novak*, 216 F.3d at 313. The Court's "reading of the provision focuses on whether the facts alleged are sufficient to support a *reasonable belief* as to the misleading nature of the statement or omission." *Id.* at 314 n.1 (emphasis added). Accordingly, "plaintiffs need only plead with particularity *sufficient* facts to support those beliefs." *Id.* (emphasis in original).

Plaintiffs have set forth ample facts to support their claims. *See, e.g.*, SAC ¶¶ 73-75 (describing a May 2007 conference call with Plaintiffs in which Countrywide admitted that its representations regarding owner occupancy rates were false); SAC ¶ 122 (describing statements by Mark Zachary, a former Countrywide executive, regarding mortgage fraud and his ignored complaints to regional management about Countrywide's deceptive practices); SAC ¶¶ 124-126 (describing senior Countrywide manager's admission to Plaintiff that the Mortgage Loans had been securitized to hide the risks and induce investors to buy them); SAC ¶ 127 (describing Countrywide employee's internal memorandum which stated his belief that Countrywide has misled Plaintiffs by inducing them to invest in the SPS1 and SPS2 Securitizations); SAC ¶¶ 212-213 (describing internal emails, publicized on the SEC website, which demonstrate that Countrywide's executives knew that the Company was abandoning its origination guidelines and underwriting standards and thereby exposing borrowers and investors to undue risk). Defendants do not appear to be challenging the inclusion of any of these paragraphs in the SAC.

Because Plaintiffs have more than shown a *reasonable* basis for fraud, references to other sources to further bolster and support the SAC's well-pleaded allegations are proper. In any event, "[t]he requirements of the PSLRA must be read consistently with its purpose . . . . *The*

*purpose of the information and belief requirement-indeed, the purpose of all of the PSLRA's heightened pleading requirements—was to weed out meritless lawsuits at the pleading stage*." *In re Initial Public Offering*, 241 F. Supp. 2d at 358 (internal citation omitted).

Plainly, the widespread claims against Countrywide that are set forth in the challenged materials can hardly be deemed "unwarranted" or "meritless," and Defendants do not suggest otherwise. Nor does the mere fact that allegations in a pleading are also repeated in other complaints or news reports render that information less trustworthy. After all, the crux of this case is that Countrywide, once the largest mortgage originator in the country, operated a massive scheme to defraud not only Plaintiffs but the entire market. Given the circumstances, it is hardly surprising that there are a rash of public and private investors (as well as states' attorneys general and the SEC) asserting similar allegations to those here.

As this Court held in a similar case:

> Here, generic references to news articles, academic literature, and press releases are sufficiently particular to support the formation of Plaintiffs' beliefs because the substance of those beliefs—that the Defendants were perpetrating a massive fraud on the securities market in connection with most every IPO—was the stuff of daily headlines. ***The alleged fraud had so permeated the news media that there can be no doubt that Plaintiffs have a sufficient basis for their information and belief, and that is all that the statute requires***. The same can be said for any of the categories of sources proffered by Plaintiffs. Because there is no real doubt in these cases that Plaintiffs have ample grounds on which to base their allegations, there is no danger that the allegations here are "unwarranted"- even if they ultimately turn out to be untrue . . . . ***To ask Plaintiffs to show more than they have would be pointless, and to ask the Court to cross-reference every paragraph of every complaint against particular media reports, articles, letters, and other sources would be a waste of this Court's limited resources***.

*Id.* at 359 (internal citations omitted and emphasis added).

The cases cited by Defendants are inapposite. In *Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F. Supp 1033, 1040 n.11 (S.D.N.Y. 1993), the court noted that "plaintiffs' complaint [was] based almost entirely on information and belief without accompanying statements of the

facts upon which the allegations are founded." *Id.* at 1040.  This case, by contrast, is not

dependent on information and belief; the SAC cites direct evidence supporting both falsity and

scienter.  The challenged references are merely *additional* support for Plaintiffs' belief that they

had been defrauded.[41]

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

motions to dismiss in their entirety.

---

[41]    *Geinko v. Padda*, No. 00 C 5070, 2002 WL 276236, at *6 n.8 (N.D. Ill. Feb. 27, 2002) is also
inapposite.  That case concerns Rule 11, not Rule 12(f), and the court cautioned that "Plaintiffs' attorneys
cannot shirk their Rule 11 obligation to conduct an appropriate investigation into the facts that is
reasonable under the circumstances by merely stating that 'the SEC alleges' certain additional facts . . .
Significantly, Plaintiffs do not allege any of these facts as their own."  *Id.* at *6 n.8.  Here, Defendants
make no Rule 11 motion, nor could they.  Plaintiffs have ample allegations to support their case, and they
allege all facts as their own.

DATED:  New York, New York
        October 28, 2009

QUINN EMANUEL URQUHART OLIVER &
HEDGES, LLP


By: _____

Daniel L. Brockett
Jake M. Shields
David D. Burnett
51 Madison Avenue, 22nd Floor
New York, New York  10010-1601
Telephone:  (212) 849-7000
Fax:  (212) 849-7100
danbrockett@quinnemanuel.com
jakeshields@quinnemanuel.com
daveburnett@quinnemanuel.com

Marshall M. Searcy III (admitted pro hac vice)
Scott R. Commerson (admitted pro hac vice)
865 S. Figueroa St. 10th Floor
Los Angeles, California 90017
Telephone:  (213) 443-3000
Fax:  (213) 443-3100
marshallsearcy@quinnemanuel.com
scottcommerson@quinnemanuel.com

*Attorneys for Plaintiffs Footbridge Limited
Trust and OHP Opportunity Limited Trust*