# EXHIBIT B

1  JOHN M. McCOY, III, Cal. Bar No. 166244
   Email: mccoyj@sec.gov
2  SPENCER E. BENDELL, Cal. Bar No. 181220
   Email: bendells@sec.gov
3  LYNN M. DEAN, Cal. Bar. No. 205562
   Email: deanl@sec.gov
4  SAM PUATHASNANON, Cal. Bar. No. 198430
   Email:  puathasnanons@sec.gov
5  PARIS WYNN, Cal. Bar No. 224418
   Email: wynnp@sec.gov
6
   Attorneys for Plaintiff
7  Securities and Exchange Commission
   Rosalind R. Tyson, Regional Director
8  Michele Wein Layne, Associate Regional Director
   5670 Wilshire Boulevard, 11th Floor
9  Los Angeles, California 90036
   Telephone:  (323) 965-3998
10 Facsimile:   (323) 965-3908

11                     **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT OF CALIFORNIA**

13                                              Case No.: **CV09-03994 VBF AJWx**

| | |
|---|---|
| 14  SECURITIES AND EXCHANGE COMMISSION, | |
| 15            Plaintiff, | **COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| 16      vs. | |
| 17  ANGELO MOZILO, DAVID SAMBOL, AND ERIC SIERACKI, | **DEMAND FOR JURY TRIAL** |
| 18            Defendants. | |
| 19 | |

20

21

22

23

24

25

26

27

28

1   Plaintiff Securities and Exchange Commission ("Commission") alleges as

2   follows:

3   ### JURISDICTION AND VENUE

4   1.   This Court has jurisdiction over this action pursuant to Sections 20(b),

5   20(d)(1), 20(e) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15

6   U.S.C. §§ 77t(b), 77t(d)(1), 77t(e), and 77v(a), and Sections 21(d)(1), 21(d)(2),

7   21(d)(3)(A), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange

8   Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(2), 78u(d)(3)(A), 78u(e) & 78aa.

9   Defendants have directly or indirectly made use of the means or instrumentalities

10   of interstate commerce, of the mails, or of the facilities of a national securities

11   exchange in connection with the transactions, acts, practices and courses of

12   business alleged in this complaint.

13   2.   Venue is proper in this district pursuant to Section 22(a) of the

14   Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

15   § 78aa, because defendants reside and transact business within this district and

16   certain of the transactions, acts, practices and courses of conduct constituting

17   violations of the federal securities laws alleged in this complaint occurred within

18   this district.

19   ### SUMMARY

20   3.   This matter involves a disclosure fraud by the three most senior

21   executives of Countrywide Financial Corporation, a mortgage lender formerly

22   based in Calabasas, California, and insider trading by Countrywide's former

23   chairman of the board and chief executive officer, Angelo Mozilo.

24   4.   From 2005 through 2007, Mozilo, along with David Sambol, chief

25   operating officer and president, and Eric Sieracki, chief financial officer, held

26   Countrywide out as primarily a maker of prime quality mortgage loans,

27   qualitatively different from competitors who engaged primarily in riskier lending.

28   To support this false characterization, Mozilo, Sieracki, and Sambol hid from

1   investors that Countrywide, in an effort to increase market share, engaged in an
2   unprecedented expansion of its underwriting guidelines from 2005 and into 2007.
3   Specifically, Countrywide developed what was referred to as a "supermarket"
4   strategy, where it attempted to offer any product that was offered by any
5   competitor.  By the end of 2006, Countrywide's underwriting guidelines were as
6   wide as they had ever been, and Countrywide was writing riskier and riskier loans.
7   Even these expansive underwriting guidelines were not sufficient to support
8   Countrywide's desired growth, so Countrywide wrote an increasing number of
9   loans as "exceptions" that failed to meet its already wide underwriting guidelines
10  even though exception loans had a higher rate of default.

11      5.      Countrywide was more dependent than many of its competitors on
12  selling loans it originated into the secondary mortgage market, an important fact it
13  disclosed to investors.  But Mozilo expected that the deteriorating quality of the
14  loans that Countrywide was writing, and the poor performance over time of those
15  loans, would ultimately curtail the company's ability to sell those loans in the
16  secondary mortgage market.  Mozilo and the company's chief risk officer warned
17  Sambol and Sieracki about the increased risk that Countrywide was assuming.
18  Thus, each of the defendants was aware, but failed to disclose, that Countrywide's
19  current business model was unsustainable.

20      6.      Mozilo, Sambol, and Sieracki were responsible for Countrywide's
21  fraudulent disclosures.  From 2005 through 2007, these senior executives misled
22  the market by falsely assuring investors that Countrywide was primarily a prime
23  quality mortgage lender which had avoided the excesses of its competitors.
24  Countrywide's Forms 10-K for 2005, 2006, and 2007 falsely represented that
25  Countrywide "manage[d] credit risk through credit policy, underwriting, quality
26  control and surveillance activities," and the 2005 and 2006 Forms 10-K falsely
27  stated that Countrywide ensured its continuing access to the mortgage backed
28  securities market by "consistently producing quality mortgages."

1       7.      In fact, the credit risk that Countrywide was taking was so alarming to

2   Mozilo that he internally issued a series of increasingly dire assessments of various

3   Countrywide loan products and the risks to Countrywide in continuing to offer or

4   hold those loans, while at the same time he, Sambol, and Sieracki continued to

5   make public statements obscuring Countrywide's risk profile and attempting to

6   differentiate it from other lenders.  In one internal email, Mozilo referred to a

7   particularly profitable subprime product as "toxic," and in another he stated that

8   the company was "flying blind," and had "no way" to predict the performance of

9   its heralded product, the Pay-Option ARM loan.  Mozilo believed that the risk was

10  so high and that the secondary market had so mispriced Pay-Option ARM loans

11  that he repeatedly urged that Countrywide sell its entire portfolio of those loans.

12  Despite their awareness of, and Mozilo's severe concerns about, the increasing risk

13  Countrywide was undertaking, Mozilo, Sambol, and Sieracki hid these risks from

14  the investing public.

15      8.      Defendants misled investors by failing to disclose substantial negative

16  information regarding Countrywide's loan products, including:

17      • the increasingly lax underwriting guidelines used by the company in
18        originating loans;

19      • the company's pursuit of a "matching strategy" in which it matched the
20        terms of any loan being offered in the market, even loans offered by
          primarily subprime originators;
21

22      • the high percentage of loans it originated that were outside its own already
23        widened underwriting guidelines due to loans made as exceptions to
          guidelines;

24      • Countrywide's definition of "prime" loans included loans made to
25        borrowers with FICO scores well below any industry standard definition
          of prime credit quality;
26

27      • the high percentage of Countrywide's subprime originations that had a
28        loan to value ratio of 100%, for example, 62% in the second quarter of
          2006; and

- Countrywide's subprime loans had significant additional risk factors, beyond the subprime credit history of the borrower, associated with increased default rates, including reduced documentation, stated income, piggyback second liens, and LTVs in excess of 95%.

Mozilo, Sambol, and Sieracki knew this negative information from numerous reports they regularly received and from emails and presentations prepared by the company's chief credit risk officer. Defendants nevertheless hid this negative information from investors.

9.     During the course of this fraud, Mozilo engaged in insider trading in Countrywide's securities. Mozilo established four sales plans pursuant to Rule 10b5-1 of the Securities Exchange Act in October, November, and December 2006 while in possession of material, non-public information concerning Countrywide's increasing credit risk and the risk that the poor expected performance of Countrywide-originated loans would prevent Countrywide from continuing its business model of selling the majority of the loans it originated into the secondary mortgage market. From November 2006 through August 2007, Mozilo exercised over 5.1 million stock options and sold the underlying shares for total proceeds of over $139 million, pursuant to 10b5-1 plans adopted in late 2006 and amended in early 2007.

## DEFENDANTS

10.     **Angelo Mozilo**, age 70, is a resident of Thousand Oaks, California. Mozilo was a founder of Countrywide and was its chairman and chief executive officer ("CEO") from its formation in 1969 until Countrywide was acquired by Bank of America in 2008.

11.     **David Sambol**, age 49, is a resident of Hidden Hills, California. He was Countrywide's president and chief operating officer ("COO") from September 2006 until its acquisition by Bank of America in 2008. Sambol was Countrywide's executive managing director, business segment operations from April 2006 until September 2006, and executive managing director and chief of mortgage banking

1   and capital markets from January 2004 until April 2006.  Sambol was a member of

2   the Countrywide board of directors from 2007 until July 2008.  Sambol also held

3   executive positions at certain Countrywide subsidiaries, including Countrywide

4   Bank.

5       12.   **Eric Sieracki**, age 52, is a resident of Lake Sherwood, California.

6   Sieracki was Countrywide's chief financial officer ("CFO") from the first quarter

7   of 2005 until its acquisition by Bank of America in 2008.

8                                **RELATED PARTY**

9       13.   **Countrywide Financial Corporation**, a Delaware corporation, was a

10  mortgage lender based in Calabasas, California.  During all times relevant to this

11  complaint, its stock was registered pursuant to Section 12(b) of the Exchange Act

12  and was listed on the New York Stock Exchange, and, until the demise of the

13  Pacific Stock Exchange, it was listed on that Exchange as well.  On July 1, 2008,

14  Countrywide merged with Bank of America and is now a wholly owned subsidiary

15  of Bank of America.  Countrywide's remaining operations and employees have

16  been transferred to Bank of America, and Bank of America ceased using the

17  Countrywide name in April 2009.  On July 1, 2008, the NYSE filed a Form 25 to

18  deregister and delist Countrywide's common stock, and on July 22, 2008

19  Countrywide filed a Form 15 deregistering its common stock under Section 12(g)

20  of the Exchange Act.

21                                   **FACTS**

22      14.   From 2005 through 2007, in Countrywide's periodic filings with the

23  Commission and in other public statements, Mozilo, Sambol, and Sieracki held

24  Countrywide out as primarily a maker of prime quality mortgage loans,

25  qualitatively different from competitors who engaged primarily in riskier lending.

26  To support this false characterization, the proposed defendants hid from investors

27  that Countrywide was engaged in an effort to increase market share and sustain

28

1  revenue generation through unprecedented expansions of its underwriting
2  guidelines, taking on ever-increasing credit risk.

3        **A.**    **Countrywide's Business**

4       15.    Countrywide originated, sold, and serviced both prime and subprime
5  (which Countrywide's periodic filings referred to as "nonprime") mortgage loans.
6  By 2005, Countrywide was the largest U.S. mortgage lender in the United States,
7  originating over $490 billion in mortgage loans in 2005, over $450 billion in 2006,
8  and over $408 billion in 2007. Countrywide recognized pre-tax earnings of $2.4
9  billion and $2 billion in its loan production divisions in 2005 and 2006,
10  respectively, and a pre-tax loss of $1.5 billion in its loan production division in
11  2007.

12       16.    Countrywide pooled most of the loans it originated and sold them in
13  secondary mortgage market transactions. Countrywide sold the pooled loans either
14  through whole loan sales or securitization. In whole loan sales, Countrywide sold
15  the loans to investors and recorded gains on the sales. In securitizations,
16  Countrywide sold interests in the pooled loans, i.e., mortgage-backed securities.
17  Countrywide's loan sales were run out of its capital markets division. In 2005,
18  Countrywide reported $451.6 million in pre-tax earnings from capital market sales,
19  representing 10.9% of its pre-tax earnings; in 2006, it recognized $553.5 million in
20  pre-tax earnings from that division, representing 12.8% of its pre-tax earnings, and
21  in 2007 it recognized a mere $14.9 million in pre-tax earnings from that division,
22  reporting a pre-tax loss overall.

23       17.    Historically, Countrywide's primary business had been originating
24  prime conforming loans that were saleable to the Government Sponsored Entities
25  ("GSEs"). In the fiscal years 2001, 2002, and 2003, Countrywide's prime
26  conforming originations were 50%, 59.6%, and 54.2% of its total loan originations,
27  respectively. In 2003, United States residential mortgage production reached a
28  record level of $3.8 trillion. Countrywide experienced record earnings in that year,

1 | with net earnings of $2.4 billion, an increase of $1.5 billion, or 182%, over 2002.

2 | In 2004, in a market where originations were declining overall, Countrywide

3 | maintained net earnings of $2.1 billion, and increased its market share from 11.4%

4 | to 12.7%.

5 |     18.    Countrywide achieved this result in large part by moving away from

6 | its historical core business of prime mortgage underwriting to aggressively

7 | matching loan programs being offered by other lenders, even monoline subprime

8 | lenders. As a result, as reported in Countrywide's periodic filings and reflected in

9 | the chart below, in 2004, 2005, and 2006, Countrywide wrote more non-

10 | conforming, subprime, and home equity loans than in any prior period:

|                          | 2001  | 2002  | 2003  | 2004  | 2005  | 2006  |
|--------------------------|-------|-------|-------|-------|-------|-------|
| **Prime Conforming**     | 50%   | 59.6% | 54.2% | 38.2% | 32%   | 31.9% |
| **Prime Non-Conforming** | 16.5% | 24.5% | 31.4% | 38.7% | 47.2% | 45.2% |
| **Home Equity**          | 6.8%  | 4.6%  | 4.2%  | 8.5%  | 9.0%  | 10.2% |
| **Nonprime (Subprime)**  | 7.8%  | 3.7%  | 4.6%  | 11.0% | 8.9%  | 8.7%  |
| **FHA/VA**               | 18.9% | 7.6%  | 5.6%  | 3.6%  | 2.1%  | 2.8%  |
| **Commercial**           | 0.0%  | 0.0%  | 0.0%  | 0.0%  | 0.8%  | 1.2%  |

20 |     19.    In 2004, Countrywide's reported production of conventional

21 | conforming loans dropped to 38.2%, its production of subprime loans had risen to

22 | 11%, its production of home equity loans had risen to 8.5%, and its production of

23 | conventional non-conforming loans had risen to 38.7%. By 2006, Countrywide

24 | had turned its prior business model on its head: a mere 31.9% of its originations

25 | were conforming, 45.2% were non-conforming, 8.7% were subprime, and 10.2%

26 | were home equity.

27 | ///

28 | ///

### B.   Countrywide's Deceptive Description of Its Loans

20.   Countrywide's Form 10-Ks deceptively described the types of loans upon which the Company's business depended.   While Countrywide provided statistics about its originations which reported the percentage of loans in various categories, such as those noted in the table in paragraph 18, the information was misleading because its descriptions of "prime non-conforming" and "nonprime" loans in its periodic filings were insufficient to inform investors what types of loans were included in those categories.   "Prime" loans were described in Countrywide's 2005, 2006, and 2007 Forms 10-K as follows:

> Prime Mortgage Loans include conventional mortgage loans, loans insured by the Federal Housing Administration ("FHA") and loans guaranteed by the Veterans Administration ("VA"). A significant portion of the conventional loans we produce qualify for inclusion in guaranteed mortgage securities backed by Fannie Mae or Freddie Mac ("conforming loans").   Some of the conventional loans we produce either have an original loan amount in excess of the Fannie Mae and Freddie Mac loan limit for single-family loans ($417,000 for 2006) or otherwise do not meet Fannie Mae or Freddie Mac guidelines.   Loans that do not meet Fannie Mae or Freddie Mac guidelines are referred to as "nonconforming loans."

21.   Nothing in that description informed investors that Countrywide's "prime non-conforming" category included loan products with increasing amounts of credit risk.   While guidance issued by the banking regulators referenced a credit score ("FICO score") at 660 or below as being an indicator of a subprime loan, some within the banking industry drew the distinction at a score of 620 or below. Countrywide, however, did not consider **any** FICO score to be too low to be categorized within "prime."   Nor did Countrywide's definition of "prime" inform

1  investors that its "prime non-conforming" category included so-called "Alt-A"

2  loan products with increasing amounts of credit risk, such as (1) reduced or no

3  documentation loans; (2) stated income loans; and (3) loans with loan to value or

4  combined loan to value ratios of 95% and higher.  Finally, it did not disclose that

5  Pay-Option ARM loans, including reduced documentation Pay-Option ARM loans,

6  were included in the category of prime loans.  Moreover, to the extent these

7  extremely risky loans were below the loan limits established by the government

8  sponsored entities that purchased these loans ("GSEs"), they would have been

9  reported by Countrywide as prime conforming loans.  In 2005 and 2006,

10  Countrywide's Pay-Option ARMs ranged between 17% and 21% of its total loan

11  originations.  It maintained the majority of these loans in the held for investment

12  portfolio at Countrywide Bank.

13       22.    Significantly, the Countrywide periodic filings do not define

14  "nonprime" in any way, and Countrywide's periodic filings failed to disclose that

15  loans in the category of subprime were not merely issued to borrowers with

16  blemished credit, but that this category included loans with significant additional

17  layered risk factors, such as (1) subprime piggyback seconds, also known as 80/20

18  loans; (2) reduced or no documentation loans; (3) stated income loans; (4) loans

19  with loan to value or combined loan to value ratios of 95% and higher; and (5)

20  loans made to borrowers with recent bankruptcies and late mortgage payments.

21       23.    By increasing its origination of non-conforming and subprime loans

22  between 2003 and 2006, Countrywide was able to originate many more loans in

23  those years and increase its market share, even as the residential real estate market

24  declined in the United States.  As of December 31, 2003, based on its own internal

25  estimates, Countrywide had an 11.4% share of the United States mortgage market.

26  By September 30, 2006, it had a 15.7% share of the market.  While Countrywide

27  boasted to investors that its market share was increasing, company executives did

28  not disclose that its market share increase came at the expense of prudent

1   underwriting guidelines.  As a result, Countrywide's share price rose from $25.28

2   on December 31, 2003 to $42.45 on December 29, 2006, the last trading day of

3   that year.

**C.   Countrywide's Market Strategy Caused it To Take On Increasing Credit Risk**

**1.   Countrywide's Undisclosed Expansion of Underwriting Guidelines and the Matching Strategy**

8       24.   By the end of 2006, Countrywide's underwriting guidelines were

9   wider and more aggressive than they had ever been.  The company's aggressive

10  guideline expansion was deliberate, and began as early as 2003.  Indeed, from

11  January 2003 until well into 2006, Countrywide's credit risk management

12  department ("Risk Management") spent approximately 90% of its time processing

13  requests for expansions of Countrywide's underwriting guidelines.

14      25.   Countrywide's "matching strategy," also known as the "supermarket

15  strategy," was a key driver of the company's aggressive expansion of underwriting

16  guidelines.  The strategy committed the company to offering any product and/or

17  underwriting guideline available from at least one "competitor," which included

18  subprime lenders.  Thus, if Countrywide did not offer a product offered by a

19  competitor, Countrywide's production division invoked the matching strategy to

20  add the product to Countrywide's menu.  For example, if Countrywide's minimum

21  FICO score for a product was 600, but a competitor's minimum score was 560, the

22  production division invoked the matching strategy to reduce the minimum required

23  FICO score at Countrywide to 560.

24      26.   The impact of the matching strategy was intensified by Countrywide's

25  "no-brokering" policy, which precluded Countrywide's loan officers from referring

26  loan applicants to other brokers and/or institutions.  Prior to its implementation,

27  loan officers could engage in a practice known as "brokering," in which the loan

28  officer would refer those borrowers deemed too risky for Countrywide to another

1  lender, which in turn paid a commission to the Countrywide loan officer.  The no-
2  brokering policy increased the incentives for Countrywide's retail sales force to be
3  aggressive in finding ways for Countrywide to underwrite a loan, regardless of
4  whether the loan satisfied the underwriting guidelines Countrywide repeatedly
5  touted to investors.

6      27.    Mozilo, Sambol, and Sieracki knew that the company was taking on
7  increased risk of defaults and delinquencies as a result of its widened underwriting
8  guidelines and matching strategy, yet Countrywide's periodic filings concealed the
9  unprecedented expansion of underwriting guidelines and the attendant increased
10 credit risk.

11                    **2.    Exception Loans Magnified Countrywide's Credit Risk**

12     28.    Though Countrywide proclaimed in its Forms 10-K for 2005, 2006,
13 and 2007 that it managed credit risk through its loan underwriting, the company's
14 increasingly wide underwriting guidelines and exceptions process materially
15 increased Countrywide's credit risk during that time.  Countrywide used an
16 automated underwriting system known as "CLUES" to actually underwrite loans.
17 The CLUES system applied the principles and variables set forth in the
18 Countrywide underwriting manuals and its loan program guide.  CLUES applied a
19 device known as the "underwriting scorecard," which assessed borrower credit
20 quality by analyzing several variables, such as FICO scores, loan to value ratios,
21 documentation type (*e.g.*, full, reduced, stated) and debt-to-income ratios.  These
22 variables were weighted differently within the scorecard, depending upon their
23 perceived strength in predicting credit performance.  In underwriting a loan,
24 Countrywide loan officers entered an applicant's information into CLUES, which
25 would (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the
26 loan to a loan officer for further consideration and/or manual underwriting.

27     29.    The CLUES program typically did not "reject" a loan if a requirement
28 of Countrywide's guidelines had not been met or if CLUES calculated that the loan

1  presented an excessive layering of risk. Instead, CLUES "referred" the loan,

2  indicating that the loan application would have to be reviewed manually prior to

3  approval. In these circumstances, to proceed with the loan, the loan officer would

4  request an "exception" from the guidelines from more senior underwriters at

5  Countrywide's structured lending desk ("SLD"). Countrywide's level of

6  exceptions was higher than that of other mortgage lenders. The elevated number

7  of exceptions resulted largely from Countrywide's use of exceptions as part of its

8  matching strategy to introduce new guidelines and product changes.

9        30.    Further, the actual underwriting of exceptions was severely

10 compromised. According to Countrywide's official underwriting guidelines,

11 exceptions were only proper where "compensating factors" were identified which

12 offset the risks caused by the loan being outside of guidelines. In practice,

13 however, **Countrywide used as "compensating factors" variables such as**

14 **FICO and loan to value, <u>which had already been assessed by CLUES in</u>**

15 <u>**issuing a "refer" finding**</u>. Countrywide underwriting manuals were amended to

16 explicitly prohibit this practice in mid-2007, but this serious deficiency was in

17 place from early 2006 through early 2007, when a large volume of obviously

18 deficient exception loans were originated by Countrywide.

19        **D.    Countrywide's Business Model Became Unsustainable**

20        31.    As described above, Countrywide depended on its sales of mortgages

21 into the secondary market as an important source of revenue and liquidity. As a

22 result, Countrywide was not only directly exposed to credit risk through the

23 mortgage-related assets on its balance sheet, but also indirectly exposed to the risk

24 that the increasingly poor quality of its loans would prevent their continued

25 profitable sale into the secondary mortgage market and impair Countrywide's

26 liquidity. Rather than disclosing this increasing risk, Mozilo, Sambol, and Sieracki

27 gave false comfort, again touting Countrywide's loan quality. For example,

28 Countrywide stated in its 2005 Form 10-K: "We ensure our ongoing access to the

1    secondary mortgage market by consistently producing quality mortgages. . . . We

2    make significant investments in personnel and technology to ensure the quality of

3    our mortgage loan production." A virtually identical representation appears in

4    Countrywide's 2006 Form 10-K. Accordingly, Countrywide's failure to disclose

5    its widening underwriting guidelines and the prevalence of exceptions to those

6    guidelines in 2005 and 2006 constituted material omissions from Countrywide's

7    periodic reports.

8            **E.      Mozilo, Sambol, and Sieracki Were Aware of the Increased**

9                   **Credit Risk Created By Expanded Underwriting Guidelines and**

10                  **Exception Loans**

11           32.   Countrywide's increasingly wide underwriting guidelines materially

12   increased the company's credit risk from 2004 through 2007, but this increased

13   risk was not disclosed to investors. In 2007, as housing prices declined,

14   Countrywide began to suffer extensive credit problems as the inherent credit risks

15   manifested themselves.

16           **1.      The September 2004 Warning**

17           33.   The credit losses experienced by Countrywide in 2007 not only were

18   **foreseeable** by the proposed defendants, they were in fact **foreseen** at least as early

19   as September 2004. Risk Management warned Countrywide's senior officers that

20   several aggressive features of Countrywide's guidelines (*e.g.,* high loan to value

21   programs, ARM loans, interest only loans, reduced documentation loans, and loans

22   with layered risk factors) significantly increased Countrywide's credit risk.

23           34.   Countrywide was taking on more risk as a direct result of the lower

24   credit quality of the loans it was originating. Countrywide's strategy of reducing

25   risk through loan sales was being frustrated as the company produced smaller

26   percentages of loans eligible for sale on a nonrecourse basis (e.g., FHA, VA and

27   conforming loans), and larger percentages of loans (e.g., subprime and

28

1    nonconforming loans) where it retained credit risk in the form of residual interests.

2    By September 2004, defendants knew the following trends:

3    •    66% of Countrywide's production was conforming in July 2003,
4         but conforming originations **had fallen** to 35% by July 2004;

5    •    21% of Countrywide's production was nonconforming in July
6         2003, but non-conforming originations **had risen** to 40% by July
7         2004; and

8    •    2% of Countrywide's July 2003 production was subprime, but
9         subprime originations **had risen** to 10% by July 2004.

10   35.    The credit risk described in the September 2004 warning **worsened**

11   from September 2004 to August 2007.  Risk Management continuously had

12   discussions with Countrywide's loan production division, which reported to

13   Sambol, about the credit concerns identified in the September 2004 warning.  In

14   fact, Risk Management conducted studies to identify relationships among certain

15   credit variables and their effect upon the probability that a loan would go into

16   serious delinquency or default.  One finding of these studies, the results of which

17   were shared with Sambol and Sieracki, was that the less documentation associated

18   with a loan, the higher the probability of default.  Nevertheless, Countrywide

19   continued to expand its underwriting guidelines, and to liberally make exceptions

20   to those guidelines, through the end of 2006.  These facts were never disclosed to

21   investors.

22        2.    **Credit Risk Management Repeatedly Alerted the**
23             **Defendants to Increases in Credit Risk**

24   36.    Both Sambol and Sieracki were members of the Countrywide credit

25   risk committee.  The credit risk committee had quarterly meetings.  At these

26   meetings, the members were provided with detailed presentations highlighting

27   Countrywide's increased credit risk.  For example, at an April 6, 2005 meeting of

28   the credit risk committee attended by Sambol, McMurray reported that (1)

Countrywide non-conforming loans originated in May 2002 were twice as likely to default as loans originated in January 2000; (2) the risk of home equity lines of credit defaulting had doubled over the past year, mainly due to the prevalence of reduced documentation in those loans; and (3) Countrywide was now a leader in the subprime market in four of six categories, whereas in December 2004 Countrywide had only been a leader in two of six categories.

37.     Similarly, Sieracki attended a June 28, 2005 meeting at which the chief operating officer noted that Countrywide was taking on "too much" balance sheet risk in home equity lines of credit ("HELOCs") and subprime loans, and had taken on "unacceptable risk" from non-owner occupied loans made at 95% combined loan to value ratios, which were an exception to Countrywide's then-existing underwriting guidelines. Risk Management also reported at that meeting that non-conforming loan programs accounted for 40% of Countrywide's loan originations and that subprime production had tripled, rising from 4% to 14% of total production. Finally, at that same meeting, Risk Management reported to the committee on evidence of borrowers misrepresenting their income and occupation on reduced documentation loan applications, and the increasing credit risks associated with Pay-Option ARM loans, for example, negative amortization, payment shock, and the necessity of raising the initial interest rate to reduce the speed of negative amortization on the loans.

38.     Sambol and Sieracki also learned of the risks associated with the company's aggressive guideline expansion in meetings of other company committees. For example, Sieracki was a member of the asset and liability committee, and Sambol attended certain of its meetings. If a proposed guideline expansion had a modeled expected default rate in excess of 8%, the proposal had to be submitted to this committee for approval. All proposed expansions to Countrywide's subprime menu from late 2005 through 2006 presented an expected default rate in excess of 8% and required approval of that committee. In June

1    2005, Sambol and McMurray engaged in a lengthy email exchange regarding the
2    impact of Countrywide's underwriting guideline expansion related to requests for
3    subprime product expansions that had been taken up by the asset and liability
4    committee in the first and second quarters of 2005.  In that exchange, McMurray
5    warned Sambol that "as a consequence of [Countrywide's] strategy to have the
6    widest product line in the industry, we are clearly out on the 'frontier' in many
7    areas." McMurray went on to note that the frontier had "high expected default
8    rates and losses."

9         39.    Additionally, proposals with high expected defaults or that were
10   otherwise controversial were referred to the Countrywide responsible conduct
11   committee for approval.  Sambol was a member of this committee, which had
12   repeatedly approved guideline expansions.  For instance, in late 2006
13   Countrywide's production divisions proposed expanding Countrywide's guidelines
14   to match certain guidelines offered by Bear Stearns and Lehman Brothers,
15   programs that were known within Countrywide as "Extreme Alt-A."  Risk
16   Management was concerned about the risks associated with these guidelines, and
17   referred the request to the responsible conduct committee.  Sambol, in his capacity
18   as a member of that committee, approved the expansion.

19        40.    Finally, both Mozilo and Sambol were aware as early as June 2006
20   that a significant percentage of borrowers who were taking out stated income loans
21   were engaged in mortgage fraud.  On June 1, 2006, Mozilo advised Sambol in an
22   email that he had become aware that the Pay-Option ARM portfolio was largely
23   underwritten on a reduced documentation basis and that there was evidence that
24   borrowers were lying about their income in the application process.  On June 2,
25   2006, Sambol received an email reporting on the results of a quality control audit
26   at Countrywide Bank that showed that **50%** of the stated income loans audited by
27   the bank showed a variance in income from the borrowers' IRS filings of greater
28

than 10%. Of those, 69% had an income variance of greater than 50%. These
material facts were never disclosed to investors.

### 3.   Warnings Regarding the Matching Strategy

41.   McMurray repeatedly provided explicit and ominous warnings about
Countrywide's matching strategy. In a June 25, 2005 email to Sambol concerning
guideline expansion and the company's growing credit risks, McMurray addressed
the matching strategy and explained that "because the matching process includes
comparisons to a variety of lenders, our [guidelines] will be a composite of the
outer boundaries across multiple lenders[,]" and that because comparisons are only
made to competitor guidelines where they are more aggressive and not used where
they are less aggressive, Countrywide's **"composite guides [sic] are likely
among the most aggressive in the industry."** (emphasis added.)

42.   On November 2, 2006, McMurray sent an email to Countrywide's
chief investment officer ("CIO"), which the CIO forwarded to Sambol, stating that
the matching strategy had caused Countrywide to cede its underwriting standards
to the most aggressive lenders in the market. In the email, McMurray asked: **"Do
we want to effectively cede our policy and is this approach "saleable" from a
risk perspective to those constituents who may worry about our risk profile**?"
(emphasis added.)

43.   In a November 16, 2006 email to Sambol, McMurray complained
about guidelines and products being introduced in contravention of credit policy.
As an example, McMurray cited the fact that Extreme Alt-A loans were being
offered by the loan production divisions, even though that program had not been
officially approved in the guideline review process. The proposed guidelines
would have permitted 100% financing, layered with additional credit risk factors
such as stated income, lower than average FICO scores, or non-owner occupied
investment properties.

1      44.    In a February 11, 2007 email to Sambol, McMurray noted that the

2   production divisions continued to advocate for, and operated pursuant to, an

3   approach based upon the matching strategy alone, and repeated his concern that the

4   strategy would cause Countrywide's guidelines to be a composite of the riskiest

5   offerings the market.  Additionally, McMurray warned that, "**I doubt this**

6   **approach would play well with regulators, investors, rating agencies etc**.  To

7   some, this approach might seem like **we've simply ceded our risk standards and**

8   **balance sheet to whoever has the most liberal guidelines**." (emphasis added.)

9          **4.**     **Warnings Regarding Guideline Expansion and Disruptions**

10               **in the Secondary Market**

11      45.    By no later than 2006, Mozilo and Sambol were on notice that

12   Countrywide's exotic loan products might not continue to be saleable into the

13   secondary market, yet this material risk was not disclosed in Countrywide's

14   periodic filings.

15      46.    In September 2006 Mozilo wrote an email to Sambol warning that he

16   believed that the Pay-Option loan was "mispriced" in the secondary market and

17   that the pricing spread could disappear quickly if there were a negative event in the

18   market.  On February 2, 2007, Risk Management warned Sambol that guideline

19   expansions could disrupt the secondary market for subprime mortgage backed

20   securities ("MBS").  Later in that quarter, the MBS market for subprime loans

21   experienced a disruption that forced Countrywide to write down loans that it had

22   previously intended to sell into that market.  Then, in August 2007, the entire

23   market for MBS experienced a severe disruption, which effectively crippled the

24   ability of Countrywide, as well as other mortgage lenders, to sell non-GSE

25   securitizations into the secondary markets and contributed to Countrywide's

26   liquidity problems.

27

28

1         **5.**     **Warnings Regarding 100% (a.k.a. 80/20 loans) Financing**

2       47.    The seriousness of Risk Management's warnings on guideline

3 expansion and the consequences of Countrywide's failure to heed such warnings

4 are vividly demonstrated by the company's experience with "80/20" subprime

5 loans. An 80/20 subprime loan is a loan where a borrower with a subprime FICO

6 score simultaneously takes out two loans to purchase a home: a first lien loan

7 (typically 80% of the purchase price), and a second lien loan (typically 20% of the

8 purchase price). As a result of having 100% financed the purchase, the borrower

9 has no initial equity in the home. Pursuant to Risk Management's "Policy on High

10 Risk Products," subprime 80/20 loans could not be originated via the exceptions

11 process, and could only be originated if Countrywide could totally extinguish the

12 credit risks (*e.g.,* residual interests or corporate guarantees) resulting from such

13 loans. But the policy was ignored by the production divisions.

14       48.    Mozilo knew of the risks Countrywide incurred by originating

15 subprime 80/20 loans and repeatedly questioned the wisdom of continuing to offer

16 the product. Mozilo became concerned about the loans in the first quarter of 2006,

17 when HSBC, a purchaser of Countrywide's 80/20 loans, began to contractually

18 force Countrywide to "buy back" certain of these loans that HSBC contended were

19 defective. On March 28, 2006, Mozilo sent an e-mail to Sambol and others,

20 directing them to implement a series of corrective measures to "avoid the errors of

21 both judgment and protocol that have led to the issues that we face today caused by

22 the buybacks mandated by HSBC." Mozilo further stated that the 100% loan-to-

23 value (also known as 80/20) subprime product is "**the most dangerous product in**

24 **existence and there can be nothing more toxic** and therefore requires that no

25 deviation from guidelines be permitted irrespective of the circumstances."

26       49.    Then, in an April 13, 2006 email, Mozilo informed Sambol, Sieracki,

27 and others that there were numerous issues that they must address relating to the

28 100% subprime second business in light of the losses associated with the HSBC

1 buyback. One issue in particular that Mozilo identified was the fact that the loans

2 had been originated "through our channels with disregard for process [and]

3 compliance with guidelines." Mozilo went on to write that he had **personally**

4 **observed a serious lack of compliance within our origination system as it**

5 **relates to documentation and generally a deterioration in the quality of loans**

6 **originated** versus the pricing of those loan [sic]." Mozilo noted that, **"[i]n my**

7 **conversations with Sambol he calls the 100% sub prime seconds as the 'milk'**

8 **of the business. <u>Frankly, I consider that product line to be the poison of</u>**

9 **<u>ours</u>.**" (emphasis added.)

10       50.    Furthermore, in an April 17, 2006 email to Sambol concerning

11 Countrywide's subprime 80/20 loans, Mozilo fumed:

12         In all my years in the business I have never seen a more toxic prduct.

13         [sic] It's not only subordinated to the first, but the first is subprime. In

14         addition, the FICOs are below 600, below 500 and some below 400[.]

15         With real estate values coming down...the product will become

16         increasingly worse. There has [sic] to be major changes in this

17         program, including substantial increases in the minimum FICO. . . .

18         Whether you consider the business milk or not, I am prepared to go

19         without milk irrespective of the consequences to our production.

20       51.    Echoing Mozilo's criticisms of the 80/20 product, in April 2006 Risk

21 Management recommended increasing the minimum FICO score on the product by

22 20 points. Sambol, then still the head of the production divisions, opposed this

23 recommendation, and noted that such an increase would make Countrywide

24 uncompetitive with subprime lenders such as New Century, Option One, and

25 Argent.

26       52.    On December 7, 2006, Mozilo circulated a memorandum drafted for

27 him by McMurray to the board of directors and all Countrywide managing

28

1   directors, including Sambol and Sieracki.  In the memorandum, Mozilo made the

2   following observations, among others:

- Countrywide had expanded its subprime underwriting guidelines in every conceivable area, lowering minimum FICOs, raising maximum loan size and LTV, and making interest only, stated income, and piggyback second loans available to subprime borrowers;

- Countrywide expected that subprime loans originated in 2006 (the "2006 Vintage") would be the worst performing on record, driven by wider guidelines and the worsening economic environment, which included rising interest rates and declining home values;

- the percentage of 60- and 90-day delinquencies in the 2006 Vintage (at 8.11% and 4.03% respectively), exceeded the percentages from each of the previous six years, and the company expected these percentages to rise; and

- 62% of Countrywide's subprime originations in the second quarter of 2006 had a loan to value ratio of 100%.

53.   In April 2006, Mozilo wrote that no premium, no matter how high, could justify underwriting a loan for a borrower whose FICO score was below 600. Yet Countrywide failed to disclose to investors the serious deficiencies in its underwriting of these "toxic" loans.

### 6.   Warnings Regarding Exception Loans

54.   Mozilo, Sambol, and Sieracki were aware of significant lapses in Countrywide's underwriting processes and the resulting risk to Countrywide.  On May 22, 2005, McMurray warned Sambol of the likelihood of significantly higher default rates in loans made on an exception basis: "[t]he main issue is to make sure everyone's aware that we will see higher default rates."  McMurray explained that

1  "exceptions are generally done at terms more aggressive than our guidelines," and

2  continued that **"[g]iven the expansion in guidelines and the growing likelihood**

3  **that the real estate market will cool, this seems like an appropriate juncture to**

4  **revisit our approach to exceptions."** (emphasis added.) McMurray also warned

5  that increased defaults would cause repurchase and indemnification requests to rise

6  and the performance of Countrywide-issued MBS to deteriorate.

7      55.   The poor quality of the loans originated through the exception process

8  became even more obvious in the first quarter of 2007.  In fact, in materials

9  distributed at a March 12, 2007 meeting of the credit risk committee attended by

10  Sambol and Sieracki, Risk Management reported that nearly 12% of the loans

11  reviewed by Countrywide in an internal quality control process were rated

12  "severely unsatisfactory" or "high risk." The causes for such a rating included

13  findings that such loans had debt-to-income, loan to value, or FICO scores outside

14  of Countrywide's already wide underwriting guidelines.  By the second quarter of

15  2007, Risk Management began to report a serious deterioration in the performance

16  of exception loans.

17      56.   In a December 13, 2007 memo that was sent to Mozilo in his capacity

18  as Countrywide's chairman of the board, Countrywide's enterprise risk assessment

19  officer noted that:

20              Countrywide had reviewed limited samples of first- and

21              second-trust-deed mortgages originated by Countrywide

22              Bank during the fourth quarter of 2006 and the first

23              quarter of 2007 in order to get a sense of the quality of

24              file documentation and underwriting practices, and to

25              assess compliance with internal policies and procedures.

26              The review resulted in . . . the finding that **borrower**

27              **repayment capacity was not adequately assessed by**

28              **the bank during the underwriting process** for home

1    equity loans.  More specifically, **debt-to-income (DTI)**

2    **ratios did not consider the impact of principal**

3    **[negative] amortization or an increase in interest**.

4    (emphasis added)

5       57.    These material deficiencies in Countrywide's underwriting were never

6    disclosed to investors in Countrywide's Forms 10-Q or 10-K for 2005 through

7    2007.

8      **F.**    **Pay-Option Arms and the Discrepancy Between the Internal and**

9         **External Portrayals of Credit Risk**

10        **1.**    **The External Story**

11       58.    Countrywide began originating Pay-Option ARM loans in 2004; by

12    the second quarter of 2005 21% of Countrywide's loan production was Pay-Option

13    ARMS.  Pay-Option ARMs allowed borrowers to choose between four payment

14    options: (1) a minimum payment which was insufficient to cover accruing interest;

15    (2) an interest-only payment; (3) a fully amortizing payment with a 30 year pay-

16    off; and (4) a fully amortizing payment with a 20 year pay-off.  If the minimum

17    payment was selected, then the accruing interest would be added to the loan's

18    principal balance, a phenomenon known as negative amortization.  Countrywide's

19    Pay-Option ARM loans typically allowed for negative amortization until the

20    principal balance reached 115% of the original loan balance, at which time the

21    payment would reset to the amount necessary to repay principal and interest in the

22    term remaining on the loan.  This resulted in a much higher monthly payment and

23    "payment shock" to many borrowers.  Even if the borrower never reached the

24    115% threshold, the loan would typically reset after five years to a fully amortizing

25    payment.  Because Countrywide began to offer Pay-Option loans in 2004,

26    Countrywide's first wave of automatic resets were scheduled to occur in 2009.

27    Unlike many other loans that Countrywide originated, most of the Pay-Option

28    loans were held for investment by Countrywide Bank.

1    59.    Countrywide publicly heralded Pay-Option loans as a safe product

2  offering.  For instance, in its 2006 Form 10-K, Countrywide proclaimed that it had

3  "prudently underwritten" its Pay-Option ARMs.  On May 31, 2006, Mozilo gave a

4  speech in which he stated, "Pay-Option loans represent the best whole loan type

5  available for portfolio investment from an overall risk and return perspective," that,

6  "[t]he performance profile of this product is well understood because of its twenty

7  year history, which includes stress tests in difficult environments[,]" and that

8  Countrywide "actively manages credit risk through prudent program

9  guidelines…and sound underwriting."

10         **2.    The Internal View**

11    60.    Contrary to such public statements extolling the virtues of the Pay-

12  Option ARM product, Mozilo, along with several of Countrywide's senior

13  executives, had concluded that the product's risks to the company were severe, and

14  they were scrambling to identify ways to mitigate them.  Sambol and Sieracki were

15  aware of these concerns.

16         **a.    Negative Amortization and Payment Shock**

17    61.    In June 2005, Risk Management warned senior executives, including

18  Sieracki, that action was needed to address the increasing pace of negative

19  amortization and the potential for payment shock associated with Pay-Option

20  ARMs.  Specifically, in a June 28, 2005 meeting of the credit risk committee,

21  which was attended by Sieracki, Risk Management recommended that the rate

22  used to calculate the minimum payment on Pay-Option ARMs ("start rate") be

23  raised to reduce negative amortization and the severity of payment shock.  Risk

24  Management explained that while the start rate remained constant at 1%, short

25  term rates (upon which borrowers' fully amortizing payments were based) had

26  risen steadily, thereby increasing the pace of negative amortization and the severity

27  of the resulting payment shock.

28

62.    At a June 22, 2006 credit risk committee meeting, attended by Sambol and Sieracki, Risk Management noted that the median time to reset on the pay option loans was getting shorter as negative amortization was accruing at a faster than expected pace.

### b.    Mozilo's Pointed Concerns About Pay-Option ARMs

63.    On April 4, 2006, Mozilo received an e-mail regarding Pay-Option loans which informed him that "72% of [Pay-Option] customers chose Minimum Payment selection in February 06, up from 60% in August 05." In response to this information Mozilo sent an email to Sambol that reflected how well he understood the negative ramifications of the information for Countrywide: "Since over 70% have opted to make the lower payment it appears that **it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies.**"

64.    About six weeks later, on May 18, 2006, Mozilo sent another e-mail to Sambol and Sieracki again sounding the alarm about the Pay-Option portfolio. Stating that "the Bank faces potential unexpected losses because higher [interest] rates will cause the loans to reset much earlier than anticipated and as a result causing mortgagors to default due to the substantial increase in their payments," Mozilo directed the management team to reduce "balance sheet risk" by refinancing Pay-Options into interest-only loans and improving consumer education about the consequences of resets. Mozilo concluded his e-mail by stating that "there is much more that we can do to manage risk much more carefully during this period of uncertainty both as to the rate environment and untested behavior of payoptions." The very next day, May 19, 2006, Mozilo wrote another email to Sambol and Sieracki, noting that Pay-Options loans presented a long term problem "unless [interest] rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen."

### c.   Mozilo's Concerns Mount

65.   Mozilo received more dire news regarding the Pay-Option loan portfolio in June 2006.  On June 1, 2006, **one day** after he gave a speech publicly praising Pay-Option ARMs, Mozilo sent an email to Sambol and other executives, in which he expressed concern that the majority of the Pay-Option ARM loans were originated based upon stated income, and that there was evidence of borrowers misrepresenting their income.  Mozilo viewed stated income as a factor that increased credit risk and the risk of default.  In his email, Mozilo reiterated his concern that in an environment of rising interest rates, resets were going to occur much sooner than scheduled, and because at least 20% of the Pay-Option borrowers had FICO scores less than 700, **borrowers "are going to experience a payment shock which is going to be <u>difficult if not impossible</u> for them to manage."**  Mozilo concluded that the company needed to act quickly to address these issues because "[w]e know or can reliably predict what's going to happen in the next couple of years."  Mozilo directed Countrywide Bank to (1) stop accumulating loans with FICO scores below 680 unless the loan-to-value ratio was 75% or lower, (2) assess the risks that the Bank faced on loans with FICO scores below 700 and determine if they could be sold out of the Bank and replaced with higher quality loans, and (3) take a careful look at the reserves and "begin to assume the worst."

66.   On July 10, 2006, Mozilo received an internal monthly report, called a "flash report," that tracked the delinquencies in the Pay-Option portfolio, as well as the percentage of borrowers electing to make the minimum payment and the amount of accumulated negative amortization on each loan.  Mozilo learned that from September 2005 through June 2006, the percentage of Pay-Option borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%.  Mozilo believed that these statistics were significant enough that he requested that the company include a letter in bold type with every new Pay-Option loan to

1  inform borrowers of the dangers of negative amortization and to encourage full

2  payment.

3      67.    About a month later, on August 16, 2006, Mozilo received an e-mail

4  from a fellow member of Countrywide's board of directors, asking whether the

5  company anticipated any significant problems with the Pay-Option portfolio.

6  Mozilo responded by reiterating the ongoing concerns he had shared with senior

7  management earlier in 2006.   By this point in time, over 75% of the Pay-Options

8  borrowers were opting for the minimum payment, which, along with rising interest

9  rates, continued to accelerate negative amortization.   Mozilo explained that, as a

10  result, the loans would reset much faster than the borrowers expected with

11  accompanying payment shock.   The only solution, Mozilo wrote, was to refinance

12  the loans before reset, but this would be difficult in light of decreasing home values

13  and rising interest rates.   Mozilo wrote that only "unlikely" events, such as a

14  dramatic rise in home values or a dramatic drop in interest rates, would alleviate

15  future payment shock.

16              **d.    Internally, Mozilo Urges Selling the Pay-Option**

17                  **Portfolio**

18      68.    Mozilo met with Sambol the morning of September 25, 2006 to

19  discuss the Pay-Option ARM loan portfolio.   The next day Mozilo sent an e-mail

20  to Sambol and Sieracki expressing even greater concern about the portfolio.   In

21  that e-mail, Mozilo wrote:

22              **[w]e have no way, with any reasonable certainty,**

23              **to assess the real risk of holding these loans on**

24              **our balance sheet.** The only history we can look to

25              is that of World Savings however their portfolio was

26              fundamentally different than ours in that their focus

27              was equity and our focus is fico.   In my judgement,

28              as a long time lender, I would always trade off fico

- 28 -

1   for equity.  The bottom line is that **we are flying**
2   **blind** on how these loans will perform in a stressed
3   environment of higher unemployment, reduced
4   values and slowing home sales.  (emphasis added)

5   69.    In his September 26, 2006 email Mozilo further stated that "**pay**
6   **options are currently mispriced in the secondary market, and that spread**
7   **could disappear quickly** if there is an foreseen [sic] headline event such as
8   another lender getting into deep trouble with this product or because of negative
9   investor occurance [sic]." (emphasis added.) He urged that the "timing [wa]s
10  right" to sell Countrywide Bank's portfolio of loans.  To mitigate these anticipated
11  losses, Mozilo proposed that the Bank "sell all newly originated pay options and
12  begin rolling off the bank balance sheet, in an orderly manner, pay options
13  currently in their port[folio]."

14  70.    McMurray responded to Mozilo's September 26, 2006 email, agreeing
15  that Countrywide "should be shedding rather than adding Pay Option risk to the
16  portfolio."  In the fall of 2006, Countrywide's CIO went further, and recommended
17  to Mozilo, Sambol, Sieracki, and others that all Pay-Option ARMs be sold from
18  Countrywide Bank because Countrywide was not receiving sufficient
19  compensation on these loans to offset the risk of retaining them on its balance
20  sheet.

21  71.    Mozilo never became comfortable with the risk presented by the Pay-
22  Option loan.  Indeed, on January 29, 2007, Mozilo wrote an email in which he
23  instructed the president of Countrywide Bank to "to explore with KPMG the
24  potential of selling out (one time transaction because of the tarred reputation of
25  Payoptions) the bulk to the Payoptions on the Bank's balance sheet and replace
26  them with HELOCS."  Then, on November 3, 2007, Mozilo instructed the
27  president of the Bank and Sambol that he did not "want any more Pay Options
28  originated for the Bank.  I also question whether we should touch this product

1   going forward because of **our inability to properly underwrite these** combined

2   with the fact that these loans are inherently unsound unless they are full doc, no

3   more than 75% LTV and no piggys" (emphasis added). Finally, on November 4,

4   2007, Mozilo advised the president of the Bank and Sambol that "[p]ay options

5   have hurt the company and the Bank badly. . . . World Savings culture permits

6   them to make these loans in a sound manner and our culture does not . . . . fico

7   scores are no indication of how these loans will perform."

8         72.    Despite the repeated warnings of Mozilo, McMurray, and the CIO, the

9   Pay-Option ARMs were never sold, and the clearly identified risks to Countrywide

10   were not disclosed to investors. Mozilo recognized as early as August 2006 that

11   Pay-Option ARM loans were one of the "only products left with margins [profit]."

12        **G.**    **Mozilo, Sambol, and Sieracki Were Responsible for**

13                **Countrywide's Periodic Filings**

14         73.    Mozilo, Sambol, and Sieracki each bore responsibility for

15   Countrywide's periodic filings. In April 2004, Countrywide promulgated a set of

16   written "Disclosure Controls and Procedures ("Disclosure Guidelines")" which

17   established the procedures governing the preparation of the company's periodic

18   reports. The Disclosure Guidelines were revised in December 2005 and again in

19   September 2006. The Disclosure Guidelines established a disclosure committee at

20   Countrywide, which Sieracki joined at least as early as December 2005. The

21   Disclosure Guidelines required Countrywide "to disclose on a timely basis any

22   information that would be expected to affect the investment decision of a

23   reasonable investor or to alter the market price of the Company's securities."

24   Countrywide's financial reporting staff was required to:

25                   seek input from and discuss with the Divisional Officers information

26                   pertaining to the past and current performance and prospects for their

27                   business unit, known trends and uncertainties related to the business

28

1                unit, [and] significant risks and contingencies that may affect the

2                business unit. . .

3 The Disclosure Guidelines also required that Countrywide's accounting division,

4 among others, assist the officers involved in the preparation of the company's

5 periodic reports in gaining a reasonable understanding of the applicable rules and

6 regulations, including the disclosure requirements set forth in Regulation S-K and

7 the relevant SEC staff guidance and interpretive materials.

8        74.     The preparation of the periodic reports at Countrywide began with a

9 review of the pertinent report from the prior period. The senior vice president for

10 financial reporting circulated to the head of each Countrywide division (1) a

11 memorandum setting forth Countrywide's disclosure obligations and (2) a template

12 ("MD&A Questionnaire") that contained questions concerning the applicable

13 officer's division and that portion of the prior period's filing that concerned the

14 officer's division.

15        75.     Starting in the first quarter of 2006, the MD&A Questionnaire for

16 credit risk management was sent to McMurray and solicited information pertaining

17 to a number of topics related to credit risk, including (1) changes in the

18 management of credit risks, (2) environmental risks and uncertainties, (3)

19 deterioration in loan quality and (4) changes in underwriting guidelines.

20        76.     After circulating the draft MD&A Questionnaires to the divisions, the

21 financial reporting group compiled them and generated the first draft of the

22 periodic report, which was reviewed and edited by the chief accounting officer and

23 the deputy CFO. The revised draft then went to the legal department and the

24 senior managing directors responsible for signing sub-certifications, as well as

25 Sieracki, Sambol, and Mozilo.

26        77.     From the certifiers and the senior officers, the draft went to the board

27 of directors. When all of the certifications had been compiled, Sieracki and Mozilo

28 were notified and they signed Sarbanes-Oxley certifications. Sieracki also signed

1  all of the Forms 10-Q and 10-K starting in the first quarter of 2005 and throughout

2  2007.  Sambol signed the Forms 10-Q for the third quarter of 2006 and all of the

3  quarters in 2007, as well as the Form 10-K for the year ended 2007.  Mozilo signed

4  the Forms 10-K for the years ended 2005, 2006, and 2007.

5          **H.**   **Sambol and Sieracki Refused Suggestions to Disclose**

6                  **Countrywide's Increased Credit Risk**

7        78.   Sambol and Sieracki actively participated in decisions to exclude

8  disclosures regarding Countrywide's widened underwriting guidelines in the

9  periodic filings.  Throughout 2006, McMurray unsuccessfully lobbied to the

10  financial reporting department that Countrywide disclose more information about

11  its increasing credit risk, but these disclosures were not made.

12        79.   In January 2007, McMurray sent an email to Sieracki, which he

13  subsequently incorporated by reference in his MD&A questionnaire, explaining

14  that Countrywide's delinquencies would increase in the future due to a weakening

15  real estate market and what McMurray characterized as credit guidelines that were

16  "wider than they have ever been."   On January 29, 2007 McMurray provided

17  Sambol and others with an outline of where credit items impacted Countrywide's

18  balance sheet.  McMurray then forwarded the email to the financial reporting staff,

19  and specifically requested that a version of the outline be included in the 2006

20  Form 10-K.  The information was not included in the 2006 Form 10-K.

21        80.   In August 2007, McMurray exchanged a series of emails with the

22  managing director of financial reporting suggesting revisions to the Form 10-Q for

23  the second quarter of 2007.  McMurray again specifically asked financial reporting

24  to include information regarding widened underwriting guidelines in the

25  prospective trends section of the Form 10-Q for the second quarter of 2007.  In

26  response, the managing director of financial reporting wrote back to McMurray,

27  stating that he did not make McMurray's changes because he **"expect[ed] those**

28

1    **changes to be <u>trumped</u> by certain reviewers.**" One of those reviewers was

2    Sambol.

3        81.    When McMurray's request that Countrywide disclose its widened

4    underwriting guidelines was not included in the draft filing, he sent a "qualified"

5    certification to the company's Sarbanes-Oxley officer, along with an email

6    articulating his concerns. That email was forwarded to the deputy CFO, who then

7    spoke with McMurray about his concerns. She took his suggestions to Sieracki

8    and Sambol, who directed her not to include them in the Form 10-Q.

9        82.    Despite McMurray's repeated requests, Countrywide never made any

10   disclosures in its Forms 10-Q or 10-K for 2005, 2006, or 2007 about the

11   unprecedented expansion of its underwriting guidelines.

12       **I.**    **<u>Mozilo, Sambol, and Sieracki Made Affirmative</u>**

13             **<u>Misrepresentations to Investors</u>**

14       83.    As set forth in detail above, Mozilo, Sambol, and Sieracki were all

15   aware that Countrywide had increasingly widened its underwriting guidelines year

16   after year from 2004 through 2006, and that Countrywide Bank's held for

17   investment portfolio included loans that were underwritten based on reduced

18   documentation, with loan to value ratios above 95%, and with subprime FICO

19   scores. Despite that knowledge, Mozilo, Sambol, and Sieracki failed to include

20   these material facts in Countrywide's Forms 10-K and 10-Q for 2005, 2006, and

21   2007. Indeed, Mozilo, Sieracki, and Sambol each made public statements from

22   2005 through 2007 that were intended to mislead investors about the increasingly

23   aggressive underwriting at Countrywide and the financial consequences of those

24   widened underwriting guidelines.

25       **1.**    **<u>Misrepresentations in Countrywide's Periodic Reports</u>**

26       84.    From 2005 through 2007, all of the proposed defendants participated

27   in preparing Countrywide's periodic reports. These documents contained

28   misrepresentations as follows:

1       85.    First, Countrywide's Forms 10-K for 2005, 2006, and 2007 stated that

2    Countrywide "manage[d] credit risk through credit policy, underwriting, quality

3    control and surveillance activities" and touted the Company's "proprietary

4    underwriting systems . . . that improve the consistency of underwriting standards,

5    assess collateral adequacy and help to prevent fraud." These statements were false,

6    because defendants knew that a significant portion of Countrywide's loans were

7    being made as exceptions to Countrywide's already extremely broad underwriting

8    guidelines.

9       86.    Second, Countrywide stated in its 2005 Form 10-K: "We ensure our

10   ongoing access to the secondary mortgage market by consistently producing

11   quality mortgages. . . . We make significant investments in personnel and

12   technology to ensure the quality of our mortgage loan production." A virtually

13   identical representation appears in Countrywide's 2006 Form 10-K. These

14   statements were false, because, as set forth in detail above, Mozilo, Sambol, and

15   Sieracki were aware that Countrywide was originating increasing percentages of

16   poor quality loans that did not comply with Countrywide's underwriting

17   guidelines.

18      87.    Third, the descriptions of "prime non-conforming" and "subprime"

19   loans in Countrywide's Forms 10-K were misleading because they failed to

20   disclose what types of loans were included in those categories. The definition of

21   "prime" loans in Countrywide's 2005, 2006, and 2007 Forms 10-K was:

22              Prime Mortgage Loans include conventional mortgage loans,

23              loans insured by the Federal Housing Administration ("FHA")

24              and loans guaranteed by the Veterans Administration ("VA").

25              A significant portion of the conventional loans we produce

26              qualify for inclusion in guaranteed mortgage securities backed

27              by Fannie Mae or Freddie Mac ("conforming loans"). Some of

28              the conventional loans we produce either have an original loan

- 34 -

1        amount in excess of the Fannie Mae and Freddie Mac loan limit

2            for single-family loans ($417,000 for 2006) or otherwise do not

3            meet Fannie Mae or Freddie Mac guidelines.  Loans that do not

4            meet Fannie Mae or Freddie Mac guidelines are referred to as

5            "nonconforming loans.

6        88.    Nothing in that definition informed investors that Countrywide

7    included in its prime category loans with FICO scores below 620.  Nor did the

8    definition inform investors that the "prime non-conforming" category included

9    loan products with increasing amounts of credit risk, such as (1) reduced and/or no

10   documentation loans; (2) stated income loans; or (3) loans with loan to value or

11   combined loan to value ratios of 95% and higher.  Finally, it did not disclose that

12   Countrywide's riskiest loan product, the Pay-Option ARM, was classified as a

13   "prime loan," and to the extent that the loan amount was below the loan limits

14   established by the GSEs, would have been reported in Countrywide's Forms 10-K

15   as a prime conforming loan.  Significantly, in 2005 and 2006, Countrywide's Pay-

16   Option ARMs ranged between 17% and 21% of its total loan originations, the

17   majority of which were held for investment at Countrywide Bank.

18       89.    Fourth, the Countrywide periodic filings noted that Countrywide

19   originated "non-prime" loans, but failed to disclose that these loans were not

20   merely issued to borrowers with blemished credit, but also included significant

21   additional risk factors, such as (1) subprime piggyback seconds, also known as

22   80/20 loans; (2) reduced documentation loans; (3) stated income loans; (4) loans

23   with loan to value or combined loan to value ratios of 95% and higher; or (5) loans

24   made to borrowers with recent bankruptcies and late mortgage payments.

25       90.    Finally, Countrywide's 2006 Form 10-K contained the

26   misrepresentation that "[w]e believe we have prudently underwritten" Pay-Option

27   ARM loans -- despite Mozilo's resounding internal alarms regarding these loans

28

- 35 -

1   and his and Sambol's knowledge that a significant percentage of borrowers were

2   misstating their incomes on stated income loans.

3   **2.**   **Mozilo and Sambol Made Additional Affirmative**

4   **Misstatements to Investors**

5   91.   Mozilo and Sambol made affirmative misleading public statements in

6   addition to those in the periodic filings that were designed to falsely reassure

7   investors about the nature and quality of Countrywide's underwriting.

8   92.   Mozilo repeatedly emphasized Countrywide's underwriting quality in

9   public statements from 2005 through 2007. For example, in an April 26, 2005

10   earnings call, Mozilo falsely stated that Countrywide's Pay-Option portfolio at the

11   bank was "all high FICO." In that same call, in response to a question about

12   whether the company had changed its underwriting practices, Mozilo stated, "We

13   don't see any change in our protocol relative to the quality of loans that we're

14   originating."

15   93.   In the July 26, 2005 earnings call, Mozilo claimed that he was "not

16   aware of any change of substance in [Countrywide's] underwriting policies" and

17   that Countrywide had not "taken any steps to reduce the quality of its underwriting

18   regimen." In that same call, Mozilo touted the high quality of Countrywide's Pay-

19   Option ARM loans by stating that "[t]his product has a FICO score exceeding 700.

20   . . . the people that Countrywide is accepting under this program . . . are of much

21   higher quality. . . that [sic] you may be seeing . . . for some other lender." On

22   January 31, 2006, Mozilo stated in an earnings call "It is important to note that

23   [Countrywide's] loan quality remains extremely high."

24   94.   On April 27, 2006, Mozilo stated in an earnings call that

25   Countrywide's "pay option loan quality remains extremely high" and that

26   Countrywide's "origination activities [we]re such that, the consumer is

27   underwritten at the fully adjusted rate of the mortgage and is capable of making a

28   higher payment, should that be required, when they reach their reset period."