These statements were false when made, because on April 4, 2006, Mozilo wrote of the bank's pay-option portfolio, "[s]ince over 70% [of borrowers] have opted to make the lower payment it appears that **it is just a matter of time that we will be faced with much higher resets and therefore much higher delinquencies.**"

95.  Then, on May 31, 2006, at the Sanford C. Bernstein Strategic Decisions Conference, Mozilo addressed investors and analysts and made additional false statements that directly contradicted the statements he was making internally within Countrywide. Specifically addressing Pay-Option loans, Mozilo told the audience that despite recent scrutiny of Pay-Option loans, "Countrywide views the product as a sound investment for our Bank and a sound financial management tool for consumers." At the May 31 conference, Mozilo added that the "performance profile of this product is well-understood because of its 20-year history, which includes 'stress tests' in difficult environments."

96.  Mozilo's statements at the Sanford Bernstein Conference were false, because at the time that he made them he had just written to Sambol and Sieracki in a May 19, 2006 email that **Pay-Option loans would continue to present a long-term problem "unless rates are reduced dramatically from this level and there are no indications, absent another terrorist attack, that this will happen.**" Moreover, on June 1, 2006, Mozilo advised Sambol in an email that he knew that the Pay-Option portfolio was largely underwritten on a reduced documentation basis, and believed there was evidence that borrowers were lying about their income in the application process. Mozilo concluded: (1) in an environment of rising interest rates, borrowers would reach the 115% negative amortization cap sooner than they expected; (2) **borrowers would suffer payment shock because of the substantially higher payments upon reset, particularly those with FICO scores below 700 who "are going to experience a payment shock which is going to be difficult if not impossible for them to manage"**; and (3) "we know or can reliably predict what's going to happen in the next couple

**of years**" so the company must act quickly to address these issues. In addition, Mozilo failed to disclose that by the time he made the statement about the 20-year history of pay-options, the history that he was referring to, that of World Savings, no longer provided him any comfort about the future performance of the portfolio.

97. At a Fixed Income Investor Forum on September 13, 2006, Mozilo upheld Countrywide as a "role model to others in terms of responsible lending." He went on to remark that "[t]o help protect our bond holder customers, we engage in prudent underwriting guidelines" with respect to Pay-Option loans. These statements were false when made because:

- On July 10, 2006, after reviewing data on an internal flash report, Mozilo learned that, from September 2005 through June 2006, the percentage of Pay-Option borrowers choosing to make the minimum payment had nearly doubled, from 37% to 71%. This was the key metric by which Mozilo measured the performance of the Pay-Option portfolio;

- On August 16, 2006 Mozilo received an e-mail asking whether the company anticipated any significant problems with the Pay-Option portfolio. Mozilo responded that rising interest rates would cause the loans to reset much faster than the borrowers expected with accompanying payment shock. The only solution, Mozilo wrote, was to refinance the loans before reset, but this would be difficult, in light of decreasing home values and rising interest rates. Only unlikely events, such as a dramatic rise in home values or a dramatic drop in interest rates, would alleviate future payment shock; and

- On September 26, 2006 Mozilo advised Sambol and Sieracki in an email that "[w]e have no way, with any reasonable certainty, to assess the real risk of holding [Pay-Option] loans on our balance sheet. The only history we can look to is that of World Savings however their portfolio was fundamentally different than ours in that their focus was equity and our focus is fico. In my judgement, [sic] as a long time lender, I would always trade off fico for equity. The bottom line is that **we are flying blind** on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales." (emphasis added)

98. In the January 30, 2007 earnings conference call, Mozilo attempted to distinguish Countrywide from other lenders by stating "we backed away from the subprime area because of our concern over credit quality." On March 13, 2007, in an interview with Maria Bartiromo on CNBC, Mozilo said that it would be a "mistake" to compare monoline subprime lenders to Countrywide. He then went on to state that the subprime market disruption in the first quarter of 2007 would "be great for Countrywide at the end of the day because all of the irrational competitors will be gone."

99. Sambol also made misleading statements that were designed to reassure investors. For example, at a May 24, 2005 investor day presentation, Sambol reassured analysts that Countrywide addressed the higher credit risk associated with adjustable rate mortgage programs by requiring different underwriting criteria such as "higher credit scores or lower loan to value ratios." At the September 13, 2006 Fixed Income Investor Forum, Sambol downplayed Countrywide's participation in originating subprime loans by falsely stating that Countrywide had been "on the sidelines" of the risky subprime market.

100. The statements in Countrywide's periodic filings and statements by its chief executives were materially false when made, because Mozilo and Sambol were well aware that Countrywide had increasingly widened its underwriting guidelines year over year from 2004 through 2006, and Countrywide's loan quality had deteriorated as a result.

J. **Countrywide's Collapse**

101. In the first quarter of 2007, subprime 80/20s experienced high levels of defaults and delinquencies, which caused severe disruptions in the secondary market for subprime loans. On January 31, 2007, two members of Countrywide's Risk Management participated in the annual meeting of the American Securitization Forum ("ASF"), which was attended by sophisticated investors who purchased mortgage backed securities in the secondary market. They reported

back in a February 2, 2007 email, which was forwarded to Sambol, and noted that, "[t]he obvious big topic of concern was 2006 vintage performance, both prime and nonprime. **All recognize that 80/20's (and the layered risk on top of them) are definitely the main culprit** and are concerned that the rating agencies sized it wrong. All want to know when we are pulling back guidelines…and why we haven't already." (emphasis added.) They went on to note that, **"[i]nvestors believed that 100% financing and layered risk is the driver."** (emphasis added.)

102. One of the Countrywide employees attending the conference observed that higher than expected losses on 80/20 loans caused investors to fear increasingly high losses and the possibility that their investments, which, in many cases, had received AAA ratings, would be downgraded. The secondary market for 80/20 loans essentially evaporated after the conference. In 2007, as a result of the increasingly risky loans that it had been underwriting, Countrywide began to report extensive credit problems. In May 2007, Countrywide disclosed in its Form 10-Q for the first quarter of 2007 that its consolidated net earnings for the quarter were $434 million, a 37% **decrease** from net earnings in the first quarter of 2006. Countrywide indicated that its first quarter results had been negatively impacted by higher delinquencies related to its subprime lending, which had caused the company to (1) take a write down of $217.8 million due to its inability to sell certain of its subprime loans into the secondary market; (2) reduce the estimated value of its retained servicing rights by $429.6 million; and (3) increase its allowance for loan losses on loans held for investment by $95.9 million.

103. Then, on August 9, 2007, Countrywide disclosed in its Form 10-Q for the second quarter of 2007 that its consolidated net earnings for the quarter were $485 million, a 33% net decrease from the second quarter of 2006. Countrywide attributed the decline to credit-related costs, specifically, a $417.2 million impairment loss on its retained interests, including $388.1 million related to home

equity loans, and a $231 million increase in its allowance for loan losses. On July 24, 2007, in the earnings release teleconference, Countrywide disclosed for the first time that its definition of "prime" loans included loans made to borrowers with FICO scores as low as 500, and that 80% of its portfolio of Pay-Option loans held for investment were underwritten based upon reduced documentation. After the disclosures regarding its credit risk on July 24, 2007, Countrywide's share price dropped from the previous day's close of $34.06 to $30.50 on July 24, an 11% decline.

104.    Concurrent with its rising credit losses, Countrywide experienced a liquidity crisis in August 2007. Revenues from Countrywide's capital markets loan sales and securitizations had dropped from $553.5 million in pre-tax earnings in 2006 to $14.9 million in 2007, and Countrywide found itself unable to access the short term credit markets by issuing commercial paper. As a result, on August 16, 2007, Countrywide announced that it had drawn down its entire $11.5 billion credit facility to supplement its cash position. Following that announcement, the ratings agencies downgraded Countrywide's securities, and Countrywide's stock declined from $21.29 per share to $18.95, another approximately 11% decline.

105.    On August 23, 2007, Countrywide announced that Bank of America had invested $2 billion in Countrywide in exchange for non-voting preferred securities.

106.    On October 26, 2007, Countrywide reported a quarterly loss of $1.2 billion. The company's Form 10-Q, filed on November 9, 2007, disclosed that Countrywide had taken a $1 billion impairment loss on its loans held for sale and mortgage backed securities, and had taken $1.9 billion in credit charges related to its allowance for loan losses and its provision for representations and warranties on loans it had securitized and sold. In the October earnings call, Mozilo nevertheless assured investors that the company would return to profitability in the fourth quarter of 2007 - a representation that caused Countrywide's share price to rise from its

previous day's close of $13.07 to $17.30 after the call, despite its poor performance in that quarter.

107.    Thereafter, Countrywide's share price continued to trend downward, driven in part by bankruptcy rumors, until it closed at $8.94 on December 31, 2007. Then, on January 8, 2008, Countrywide's shares dropped 28%, from $7.64 to $5.47, again on rumors that the company intended to file for bankruptcy. On January 11, 2008, prior to reporting its year-end 2007 results, Countrywide announced that it was being acquired by Bank of America in an all stock transaction estimated to have an approximate value of $4 billion.

108.    On March 29, 2008, in its Form 10-K for the year ended December 31, 2007, Countrywide disclosed that the contraction of the secondary market for its loans had increased its financing needs because it was required to hold loans for longer periods pending sale and certain loans had become unmarketable and had to be held for investment. In response to these funding needs, Countrywide disclosed that it had: (1) speeded integration of mortgage banking activities into Countrywide Bank to reduce its dependency on the secondary markets; (2) taken a $2 billion infusion from Bank of America in exchange for shares of preferred stock; (3) drawn down an $11.5 billion credit line to maintain liquidity; and (4) revised its product offerings and underwriting guidelines, such that the majority of its loan production was again eligible for sale to the government sponsored entities.

K.    **Stock Sales of Mozilo and Sambol**

109.    Both Mozilo and Sambol realized profits on sales of Countrywide stock in 2005, 2006, and 2007, through stock sales pursuant to various 10b5-1 plans. From May 9, 2005, when the Form 10-Q for the first quarter of 2005 was filed, through the end of 2007, Mozilo exercised stock options and sold the underlying shares for total proceeds of at least $260 million, and Sambol exercised stock options and sold the underlying shares for total proceeds of at least $40 million.

### L. Mozilo, Sambol, and Sieracki Participated in Several Offerings of Countrywide Securities While the Misleading Periodic Reports Were Outstanding

110. On February 9, 2006, Countrywide filed a registration statement on Form S-3ASR that registered a then indeterminate amount of common stock, preferred stock, stock purchase contracts, stock purchase units, and debt securities of Countrywide. Thereafter, Countrywide filed 180 prospectus supplements identifying the securities it was offering for sale, including a Post-Effective Amendment to that Form S-3ASR dated October 30, 2006. On November 16, 2007, Countrywide filed a registration statement on Form S-3ASR that registered $2 billion worth of Series A Floating Rate Convertible Senior Debentures and $2 billion worth of Series B Floating Rate Convertible Senior Debentures. Sieracki, Sambol and Mozilo signed all of these offerings, each of which incorporated one of the false Form 10-Ks by reference.

### M. Insider Trading By Mozilo

111. Mozilo also engaged in insider trading in Countrywide securities. Mozilo established four sales plans pursuant to Rule 10b5-1 of the Exchange Act in October, November, and December 2006 while in possession of material, non-public information concerning the operations and financial condition of Countrywide.

### C. Countrywide's Insider Trading Policy

112. During the relevant period, Countrywide had an insider trading policy in effect, dated as of June 24, 2005, which prohibited trading in Countrywide securities on the basis of material non-public information. The policy included a section entitled "Material Information" that stated:

> 3.2 Material Information
>
> U.S. federal securities laws prohibit transactions while aware of material nonpublic information. "Material" information means information relating to the

company with publicly traded securities, which, if publicly disseminated, would likely affect the market price of any of its securities, or which would likely be considered important by a reasonable investor in determining whether to buy, sell, or hold such securities.

In addition, the policy included a section regarding 10b5-1 sales plans that stated:

    4.3    <u>10b5-1 Trading Arrangements</u>

    A.    Section 10b5-1 of the Exchange Act creates an exception to the prohibition against trading while in the possession of material nonpublic information. In order to take advantage of the exception set forth in Section 10b5-1 of the Exchange Act, Directors and Executives Officers must enter into a 10b5-1 Trading Plan; provided that such Trading Plan:

        i.    specifies the amount of shares to be purchased or sold and the price at which and the date on which the shares are to be purchased or sold; <u>or</u>

        ii.    includes a written formula or algorithm, or computer program, for determining the amount of shares to be purchased or sold and the price at which and the date on which the shares are to be purchased or sold; <u>or</u>

        iii.    does not permit the individual to exercise any subsequent influence over how, when or whether to effect purchases or sales; provided, in addition, that any other person who, pursuant to the contract, instruction, or plan, did exercise such influence must not be aware of the material nonpublic information when doing so; <u>and</u>

        iv.    was acknowledged by Countrywide in writing and pre-cleared by the Office of the Chief Legal Officer.

113. Mozilo knew about and understood the Countrywide insider trading policy. In addition, prior to the execution of each 10b5-1 sales plan, Countrywide's legal department was required to review and approve the sales plan

- 44 -

and Mozilo was required to orally represent to Countrywide's general counsel that he was not in possession of material non-public information.

### 2. Mozilo Established His 2006 10b5-1 Sales Plans While In Possession of Material, Nonpublic Information

114. As set forth in section E. above, in 2006, Mozilo possessed material non-public information regarding the characteristics and performance of Pay-Option ARM loans as well as increasing credit risks associated with this product. None of this information was disclosed to the public prior to the establishment of Mozilo's sales plans in October, November, and December 2006.

115. As set forth in section F. above, in 2006, Mozilo learned of red flags concerning Countrywide's expanded underwriting guidelines and concluded that certain of Countrywide's mortgage loans would have a future detrimental financial impact on the company. In response to this information, beginning in early 2006, Mozilo raised his concerns with other members of senior management and instructed them to take action to mitigate risks associated with lower quality loans.

116. While in possession of this material, non-public information, Mozilo established four different Rule 10b5-1 plans.

117. On October 27, 2006, Mozilo established a sales plan that directed his broker to exercise 3,989,588 stock options and sell the underlying shares on specific days set forth in the plan beginning on November 1, 2006 and ending no later than October 5, 2007 (the "October 2006 Plan").

118. Mozilo gave final approval to create the October 2006 Plan during a meeting with his financial advisor on September 25, 2006, one day before sending an e-mail to Sambol and Sieracki, as described in paragraphs 68 and 69 above, that stated among other things, that "**we are flying blind on how these loans will perform in a stressed environment of higher unemployment, reduced values and slowing home sales**." (emphasis added).

119.  Also on October 27, 2006, Mozilo established a sales plan in the name of the Mozilo Family Foundation, a charitable organization that he chaired, that directed the broker to sell 91,999 shares of Countrywide stock held by the Foundation: 23,000 shares to be sold on November 1, 6, and 16, 2006 and 22,999 shares to be sold on November 21, 2006 (the "Foundation Plan").

120.  On November 13, 2006, Mozilo established a sales plan for the Mozilo Living Trust, a revocable trust created for the benefit of his family, that directed the broker to sell 100,000 shares of Countrywide stock in lots of 25,000 shares on November 16, 21, 29, and December 4, 2006 (the "Trust Plan").

121.  On December 12, 2006, Mozilo established a sales plan that directed his broker to exercise 1,389,580 stock options and sell the underlying shares on specific days set forth in the plan beginning on January 5, 2007 and ending no later than December 14, 2007 (the "December 2006 Plan").

122.  Mozilo executed the December 2006 Sales Plan five days after he circulated a memorandum, described in paragraph 52 above, to all managing directors and the board of directors that analyzed subprime mortgages.

123.  On February 2, 2007, Mozilo amended the December 2006 Plan ("February Amendment") by directing the exercise of an additional 2,467,777 stock options and selling the underlying shares on the schedule already set forth in the December 2006 Plan.

124.  From November 2006 through October 2007, Mozilo exercised over five million stock options and sold the underlying shares pursuant to the four sales plans, realizing gains of over $139 million.

///
///
///
///
///

## FIRST CLAIM FOR RELIEF

## FRAUD IN THE OFFER OR SALE OF SECURITIES

### Violations of Section 17(a) of the Securities Act

### (Against All Defendants)

125. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

126. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails:

    a.    with scienter, employed devices, schemes, or artifices to defraud;

    b.    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

127. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

///
///
///
///
///
///

## SECOND CLAIM FOR RELIEF

## FRAUD IN CONNECTION WITH THE PURCHASE

## OR SALE OF SECURITIES

**Violations and Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder**

**(Against All Defendants)**

128. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

129. Defendants, and each of them, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    a. employed devices, schemes, or artifices to defraud;

    b. made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    c. engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

130. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5.

///
///
///
///

# THIRD CLAIM FOR RELIEF

## VIOLATIONS OF COMMISSION PERIODIC REPORTING REQUIREMENTS

**Aiding and Abetting Violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder**

(Against All Defendants)

131. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

132. Countrywide violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder, by filing with the Commission annual reports on Form 10-K for fiscal years 2005, 2006, and 2007 and quarterly reports on Form 10-Q for each quarter in 2005, 2006, and 2007 that were materially false and failed to include material information necessary to make the required statements, in light of the circumstances under which they were made, not misleading.

133. Mozilo, Sambol, and Sieracki knowingly provided substantial assistance to Countrywide in its violation of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, and 13a-13 thereunder in connection with Countrywide's annual reports for fiscal years 2005, 2006, and 2007 and its quarterly reports for each quarter in 2005, 2006, and 2007.

134. By engaging in the conduct described above and pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), Mozilo, Sambol, and Sieracki aided and abetted Countrywide's violations, and unless restrained and enjoined will continue to aid and abet violations, of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

///

///

///

## FOURTH CLAIM FOR RELIEF

## CERTIFICATION VIOLATIONS

### Violations of Rule 13a-14 of the Exchange Act

### (Against Defendants Mozilo and Sieracki)

135. The Commission realleges and incorporates by reference ¶¶ 1 through 124 above.

136. Mozilo and Sieracki violated Rule 13a-14 by signing the certifications included with Countrywide fiscal year 2005, 2006, and 2007 Forms 10-K, certifying, among other things, that the forms fully complied with the requirements of the Exchange Act and fairly presented, in all material respects, the financial condition and results of operations of the company, when, in fact, the reports contained untrue statements of material fact and omitted material information necessary to make the reports not misleading.

137. By engaging in the conduct described above, defendants Mozilo and Sieracki violated Exchange Act Rule 13a-14, 17 C.F.R. § 240.13a-14. Unless restrained and enjoined, defendants Mozilo and Sieracki will continue to violate Rule 13a-14, 17 C.F.R. § 240.13a-14.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the defendants committed the alleged violations.

### II.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Mozilo and his agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act,

and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### III.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Sambol and his agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder, and from aiding and abetting violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### IV.

Issue judgments, in a form consistent with Fed. R. Civ. P. 65(d), permanently enjoining Defendant Sieracki and his agents, servants, employees, attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the order by personal service or otherwise, from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act, and Rules 10b-5 and 13a-14 thereunder, and from aiding and abetting violations of Section 13(a) of the Exchange Act, and Rules 12b-20, 13a-1, and 13a-13 thereunder.

### V.

Enter an order, pursuant to Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), prohibiting defendants Mozilo, Sambol, and Sieracki from acting as officers or directors of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

///

///

## VI.

Order defendants Mozilo and Sambol to disgorge all ill-gotten gains from their illegal conduct, together with prejudgment interest thereon.

## VII.

Order defendants Mozilo, Sambol, and Sieracki to pay civil penalties under Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3).

## VIII.

Order defendant Mozilo to pay a civil penalty under Section 21A(a) of the Exchange Act, 15 U.S.C. § 78u-1(a).

## IX.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## X.

Grant such other and further relief as this Court may determine to be just and necessary.

DATED: June 4, 2009

*Lynn M. Dean*
JOHN M. McCOY, III
SPENCER E. BENDELL
LYNN M. DEAN
SAM PUATHASNANON
PARIS WYNN
Attorneys for Plaintiff
Securities and Exchange Commission

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury.

DATED: June 4, 2009

*Lynn M. Dean*
JOHN M. McCOY, III
SPENCER E. BENDELL
LYNN M. DEAN
SAM PUATHASNANON
PARIS WYNN
Attorneys for Plaintiff
Securities and Exchange Commission