# EXHIBIT C

1  EDMUND G. BROWN JR.,
     Attorney General of the State of California
2  ALBERT NORMAN SHELDEN
     Senior Assistant Attorney General
3  RONALD REITER
     Supervising Deputy Attorney General
4  KATHRIN SEARS (Bar No. 146684)
   ROBYN SMITH (Bar No. 165446)
5  BENJAMIN G. DIEHL (Bar No. 192984)
   LINDA HOOS (Bar No. 217620)
6    Deputy Attorneys General
   300 S. Spring Street, Suite 1702
7  Los Angeles, CA  90013

8
   Attorneys for Plaintiff,
9  the People of the State of California

10

11              SUPERIOR COURT OF THE STATE OF CALIFORNIA

12               FOR THE COUNTY OF LOS ANGELES COUNTY

13                         NORTHWEST DISTRICT

| | |
|---|---|
| 14  THE PEOPLE OF THE STATE OF CALIFORNIA, | Case No.: |
| 15 | **COMPLAINT FOR RESTITUTION, INJUNCTIVE RELIEF, OTHER EQUITABLE RELIEF, AND CIVIL PENALTIES** |
| 16                Plaintiff, | |
| 17        v. | |
| 18  COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation; COUNTRYWIDE HOME LOANS, INC., a New York corporation; FULL SPECTRUM LENDING, INC., a California Corporation; ANGELO MOZILO, an individual; DAVID SAMBOL, an individual; and DOES 1-100, inclusive, | |
| 19 | |
| 20 | |
| 21 | |
| 22                Defendants. | |
| 23 | |

24  ///

25  ///

26  ///

27  ///

28                          **COMPLAINT**

1    Plaintiff, the People of the State of California, by and through Edmund G. Brown Jr.,

2    Attorney General of the State of California, alleges the following, on information and belief:

3    **I.    DEFENDANTS AND VENUE**

4        1.    At all relevant times, defendant Countrywide Financial Corporation ("CFC"), a

5    Delaware corporation, has transacted and continues to transact business throughout the State of

6    California, including in Los Angeles County.

7        2.    At all relevant times, defendant Countrywide Home Loans, Inc. ("CHL"), a New

8    York corporation, has transacted and continues to transact business throughout the State of

9    California, including in Los Angeles County.  CHL is a subsidiary of CFC.

10        3.    At all relevant times, until on or about December 15, 2004, Full Spectrum

11    Lending, Inc. ("Full Spectrum"), was a California corporation that transacted business throughout

12    the State of California, including in Los Angeles County, and was a subsidiary of CFC.   On or

13    about December 15, 2004, Full Spectrum was merged into and became a division of CHL.  For

14    all conduct that occurred on or after December 15, 2004, any reference in this complaint to CHL

15    includes reference to its Full Spectrum division.

16        4.    Defendants CFC, CHL, and Full Spectrum are referred to collectively herein as

17    "Countrywide" or "the Countrywide Defendants."

18        5.    At all times pertinent hereto, defendant Angelo Mozilo ("Mozilo") was Chairman

19    and Chief Executive Officer of CFC.  Defendant Mozilo directed, authorized, and ratified the

20    conduct of the Countrywide Defendants set forth herein.

21        6.    At all times pertinent hereto, defendant David Sambol ("Sambol") is and was the

22    President of CHL and, since approximately September, 2006, has served as the President and

23    Chief Operating Officer of CFC.  Sambol directed, authorized and ratified the conduct of CHL,

24    and after, September, 2006, the Countrywide Defendants, as set forth herein.  Defendant Sambol

25    is a resident of Los Angeles County.

26        7.    Plaintiff is not aware of the true names and capacities of the defendants sued as

27    Does 1 through 100, inclusive, and therefore sues these defendants by such fictitious names.

28    Each of these fictitiously named defendants is responsible in some manner for the activities

1   alleged in this Complaint. Plaintiff will amend this Complaint to add the true names of the

2   fictitiously named defendants once they are discovered.

3         8.    The defendants identified in paragraphs 1 through 7, above, shall be referred to

4   collectively as "Defendants."

5         9.    Whenever reference is made in this Complaint to any act of any defendant(s), that

6   allegation shall mean that each defendant acted individually and jointly with the other

7   defendants.

8         10.    Any allegation about acts of any corporate or other business defendant means that

9   the corporation or other business did the acts alleged through its officers, directors, employees,

10   agents and/or representatives while they were acting within the actual or ostensible scope of their

11   authority.

12         11.    At all relevant times, each defendant committed the acts, caused or directed others

13   to commit the acts, or permitted others to commit the acts alleged in this Complaint.

14   Additionally, some or all of the defendants acted as the agent of the other defendants, and all of

15   the defendants acted within the scope of their agency if acting as an agent of another.

16         12.    At all relevant times, each defendant knew or realized that the other defendants

17   were engaging in or planned to engage in the violations of law alleged in this Complaint.

18   Knowing or realizing that other defendants were engaging in or planning to engage in unlawful

19   conduct, each defendant nevertheless facilitated the commission of those unlawful acts. Each

20   defendant intended to and did encourage, facilitate, or assist in the commission of the unlawful

21   acts, and thereby aided and abetted the other defendants in the unlawful conduct.

22         13.    At all relevant times, Defendants have engaged in a conspiracy, common

23   enterprise, and common course of conduct, the purpose of which is and was to engage in the

24   violations of law alleged in this Complaint. This conspiracy, common enterprise, and common

25   course of conduct continues to the present.

26         14.    The violations of law alleged in this Complaint occurred in Los Angeles County

27   and elsewhere throughout California and the United States.

28   **II.**    **DEFENDANTS' BUSINESS ACTS AND PRACTICES**

15.     This action is brought against Defendants, who engaged in false advertising and unfair competition in the origination of residential mortgage loans and home equity lines of credit ("HELOCs").

16.     Countrywide originated mortgage loans and HELOCs through several channels, including a wholesale origination channel and a retail origination channel. The Countrywide employees who marketed, sold or negotiated the terms of mortgage loans and HELOCs in any of its origination channels, either directly to consumers or indirectly by working with mortgage brokers, are referred to herein as "loan officers."

17.     In Countrywide's wholesale channel, loan officers in its Wholesale Lending Division ("WLD") and Specialty Lending Group ("SLG") (now merged into the WLD) worked closely with a nationwide network of mortgage brokers to originate loans. In its wholesale channel, Countrywide often did business as "America's Wholesale Lender," a fictitious business named owned by CHL. In Countrywide's retail channel, loan officers employed by Countrywide in its Consumer Markets Division ("CMD") sold loans directly to consumers. In addition, loan officers employed by Full Spectrum up until December 14, 2004, and thereafter by Countrywide's Full Spectrum Lending Division ("FSLD"), sold loans directly to consumers as part of Countrywide's retail channel.

18.     Countrywide maintained sophisticated electronic databases by means of which corporate management, including but not limited to defendants Mozilo and Sambol, could obtain information regarding Countrywide's loan production status, including the types of loan products, the number and dollar volume of loans, the underwriting analysis for individual loans, and the number of loans which were approved via underwriting exceptions. Defendants used this information, together with data they received regarding secondary market trends, to develop and modify the loan products that Countrywide offered and the underwriting standards that Countrywide applied.

19.     The mortgage market changed in recent years from one in which lenders originated mortgages for retention in their own portfolios to one in which lenders attempted to generate as many mortgage loans as possible for resale on the secondary mortgage market. The

1   goal for lenders such as Countrywide was not only to originate high mortgage loan volumes but

2   also to originate loans with above-market interest rates and other terms which would attract

3   premium prices on the secondary market.

4   20.   In 2004, in an effort to maximize Countrywide's profits, Defendants set out to

5   double Countrywide's share of the national mortgage market to 30% through a deceptive scheme

6   to mass produce loans for sale on the secondary market. Defendants viewed borrowers as

7   nothing more than the means for producing more loans, originating loans with little or no regard

8   to borrowers' long-term ability to afford them and to sustain homeownership. This scheme was

9   created and maintained with the knowledge, approval and ratification of defendants Mozilo and

10  Sambol.

11  21.   Defendants implemented this deceptive scheme through misleading marketing

12  practices designed to sell risky and costly loans to homeowners, the terms and dangers of which

13  they did not understand, including by (a) advertising that it was the nation's largest lender and

14  could be trusted by consumers; (b) encouraging borrowers to refinance or obtain purchase money

15  financing with complicated mortgage instruments like hybrid adjustable rate mortgages or

16  payment option adjustable rate mortgages that were difficult for consumers to understand; (c)

17  marketing these complex loan products to consumers by emphasizing the very low initial

18  "teaser" or "fixed" rates while obfuscating or misrepresenting the later steep monthly payments

19  and interest rate increases or risk of negative amortization; and (d) routinely soliciting borrowers

20  to refinance only a few months after Countywide or the loan brokers with whom it had "business

21  partnerships" had sold them loans.

22  22.   Defendants also employed various lending policies to further their deceptive

23  scheme and to sell ever-increasing numbers of loans, including (a) the dramatic easing of

24  Countrywide's underwriting standards; (b) the increased use of low- or no-documentation loans

25  which allowed for no verification of stated income or stated assets or both, or no request for

26  income or asset information at all; (c) urging borrowers to encumber their homes up to 100% (or

27  more) of the assessed value; and (d) placing borrowers in "piggyback" second mortgages in the

28  form of higher interest rate HELOCs while obscuring their total monthly payment obligations.

1      23.    Also to further the deceptive scheme, Defendants created a high-pressure sales

2  environment that propelled its branch managers and loan officers to meet high production goals

3  and close as many loans as they could without regard to borrower ability to repay.  Defendants'

4  high-pressure sales environment also propelled loan officers to sell the riskiest types of loans,

5  such as payment option and hybrid adjustable rate mortgages, because loan officers could easily

6  sell them by deceptively focusing borrowers' attention on the low initial monthly payments or

7  interest rates.  Defendants also made arrangements with a large network of mortgage brokers to

8  procure loans for Countrywide and, through its loan pricing structure, encouraged these brokers

9  to place homeowners in loans with interest rates higher than those for which they qualified, as

10  well as prepayment penalty obligations.  This system of compensation aided and abetted brokers

11  in breaching their fiduciary duties to borrowers by inducing borrowers to accept unfavorable loan

12  terms without full disclosure of the borrowers' options and also compensated brokers beyond the

13  reasonable value of the brokerage services they rendered.

14      24.    Countrywide received numerous complaints from borrowers claiming that they

15  did not understand their loan terms.  Despite these complaints, Defendants turned a blind eye to

16  the ongoing deceptive practices engaged in by Countrywide's loan officers and loan broker

17  "business partners," as well as to the hardships created for borrowers by its loose underwriting

18  practices.  Defendants cared only about selling increasing numbers of loans at any cost, in order

19  to maximize Countrywide's profits on the secondary market.

20  **III.    THE PRIMARY PURPOSE OF DEFENDANTS' DECEPTIVE BUSINESS
       PRACTICES WAS TO MAXIMIZE PROFITS FROM THE SALE OF LOANS TO**

21  **       THE SECONDARY MARKET**

22      25.    Defendants' deceptive scheme had one primary goal – to supply the secondary

23  market with as many loans as possible, ideally loans that would earn the highest premiums.  Over

24  a period of several years, Defendants constantly expanded Countrywide's share of the consumer

25  market for mortgage loans through a wide variety of deceptive practices, undertaken with the

26  direction, authorization, and ratification of defendants Sambol and Mozilo, in order to maximize

27  its profits from the sale of those loans to the secondary market.

28

26.    While Countrywide retained ownership of some of the loans it originated, it sold the vast majority of its loans on the secondary market, either as mortgage-backed securities or as pools of whole loans.

27.    In the typical securitization transaction involving mortgage-backed securities, loans were "pooled" together and transferred to a trust controlled by the securitizer, such as Countrywide. The trust then created and sold securities backed by the loans in the pool. Holders of the securities received the right to a portion of the monthly payment stream from the pooled loans, although they were not typically entitled to the entire payment stream. Rather, the holders received some portion of the monthly payments. The securitizer or the trust it controlled often retained an interest in any remaining payment streams not sold to security holders. These securitizations could involve the pooling of hundreds or thousands of loans, and the sale of many thousands of shares.

28.    Countrywide generated massive revenues through these loan securitizations. Its reported securities trading volume grew from 647 billion dollars in 2000, to 2.9 trillion dollars in 2003, 3.1 trillion dollars in 2004, 3.6 trillion dollars in 2005, and 3.8 trillion dollars in 2006. (These figures relate to the ostensible values given to the securities by Countrywide or investors, and include securities backed by loans made by other lenders and purchased by Countrywide.)

29.    For the sale of whole (i.e., unsecuritized) loans, Countrywide pooled loans and sold them in bulk to third-party investors, often (but not exclusively) Wall Street firms. The sale of whole loans generated additional revenues for Countrywide. Countrywide often sold the whole loans at a premium, meaning that the purchaser paid Countrywide a price in excess of 100% of the total principal amount of the loans included in the loan pool.

30.    The price paid by purchasers of securities or pools of whole loans varied based on the demand for the particular types of loans included in the securitization or sale of whole loans. The characteristics of the loans, such as whether the loans are prime or subprime, whether the loans have an adjustable or fixed interest rate, or whether the loans include a prepayment penalty, all influenced the price.

31.     Various types of loans and loan terms earned greater prices, or "premiums," in the secondary market. For example, investors in mortgages and mortgage backed securities have been willing to pay higher premiums for loans with prepayment penalties. Because the prepayment penalty deters borrowers from refinancing early in the life of the loan, it essentially ensures that the income stream from the loan will continue while the prepayment penalty is in effect. Lenders, such as Countrywide, typically sought to market loans that earned it higher premiums, including loans with prepayment penalties.

32.     In order to maximize the profits earned by the sale of its loans to the secondary market, Countrywide's business model increasingly focused on finding ways to generate an ever larger volume of the types of loans most demanded by investors. For example, Countrywide developed and modified loan products by discussing with investors the prices they would be willing to pay for loans with particular characteristics (or for securities backed by loans with particular characteristics), and ███████████████████████████████████████ ██████████████████████████████████. This enabled Countrywide to determine which loans were most likely to be sold on the secondary market for the highest premiums.

33.     Further, rather than waiting to sell loans until after they were made, Countrywide would sell loans "forward" before loans were funded. In order to determine what loans it could sell forward, Countrywide would both examine loans in various stages of production and examine its projected volume of production over the next several months.

34.     Loans that were sold forward were sold subject to a set of stipulations between Countrywide and the purchaser. For example, in a sale of whole loans, Countrywide might agree on October 1 that on December 1 it would deliver 2000 adjustable rate mortgage loans with an average interest rate of 6.0%, half of which would be subject to a prepayment penalty, among other characteristics. (None of these loans would have been made as of October 1.) Based on these stipulations regarding the characteristics of the loans to be included in the pool, an investor might agree to pay a price totaling 102.25% of the total face value of the loans. In other words, the purchaser agreed in advance to pay a premium of 2.25%. Then, if the loans actually delivered

1  on December 1 had a slightly higher or lower average interest rate, the terms of the stipulation

2  would specify how much the final price would be adjusted.

3      35.    The information regarding the premiums that particular loan products and terms

4  could earn on the secondary market was forwarded to Countrywide's production department,

5  ███████████████████████████████████████████████████████████.

6  [Redacted description of production department's responsibilities.]

7      36.    Countrywide originated as many loans as possible not only to maximize its profits

8  on the secondary market, but to earn greater profits from servicing the mortgages it sold.

9  Countrywide often retained the right to service the loans it securitized and sold as pools of whole

10 loans.  The terms of the securitizations and sales agreements for pools of whole loans authorized

11 Countrywide to charge the purchasers a monthly fee for servicing the loans, typically a

12 percentage of the payment stream on the loan.

13     37.    Tantalized by the huge profits earned by selling loans to the secondary market,

14 Defendants constantly sought to increase Countrywide's market share: the greater the number

15 and percentage of loans it originated, the greater the revenue it could earn on the secondary

16 market.  Countrywide executives, including defendant Mozilo, publicly stated that they sought to

17 increase Countrywide's market share to 30% of all mortgage loans made and HELOCs extended

18 in the country.

19     38.    In its 2006 annual report, Countrywide trumpeted the fact that "[w]hile the overall

20 residential loan production market in the United States has tripled in size since 2000, from $1.0

21 trillion to $2.9 trillion at the end of 2006, Countrywide has grown nearly three times faster, going

22 from $62 billion in loan originations in 2000 to $463 billion in 2006."

23     39.    In addition, Countrywide directly and indirectly motivated its branch managers,

24 loan officers and brokers to market the loans that would earn the highest premiums on the

25 secondary market without regard to borrower ability to repay.  For example, the value on the

26 secondary market of the loans generated by a Countrywide branch was an important factor in

27 determining the branch's profitability and, in turn, branch manager compensation.  Managers

28 were highly motivated to pressure their loan officers to sell loans that would earn Countrywide

1  the highest premium on the secondary market, which resulted in aggressive marketing of such

2  loans to consumers.

3       40.    The secondary market affected Countrywide's pricing of products and, in order to

4  sell more loans on the secondary market, Countrywide relaxed its underwriting standards and

5  liberally granted exceptions to those standards. Countrywide managers and executives, including

6  but not limited to defendants Mozilo and Sambol, had access to information that provided

7  transparency and a seamless connection between secondary market transactions, the loan

8  production process, and managerial and sales incentives.

9  **IV.   COUNTRYWIDE ENGAGED IN DECEPTIVE PRACTICES IN THE SALE OF COMPLEX AND RISKY LOANS TO CONSUMERS**

10

11      41.    Countrywide offered a variety of loan products that were both financially risky

12  and difficult for borrowers to understand, including in particular payment option and hybrid

13  adjustable rate mortgages and second loans in the form of home equity lines of credit.

14      **A.    The Pay Option ARM**

15      42.    Particularly after 2003, Countrywide aggressively marketed its payment option

16  adjustable rate mortgage ("Pay Option ARM") under the direction, authorization and ratification

17  of defendants Mozilo and Sambol. The Pay Option ARM, which Countrywide classified as a

18  "prime" product, is a complicated mortgage product which entices consumers by offering a very

19  low "teaser" rate – often as low as 1% – for an introductory period of one or three months. At

20  the end of the introductory period, the interest rate increases dramatically. Despite the short

21  duration of the low initial interest rate, Countrywide's Pay Option ARMs often include a one,

22  two or three-year prepayment penalty.

23      43.    When the teaser rate on a Pay Option ARM expires, the loan immediately

24  becomes an adjustable rate loan. Unlike most adjustable rate loans, where the rate can only

25  change once every year or every six months, the interest rate on a Pay Option ARM can change

26  every month (if there is a change in the index used to compute the rate).

27      44.    Countrywide's Pay Option ARMs were typically tied to either the "MTA,"

28  "LIBOR" or "COFI" index. The MTA index is the 12-month average of the annual yields on

1  actively traded United States Treasury Securities adjusted to a constant maturity of one year as

2  published by the Federal Reserve Board. The LIBOR (London Interbank Offered Rate) index is

3  based on rates that contributor banks in London offer each other for inter-bank deposits. Separate

4  LIBOR indices are kept for one month, six-month, and one-year periods, based on the duration of

5  the deposit. For example, the one-year LIBOR index reported for June 2008 is the rate for a

6  twelve-month deposit in U.S. dollars as of the last business day of the previous month. The

7  COFI (11th District Cost of Funds Index) is the monthly weighted average of the interest rates

8  paid on checking and savings accounts offered by financial institutions operating in the states of

9  Arizona, California and Nevada.

10      45.      Although the interest rate increases immediately after the expiration of the short

11  period of time during which the teaser rate is in effect, a borrower with a Pay Option ARM has

12  the option of making monthly payments as though the interest rate had not changed. Borrowers

13  with Pay Option ARMs typically have four different payment options during the first five years

14  of the loan. The first option is a "minimum" payment that is based on the introductory interest

15  rate. The minimum payment, which Countrywide marketed as the "payment rate," is the lowest

16  of the payment options presented to the borrower. Most of Countrywide's borrowers choose to

17  make the minimum payment.

18      46.      The minimum payment on a Pay Option ARM usually is less than the interest

19  accruing on the loan. The unpaid interest is added to the principal amount of the loan, resulting

20  in negative amortization. The minimum payment remains the same for one year and then

21  increases by 7.5% each year for the next four years. At the fifth year, the payment will be

22  "recast" to be fully amortizing, causing a substantial jump in the payment amount often called

23  "payment shock."

24      47.      However, the loan balance on a Pay Option ARM also has a negative amortization

25  cap, typically 115% of the original principal of the loan. If the balance hits the cap, the monthly

26  payment is immediately raised to the fully amortizing level (i.e., all payments after the date the

27  cap is reached must be sufficient to pay off the new balance over the remaining life of the loan).

28  When that happens, the borrower experiences significant payment shock. A borrower with a

Countrywide Pay Option ARM with a 1% teaser rate, who is making the minimum payment, is very likely to hit the negative amortization cap and suffer payment shock well before the standard 5-year recast date.

48.     Instead of making the minimum payment, the borrower has the option of making an interest-only payment for five years. The borrower then experiences payment shock when the payment recasts to cover both principal and interest for the remaining term of the loan. Alternatively, the borrower can choose to make a fully amortizing principal and interest payment based on either a 15-year or a 30-year term.

49.     The ever-increasing monthly payments and payment shock characteristic of Pay Option ARMs are illustrated by the following example of a Countrywide loan. The loan had an initial principal balance of $460,000.00, a teaser rate of 1%, and a margin of 2.9% (such that after the one-month teaser rate expired, the interest would be the 1-month LIBOR index plus 2.9%, rounded to the nearest 1/8th percent). After the teaser rate expired, based on the 1-month LIBOR rate as of the date the borrower obtained the loan, the interest rate would increase to 7.00%. Assuming the 7.00% interest rate remained in place, and the borrower chose to make the minimum payment for as long as possible, the payment schedule would be approximately as follows:

        a.     $1,479.54 per month for the first year;

        b.     $1,590.51 per month for the second year;

        c.     $1,709.80 per month for the third year;

        d.     $1,838.04 per month for the fourth year;

        e.     $1,975.89 per month for the first nine months of the fifth year; and

        f.     approximately $3747.83 per month for the remaining twenty-five years and three months on the loan.

50.     Once the payments reach $3747.83, this Pay Option ARM will have negatively amortized such that the balance of the loan will have increased to approximately $523,792.33. At that point, the borrower will be faced with a payment more than two-and-a-half times greater than the initial payment and likely will be unable to refinance unless his or her home has

1    increased in value at least commensurately with the increased loan balance. In addition,

2    increases in the LIBOR rate could cause the borrower to hit the negative amortization cap earlier,

3    and also could result in even higher payments. If the interest rate reached 8%, just 1% higher, the

4    negative amortization cap would be reached sooner and payments could reach $4,000.00 per

5    month, or higher.

6        51.    During the underwriting process, Countrywide did not consider whether

7    borrowers would be able to afford such payment shock. Further, depending on the state of the

8    his or her finances, even the interim increases in the minimum payment may well have caused

9    dramatic hardship for the borrower.

10        52.    Even if the borrower elects to make interest-only payments, he or she still will

11    experience payment shock. Again assuming the interest rate stays constant at 7.00% over the life

12    of the loan, the borrower's initial payments would be approximately $2,683.33 for five years.

13    Thereafter, the payment will increase to approximately $3,251.18 per month, an increase of over

14    20%.

15        53.    Nearly all Countrywide's Pay Option ARM borrowers will experience payment

16    shock such as that illustrated in paragraphs 49 through 52 above. As of December 31, 2006,

17    almost 88% of the Pay Option ARM portfolio held by Defendants consisted of loans that had

18    experienced some negative amortization. This percentage increased to 91% as of December 31,

19    2007.

20        54.    Countrywide sold thousands of Pay Option ARMs, either through its branches or

21    through brokers. For example, on a national basis, approximately 19% of the loans originated

22    by Countrywide in 2005 were Pay Option ARMs. Countrywide made many of these loans in

23    California.

24        55.    These loans were highly profitable. Countrywide had a gross profit margin of

25    approximately 4% on Pay Option ARMs, compared to 2% on mortgages guaranteed by the

26    Federal Housing Administration.

27        56.    Countrywide retained ownership of a number of loans for investment purposes,

28    including thousands of Pay Option ARMs. Countrywide reported the negative amortization

1   amounts on these Pay Option ARMs (i.e., the amount by which the balances on those loans
2   increased) as income on its financial statements.  The negative amortization "income" earned by
3   Countrywide totaled 1.2 billion dollars by the end of of 2007.

4       57.     Moreover, Pay Option ARMs with higher margins could be sold for a higher
5   premium on the secondary market, because the higher margins would produce a greater interest
6   rate and therefore a larger income stream.  To insure an abundant stream of such loans,
7   Countrywide pushed its loan officers to sell Pay Option ARMs and paid loan brokers greater
8   compensation for selling a Pay Option ARM with a higher margin, or above-par rate, thus
9   encouraging them to put consumers into higher cost loans.  Countrywide also used a variety of
10  deceptive marketing techniques to sell its Pay Option ARMs to consumers.

11      58.     Countrywide deceptively marketed the Pay Option ARM by aggressively
12  promoting the teaser rate.  Television commercials emphasized that the payment rate could be as
13  low as 1% and print advertisements lauded the extra cash available to borrowers because of the
14  low minimum payment on the loan.  Television advertisements did not effectively distinguish
15  between the "payment rate" and the interest rate on the loans, and any warnings about potential
16  negative amortization in Countrywide's print advertisements were buried in densely written small
17  type.

18      59.     Borrowers, enticed by the low teaser rate, were easily distracted from the fine
19  print in the loan documents and did not fully understand the terms or the financial implications of
20  Countrywide's Pay Option ARMs.

21      60.     When a borrower obtained a Pay Option ARM from Countrywide, the only initial
22  monthly payment amount that appeared anywhere in his or her loan documents was the minimum
23  payment amount.  In other words, documents provided to the borrower assumed he or she would
24  make only the minimum payment. Thus, a borrower would not know the monthly payment
25  necessary to make a payment that would, for example, cover accruing interest, until he or she
26  received the first statement after the expiration of the teaser rate, well after all loan documents
27  were signed.

28

1    61.    Countrywide and the brokers it accepted as its "business partners" misrepresented
2    or obfuscated the true terms of the Pay Option ARMs offered by Countrywide, including but not
3    limited to misrepresenting or obfuscating the amount of time that the interest rate would be fixed
4    for the loan, misrepresenting or obfuscating the risk of negative amortization and the fact that the
5    payment rate was not the interest rate, and misrepresenting or obfuscating that the minimum
6    payment would not apply for the life of the loan.

7    62.    Countrywide and its business partner brokers also misrepresented or obfuscated
8    how difficult it might be for borrowers to refinance a Pay Option ARM loan.  In fact, after
9    making only the minimum payment, because of negative amortization the borrower likely would
10   not be able to refinance a Pay Option ARM loan unless the home serving as security for the
11   mortgage had increased in value.  This is particularly true in cases for borrowers whose loans
12   have a very high loan-to-value ratio.

13   63.    Countrywide and its business partner brokers often misrepresented or obfuscated
14   the fact that a particular Pay Option ARM included a prepayment penalty and failed to explain
15   the effect that making only the minimum payment would have on the amount of the prepayment
16   penalty. If a borrower seeks to refinance after having made the minimum payment for an
17   extended period, but while a prepayment penalty is still in effect, the negative amortization can
18   cause the amount of the prepayment penalty to increase.  Prepayment penalties typically equal six
19   months worth of accrued interest.   As negative amortization causes the loan principal to
20   increase, it also causes an increase in the amount of interest that accrues that each month, thereby
21   increasing the prepayment penalty.

22   64.    Countrywide and its business partner brokers also represented that the prepayment
23   penalty could be waived if the borrower refinanced with Countrywide.  However, Countrywide
24   sells most of the loans it originates, and Countrywide has at most limited authority to waive
25   prepayment penalties on loans it does not own, even when it controls the servicing (and is often
26   required to pay the prepayment penalties on loans it does not own in the instances where it is not
27   able to collect the penalty from the borrower).

28   **B.    Hybrid ARM Loans**

1    65.    In addition to the Pay Option ARMs, Countrywide offered "Hybrid" ARM loans.

2   Hybrid ARMs have a fixed interest rate for a period of 2, 3, 5, 7, or 10 years, and then an

3   adjustable interest rate for the remaining loan term.  The products described below were offered

4   with the approval, direction and ratification of defendants Sambol and Mozilo.

5            **(1)  2/28 and 3/27 ARMs**

6    66.    Countrywide typically offered "2/28" Hybrid ARMs through its Full Spectrum

7   Lending Division.  These 2/28 ARM loans have low, fixed interest rates for the first two years

8   (the "2" in "2/28").  The loans often only required interest-only payments during the period the

9   initial rate was in effect, or sometimes for the first five years of the loan.

10   67.    After the initial rate expires, the interest rate can adjust once every six months for

11  the next 28 years (the "28" in "2/28").  During this period, the interest rate typically is

12  determined by adding a margin to the one-year LIBOR index, except that the amount the interest

13  rate can increase at one time may be limited to 1.5%.  Because the initial rate is set independent

14  of the index, the payment increase can be dramatic, particularly if the loan called for interest-only

15  payments for the first two or five years.

16   68.    Countrywide also offered "3/27" ARMs, which operate similarly to 2/28 ARMs,

17  except that the low initial rate is fixed for three rather than two years, and the interest rate then

18  adjusts for 27 rather than 28 years.

19   69.    Countrywide underwrote 2/28 and 3/27 ARMs based on the payment required

20  while the initial rate was in effect, without regard to whether the borrower could afford the loan

21  thereafter.  And, like Pay Option ARMs, Countrywide's 2/28 and 3/27 ARMs typically contain

22  prepayment penalties.

23   70.    A borrower with a 2/28 ARM, like a borrower with a Pay Option ARM, is

24  subjected to steadily increasing monthly payments as well as payment shock.  For example, a

25  Countrywide borrower obtained a 2/28 ARM for $570,000, with an initial rate of 8.95% for the

26  first two years.  Thereafter, the interest rate was to be calculated by adding a margin of 7.95% to

27  the six-month LIBOR index.  The promissory note for this 2/28 ARM provides that the interest

28  rate can never be lower 8.95% and can go as high as 15.95%.  Based on the LIBOR rate that

1  applied at the time the borrower received the loan and the terms of the note governing interest
2  rate (and therefore payment) increases, the anticipated payment schedule was:

3          a.    $4,565.86 per month for two years;

4          b.    $5,141.98 per month for six months;

5          c.    $5,765.48 per month for six months; and

6          d.    payments of $6,403.01 per month or more thereafter.

7      71.    This borrower's monthly payments on this 2/28 ARM will thus increase by
8  approximately 40% just during the 12 months between the end of the second year and beginning
9  of the fourth year of the loan.

10          **(2)**    **5/1, 7/1, and 10/1 ARMs**

11      72.    Countrywide also offered 5/1, 7/1, and 10/1 "interest-only" loans. Marketed as
12  having "fixed" or "fixed period" interest rates, these loans carried a fixed interest rate for the first
13  5, 7, or 10 years respectively. These loans were underwritten based on the initial fixed, interest-
14  only payment until at least the end of 2005. However, when the fixed rate period expires, the
15  interest rate adjusts once per year and is determined by adding a margin to an index. The
16  monthly payments dramatically increase after the interest-only period, because payments over the
17  remaining 25, 23, or 20 years are fully amortized to cover both principal and interest.

18      73.    For example, if a borrower had a 5/1 loan for $500,000 that remained constant at
19  7.5% for the life of the loan, the monthly payments during the five year interest-only period
20  would be $3,125.00. The monthly payment would increase to approximately $3,694.96 for the
21  remaining 25 years of the loan. If the interest rate increased to 8% over the remaining 25 years,
22  the payment would jump to $3,859.08 per month.

23      74.    Collectively, 2/28, 3/27, 5/1, 7/1, and 10/1 ARMs will be referred to herein as
24  "Hybrid ARMs."

25

26          **(3)**    **Countrywide's Deceptive Marketing of its Hybrid ARMs**

27      75.    Countrywide marketed Hybrid ARMs by emphasizing the low monthly payment
28  and low "fixed" initial interest rate. Countrywide and its business partner brokers misrepresented

1  or obfuscated the true terms of these loans, including but not limited to misrepresenting or

2  obfuscating the amount of time that the fixed rate would be in effect, misrepresenting or

3  obfuscating the fact that the interest rates on the loans are adjustable rather than fixed, and

4  obfuscating or misrepresenting the amount by which payments could increase once the initial

5  fixed rate expired.

6      76.    Countrywide and its business partner brokers also often misrepresented or

7  obfuscated the fact that Hybrid ARMs, particularly 2/28 and 3/27 ARMs, included prepayment

8  penalties, or represented that the prepayment penalties could be waived when the borrowers

9  refinanced with Countrywide.  However, most loans originated by Countrywide are sold on the

10  secondary market and, as described in paragraph 64, above, Countrywide generally cannot waive

11  the terms of loans it does not own, even when it controls the servicing.

12      77.    Countrywide and its brokers also misrepresented or obfuscated how difficult it

13  might be for borrowers to refinance Hybrid ARMs.  Although borrowers often were assured that

14  they would be able to refinance, those seeking to refinance Hybrid ARMs after the expiration of

15  the initial interest-only period likely would be able to do so unless the home serving as security

16  for the mortgage had maintained or increased its value.  This was particularly true for borrowers

17  whose loans have very high loan-to-value ratios, as there would be no new equity in the

18  borrowers' homes to help them pay fees and costs associated with the refinances (as well as any

19  prepayment penalties that may still apply).

20      C.    **Home Equity Lines of Credit**

21      78.    Countrywide also aggressively marketed HELOCs, particularly to borrowers who

22  had previously obtained or were in the process of obtaining a first mortgage loan from

23  Countrywide.  Defendants referred to such HELOCs as "piggies" or "piggyback loans," and

24  referred to simultaneously funded first loans and HELOCs as "combo loans."  The first loan

25  typically covered 80% of the appraised value of the home securing the mortgage, while the

26  HELOC covered any of the home's remaining value up to (and sometimes exceeding) 20%.

27  Thus, the HELOC and the first loan together often encumbered 100% or more of a home's

28  appraised value.

1       79.    Under the terms of the piggyback HELOCs, borrowers received monthly bills for

2   interest-only payments for the first five years of the loan term (which could be extended to ten

3   years at Countrywide's option), during which time they could also tap any unused amount of the

4   equity line.  This was called the "draw period."

5       80.    Because Countrywide offered HELOCs as piggybacks to Pay Option and Hybrid

6   ARMs, 100% or more of a property's appraised value could be encumbered with loans that

7   required interest-only payments or allowed for negative amortization.

8       81.    Countrywide typically urged borrowers to draw down the full line of credit when

9   HELOCs initially funded.  This allowed Countrywide to earn as much interest as possible on the

10  HELOCs it kept in its portfolio, and helped generate the promised payment streams for HELOCs

11  sold on the secondary market.  For the borrower, however, drawing down the full line of credit at

12  funding meant that there effectively was no "equity line" available during the draw period, as the

13  borrower would be making interest-only payments for five years.

14      82.    Upon the end of the draw period, the HELOC notes generally require borrowers to

15  repay the principal and interest in fully amortizing payments over a fifteen year period.  A fully

16  drawn HELOC was therefore functionally a 20- or 25-year closed-end mortgage.  However,

17  Countrywide did not provide borrowers with any documents or other materials to help them

18  calculate the principal and interest payments that would be due after the draw, or interest-only,

19  period.

20      83.    Countrywide HELOCs were underwritten not to the fully amortizing payment, but

21  to the interest-only payments due during the draw period.  Countrywide typically charged an

22  early termination fee for HELOCs closed before three years, and sometimes would charge a

23  monthly fee for HELOCs where the balance fell below a specified amount.

24      84.    A borrower with an interest-only or a negatively amortizing loan faces even

25  greater payment shock if he or she also has a fully drawn HELOC.  For example, a borrower

26  with a fully drawn $100,000 HELOC at a 7.00% interest rate will have monthly interest-only

27  payments of approximately $583.33.  At the end of the draw period, the payment will increase to

28  $898.83.  This payment increase is in addition to whatever payment increase the borrower is

experiencing on his or her first mortgage. This potential dual payment shock is typically

obfuscated from or not explained to borrowers. Moreover, a borrower with a piggyback HELOC,

particularly a borrower whose first mortgage negatively amortized or allowed interest-only

payments, is even less likely to be able to refinance at the time of his or her payment shock

unless his or her home has increased in value.

## V.   COUNTRYWIDE EASED AND DISREGARDED UNDERWRITING STANDARDS IN ORDER TO INCREASE ITS MARKET SHARE

85.     Driven by its push for market share, Countrywide did whatever it took to sell

more loans, faster – including by easing its underwriting criteria and disregarding the minimal

underwriting criteria it claimed to require. By easing and disregarding its underwriting criteria,

Countrywide increased the risk that borrowers would lose their homes. Defendants Mozilo and

Sambol actively pushed for easing Countrywide's underwriting standards and documentation

requirements, allowed the liberal granting of exceptions to those already eased standards and

requirements, and received reports detailing the actual underwriting characteristics and

performance of the loans Countrywide funded.

### A.   Countrywide's Low- and No-Documentation Loans

86.     Traditionally, lenders required borrowers seeking mortgage loans to document

their income, for example by providing W-2s or tax returns, as well as assets. Countrywide,

however, disregarded such documentation requirements with respect to its riskiest loan products

and introduced a variety of reduced or no documentation loan programs that eased and

quickened the loan origination process. The vast majority of the Hybrid ARMs and nearly all of

the Pay Option ARMs originated by Countrywide were reduced or no documentation loans.

87.     As an example of one of its widespread no documentation programs, Countrywide

made Pay Option ARMs, Hybrid ARMs, and piggyback HELOCs, among other loans, pursuant

to its "Stated Income Stated Assets," or "SISA," program. The borrower's income and assets

were stated but not verified. Employment was verbally confirmed and income was supposed to

be roughly consistent with incomes earned in the type of job in which the borrower was

1  employed. Reduced documentation loans, in turn, allowed borrowers to document their income

2  through the provision of W-2 tax forms, bank statements, or verbal verification of employment.

3     88.     These low- and no-documentation programs, such as SISA, enabled Countrywide

4  to process loans more quickly and therefore to make more loans. Stated income loans also

5  encouraged the overstating of income – loan brokers and officers either overstated the borrower's

6  income without his or her knowledge, or led the borrower into overstating his or her income

7  without explaining the risk of default that the borrower would face with a loan he or she could

8  not actually afford. According to a former Countrywide loan officer, for example, a loan officer

9  might say, "with your credit score of X, for this house, and to make X payment, X is the income

10 you need to make." Many borrowers responded by agreeing that they made X amount in income.

11    89.     For stated income loans, it became standard practice for loan processors and

12 underwriters to check www.salary.com to see if a stated income was within a reasonable range,

13 with more tolerance on the upside for California salaries. Because loan officers knew about this

14 practice, they too would look at salary.com to figure out the parameters ahead of time and know

15 by how much they could overstate (or fabricate) income.

16      **B.     Countrywide's Easing of Underwriting Standards**

17    90.     Countrywide also relaxed, and often disregarded, the traditional underwriting

18 standards used to separate acceptable from unacceptable risk in order to produce more loans for

19 the secondary market. Initially, for example, a borrower had to have a credit score of ▮ for a

20 stated income loan. As the secondary market's appetite for loans increased, Countrywide relaxed

21 its guidelines so that a borrower with a credit score of ▮ could get a stated income loan with

22 100% financing.

23    91.     Underwriting standards which Countrywide relaxed included qualifying interest

24 rates (the rate used to determine whether borrowers can afford loans), loan-to-value ratios (the

25 amount of the loan(s) compared to lower of the appraised value or sale price of the property), and

26 debt-to-income ratios (the amount of borrowers' monthly income compared to their monthly

27 indebtedness).

28

92. With respect to qualifying rates, while Countrywide offered loans with initial low payments that would increase, loans were underwritten without regard to borrowers' long-term financial circumstances. Until at least the end of 2005, Countrywide underwrote and approved its Hybrid ARMs based on the fixed interest rate applicable during the initial period of the loan, without taking into account whether the borrowers would be able to afford the dramatically higher payments that would inevitably be required during the remaining term of the loan.

93. In addition, Countrywide's approach to underwriting and marketing Pay Option ARMs diverged. Countrywide underwrote Pay Option ARMs based on the assumption that borrowers would not make the minimum payment and therefore not experience negative amortization. In contrast, Countrywide marketed Pay Option ARMs by emphasizing the minimum payments. Countrywide continued this underwriting practice even though it knew that many of its Pay Option ARM borrowers would choose to make only the minimum monthly payment and that a high percentage of such borrowers had experienced negative amortization on their homes, as described in paragraph 53, above.

94. Countrywide also underwrote and approved HELOCs based on the borrower's ability to afford the interest-only payments during the initial period of the loan, not based on the borrower's ability to afford the subsequent, fully amortized principal and interest payments.

95. Countrywide eased other basic underwriting standards. Starting in 2003, as Defendants pushed to expand market share, underwriting standards and verification requirements became more flexible to enable underwriters to approve loans faster. Countrywide, for example, allowed higher and higher loan-to-value ("LTV") and combined loan-to-value ("CLTV") ratios – the higher the ratio, the greater the risk that a borrower will default and will be unable to refinance in order to avoid default. Similarly, Countrywide approved loans with higher and higher debt-to-income ("DTI") ratios – the higher ratio, the greater the risk the borrower will have cash-flow problems and miss mortgage payments.

C. **Countrywide's "Exception" Underwriting Compromised Standards**

96. Countrywide approved loans that it knew to be high risk, and therefore highly likely to end up in default, by ignoring its own minimal underwriting guidelines. Based on the

proposed loan terms and the borrower's financial and credit information, Countrywide's computerized underwriting system ("CLUES") issued a loan analysis report that rated the consumer's credit and ability to repay the loan, and also indicated whether a proposed loan was in compliance with Countrywide's underwriting guidelines. Based on this analysis, the CLUES report would recommend that the loan be approved, the loan be declined, or that the loan be "referred" to manual underwriting.   CLUES, for example, might flag a "rule violation" if the borrower's LTV, CLTV or credit score fell outside the guidelines for a given loan product.   In such instances, CLUES would make a recommendation to "refer" the loan for further analysis by a Countrywide underwriter.

97.     The CLUES result was only a recommendation, not a final decision. The role of the underwriter was basically to verify information and ultimately decide whether to approve a loan based on Countrywide's underwriting criteria. Underwriters could overcome potential rule violations or other underwriting issues flagged by CLUES by adding on "compensating factors," such as letters from the borrower that addressed a low FICO score or provided explanations regarding a bankruptcy, judgment lien, or other issues affecting credit status.

98.     Underwriters were under intense pressure to process and fund as many loans as possible.   They were expected to process 60 to 70 loans per day, making careful consideration of borrowers' financial circumstances and the suitability of the loan product for them nearly impossible.

99.     As the pressure to produce loans increased, underwriters, their superiors, branch managers, and regional vice presidents were given the authority to grant exceptions to Countrywide's minimal underwriting standards and to change the terms of a loan suggested by CLUES. Even if CLUES had recommended denying a loan, the underwriter could override that denial if he or she obtained approval from his or her supervisor.

100.     Because of the intense pressure to produce loans, underwriters increasingly had to justify why they were not approving a loan or granting an exception for unmet underwriting criteria to their supervisors, as well as to dissatisfied loan officers and branch managers who earned commissions based on loan volume. Any number of Countrywide managerial employees

1  could override an underwriter's decision to decline a loan and request an exception to an
2  underwriting standard. Countrywide employees also could submit a request for an exception to
3  Countrywide's Structured Loan Desk in Plano, Texas, a department specifically set up by
4  Countrywide, at the direction of defendants Mozilo and Sambol, to grant underwriting
5  exceptions. According to a former employee, in 2006, 15,000 to 20,000 loans a month were
6  processed through the Structured Loan Desk.

7       101.   Countrywide granted exceptions liberally, further diluting its already minimal
8  underwriting standards for making loans. Countrywide granted exception requests in a variety of
9  circumstances where one or more basic underwriting criteria of the borrower did not meet loan
10  product guidelines, including, for example, LTV or CLTV, loan amount and credit score.
11  Countrywide placed borrowers in risky loans such as Hybrid and Pay Option ARMs, based on
12  stated but not verified income and assets, and then overlooked its few remaining underwriting
13  indicia of risk.

14       102.   To attract more business Countrywide promoted its relaxed underwriting
15  standards and ready grant of exceptions to brokers. For example, Countrywide promoted
16  "Unsurpassed Product Choices and Flexible Guidelines," including (a) "100% financing for
17  purchase or refinancing" loans; (b) "80/20 combo loans for stated Self-Employed and Non Self-
18  Employed;" (c) "Stated Self-Employed and Non Self-Employed loan programs with as low as a
19  500 credit score." Countrywide stated that its "Specialty Lending Group's experienced and
20  knowledgeable loan experts are empowered to review all loan packages, make sound credit
21  decisions and provide quality lending solutions - yes, even for 'hard to close' loans."

22       **D.    Countrywide's Risk-Layering and Pressure to Sell "Piggyback" Loans
23          Further Loosened Underwriting Practices**

24       103.   Countrywide compromised its underwriting standards even further by risk
25  layering, i.e., combining high risk loans with one or more relaxed underwriting standards.
26  Countrywide was well aware that layered risk created a greater likelihood that borrowers would
27  lose their homes.

28       104.   As early as January 2005, Countrywide identified the following borrower/loan

1   characteristics as having a negative impact on the underwriting evaluation process: ███

2   ███████████████████████████████████████████████████████

3   ███████████████████████████████████████████████████████

4   ███████████████████████. [Redacted description of risk factors

5   identified by Countrywide.]

6       105.   Nonetheless, Countrywide combined these very risk factors in the loans it

7   promoted to borrowers. Countrywide introduced, for example, loan programs that allowed for

8   higher LTVs/CLTVs, less documentation and lower credit scores. A high risk loan such as a Pay

9   Option ARM could be sold to borrowers with increasingly lower credit scores. In addition, by

10  accepting higher DTI ratios and combining Pay Option ARMs with second mortgages that

11  allowed borrowers to finance a down payment, Countrywide would qualify borrowers with fewer

12  financial resources, and hence a higher likelihood of default.

13      106.   With a second or "piggyback" mortgage, the borrower could get a first loan for

14  80% of the purchase price (i.e., an 80% LTV) and a second loan for 20% of the purchase price (a

15  20% LTV), for a combined loan-to-value ratio of 100%. This allowed the borrower to finance a

16  down payment and also avoid paying mortgage insurance (which typically is required if the LTV

17  on a first loan exceeds 80%). Such loans obviously were risky as the borrower had contributed

18  no funds whatsoever to the loan and, if the loan required no documentation, had only stated his or

19  her income and assets.

20      107.   The following examples describe risk layering and underwriting exceptions

21  granted to several California borrowers to whom Countrywide sold Hybrid or Pay Option ARMs.

22  These examples represent only a small percentage of the large number of California residents

23  who are likely facing foreclosure due to Countrywide's widespread practice of risk-layering.

24          a.      A Countrywide loan officer convinced a borrower to take a Pay Option

25          ARM with a 1-month teaser rate and a 3-year prepayment penalty, plus a full-draw

26          piggyback HELOC, based on the loan officer's representation that the value of the

27          borrower's home would continue to rise and he would have no problem refinancing. The

28          borrower's DTI was ██% and FICO was ██. An exception was granted for ███



. The loan closed in January 2006, and a Notice of Default issued in June 2007. [Redacted example of underwriting exception approved by Countrywide.]

      b.     The CLUES report issued for a loan applicant in February 2005 stated that

. [Redacted example of underwriting exception approved by Countrywide.]

      c.

. [Redacted example of underwriting exception approved by Countrywide.]

**VI.  <u>COUNTRYWIDE ENGAGED IN DECEPTIVE MARKETING PRACTICES TO SELL INCREASING NUMBERS OF LOANS</u>**

108.    Driven by its push for market share, Countrywide did whatever it took to sell more loans, faster – including by engaging in a number of deceptive marketing practices under the direction and with the ratification of defendants Mozilo and Sambol.

**A.    Countrywide Deceptively Lulled Borrowers Into Believing That it Was a "Trusted Advisor" Looking Out for the Borrowers' Best Interests**

109.    Countrywide sought to induce borrowers into believing that it was looking out for their best interest through various types of solicitations. Countrywide published television, radio, and print advertisements, for example, touting itself as "the company you can trust" and urging consumers to "join the millions of homeowners who have trusted Countrywide." Countrywide capitalized on its status as the "number one mortgage lender" and claimed that it was a mortgage loan expert capable of advising customers. For example, Countrywide claimed that it "had years to perfect [its] craft" and offered "industry leading expertise" and that "[w]ith over 35 years of service and one of the widest selections of loan programs, [it] is an expert at finding solutions for all kinds of situations." As another example, Countrywide offered "consultation[s] with our home loan experts" and claimed it "would go the distance with you to help secure a loan program to fit your financial needs and goals."

110.    Countrywide also engaged in extensive solicitation campaigns aimed at those borrowers it was easiest for it to find -- existing Countrywide customers. Countrywide targeted existing customers with tailored letters and e-mail solicitations, creating the impression that it was a mortgage expert that advised its borrowers, at no cost, regarding the financial mortgage options that were in their best interest. For example, Countrywide took advantage of Pay Option ARM customers' worries regarding potential future "steep payment adjustments," by sending them a "special invitation" to talk with "specially-trained consultants" regarding "your current financial situation, at no charge, to see if refinancing may help put you in a better financial position."

111.    Countrywide also created an annual "anniversary" campaign, by sending letters and e-mails to existing customers offering a "free Anniversary Loan Review," which it touted as a "home loan analysis" with an "experienced Loan Consultant." Countrywide advertised itself in

1   these solicitations as, for example, an "expert at finding solutions" and "smart financial options"

2   that would best suit borrowers' financial needs.

3       112.    Countrywide operated an extensive telemarketing operation, aimed both at new

4   potential customers and existing Countrywide customers, in which it touted its expertise and

5   claimed to find the best financial options for its customers.  For example, Countrywide instructed

6   its Full Spectrum loan officers to memorize a script that instructed them to "build rapport" and

7   "gain trust" in conversations with potential customers, and to do so with existing customers by

8   "positioning" telephone calls, the true purpose of which was to sell refinance loans, as "Customer

9   Service loan check-up[s]." On these calls, loan officers were instructed to ████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████████████████. [Redacted description

12   of marketing training for loan officers.]  Countrywide instructed FSLD loan officers to state, for

13   example, "I'm an experienced mortgage lending professional specializing in helping people

14   improve their financial situation."  Countrywide even instructed loan officers to offer to provide

15   advice on other lender's mortgage loans and to tell potential customers, that "even if you're

16   working with someone else and just want a second opinion – mortgages can be very complicated.

17   I'm here for that."

18       113.    In addition, when handling initial calls from prospective customers, for example,

19   Countrywide instructed its FSLD loan officers to ████████████████████

20   ████████████████████████████████████████████████████████

21   ████████████████████████████████████████

22   ████████████████████████████. [Redacted description of marketing

23   training for loan officers.]  Contrary to the kinds of representations described in this paragraph

24   and paragraphs 109 through 112, above, Countrywide often did not sell borrowers loans that

25   were in their best interest.

28   **B.**    **Countrywide Encouraged Serial Refinancing**

114.    In order to constantly produce more loans for sale to the secondary market, Countrywide aggressively marketed refinance loans to those homeowners it had no trouble finding -- Countrywide customers. Countrywide misled these borrowers regarding the benefits of refinancing, including by using the deceptive marketing practices described in paragraphs 119 through 128 below. In addition, Countrywide created a perpetual market for its refinance loans by selling Pay Option and Hybrid ARMs that borrowers would have to refinance in order to avoid payment shock. Countrywide knew that borrowers who could not afford the inevitable payment increase on such loans and who were unable to refinance would be at great risk of losing their homes.

115.    Countrywide provided lists of existing customers to its loan officers responsible for outbound marketing. Defendants' loan officers hounded Countrywide customers by phone, mail, and electronic mail with refinance loan offers. For example, ███████████████

███████████████████████████████████████

██████. [Redacted description of Countrywide's marketing plans for soliciting existing Countrywide customers to refinance.] FSLD "leads" – telephone numbers for existing, eligible customers – were uploaded into a telemarketing database on a weekly basis.

116.    Countrywide even solicited customers who were having trouble making payments or facing foreclosure, without regard to the risk that the customer would default on Pay Option and Hybrid ARM refinance loans. FSLD solicited existing prime customers who had "recurring" missed payments. Countrywide required its customer service representatives to market refinance loans to borrowers who called with questions, including borrowers who were behind on their monthly payments or facing foreclosure.

117.    Countrywide  also solicited existing customers on other occasions, including on their annual loan "anniversaries" (see paragraph 111, above) and shortly before a rate or payment was to reset on Pay Option or Hybrid ARMs, without regard to whether the loan had a prepayment penalty period that had not yet expired. In doing so, the Countrywide Defendants refinanced borrowers while the prepayment penalty on their prior Countrywide loan was still in effect, often concealing the existence of the prepayment penalty.

1    118.    Countrywide claims that approximately 60% of FSLD's business has been

2    comprised of refinancing Countrywide loans.

3    **C.    Countrywide Misled Borrowers About the True Terms of Pay Option and
         Hybrid ARM Loans by Focusing the Borrowers' Attention on Low
4        Beginning Payments and Teaser Rates**

5    119.    Because Pay Option ARM and Hybrid ARMs start with lower monthly payments

6    and interest rates than most other types of loan products, and given their complex nature,

7    Countrywide was able to easily sell such loans to borrowers by focusing on the initial low

8    monthly payments and/or rates and by obscuring or misrepresenting the true risks of such loans.

9    120.    With respect to Pay Option ARMs, the crux of Countrywide's sales approach was

10   to "sell the payment." When presenting a borrower with various loan options, for example,

11   Countrywide would "sell the payment" by showing the borrower the minimum monthly

12   payments for the Pay Option ARM in comparison to other loan products with larger payments.

13   Then, Countrywide would ask which payment the borrower preferred without discussing other

14   differences between the loan products. Naturally, in this situation, most borrowers chose the

15   option with the lowest payment, the Pay Option ARM, without realizing that the payment would

16   last for only a short time before it would begin to increase.

17   121.    If, instead, Countrywide presented the Pay Option ARM as the only option, it

18   would "sell the payment" by emphasizing the low minimum payment and how much the

19   borrower would "save" every month by making such a low payment, without discussing the

20   payment shock and negative amortization that inevitably result when borrowers make minimum

21   payments. Given the complexity of Pay Option ARMs, such a presentation easily misled

22   borrowers regarding the long-term affordability of their loans.

23   122.    Countrywide also represented that the initial monthly payment would last for the

24   entire term of the loan, or for some period longer than that provided for by the loan's terms.

25   123.    Countrywide engaged in similar deceptive representations with respect to Hybrid

26   ARMs. For example, Countrywide focused its sales presentation on the interest-only payments

27   during the initial fixed-rate period, i.e. the 2-year period on a 2/28 ARM or the 3-year period on a

28   3/27 ARM, not on how the payment would adjust to include both principal and interest after the

1 initial fixed-rate period. It also represented that the payments would last for the entire term of the

2 loan, or for some period longer than that provided for by the loan's terms.

3      124.   When selling Pay Option and Hybrid ARMs, Countrywide engaged in another

4 deceptive practice – rather than selling the payment, it would sell the rate. Countrywide either

5 focused exclusively on the initial one-month, two-year, or three-year "fixed" interest rate, for

6 example, without discussing that the rate would reset after the initial period to a potentially much

7 higher rate, or it represented that the initial interest rate would last for a much longer period than

8 it actually did or for the entire term of the loan.

9      125.   Countrywide's letter and e-mail solicitations, as well as telemarketing calls, also

10 focused borrowers' attention on short-term low monthly payments. FSLD loan officers, for

11 example, were required to memorize scripts that marketed low monthly payments by focusing (a)

12 on the potential customer's dissatisfaction with his or her current monthly payments under his or

13 her current mortgage loan and/or (b) on so-called "savings" that result from minimum monthly

14 payments. As just one of many potential examples, to overcome a borrower's claim that he or

15 she already has a loan with a low interest rate, Countrywide required FSLD loan officers to

16 memorize the following response: "I certainly understand how important that is to you. But let

17 me ask you something . . . . Which would you rather have, a long-term fixed payment, or a short-

18 term one that may allow you to realize several hundred dollars a month in savings? I am able to

19 help many of my clients lower their monthly payments and it only takes a few minutes over the

20 phone to get started." What the FSLD loan officer did not state was that the borrowers would, in

21 fact, not save money because the payment on the new loan would ultimately exceed the payment

22 on the borrower's current loan.

23      126.   Borrowers subjected to any of the deceptive marketing practices described above

24 would not understand the true risks and likely unaffordability of their Pay Option or Hybrid

25 ARMs. Many borrowers did not read their loan documents and disclosures before signing.

26 Countrywide often made borrowers sign a large stack of documents without providing the

27 borrower with time to read them. Other borrowers were unable to read English. And, given the

28

1  complexity of Pay Option and Hybrid ARMs, many borrowers who managed to read their loan

2  documents did not understand the terms of the loans they were being sold.

3       127.    As a result, many borrowers who obtained Pay Option and Hybrid ARMs did not

4  understand that their initial monthly payment would at some point "explode," that their initial

5  interest rate would increase and become adjustable, or that the principal amount of their loans

6  could actually increase.   Countrywide received numerous complaints regarding these practices

7  from consumers, including over [    ] complaints per year handled by the [                    ]

8  alone between approximately January 2005 and August 2007.   Many borrowers complainted that

9  they did not understand the terms of their Pay Option and Hybrid ARMs, including the potential

10 magnitude of changes to their monthly payments, interest rates, or loan balances.   Many

11 borrowers also complained that Countrywide's loan officers either did not tell them about the

12 payment or rate increases on such loans or promised that they would have fixed-rate, fixed

13 payment loans, rather than adjustable rate mortgage loans with increasing payments.

14      128.    Despite these complaints, Defendants did not alter their deceptive marketing

15 practices and did not address the hardship created by their practice of making Pay Option and

16 Hybrid ARMs with little or no regard to affordability.   Defendants cared only about doing

17 whatever it took to sell increasing numbers of loans.

18      **D.     Countrywide Misled Borrowers About their Ability to Refinance Before The
            Rates or Payments on Their Pay Option and Hybrid ARMs Increased**

19      129.    If a borrower was able to figure out that he or she had obtained a Pay Option or

20 Hybrid ARM *before* signing the loan documents, he or she may still have been misled by

21 Countrywide in another way – Countrywide's loan officers often overcame borrower concerns

22 about exploding monthly payments or increasing interest rates by promising that they would be

23 able to refinance with Countrywide into a loan with more affordable terms before the payments

24 or rate reset.

25      130.    Countrywide often represented that the value of a borrower's home would

26 increase, thus creating enough equity to obtain a loan with better terms.   However, borrowers

27 with interest-only or negatively amortizing loans that encumbered as much as, if not more than,

28

1   100% of their home's appraised value, were highly unlikely to be able to refinance into another

2   loan if their home did not increase in value. Additionally, any consumers who sought to

3   refinance a Countrywide mortgage would likely incur a substantial prepayment penalty, thus

4   limiting their ability to obtain a more favorable loan.

5        131.   Countrywide loan officers often misrepresented or obfuscated the fact that a

6   borrower's loan had a prepayment penalty or misrepresented that a prepayment penalty could be

7   waived. Countrywide also promised borrowers that they would have no problem refinancing

8   their Pay Option or Hybrid ARMs, when in fact they might have difficulty refinancing due to the

9   existence of prepayment penalties. Prepayment penalties on Pay Option and Hybrid ARMs

10   essentially prevent many borrowers from refinancing such unaffordable loans before their

11   payments explode or rates reset.

12        132.   Countrywide received numerous complaints from borrowers who claimed that

13   they had not been told about the prepayment penalty or that the loan officer promised they would

14   not have one. Again, despite receiving such complaints, Defendants turned a blind eye to

15   deceptive marketing practices regarding prepayment penalties and the resulting adverse financial

16   consequences to borrowers.

17   **E.**    **Countrywide Misled Borrowers About the Cost of Reduced and No**
      **Document Loans**

18

19        133.   Countrywide touted its low documentation requirements, urging borrowers to get

20   "fastrack" loans so that they could get cash more quickly. However, many borrowers who

21   obtained these loans possessed sufficient documentation to qualify for full document mortgages,

22   and some submitted that documentation to their loan officer or to one of Countrywide's business

23   partner brokers. In emphasizing the ease, speed and availability of reduced or no document

24   loans, Countrywide and its brokers concealed the fact that borrowers could qualify for a lower

25   rate or reduced fees if they elected to apply for a mortgage by fully documenting their income

26   and assets.

27   **F.**    **Countrywide Misled Borrowers Regarding the Terms of HELOCs**

28

1    134.    Countrywide misrepresented the terms of HELOCs, including without limitation

2    by failing to inform the borrower that he or she would not have access to additional credit

3    because he or she was receiving a full draw or that the monthly payment on the HELOC was

4    interest-only and the borrower therefore would not be able to draw additional funds on the

5    HELOC at a later date.

6    135.    Countrywide also misrepresented or obfuscated the payment shock that borrowers

7    would experience after the interest-only payment period on the HELOCs ended.  Countrywide's

8    Call Center received large numbers of calls from borrowers complaining that they did not

9    understand that the payments on their full-draw HELOCs would only cover interest, or that the

10    interest rates on their HELOCs would adjust and increase.

11    **VII.    IN ORDER TO INCREASE MARKET SHARE, DEFENDANTS CREATED A**

12    **HIGH-PRESSURE SALES ENVIRONMENT WHERE EMPLOYEES WERE**
    **REWARDED FOR SELLING AS MANY LOANS AS THEY COULD, WITHOUT**
    **REGARD TO BORROWERS' ABILITY TO REPAY**

13

14    136.    Despite touting itself as a lender that cared about its borrowers, Countrywide was,

15    in essence, a mass production loan factory set up to produce an ever-increasing stream of loans

16    without regard to borrowers' ability to repay their loans and sustain homeownership.  In order to

17    provide an endless supply of loans for sale to the secondary market, Defendants pressured

18    Countywide employees involved in the sale and processing of loans to produce as many loans as

19    possible, as quickly as possible, and at the highest prices.

20    137.    Defendants created this pressure through a compensation system, which

21    predictably led  employees to disregard Countrywide's minimal underwriting guidelines and to

22    originate loans without regard to their sustainability.  Countrywide's compensation system also

23    motivated its loan officers to engage in the deceptive marketing practices described in the

    preceding sections.
24
25    138.    Defendants incentivized managers to place intense pressure on the employees they

26    supervised to sell as many loans as possible, as quickly as possible, at the highest prices possible.

    Branch managers received commissions or bonuses based on the net profits and loan volume
27
    generated by their branches.  In most circumstances, however, branch managers were eligible for
28

1   such commissions or bonuses only if █████████████████████████████████████

2   ███████████████████. [Redacted descriptions regarding minimum requirements for commission

3   or bonus eligibility.] Branch managers were also rewarded for meeting production goals set by

4   corporate management, ████████████████████████████████████████████████

5   ██████████████████████████████████████ – or penalized for failing to do so.

6   [Redacted description of the criteria Countrywide used to adjust branch managers' commissions

7   or bonuses.]

8       139.    Countrywide provided branch managers with access to computer applications and

9   databases that allowed them to monitor loan sales on a daily basis and pressure employees to

10  "sell, sell, sell." A branch manager could input the type of loan (such as a Pay Option ARM), █

11  ██████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████ and determine what price a

13  borrower would pay for that loan, as well as the amount of profit the loan would likely generate

14  for the branch. Branch managers could also monitor their branches' loan sales performance by

15  tracking loans that were in the process of being underwritten and the prices and characteristics of

16  loans sold by the branch and by particular loan officers, during any specified time period.

17      140.    With such tools available, Countrywide's branch managers were able to

18  constantly pressure loan officers, loan processors, and underwriters to do their part in increasing

19  loan production – by hunting down more borrowers, selling more loans, and processing loans as

20  quickly as possible, thereby boosting loan production, branch profits, and branch manager

21  commissions and bonuses. This high-pressure sales environment invited deceptive sales

22  practices and created incentives for retail branch managers, other managers, loan officers, loan

23  specialists, and underwriters to jam loans through underwriting without regard to borrower

24  ability to repay.

25      141.    Countrywide created additional pressure to engage in deceptive marketing

26  practices and sell loans without regard to their sustainability by paying its loan officers and

27  managers a modest base salary that could be supplemented by commissions or bonuses. In most

28

1  circumstances, the employees were eligible to receive these commissions or bonuses only if they,

2  or the employees they supervised, sold a minimum number or dollar volume of loans.

3      142.   Not only did this compensation system create incentives for employees to sell as

4  many loans as possible, as quickly as possible, it also created incentives for retail employees to

5  steer borrowers into riskier loans.  For example, Countrywide paid greater commissions and

6  bonuses to CMD managers and loan officers for selling

7  ███████████████████████████████.  [Redacted description of loan products.]

8  Countrywide also paid greater commissions and bonuses to FSLD managers and loan officers for

9  ████████████████████████.  [Redacted description of loan products.]

10     143.   Countrywide's compensation system also created incentives for wholesale loan

11  officers to steer brokers and their clients into riskier loans.  Countrywide's wholesale loan

12  officers worked one-on-one with "business partner" brokers approved by Countrywide.  The loan

13  officers cultivated relationships with brokers in order to persuade them to bring their business to

14  Countrywide and, in particular, to work with a particular loan officer so that he or she, and his or

15  her managers, could earn greater commissions.  ████████████████████████

16  █████████████████████████████████████████████

17  █████████████████████████████████████████████

18  ███████████████████████████████████████

19  ███████████████████████████████████████████

20  ██.  [Redacted description of compensation paid by Countrywide for the sale of particular loan

21  products.]

22     144.   Countrywide's compensation system also rewarded employees for selling ████

23  █████████████████████████████████████

24  ████████████████████████████████████████

25  █████████████████████████████████████████

26  █████████████████████████████████████████

27  █████████████████████████████████████████

28

1         ▇▇▇▇▇. [Redacted description of compensation paid by Countrywide for the sale of

2 particular loan products.]

3      145.   Countrywide's high-pressure sales environment and compensation system

4 encouraged serial refinancing of Countrywide loans. The retail compensation systems created

5 incentives for loan officers to churn the loans of borrowers to whom they had previously sold

6 loans, without regard to a borrower's ability to repay, and with the consequence of draining

7 equity from borrowers' homes. Although Countrywide maintained a policy that discouraged loan

8 officers from refinancing Countrywide loans within a short time period after the original loan

9 funded (Countrywide often changed this time period, which was as low as ▇▇▇ months for some

10 loan products), loan officers boosted their loan sales by targeting the easiest group of potential

11 borrowers to locate – Countrywide borrowers – as soon as that period expired.

12      146.   Countrywide management at all levels pressured the employees below them to sell

13 and approve more loans, at the highest prices, as quickly as possible, in order to maximize

14 Countrywide's profits on the secondary market. Defendant Sambol, for example, monitored

15 Countrywide's loan production numbers and pressured employees involved in selling loans or

16 supervising them to produce an ever-increasing numbers of loans, faster. Regional vice

17 presidents pressured branch managers to increase their branches' loan numbers. Branch

18 managers pressured loan officers to produce more loans, faster, and often set their own branch-

19 level production quotas.

20      147.   Underwriters were also pressured to approve greater numbers of loans quickly and

21 to overlook underwriting guidelines while doing so. Defendant Sambol pressured underwriters

22 to increase their loan production and to increase approval rates by relaxing underwriting criteria.

23 Regional operations vice presidents, branch operations managers, branch managers, and loan

24 officers all pressured underwriters to rush loan approvals. Countrywide required underwriters to

25 meet loan processing quotas and paid bonuses to underwriters who exceeded them.

26      148.   Customer service representatives at Countrywide's Call Center also were expected

27 to achieve quotas and received bonuses for exceeding them. Countrywide required service

28 representatives to complete calls in three minutes or less, and to complete as many as sixty-five

to eighty-five calls per day. Although three minutes is not sufficient time to assist the confused or distressed borrowers who contacted them, Countrywide required service representatives to market refinance loans or piggyback HELOCs to borrowers who called with questions -- including borrowers who were behind on their monthly payments or facing foreclosure. Using a script, the service representatives were required to pitch the loan and transfer the caller to the appropriate Countrywide division. Service representatives also received bonuses for loans that were so referred and funded.

149. Countrywide employees from senior management down to branch managers pressured the employees below them to sell certain kinds of products. Regional vice presidents, area managers, and branch managers pushed loan officers to sell Pay Option ARMs, piggyback HELOCs, and loans with prepayment penalties, primarily because such loans boosted branch profits, manager commissions, and Countrywide's profits on the secondary market.

150. If any of these employees, including branch managers, loan officers, loan processors, underwriters, and customer service representatives, failed to produce the numbers expected, Countrywide terminated their employment.

## VIII.  AS PART OF ITS DECEPTIVE SCHEME, COUNTRYWIDE COMPENSATED ITS BUSINESS PARTNER BROKERS AT A HIGHER RATE FOR MORE PROFITABLE LOANS, WITHOUT CONSIDERATION OF SERVICES ACTUALLY PROVIDED BY THE BROKERS

151. In California, a mortgage broker owes his or her client a fiduciary duty. A mortgage broker is customarily retained by a borrower to act as the borrower's agent in negotiating an acceptable loan. All persons engaged in this business in California are required to obtain real estate licenses and to comply with statutory requirements. Among other things, the mortgage broker has an obligation to make a full and accurate disclosure of the terms of a loan to borrowers, particularly those that might affect the borrower's decision, and to act always in the utmost good faith toward the borrower and to refrain from obtaining any advantage over the borrower.

152. Countrywide paid brokers compensation in the form of yield spread premiums or rebates to induce brokers to place borrowers in loans that would earn Countrywide the greatest

1  profit on the secondary market, regardless of whether the loans were in the best interest of, or

2  appropriate for, the borrowers.  In fact, the mortgages that earned Countrywide the highest profit,

3  and therefore would pay the highest rebates or yield spread premiums to brokers, often were not

4  in the best interest of the borrower.

5  153.  For example, Countrywide paid a yield spread premium to brokers if a loan was

6  made at a higher interest rate than the rate for which the borrower qualified and without regard

7  for the services actually provided by the broker.  Countrywide paid a rebate to a broker if he or

8  she originated or negotiated a loan that included a prepayment penalty.  A three-year prepayment

9  penalty resulted in a higher rebate to the broker than a one-year prepayment penalty.

10  Countrywide would pay this higher rebate even in instances where the loan did not include a

11  provision, such as a more favorable origination fee or interest rate, to counterbalance the

12  prepayment penalty, and where brokers did not perform any additional services in connection

13  with the loan.

14  154.  Countrywide also would pay rebates in exchange for a broker providing an

15  adjustable rate loan with a high margin (the amount added to the index to determine the interest

16  rate).  Countrywide would provide an additional rebate to brokers if they were able to induce a

17  borrower to obtain a line of credit.

18  155.  Countrywide accepted loans from brokers in which the broker earned up to ▮

19  points (i.e., ▮ percent of the amount of the loan), whether in origination fees, rebates, or yield

20  spread premiums.  This high level of compensation was well in excess of the industry norm and

21  encouraged brokers to sell Countrywide loans without regard to whether the loans were in their

22  clients' best interest.  In addition, the compensation paid by Countrywide to brokers was well in

23  excess of, and not reasonably related to, the value of the brokerage services performed by

24  Countrywide's business partner brokers.

25  156.  In order to maximize their compensation from Countrywide, brokers misled

26  borrowers about the true terms of Pay Option and Hybrid ARMs, misled borrowers about their

27  ability to refinance before the rates or payments on their loans increased, misled borrowers about

28  the cost of reduced and no document loans, and misled borrowers regarding the terms of

1  HELOCs by engaging in the same kinds of deceptive practices alleged at paragraphs 58 through
2  64, 75 through 77, 108 through 117, and 119 through 135 above.

3      157.   Borrowers often did not realize that their loans contained terms that were
4  unfavorable to them and provided greater compensation to their brokers specifically as payment
5  for those unfavorable terms.  An origination fee or other charges imposed by a broker are either
6  paid by the borrower or financed as part of the loan.  In contrast, rebates and yield spread
7  premiums are not part of the principal of the loan and instead are paid separately by Countrywide
8  to the broker.  Documentation provided to the borrower might indicate, at most, that a yield
9  spread premium or rebate was paid outside of closing (often delineated as "p.o.c." or "ysp poc"),
10 with no indication that the payment constituted compensation from Countrywide to the broker for
11 placing the borrower in a loan with terms that were not in the borrower's best interest, such as a
12 higher interest rate or lengthier prepayment penalty.

13     158.   Countrywide closely monitored and controlled the brokers with whom it worked.
14 Countrywide required brokers it accepted as "business partners" to cooperate and provide all
15 information, documents and reports it requested so that Countrywide could conduct a review of
16 the broker and its operations.  In addition, Countrywide required the broker to warrant and
17 represent that all loans were closed using documents either prepared or expressly approved by
18 Countrywide.

19 **IX.   AS A RESULT OF DEFENDANTS' DECEPTIVE SCHEME, THOUSANDS OF
   CALIFORNIA HOMEOWNERS HAVE EITHER LOST THEIR HOMES OR
20 FACE FORECLOSURE AS THE RATES ON THEIR ADJUSTABLE RATE
   MORTGAGES RESET**

21     159.   Due to Countrywide's lack of meaningful underwriting guidelines and risk-
22 layering, Countrywide's deceptive sales tactics, Countrywide's high-pressure sales environment,
23 and the complex nature of its Pay Option and Hybrid ARMs, a large number of Countrywide
24 loans have ended in default and foreclosure, or are headed in that direction.  Many of its
25 borrowers have lost their homes, or are facing foreclosure, because they cannot afford the
26 payment shock and their properties are too heavily encumbered for them to be able to refinance
27 and pay prepayment penalties.
28

1    160.    The national pace of foreclosures is skyrocketing.  In the month of May 2008,

2    approximately 20,000 Californians lost their homes to foreclosure, and approximately 72,000

3    California homes (roughly 1 out of 183 homes) were in default.  This represented an 81%

4    increase from May 2007, at which point the rate was roughly 1 out of every 308 households,

5    while the May 2007 rate represented a 350% increase from May 2006.

6    161.    Countrywide mortgages account for a large percentage of these delinquencies and

7    foreclosures.  Countrywide's 10-K filed in February, 2008, estimated that as of December 31,

8    2007, a staggering 27.29% of its non-prime mortgages were delinquent.  As of that date,

9    approximately 26% of Countrywide's loans were secured by properties located in California.

10    162.    These numbers have only worsened.  As of April, 2008, ▇% of the mortgages

11    owned by Countrywide Home Loans were in some stage of delinquency or foreclosure, including

12    ▇% of originated non-prime loans, and ▇% of Pay Option ARMs.

13    163.    In January and March, 2008, Countrywide recorded ▇ notices of default in

14    Alameda, Fresno, Riverside, and San Diego counties alone.  Those ▇ notices of default

15    represented an aggregate total of delinquent principal and interest of more than ▇

16    dollars.  An October 2007 report prepared by Credit Suisse estimated that Countrywide's

17    delinquency and foreclosure rates are likely to double over the next two years.

18    164.    This may well understate the extent of the crisis facing California homeowners

19    with Countrywide mortgages, as more and more Pay Option ARMs go into delinquency.

20    Approximately 60% of all Pay Option ARMs (made by any lender) were made in California, and

21    many of these were made by Countrywide.  Once the thousands of Pay Option ARMs sold by

22    Countrywide to California borrowers reach their negative amortization cap or otherwise reset to

23    require fully indexed principal and interest payments, which will occur over the next two years

24    for many such loans made between 2003 and 2006, the number of such loans in default is likely

25    to skyrocket even above their current high delinquency rate.

26

27

28

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17500

## (UNTRUE OR MISLEADING STATEMENTS)

165.    The People reallege and incorporate by reference all paragraphs above, as though fully set forth in this cause of action.

166.    Defendants have violated and continue to violate Business and Professions Code section 17500 by making or disseminating untrue or misleading statements, or by causing untrue or misleading statements to be made or disseminated, in or from California, with the intent to induce members of the public to enter into mortgage loan or home equity line of credit transactions secured by their primary residences. These untrue and misleading statements include but are not necessarily limited to:

a.      Statements that Countrywide was a mortgage loan expert that could be trusted to help borrowers obtain mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 109 through 113, above;

b.      Statements regarding the terms and payment obligations of Pay Option ARMs offered by Countrywide, including statements that the initial payment rate was the interest rate, statements regarding the duration of the initial payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 58 through 64, 119 through 122, and 124 through 128, above;

c.      Statements regarding the terms and payment obligations of Hybrid ARMs offered by Countrywide, including statements regarding the duration of the initial interest-only payment, statements regarding the duration of the initial interest rate, and statements obfuscating the risks associated with such mortgage loans, as described in paragraphs 75 through 77, 119, and 123 through 128, above;

d.      Statements regarding the terms and payment obligations of HELOCs, as described in paragraphs 134 through 135, above; and

e.      Statements that borrowers with Pay Option and Hybrid ARMs offered by Countrywide would be able to refinance the mortgage loans before the interest rates reset, when in fact they most likely could not, as described in paragraphs 62, 76, 77, and 129 through 132, above;

f.      Statements regarding prepayment penalties on Pay Option and Hybrid ARMs offered by Countrywide, including statements that the mortgage loans did not have prepayment penalties, when in fact they did, and statements that prepayment penalties could be waived, when in fact they could not, as described in paragraphs 63, 64, 76, and 131 through 132, above;

g.      Statements regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

h.      Statements regarding the benefits or advisability of refinancing mortgage loans with Pay Option and Hybrid ARMs offered by Countrywide, as described in paragraphs 110 through 118, above; and

i.      Statements regarding the existence of prepayment penalties on mortgage loans being refinanced with Countrywide mortgage loans, as described in paragraph 117, above.

167.    Defendants knew, or by the exercise of reasonable care should have known, that these statements were untrue or misleading at the time they were made.

## SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS

## VIOLATIONS OF BUSINESS AND PROFESSIONS CODE SECTION 17200

## (UNFAIR COMPETITION)

168.    The People reallege and incorporate by reference all paragraphs above, as through fully set forth in this cause of action.

169.    Defendants have engaged in, and continue to engage in, acts or practices that constitute unfair competition, as that term is defined in Section 17200 of the Business and Professions Code. Such acts or practices include, but are not limited to, the following:

a.      Creating and maintaining a deceptive scheme to mass produce loans for

sale on the secondary market, as described in paragraphs 15 through 164, above;

b.  Making untrue or misleading representations that Countrywide could be trusted to sell borrowers mortgage loans that were appropriate to their financial circumstances, as described in paragraphs 109 through 113, above;

c.  Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's Pay Option and Hybrid ARMs, including representations regarding the payment rate, the duration of initial interest rates, the duration of initial monthly payments, the inclusion of prepayment penalties, the waivability of prepayment penalties, the payment shock that borrowers were likely to experience, and the risks associated with such mortgage loans, as described in paragraphs 58 through 64, 75 through 77, and 119 through 132, above;

d.  Making untrue or misleading representations regarding the terms and payment obligations of Countrywide's HELOCs, as described in paragraphs 134 through 135, above;

e.  Making untrue or misleading representations regarding the costs of reduced or no documentation mortgage loans, as described in paragraph 133, above;

f.  Making untrue or misleading representations regarding the true likelihood or circumstances under which borrowers would be able to refinance Pay Option or Hybrid ARMs offered by Countrywide, as described in paragraphs 62, 76, 77, and 129 through 132, above;

g.  Soliciting borrowers to refinance mortgage loans by misrepresenting the benefits of doing so or by misrepresnting or obfuscating the fact that in doing so the borrowers will incur a prepayment penalty, as described in paragraphs 110 through 118, above;

h.  Making mortgage loans and extending HELOCs without regard to whether borrowers would be able to afford monthly payments on those loans or HELOCs after the expiration of the initial interest rates on the mortgage loans, or the draw periods on the HELOCs, as described in paragraphs 85 through 107, above;

i.      Aiding and abetting the breach of the fiduciary duty owed by mortgage brokers to California borrowers, as described in paragraphs 151 through 158, above;

j.      Failing to provide borrowers with documents sufficient to inform them of their payment obligations with respect to fully drawn HELOCs, as described in paragraphs 81 through 84, above;

k.      Paying compensation to mortgage brokers that was not reasonably related to the value of the brokerage services they performed, as described in paragraphs 152 through 155, above; and

l.      Violating Section 17500 of the Business and Professions Code, as described in the First Cause of Action, above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.      Pursuant to Business and Professions Code section 17535, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from making any untrue or misleading statements in violation of Business and Professions Codes section 17500, including the untrue or misleading statements alleged in the First Cause of Action.

2.      Pursuant to Business and Professions Code section 17203, that all Defendants, their employees, agents, representatives, successors, assigns, and all persons who act in concert with them be permanently enjoined from committing any acts of unfair competition, including the violations alleged in the Second Cause of Action.

3.      Pursuant to Business and Professions Code sections 17535, that the Court make such orders or judgments as may be necessary to prevent the use or employment by any Defendant of any practices which violate section 17500 of the Business and Professions Code, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any such practice.

4.      Pursuant to Business and Professions Code section 17203, that this court make such orders or judgments as may be necessary to prevent the use or employment by any

1  Defendant of any practice which constitutes unfair competition or as may be necessary to restore

2  to any person in interest any money or property, real or personal, which may have been acquired

3  by means of such unfair competition.

4      5.      Pursuant to Business and Professions Code section 17536, that Defendants, and

5  each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred

6  dollars ($2,500) for each violation of Business and Professions Code section 17500 by

7  Defendants, in an amount according to proof.

8      6.      Pursuant to Business and Professions Code section 17206, that Defendants, and

9  each of them, be ordered to pay a civil penalty in the amount of two thousand five hundred

10  dollars ($2,500) for each violation of Business and Professions Code section 17200 by

11  Defendants, in an amount according to proof.

12      7.      That Plaintiff recover its costs of suit, including costs of investigation.

13      8.      For such other and further relief that the Court deems just, proper, and equitable.

14

15  DATED:    June  24, 2008                    EDMUND G. BROWN JR.
                                                Attorney General
16                                              ALBERT NORMAN SHELDEN
                                                Senior Assistant Attorney General
17                                              RONALD REITER
                                                Supervising Deputy Attorney General
18                                              KATHRIN SEARS
                                                ROBYN SMITH
19                                              BENJAMIN G. DIEHL
                                                LINDA HOOS
20                                              Deputy Attorneys General

21

22                              By:  _____
23                                   BENJAMIN G. DIEHL
                                     Deputy Attorney General
24

25

26

27

28