# EXHIBIT D

Atty. No. 99000

## IN THE CIRCUIT COURT OF COOK COUNTY, STATE OF ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

FILED
2008 JUN 25  AM 10: 18

CIRCUIT COURT OF COOK
COUNTY, ILLINOIS
CHANCERY DIV.

DOROTHY BROWN —CLERK

THE PEOPLE OF THE STATE OF
ILLINOIS,

      Plaintiff,

v.

COUNTRYWIDE FINANCIAL
CORPORATION, a Delaware
corporation; COUNTRYWIDE HOME
LOANS, INC., a New York
corporation also d/b/a Full Spectrum
Lending; FULL SPECTRUM
LENDING, a California corporation
formerly doing business in Illinois;
COUNTRYWIDE HOME LOANS
SERVICING, LP, a Texas partnership;
and ANGELO R. MOZILO,
individually and in his capacity as
Chief Executive Officer of Defendant
COUNTRYWIDE FINANCIAL
CORPORATION;

      Defendants.

    (
    (
    (
    (
    (
    (

**08CH22994**

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

NOW COMES the Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA

MADIGAN, Attorney General of the State of Illinois, and complains of Defendants

COUNTRYWIDE FINANCIAL CORPORATION, a Delaware corporation, COUNTRYWIDE

HOME LOANS, INC., a New York corporation also doing business as Full Spectrum Lending,

FULL SPECTRUM LENDING, a California corporation formerly doing business in Illinois,

COUNTRYWIDE HOME LOANS SERVICING LP, a Texas partnership, and ANGELO R.

MOZILO, individually and in his capacity as Chief Executive Officer of Defendant

COUNTRYWIDE FINANCIAL CORPORATION.

Countrywide, in pursuit of market share, engaged in unfair and deceptive practices

including the loosening of underwriting standards, structuring unfair loan products with risky

features, engaging in misleading marketing and sales techniques, and incentivizing employees

and brokers to sell more and more loans with risky features.  Countrywide's business practices

resulted in unaffordable mortgage loans and increased delinquencies and foreclosures for Illinois

homeowners.

Countrywide's explosive growth was paralleled by the demand for loans with non-

traditional risky features on the secondary market.  Through the securitization process,

Countrywide shifted the risk of the failure of these non-traditional loans to investors.  Moreover,

securitization allowed Countrywide to gain much needed capital to fuel the origination process

and reach its goal of capturing more and more market share.  As the risky Countrywide loans

began to fail, it was forced to repurchase or replace the failing loans in the investor pools.  This

created further pressure to increase the volume of loan origination.

To facilitate the increase in loan origination volume, Countrywide relaxed its

underwriting standards and sold unaffordable and unnecessarily expensive loans.  Reduced

documentation underwriting guidelines were heavily used to qualify many borrowers for

unaffordable loans.  Countrywide created so-called "affordability" loan products, such as

adjustable rate mortgages and interest-only loan products, that only required qualifying

borrowers at less than the full interest rate for the loan products.  Countrywide pushed products

that containing layers of unduly risky features, such as pay option ARMs and mortgage loans for

100% of the value of borrowers' homes.  Unfair and deceptive advertising, marketing and sales

practices were utilized to push mortgages, while hiding the real costs and risks to borrowers. These practices included enticing borrowers with low teaser rates, low monthly payments and "no closing cost" loans that failed to make clear and conspicuous disclosures of the products' risks. Finally, Countrywide engaged in unfair and deceptive acts and practices while servicing borrowers' loans, such as requiring borrowers to make initial payments without regard to whether a loan repayment plan or loan modification was even possible.

## JURISDICTION AND VENUE

1.     This action is brought for and on behalf of THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, pursuant to the provisions of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*, the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*, and her common law authority as Attorney General to represent the People of the State of Illinois.

2.     Venue for this action properly lies in Cook County, Illinois, pursuant to Section 2-101 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, in that the Defendants are doing business in Cook County, Illinois.

## PARTIES

3.     Plaintiff, THE PEOPLE OF THE STATE OF ILLINOIS, by LISA MADIGAN, Attorney General of the State of Illinois, is charged, *inter alia,* with the enforcement of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* and the Illinois Fairness in Lending Act, 815 ILCS 120/1 *et seq.*

4.     Defendant ANGELO R. MOZILO is a co-founder of Defendant COUNTRYWIDE FINANCIAL CORPORATION, which was formed as Countrywide Credit Industries in 1969.

5.     Defendant MOZILO participates in, manages, controls, and has knowledge of the day-to-day activities of Defendant COUNTRYWIDE FINANCIAL CORPORATION.  He has been the Chairman of Defendant COUNTRYWIDE FINANCIAL CORPORATION'S Board since March 1999 and Chief Executive Officer of the company since February 1998.  Defendant MOZILO was also President of the company from March 2000 through December 2003 and has served in other executive capacities since the company's formation.

6.     Defendant MOZILO has stated that he has "devoted [his] life to building from the ground up a mortgage banking company focused on providing homeownership opportunities to all Americans" for the last four decades.

7.     Although Defendant MOZILO resides in California, his companies conduct business in Illinois and, on at least two occasions, he has engaged in purposeful activity to further the interests of Defendant COUNTRYWIDE FINANCIAL CORPORATION (and its subsidiaries) while in the State of Illinois.

8.     Specifically, during an April 27, 2006 earnings conference call, Defendant MOZILO reported that he had just finished a tour of the offices of the subsidiary that handles the securitization of mortgage loans originated by Defendant COUNTRYWIDE FINANCIAL CORPORATION.  As he reported, one of those offices was in Chicago.

9.     In addition, during October 1998, Defendant MOZILO appeared at the Mortgage Banker's Association of America's annual convention in Chicago.  At this appearance, Defendant MOZILO discussed the turbulence in the mortgage business and stated that only big firms with adequate resources to maintain access to bank lenders and the capital markets would survive.  He predicted that Defendant COUNTRYWIDE FINANCIAL CORPORATION would be a beneficiary of the market turbulence.

10.     Defendant COUNTRYWIDE FINANCIAL CORPORATION is a thrift holding company.  It has numerous subsidiaries that originate, purchase, securitize, sell and service residential and commercial loans; provide loan closing services such as credit reports, appraisals and flood determinations; conduct fixed income securities underwriting and trading activities; provide property, life and casualty insurance; and manage a captive mortgage reinsurance company.

11.     Since December 23, 1980, Defendant COUNTRYWIDE HOME LOANS, INC., a wholly-owned subsidiary of Defendant COUNTRYWIDE FINANCIAL CORPORATION, has been a registered foreign corporation in the State of Illinois.  Defendant COUNTRYWIDE HOME LOANS, INC. is a licensed Illinois mortgage bank, holding mortgage banker license MB.0000139, which is issued by the Illinois Department of Financial and Professional Regulations, Division of Banking.  Since 2004, Defendant COUNTRYWIDE HOME LOANS, INC. has also done business in Illinois as Full Spectrum Lending.

12.     Defendant FULL SPECTRUM LENDING, INC., was a registered foreign corporation in the State of Illinois from October 3, 1996 through April 25, 2005.  FULL SPECTRUM LENDING, INC. was a licensed Illinois mortgage bank, holding mortgage banker license MB.0004910, which was issued by the Illinois Department of Professional Regulations, Division of Banking.  Defendant FULL SPECTRUM LENDING, INC. became a division of Defendant COUNTRYWIDE HOME LOANS, INC. in 2004.  In April 2005, FULL SPECTRUM LENDING, INC. withdrew as a registered foreign corporation and began operating in Illinois as Full Spectrum Lending, a division of COUNTRYWIDE HOME LOANS, INC.

13.     In its annual reports from 1999 to 2006, Defendant COUNTRYWIDE FINANCIAL CORPORATION emphasized that mortgage banking, which has historically been conducted

5

through Defendant COUNTRYWIDE HOME LOANS, INC. for prime loan originations and

Defendant FULL SPECTRUM LENDING, INC. for subprime loan originations, was its core

business. Defendant COUNTRYWIDE FINANCIAL CORPORATION has stated that the

company is engaged primarily in residential mortgage lending and that Defendant

COUNTRYWIDE HOME LOANS, INC. is its primary subsidiary.

14.     During the entire time period from 1999 to 2006, there was a significant identity in the

corporate governance and managing directors of Defendant COUNTRYWIDE FINANCIAL

CORPORATION and Defendant COUNTRYWIDE HOME LOANS, INC. For example,

between 1999 and 2005, Stanford Kurland was the Chief Executive Officer for Defendant

COUNTRYWIDE HOME LOANS, INC. and he was also the Chief Operating Officer for

Defendant COUNTRYWIDE FINANCIAL CORPORATION. In 2006, David Sambol became

Chairman of the Board and Chief Executive Officer for Defendant COUNTRYWIDE HOME

LOANS, INC. and President and Chief Operating Officer of Defendant COUNTRYWIDE

FINANCIAL CORPORATION.

15.     There was also overlap between the management of Defendant FULL SPECTRUM

LENDING, INC., when it was a separate company, and Defendant COUNTRYWIDE

FINANCIAL CORPORATION. Specifically, Gregory Lumsden has been the President and

Chief Executive Officer for Defendant FULL SPECTRUM LENDING, INC. from 2001, when it

was a separate company, to the present day, when it is a division of Defendant

COUNTRYWIDE HOME LOANS, INC. He has been and is currently a managing director for

Defendant COUNTRYWIDE FINANCIAL CORPORATION.

16.     Defendant COUNTRYWIDE FINANCIAL CORPORATION issues consolidated annual

reports and SEC filings with Defendant COUNTRYWIDE HOME LOANS, INC. Additionally,

6

Defendant COUNTRYWIDE FINANCIAL CORPORATION files a consolidated federal

income tax return and a combined state income tax return in California with Defendant

COUNTRYWIDE HOME LOANS, INC. and Defendant FULL SPECTRUM LENDING, INC.

Defendant COUNTRYWIDE FINANCIAL CORPORATION also issued consolidated earnings

statements and balance sheets for itself, Defendant COUNTRYWIDE HOME LOANS, INC. and

Defendant FULL SPECTRUM LENDING, INC.

17.    Defendant COUNTRYWIDE FINANCIAL CORPORATION controls the policies and

operations and profits from the activities of Defendant COUNTRYWIDE HOME LOANS, INC.

and Defendant FULL SPECTRUM LENDING, INC.  Defendant COUNTRYWIDE

FINANCIAL CORPORATION arranged and profited from the securitization and/or sale of loans

originated and serviced by Defendant COUNTRYWIDE HOME LOANS, INC. and Defendant

FULL SPECTRUM LENDING, INC.

18.    Because they acted cooperatively in carrying out the conduct alleged in this Complaint,

Defendants ANGELO R. MOZILO,  COUNTRYWIDE FINANCIAL CORPORATION,

COUNTRYWIDE HOME LOANS, INC. and FULL SPECTRUM LENDING, INC. are

collectively referred to as "Countrywide," unless otherwise specified, and each is responsible for

the unlawful conduct alleged herein.

19.    Defendant COUNTRYWIDE HOME LOANS SERVICING, LP is a licensed mortgage

bank, holding mortgage banker license MB.0006041, which was issued by the Illinois

Department of Financial and Professional Regulation, Division of Banking.  Defendant

COUNTRYWIDE HOME LOANS SERVICING, LP is a Texas limited partnership directly

owned by two wholly-owned subsidiaries of Defendant COUNTRYWIDE HOME LOANS,

INC. Defendant COUNTRYWIDE HOME LOANS SERVICING, LP services loans originated

by Defendant COUNTRYWIDE HOME LOANS, INC., the Federal National Mortgage

Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), the

Government National Mortgage Association (Ginnie Mae), the United States Department of

Housing and Urban Development, and the United States Veterans Administration.

20.     Any allegation about any acts of Defendants COUNTRYWIDE HOME LOANS, INC.,

COUNTRYWIDE FINANCIAL CORPORATION, FULL SPECTRUM LENDING, INC. or

COUNTRYWIDE HOME LOANS SERVICING, LP, means that the entities did the acts alleged

through their officers, directors, employees, agents and/or representatives while they were acting

within the actual or ostensible scope of their authority.

## COMMERCE

21.     Section 1(f) of the Consumer Fraud and Deceptive Business Practices Act, 815 ILCS

505/1(f), defines "trade" and "commerce" as follows:

> The terms 'trade' and 'commerce' mean the advertising, offering for sale,
> sale, or distribution of any services and any property, tangible or
> intangible, real, personal, or mixed, and any other article, commodity, or
> thing of value wherever situated, and shall include any trade or commerce
> directly or indirectly affecting the people of this State.

22.     Defendants are and were, at all relevant times hereto, engaged in trade and commerce in

the State of Illinois, in that they offered mortgage lending services to the general public of the

State of Illinois.

23.     The Attorney General's Office has received over 200 complaints related to Countrywide

since 2005.

## COUNTRYWIDE'S BUSINESS PRACTICES RESULTED IN UNAFFORDABLE MORTGAGE LOANS AND INCREASED FORECLOSURES IN ILLINOIS

Countrywide's Domination of the Mortgage Industry

24.     Both Countrywide Financial Corporation ("CFC") and Countrywide Home Loans, Inc. are based in Calabasas, California.  CFC was formed by David Loeb and Angelo Mozilo as Countrywide Credit Industries in 1969. The company went public shortly thereafter.  Loeb retired in 2000.  The company restructured in 2001 and assumed its current name in 2002.

25.     Through its numerous subsidiaries, CFC is involved in virtually every segment of the residential mortgage industry.  The company sells, purchases, securitizes and services residential and commercial loans; provides loan closing services such as credit reports, appraisals and flood determinations; conducts fixed income securities underwriting and trading activities; provides property, life and casualty insurance; and manages a captive mortgage reinsurance company.

26.     CFC's primary subsidiary, Countrywide Home Loans, Inc., offers loans to consumers through three production channels.  The first channel is comprised of Countrywide's prime consumer-direct (retail) lending locations, referred to as the Consumer Markets Division, and nonprime consumer-direct (retail) lending locations, referred to as Full Spectrum Lending.  The second channel is wholesale lending through a network of mortgage loan brokers and other financial intermediaries.  The third channel is correspondent lending through which Countrywide provides lines of credit to financial institutions such as independent mortgage companies, commercial banks, savings and loans and credit unions, purchases the mortgages made pursuant to the lines of credit, and then arranges for the securitization of these loans.

27.     Today, Countrywide is America's largest mortgage lender.  In the first quarter of 2008, the company originated $73 billion dollars nationally in mortgage loans.  Countrywide has also been a significant originator of subprime mortgages.  By the first quarter of 2007, Countrywide

had become the largest originator of subprime loans, with a total subprime loan volume of roughly $ 7,881,000,000.

28.    Countrywide is also the nation's largest loan servicer.  The company administers $1.5 trillion in loans made by both it and other institutions.  Countrywide's servicing operation generated $1.4 billion in revenue in the first quarter of 2008.

29.    Countrywide has a significant presence in Illinois.  At the peak of its presence in Illinois, Countrywide operated approximately 100 retail branch offices and its mortgage loan products were offered by numerous mortgage brokers licensed to do business in Illinois.  Countrywide also purchased loans through a network of some 2,100 correspondent lenders.

30.    Countrywide was the largest lender in Illinois in 2004, 2005, and 2006.  During these years, Countrywide sold approximately 94,000 loans to Illinois consumers.

31.    In addition, Countrywide is the largest lender in the Chicago area.  In 2006, for example, Countrywide made over 21,000 loans to consumers in the seven county Chicago area.

The Explosive Growth of a Market for Loans with Non-Traditional Risky Features

32.    Countrywide's growth paralleled and was fueled by the rise of private-label securitization in the mortgage industry.

33.    Securitization of mortgage loans is a relatively recent phenomenon.  Historically, mortgages were long-term, fixed rate, amortizing products sold by depository institutions.  From the post-World War II era to 1973, savings and loan institutions held the majority of all mortgages.

34.    The privatization of the Federal National Mortgage Association (Fannie Mae) in 1968 and the creation of the Federal Home Loan Mortgage Corporation (Freddie Mac) in 1970 laid the groundwork for securitization of mortgages and the secondary market's role in the mortgage

10

industry. Fannie Mae and Freddie Mac, also known as government-sponsored entities ("GSEs"), began purchasing loans from financial institutions. These financial institutions were required to make limited representations and warranties regarding the quality of the loans. Any remaining risk passed on to the GSEs.

35.     After purchase, the GSEs bundled the mortgages into pools in order to sell the income stream to investors. An asset-backed or mortgage-backed security is ultimately created from such a pool of loans. The entire process is generally referred to as securitization. As used by the GSEs, the primary purpose of securitization was to create liquidity for funding more residential mortgage loans.

36.     There are limits on the types of loans that Fannie Mae and Freddie Mac purchase. The loans they purchase are subject to certain standards regarding loan amount and credit risk, which generally must be demonstrated through written documents showing the borrower's credit score, income, assets and liabilities and the value of the home securing the loan. Loans that meet the underwriting standards are referred to in the mortgage industry as "conforming loans." Like other mortgage lenders, Countrywide marketed and sold conforming loans to borrowers and then sold these loans to the GSEs.

37.     Until the early 1990s, "non-conforming loans," or loans that did not meet the GSEs' underwriting standards, were rare and expensive. Borrowers who were considered subprime (due to credit profiles riskier than the minimum required for conforming loans) or were unable to document income and assets, or who wanted loan amounts in excess of the GSEs' underwriting guidelines had few options. This situation would soon change.

38.     In the early 1990s, banking regulators adopted new rules at a time when banks were under considerable financial stress from the 1991 recession. For the first time, the new rules

11

measured bank health through the use of a capital to asset ratio. Unable to raise new capital to increase the ratio, banks found it easier to reduce assets instead, and securitization proved particularly useful for that task. These assets included mortgage loans.

39.     Once banks had an incentive to divest assets, and with securitization enabling them to pass at least part of the risk of a loan's failure to investors, financial institutions became less wary of making riskier non-conforming loans. Securitization was no longer just a tool to create liquidity in the conforming mortgage industry. Instead, mortgage originators could employ it as a way of shedding much of the credit risk associated with non-conforming loans that they originated.

40.     Wall Street became aware of the potential cash flow from the securities backed by non-conforming mortgage loans. Investors were attracted to these securities because they assumed that non-conforming mortgage-backed securities would share the same stable performance of the conforming mortgage-backed securities issued by the GSEs. The favorable investment grade ratings given to the securities by the various ratings agencies – which allowed institutional investors such as state pension funds to buy the products – seemed to corroborate this assumption.

41.     In addition, the yields on the non-conforming loan securities were attractive. While subprime loans – a type of non-conforming loan – carry greater risks, they also produce higher returns. For a time, the large returns on subprime mortgage-backed securities outpaced (and concealed) high failure rates of loans in securitization pools.

42.     Investors paid a premium for certain types of loans and certain loan features, such as loans with high interest rates (i.e., subprime loans) or loans with prepayment penalties. Indeed, investors' growing appetite for mortgage-backed securities fueled a surge in the origination of

12

subprime mortgage lending. Between 1994 and 2005, subprime mortgage lending grew from

$35 billion to $625 billion. By the first quarter of 2007, subprime mortgage-backed securities

were being sold at a rate of $100 billion per quarter. The explosive growth in subprime

mortgage lending also marked a shifting away from traditional underwriting standards.

43.     Lenders, such as Countrywide, were aware of the types of loans and loan features for

which investors would pay a premium. Investor demand and secondary market valuation,

therefore, became the primary concern when determining what types of loans to market and sell

and at what price, rather than the consumers' ability to repay the loans. Countrywide sought to

place greater numbers of borrowers into loans laden with these premium-enhancing features.

44.     Countrywide had already established a small presence in the subprime lending field in the

late 1990s, when it formed its retail subprime lending unit, Full Spectrum Lending. Following

David Loeb's retirement in 2000, Countrywide became more aggressive in growing its business

in an effort to be the nation's largest mortgage lender. Countrywide expanded the range of non-

conforming loan products that it offered to consumers and began to concentrate more on

subprime lending and exotic mortgage products. For example, in 2002, Countrywide originated

roughly $9 billion in subprime loans. In 2005, that number shot up to over $44 billion.

45.     Countrywide also changed its corporate strategy to focus on increasing loan volume,

which would in turn generate more loan origination fees for the company. Instead of focusing on

fixed rate loans to creditworthy borrowers, the company began to emphasize reduced

documentation loans and adjustable rate products. For example, in 2003, only 18% of the loans

originated by Countrywide had adjustable interest rates. In 2004, however, that number had

grown to 49%.

46.     By 2005, Countrywide's growth in both revenue and number of loans originated was fueled by the company's origination of a menu of risky loan products, such as reduced documentation loans, option ARMs, and loans for 100% of a home's value.

Record Numbers of Foreclosures Nationally and in Illinois

47.     For many years, rising home prices concealed the consequences of Countrywide's increased drive to sell loans regardless of the borrower's credit risk and ability to repay the loan. Borrowers were often lured into expensive home loans with the promise that they could refinance if the loan became unaffordable. As long as housing prices continued to rise and credit remained available, many borrowers followed this strategy. Predictably, with the collapse of the mortgage market and concomitant drop in housing prices, the days when borrowers could refinance out of an unaffordable mortgage ended, and, as has been widely documented, defaults and foreclosures nationwide are rapidly rising.

48.     In the third quarter of 2007, 24% of all outstanding subprime loans and 30% of subprime ARMs were either delinquent or in foreclosure. The Center for Responsible Lending has projected that 2.2 million homeowners nationwide will lose their homes as a result of failed subprime home loans originated from 1998 through 2006. This number could very well grow larger, as the projection was made before subprime default rates skyrocketed in 2007.

49.     In the Chicago area, the foreclosure crisis resulting from subprime loan origination will likely linger longer than in other parts of the country. In 2006, the Chicago metropolitan area had more "high-cost" (i.e., subprime) mortgages than any other metropolitan area in the country, according to a *Chicago Reporter* study. This marked the third year in a row that the Chicago metro area claimed the nation's top spot for high-cost mortgages. Countrywide led the way with high-cost loans in Chicago – in 2006 it was the leader in high-cost lending.

14

50.     Ultimately, although homeownership for subprime borrowers increased during recent years, it appears that there will be a net loss in homeownership nationwide. With the number of completed subprime foreclosures from 1998 to 2006 exceeding the number of homebuyers who used a subprime loan to enter the marketplace, the Center for Responsible Lending estimates that subprime mortgage lending has resulted in a net loss in homeownership of 900,000 homes nationwide. According to federal government figures, in 2007 homeownership suffered the biggest one-year drop on record.

51.     The failure of subprime loans explains only part of the homeownership crisis. Risky loan origination practices used in the prime mortgage market, such as volatile loan products like option ARMs and lax underwriting standards, also contributed to the current situation. Nationally, roughly 243,000 homes were in some stage of the foreclosure process in April 2008. This is up 65% from April 2007. The nationwide delinquency rate on mortgage payments grew to 6.35% in the first quarter of 2008, the highest since 1979.

52.     Illinois' home foreclosure rates have ranked among the highest in the nation for more than a year. Illinois experienced a 46% increase in the number of unique properties in foreclosure from 2006 to 2007 – 64,310 properties in 2007 as compared with 44,047 the year before. Lenders filed 9,670 foreclosures in May of this year alone, placing the state eighth in the number of new foreclosures filed. This represents a 41.71% increase from May 2007.

53.     The external costs of the mortgage collapse, in terms of declining property values and shrinking tax bases, are estimated to run over $200 billion nationally, with urban centers hit hardest. In Illinois, the loss is projected to be $15 billion, with $13 billion in Chicago.

Countrywide's Role in the Foreclosure Crisis Nationally and in Illinois

54.     The delinquency rate on the mortgage loans of America's biggest mortgage lender and servicer, Countrywide, was 9.27% by the end of March 2008. The company originated $7 billion nationally in mortgage loans in *one quarter* of 2008. The March 2008 9.27% delinquency rate was an increase from 5.02% at the end of 2006 and 3.68% in March 2006.

55.     The incidence of "seriously delinquent" loans – loans that are 90 days or more past due or in foreclosure – is also increasing. Countrywide's latest financial filing says that 4.81% of the loans it services were seriously delinquent as of the end of March 2008. This serious delinquency rate was up almost four times from 1.70% at the same time in 2007.

56.     In terms of actual foreclosures, the percentage of Countrywide loans in foreclosure at the end of March 2008, 1.28%, had almost doubled from 0.69% at the end of March 2007.

57.     Countrywide's subprime loans have failed even more frequently. By the end of the first quarter of 2008, 35.88% of the subprime loans serviced by Countrywide were delinquent, up from 19.62% in the first quarter of 2007. Slightly over 21% of all Countrywide subprime loans serviced by the company were seriously delinquent by the end of March 2008, up from 7.82% in March 2007.

58.     The number of Countrywide foreclosure filings in Illinois is troubling. From 2006 to 2007, all foreclosure complaint filings in Cook Country increased by 46%. For this same period, however, Countrywide Home Loans, Inc.'s foreclosure complaint filings increased by 117%. From January 2004 through June 2008, Countrywide Home Loans, Inc. has foreclosed upon at least 2,534 Cook County homeowners. Note that this number does not include foreclosures filed by Full Spectrum Lending or any other Countrywide entity.

Securitization Sleight of Hand Masked Countrywide's Systemic Loan Origination Issues

59.     Countrywide's delinquency and foreclosure numbers show that there were systemic problems with the company's loan origination standards. These loosened loan origination standards came into place due to Countrywide's securitization practices.

60.     Countrywide's quest for domination in the mortgage lending industry is well-documented. During a May 24, 2005 investor conference, Defendant and Countrywide CEO Angelo Mozilo stated: "I am going to – little question – it's a question of dominance, you have heard this before we – we have [no] intention to structure the company to be at second place or third place." This sentiment was echoed by then-Countrywide President and Chief Operating Officer Stanley Kurland, who stated: "In the past, we talked about origination market share reaching 30% by 2008 and, as we've noted, this was intended to be a stretch goal as it is part of our culture, part of our nature to set aggressive targets." Ultimately, this quest for market domination created a self-perpetuating cycle in which Countrywide raced against time to originate loans of decreasing quality to cover up the failure of its prior loan originations.

61.     This cycle began with Countrywide's attempt to gain market share. The company had to acquire capital to fund loans and find borrowers to buy the loans. To find borrowers, Countrywide both expanded its menu of nonconforming mortgage products and loosened the standards for selling its products to reach untapped consumers. To gain capital, Countrywide relied on securitizing the loans that it made from its menu of nonconforming mortgage products and loosened loan origination standards.

62.     Securitization allowed Countrywide to generate capital using one of two methods. In one method, Countrywide sold the loans it made to third parties who then aggregated the loans into pools and sold the income streams from the pooled loans to investors. In this arrangement, a

17

party other than a Countrywide-controlled entity had an opportunity to evaluate the quality of the loans being aggregated. This party was able to enforce any representations and warranties that Countrywide made when selling the mortgage loans.

63.    In the other method, Countrywide eliminated the third-party intermediaries and completed the securitization process by itself. Countrywide Financial Corporation created numerous subsidiaries for this exact purpose. These subsidiaries purchased loans from Countrywide entities, pooled them, and issued securities that were later sold through a brokerage house. Securitization done through affiliated entities reduced any potential for delay in the process.

64.    This second method allowed Countrywide to control the entire origination and securitization process. In other words, Countrywide sold the loans itself, purchased and aggregated the loans itself, and issued the securities itself.[1] The same corporate executive could even sign off on securitization contracts as both the originator of the underlying mortgage loans and the purchaser of the same loans.

65.    Countrywide had strong incentives to securitize its loans quickly. In order for an asset-backed security to meet the Securities and Exchange Commission's requirements, it may not have non-performing loans and delinquent loans may not constitute 50% or more of the pool on the date the pool is readied for sale.[2]

66.    The securitization process was beneficial for Countrywide because it both generated capital and allowed Countrywide to shed "credit risk" from the possible failure of the underlying

---

[1] In this self-dealing method, it is unclear how the required representations and warranties regarding the quality of the underlying loans would be enforced. Moreover, the Bank for International Settlements issued a 1992 report noting that "[t]here is at least a potential conflict of interest if a bank originates, sells, services and underwrites the same issue of securities." BIS is an international organization established in 1930 which fosters international monetary and financial cooperation and serves as a bank for central banks.

[2] Under this analysis, pay-option ARMs would have been among the most desirable products to satisfy this element since, with their very low teaser rate and option to make less than full interest payments for a certain period, they are unlikely to experience early payment defaults.

mortgage loans. Credit risk is the potential for financial loss resulting from the failure of a

borrower to pay on a mortgage loan. As CFC noted in its annual regulatory filing for 2003, it

managed "mortgage credit risk principally by securitizing substantially all mortgage loans that

we produce, and by only retaining high credit quality mortgages in our loan portfolio." In

comments to federal regulators, Countrywide advised that any guidance on nontraditional

mortgage products "contain explicit acknowledgement that the risk profile of a lender who

*effectively transfers the economic risks of a loan to the secondary market* is lower than that of a

portfolio lender" (emphasis added).

67.    By selling loans onto the secondary market, Countrywide created loan pooling

agreements through which it sought to limit its responsibility for the performance of the loans.

For instance, Countrywide is required to repurchase the loan from investors under these

agreements only in the event of documentation errors, underwriting errors, fraud, or early

payment defaults (i.e., the borrower defaults within one or two months after the loan sale).

68.    Although Countrywide attempted to shed the risk of originating loans of lower quality, it

retained some credit risk due to the representations and warranties that it is required to make

when selling mortgage loans to either third parties or itself for securitization. As a result,

investors still have some level of recourse against the company for defective loans.

69.    This recourse generally takes one of two forms. In some cases, these agreements

required Countrywide to indemnify the investors for the defective loans. In other cases,

however, Countrywide could simply swap in new loans for the defective loans through the

"removal of accounts provisions" included in some of its securitization agreements. Swapping

loans was preferable to lenders because it does not them to actually give investors cash.

70.     Under this approach, a lender, like Countrywide, needed to generate more loans if it both

wanted to continue securitizing and needed to replace the defaulting loans removed from the

securitized pools.  In addition, the lender, who is not able to transfer the defaulted loans it takes

back from the pools to anyone else, will want to hold more good loans on its balance sheet to

offset the increasing numbers of bad loans it is holding.  The lender must originate more loans to

hold on its books – in the hope that a sufficient number of the new loans will not default – to

offset the bad loans.  Countrywide admitted that it did as much in its December 31, 2005 10-K

filing, in which the company disclosed that "[t]he impact in the increase of the allowance for

[delinquent option] loan losses will be partially mitigated by the addition of new loans to our

portfolio."

71.     As Countrywide well knew or should have known, the loans that underpinned

Countrywide's securitizations were unstable.  In fact, the loans began to fail at a precipitous rate.

As the company observed in 2007, the volume of claims for breaches of its representations and

warranties grew due to the deterioration in credit performance of its loans.  Thus, Countrywide

had to accelerate origination to satisfy increased investor claims at precisely the time when it was

already increasing origination to simply obtain capital to maintain its market position.

Defendants' Unfair and Deceptive Underwriting Standards, Loan Products, Sales Techniques
and Servicing Practices

72.     Countrywide's need to accelerate loan originations compelled the company to develop a

business model that, beginning in at least 2003 or 2004 and lasting into 2007, reflected the

company's  indifference to whether homeowners could afford its loans.  As part of this model,

Countrywide: (a) originated mortgage loans to borrowers who did not have the ability to repay

the loan; (b) originated mortgage loans with multiple layers of risk that exposed borrowers to an

unnecessarily high risk of foreclosure or loss of home equity; (c) originated unnecessarily more

expensive mortgage loans to unknowing borrowers; and (d) engaged in unfair and/or deceptive marketing and advertising acts or practices.

73.    Also, Countrywide implemented a compensation structure that incentivized broker and employee misconduct without exercising sufficient oversight to ensure that misconduct did not occur due to:

      a.   Implementing a compensation structure that incentivized employees to maximize loan sales without proper oversight, resulting in the sale of unaffordable and/or unnecessarily expensive loans;

      b.   Failing to adequately supervise and/or implement proper underwriting guidelines to see whether brokers used and sold reduced documentation loans to avoid revealing borrowers' true income and assets;

      c.   Rewarding brokers for selling loans with certain risky loan features such as prepayment penalties without ensuring that borrowers received a benefit from the risky features; and

      d.   Structuring the compensation for option ARMs in such a way that brokers were incentivized to sell this riskier loan product – to the exclusion of other products – in order to obtain the maximum yield spread premium possible.

74.    Countrywide's servicing division, Countrywide Home Loans Servicing, LP, unfairly and deceptively required borrowers to make additional payments just to consider whether they would qualify for a loan repayment or modification plan – regardless of the potential feasibility or affordability of such a plan.

75.    Former employees commented on Countrywide's increasing disregard for a borrower's ability to repay a mortgage loan.  For example, a former Full Spectrum Lending Division

employee stated that the division (which was Countrywide's subprime lending arm) had

underwriting guidelines that would approve virtually any loan.  Likewise, an underwriter in

Countrywide's Wholesale Lending Division said that her supervisor would approve most of the

loans that she herself did not feel comfortable approving.

76.    Even though former employees noted that Countrywide had loose underwriting

standards, the company also had a system to grant exceptions to those standards.  A Countrywide

wholesale account executive said that in the beginning of 2006, Countrywide became very

aggressive in granting exceptions to their underwriting criteria – further diluting borrower

protections.

77.    This employee also explained that she was pushed to sell more "Expanded Criteria"

loans.  Another wholesale account executive remarked that Countrywide paid its employees

more to sell "Expanded Criteria" loans.  Expanded Criteria loans included loans with reduced

documentation underwriting, higher loan-to-value ratios and other risky loan features.

78.    Countrywide itself observed in its first quarter 2008 10-Q the consequences of this

expansion into risky products and practices.  It disclosed that, since 2007, it had "observed a

marked decline in credit performance (as adjusted for age) for recent vintages, especially those

loans with higher risk characteristics, including reduced documentation, high loan to value ratios

or low credit scores."

79.    As described, Countrywide's expansion into riskier products and practices became

apparent in a number of ways.

### Countrywide Sold Unaffordable and More Expensive Loans to Borrowers Due to its Lax Underwriting Standards

80.    For the reasons described above, Countrywide relaxed its underwriting standards in

recent years.  These relaxed underwriting standards allowed the mass selling of reduced

documentation loans and the failure to ensure borrowers had sufficient capacity to repay the mortgages Countrywide sold them.

A.     Countrywide Inappropriately Sold Reduced Documentation Loans

81.     Countrywide's relaxation of traditional underwriting standards is evident in its increased reliance on reduced documentation loans.  From 2005 through the first half of 2007, a majority of the Countrywide mortgages sold in Illinois were reduced documentation loans, often called "stated-income" or "liar's loans."   Countrywide underwrote these loans with less documentation and, consequently, less verification, of borrowers' income and assets than traditional mortgages.

82.     The four types of reduced documentation loans sold by Countrywide from at least 2004 through the first half of 2007 are described as follows:

a.  The "Stated Income Verified Assets" loan, often referred to as a "SIVA," required the disclosure of employment, income and assets on the loan application. Employment and assets were verified, but income was not verified by Countrywide.  A debt-to-income ratio was calculated based on the stated income and it typically had to meet certain requirements.  This product was the most commonly sold reduced documentation loan.  In addition to the SIVA product, Countrywide sold a product known as the "Fast 'n' Easy" that had similar underwriting criteria.  Borrowers whose credit score exceeded a certain threshold could qualify for the Fast 'n' Easy as opposed to the SIVA product.

b.  The "No Ratio" loan, often called a "NIVA," required the disclosure of employment and assets on the loan application, both of which were verified. However, income could not be disclosed on the loan application, and

Countrywide did not calculate debt-to-income ratios in qualifying borrowers for these loans.

c. A "Stated Income Stated Assets" loan, or "SISA," required that employment be disclosed and verified, but neither income nor assets were verified by Countrywide.

d. A "No Income No Assets No Employment" loan, also called a "No Doc" or "NINA" loan, prohibited disclosure of employment, income and assets on the loan application. No debt-to-income ratio was calculated to qualify the borrower.

83.    The various types of reduced documentation loans sold by Countrywide are collectively referred to in this Complaint as "reduced documentation" or "stated income" loans.

84.    Countrywide sold reduced documentation loans to prime borrowers and some types of reduced documentation loans to subprime borrowers.  Over time, Countrywide actually lowered the minimum credit score for which it would approve a reduced documentation loan to include a broader set of borrowers.  Countrywide also lessened underwriting standards for reduced documentation loans sold to subprime borrowers, increasing the numbers of subprime borrowers who were eligible to receive these loans.  In fact, during recent years, a significant percentage of the subprime loans Countrywide sold to Illinois borrowers were reduced documentation loans.

85.    Because a majority of the loans sold in Illinois in recent years were reduced documentation loans, Countrywide employees and brokers clearly sold reduced documentation loans to borrowers regardless of the borrowers' ability of the borrower to document income and assets. In fact, Countrywide sold some of its reduced documentation loans to salaried borrowers who received W-2's from their employment.  Countrywide had no rules restricting the sale of reduced documentation loans to borrowers who had difficulty documenting their income.

Rather, they could be sold to borrowers regardless of the ease or difficulty of documenting their income, employment or assets.

86.     Countrywide had very few safeguards on the use and underwriting of reduced documentation loans.  The only check on fraudulent income was a reasonableness standard allegedly used by Countrywide.  Early on, Countrywide employees merely used their judgment in deciding whether or not a stated income loan seemed reasonable.  In or around 2005 or 2006, Countrywide required its employees to use salary.com – a website that provides a salary range for a given job title or profession in a certain zip code – to determine whether the income stated on the loan application appeared reasonable.  However, if the stated income fell outside of the range provided by salary.com, Countrywide underwriters could still approve the loan.

87.     In addition to a lack of controls on these risky underwriting guidelines, Countrywide pushed their sales employees, both retail and wholesale, and their underwriters to sell and close large volumes of loans without due regard for the risk to borrowers as quickly as possible. Countrywide fired employees for low production when they failed to originate and close sufficient numbers of loans.

88.     To encourage the fast origination of loans, Countrywide compensated its sales employees, at least in part, on the volume of loans sold.  The more loans its employees sold, the more money Countrywide paid them.  Countrywide sales employees were paid on a tiered bonus system that compensated them more for each tier of sales volume they reached during the month. Once an employee sold enough loans to put him in the next tier for that month, he would earn more on *each* loan he had sold during that month.  A substantial portion of the salary of Countrywide sales employees, both retail and wholesale, was based on sales volume.  In fact, wholesale account executives—Countrywide employees who dealt with brokers—were paid only

on commission, they had no base salary. Countrywide employees, therefore, had incentives to sell as many loans as possible – regardless of credit risk.

89.    Countrywide's underwriters were also compensated based on the number of loans they underwrote. They were paid a base salary, but a large percentage of their total salary was a bonus payment based on the number of loans underwritten. In addition, the goal for underwriters who reviewed broker files was to approve and process purchase files in 24 hours and refinance files in 48-72 hours. One underwriter stated that, for a period of time, she was required to underwrite 25 loan files a day during the week and 25-35 loan application files over the weekend. Thus, Countrywide underwriters also had a large incentive to underwrite as many loans as possible as quickly as possible, and Countrywide pushed them to do so.

90.    In addition to these compensation incentives for its own employees, Countrywide enticed its mortgage brokers to sell reduced documentation loans with advertisements proclaiming

> Expanded Criteria: More ways to say yes! Qualify more of your borrowers with Expanded Criteria programs from Countrywide®, America's Wholesale Lender®. Countrywide offers some of the most flexible documentation guidelines in the industry. Our extensive Expanded Criteria programs provide you with solutions that help you close more loans. You'll see that when it comes to lower documentation loans; no one delivers like Countrywide.

91.    Countrywide also enticed brokers with advertisements that said "Designed to deliver Low Doc and No Doc solutions to meet the needs of virtually every type of borrower," "NO INCOME NO ASSETS DOC OPTIONS," "Reduced Doc – Simplified and Enhanced!," and "Low down payment, low documentation solutions."

92.    The lack of rules and oversight on stated income loans, and the push for employees to sell more loans and to close loans quickly, facilitated rampant fraud in the sales of reduced documentation loans. Countrywide sales employees and brokers used reduced documentation loans as a way to qualify borrowers for loans they could not afford. One former Countrywide

employee has estimated that approximately 90% of all reduced documentation loans sold out of the branch where he worked in Chicago had inflated incomes.

93.     As noted in a Chicago Tribune article, the Mortgage Asset Research Institute reviewed 100 stated income loans, comparing the income on the loan documents with the borrowers' tax documents. The review found that almost 60% of the income amounts were inflated by more than 50%, and that 90% of the loans had inflated income of at least 5%.

94.     Countrywide sales employees sometimes received income documentation (e.g. W-2's or tax returns) and determined that the borrower could not qualify for the loan based on their real income.  The employee would then submit the loan as a stated income loan, inflating the borrower's income to qualify him for the loan.  Countrywide "stretch[ed] the income" on reduced documentation loans as far as possible.

95.     In the review of one Illinois mortgage broker's sales of Countrywide loans, the vast majority of the loans had inflated income, almost all without the borrowers' knowledge.

96.     Many Countrywide borrowers were not aware they were receiving a reduced documentation loan, and did not realize they were being sold a loan they could not afford and were not qualified to receive.

97.     In addition to a lack of rules concerning what borrowers were appropriate for reduced documentation loans, Countrywide failed to have sufficient controls concerning what loan programs could be sold as reduced documentation loans.  Many of the riskier exotic and "affordability" products offered by Countrywide were sold with reduced documentation.  For example, Countrywide's option ARM and interest-only products could be sold with reduced documentation underwriting.  Countrywide also sold loans with very high loan-to-value ratios with reduced documentation underwriting.

98.     Countrywide pushed these products in advertisements to its mortgage brokers like:

"Check Out Countrywide's Expanded Criteria 80/20 Loans with Reduced Documentation!";

"Low down payment, low documentation solutions. Qualify more borrowers with high LTVs and

low doc options from Countrywide®, America's Wholesale Lender®;" "Stated Income Program

Enhancements. Up to 100% LTV;" and "The PayOption ARM from Countrywide®, America's

Wholesale Lender® offers your qualified borrowers reduced paperwork with the Stated

Income/Stated Assets (SISA) documentation option."

99.     Not surprisingly, reduced documentation loans have higher delinquency rates than full

documentation loans, further suggesting the prevalence of fraud in these loans.

100.    Countrywide acknowledged the existence of higher default rates for reduced

documentation loans in its 10-Q filing for the first quarter of 2008:

> We attribute the overall increase in delinquencies in our servicing portfolio from
> March, 31, 2007 to March 31, 2008, to increased production of loans in recent
> years with higher loan-to-value ratios and reduced documentation requirements,
> combined with a weakening housing market and significant tightening of
> available credit and to portfolio seasoning.

101.    Even if income was not inflated, Countrywide charged many borrowers more for reduced

documentation loans. Countrywide employees used reduced documentation loans because they

were faster, easier to sell, and to underwrite. It took as little as 30 minutes to underwrite some

reduced documentation loans, and some loans closed the same day the application was taken

from the borrower. This scheme enabled Countrywide employees to sell more loans and make

more money. So, some borrowers who could easily have documented their income were sold

more expensive reduced documentation loans by Countrywide employees and brokers.

102.    In short, Countrywide's sale of reduced documentation loans put many Illinois borrowers into unnecessarily riskier and more costly loans and, for many borrowers, loans that they could not afford.

B.    Countrywide Inappropriately Qualified Borrowers For Adjustable Rate and Interest-Only Mortgages Based on Less than a Fully-Indexed Rate or Less Than Fully-Amortizing Payments

103.    In addition to increased sales of reduced documentation loans, in recent years Countrywide also increased its sale of "affordability" products.  These loans allowed borrowers to obtain a loan with low initial payments that would not continue for the life of the loan. Countrywide qualified borrowers at this initial low payment knowing that they would not be able to repay the loan in its entirety.

104.    One affordability product Countrywide sold was an interest-only loan.  An interest-only loan allows borrowers to make payments covering only the interest on their loan during the first years of the loan, usually the first 3, 5, 7 or 10 years.  After this initial period, borrowers must make fully-amortizing payments to pay off their principal balance plus interest over the remaining life of the loan.  The interest-only payments at the beginning of the loan are much lower than the later fully-amortizing payments.

105.    According to an article by the New York Times published on November 11, 2007, Countrywide was the second leading originator of interest-only loans from 2006 through the second quarter of 2007.

106.    Countrywide sold interest-only loans to prime and subprime borrowers as stated income loans.  In 2005 and 2006, Countrywide's interest-only loan was sold to a borrower with a credit score as low as 560 , and as a stated income loan to a borrower with a credit score as low as 620.

107.    In 2007, Countrywide qualified non-prime borrowers to receive interest-only loans for up to $1 million with a minimum credit score of 600 and up to $850,000 with a minimum credit score of 580.  Interest-only loans in lesser amounts were also available to non-prime borrowers as stated income loans.  One Countrywide ad to brokers touts "Interest-Only loans from Countrywide®, America's Wholesale Lender® offer low monthly payments for the initial loan period, possibly helping your non-prime customers qualify for a bigger loan amount."

108.    During at least part of the time from 2003 through 2007, Countrywide qualified its borrowers at less than fully-amortized payments on its interest-only products.  According to comments Countrywide provided to federal regulators concerning the proposed Interagency Guidance on Nontraditional Mortgage Products, Countrywide stated that "[i]nterest-only loans are designed to be an affordability product, allowing borrowers to qualify at the 'minimum' or lower non-amortizing interest only payment for a fixed and extended term.  We [Countrywide] believe that it is appropriate to qualify borrowers based on the interest only payment."

109.    Countrywide advertised these loose underwriting standards to its brokers in ads like "Maximize your borrower's cash flow with Interest-Only loans.  Qualify based on the Interest-Only payment."

110.    The practice of qualifying borrowers at low interest-only payments, which, under the terms of the mortgage, can only be paid during a certain period of the loan and then a higher, fully amortizing payment will be required, places borrowers into loans that they ultimately may not be able to afford.  Such a practice implicitly relies on borrowers either changing their financial circumstances or being able to sell their home or refinance their loan.

111.    Moreover, these interest-only loans could be given using the loose standards of a Stated Income; No Ratio; Stated Income, Stated Asset; and a No Income, No Assets or Employment (No Doc) loan, creating even more risk that the borrower would not be able to afford the loan.

112.    Countrywide advertised its "flexible qualifying criteria" even to brokers selling this product to subprime borrowers. In one ad to brokers titled "Interest Only Now Available for Non-Prime Stated Wage Earners," Countrywide told its brokers that their "Interest Only loan options give Stated Wage Earners more flexible qualifying criteria." Countrywide went on to entice brokers to "learn more about how our Non-Prime Interest Only loan programs can help you increase your business and qualify more borrowers for their dream home . . .". This interest-only product could be sold as a stated income loan to a borrower with a credit score as low as 620.

113.    The interest-only loan advertised above could also be a hybrid ARM. Borrowers who took out this loan as a hybrid adjustable rate mortgage ("ARM") received a loan that (1) allowed them to pay only the interest portion of their full payment for the first years of the loan, and (2) came with a discounted interest rate that would likely increase after the first few years. Such borrowers were set up for a payment shock once the discounted fixed rate term and interest-only portion of their loan was over.

114.    Countrywide used these products to entice unsuspecting borrowers with low monthly payments and to qualify more borrowers for loans – often loans that they might not be able to afford long-term.

115.    Another affordability product sold by Countrywide was the hybrid ARM. These loans typically have a two-or three- year fixed rate followed by 28 or 27 years of a variable rate, and are often referred to as a 2/28 and 3/27. These loans usually came with low, discounted interest

rates during the short fixed-rate period. After the fixed-rate period ended, the rate would

adjust—but could only adjust up, not down—every six months to a year, based on an index plus

a margin. Countrywide sold these loans to prime and subprime borrowers.

116.    Countrywide also qualified its borrowers at less than fully-indexed rates on its 2/28's and

3/27's, meaning that Countrywide qualified the borrowers based on low rates that would adjust

upward in two or three years without regard to whether the borrowers could afford the higher

rates. This scheme forced borrowers into unaffordable payments once the fixed rate period of

their loans terminated because they were not qualified at these higher payments.

117.    One Illinois consumer's experience provides an example of Countrywide's business

practice of placing borrowers in unaffordable hybrid ARM loans. Countrywide was the servicer

for a 64 year-old widow's mortgage loan. This widow lived on a fixed income. At the time

Countrywide purchased the servicing rights for her loan, the widow had a 30-year fixed-rate

mortgage with a monthly payment of approximately $300. In January 2005, Countrywide

refinanced this 64 year-old borrower into a 3/27 interest-only loan with a fixed rate for only the

first three years of the loan. The consumer's monthly payment more than doubled to

approximately $800 a month. Even before this consumer's loan reset, however, she was unable

to afford her mortgage payment – showing that Countrywide refinanced her into an unaffordable

adjustable rate mortgage.

118.    Countrywide acknowledged in a May 7, 2007 letter to the Office of Thrift Supervision

commenting on a proposed federal Statement on Subprime Mortgage Lending that: "Specifically

looking at originations in the fourth quarter of 2006, we know that almost 60% of the borrowers

who obtained subprime hybrid ARMs [from Countrywide] would not have qualified at the fully

indexed rate." Countrywide also acknowledged that "almost 25% of the borrowers would not

have qualified for any other [Countrywide] product." Even removing the added risk layers of reduced documentation and high loan-to-value ratios, Countrywide knew that a majority of the borrowers who received their hybrid ARMs, at least during this period, were likely unable to afford the loans unless they refinanced by the time the introductory fixed period expired.

119.   Countrywide did not inform its borrowers who were qualified at less than a fully-indexed rate or less than a fully-amortizing payment, that they were not qualified at the higher payments after the loans reset.

120.   Countrywide made loans to borrowers that they ultimately would not be able to afford, relying on the premise that borrowers would be able to continue to refinance out of their unaffordable loans into new loans – and without making clear to borrowers the costs and risks of such loans.

### Countrywide Pursued Market Share With Products That Layered Borrowers' Loans with Unnecessary Additional Risk

121.   Even as it was relaxing its underwriting standards to increase loan origination, Countrywide also sought to increase its market share by offering new products packed with features that compounded risk to the borrower. These included option ARM mortgage products and loans for all or close to all of a homeowner's equity in a home.

122.   The New York Times aptly described Countrywide's increasing origination of exotic products during the period from 2005 into 2007 with a quote from a former Countrywide executive that: "To the extent that more than 5 percent of the market was originating a particular product, any new alternative mortgage product, then Countrywide would originate it."

A.    Countrywide's Combined its PayOption ARM with Unnecessary Layers of Risk, Improper Marketing, Confusing Disclosures, Inappropriate Sales Incentives and Inadequate Oversight

123.   Countrywide's marketing and selling of option ARM mortgage loans exemplifies the company's increasing reliance on unfair and deceptive loan products and sales techniques to increase its market share.

124.   From their inception, option ARMs were intended to be "a niche product aimed at sophisticated and well-heeled borrowers who wanted flexibility." Starting in 2003, however, option ARM origination grew beyond this narrow market, particularly at Countrywide.

125.   Option ARMs, frequently referred to as "exotic" mortgage products, have three core features that sharply contrast with traditional mortgage loan products.

126.   First, for a certain period of time, borrowers have four options as to which payment to make each month.  These payment options are (1) a minimum payment that covers none of the principal and only part of the interest normally due each month; (2) an interest-only payment; (3) a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to pay off the loan in 15 years.

127.   Second, an option ARM may result in negative amortization – meaning that the amount owed increases over time.  The amount of accrued interest that is not paid each month is added onto the borrower's loan balance.  Therefore, the balance of the borrower's loan will actually increase by the amount of the unpaid interest if the borrower makes only minimum payments.

128.   Traditionally, failure to pay the amount of accrued interest on a loan each month results in default and, ultimately, foreclosure.  This outcome is a negative event for both the borrower and the lender.  With option ARMs, however, Countrywide was able to neutralize this negative

event – at least for itself. Countrywide simply added this uncollected interest to the borrower's loan as additional principal and calculated the interest on this new, higher amount of principal.

129.    There was, however, a cap to the amount of unpaid interest growing from negative amortization that could be added to the principal of the loan. Once the loan balance hit a certain ceiling – typically 115% of the loan's value – the minimum and interest-only payment options were removed and the borrower had to make fully-amortizing principal and interest payments. This "recasting" of the loan is the third core feature of a option ARM.

130.    The fully-amortizing payments that borrowers must make after recast are far more than the minimum payment that the borrowers had been previously making. Taking one consumer's loan as an example, the monthly minimum payment was $751, but the fully amortizing payment was $1834. The payment shock experienced by option ARM borrowers when the interest rate on their adjustable rate mortgage fluctuated was small compared to the payment shock from a loan recasting to require the fully-amortizing payment. Assuming steady interest rates, recasting for consumers who consistently make the minimum required payment will occur approximately three to four years after origination of the loan.

131.    Countrywide quickly became a leader in this profitable and growing part of the mortgage market. Option ARMs increased from approximately 3% of the company's loan production during the quarter ended June 30, 2004, to approximately 21% of its production during the quarter ended June 30, 2005.

132.    The reason for Countrywide's increasing origination of option ARMs is clear: profit. An investigation by the New York Times revealed that option ARMs "were especially lucrative. Internal company documents from March [2007] show that Countrywide made gross profit

margins of more than 4 percent on such loans, compared with 2 percent margins earned on loans backed by the Federal Housing Administration."

133.    At the same time that Countrywide touted the profitability of these loans, it also acknowledged that they were riskier for borrowers.  The company said in its June 30, 2005 10-Q filing, "[w]hen the monthly payments for pay-option loans eventually increase, borrowers may be less likely to pay the increased amounts and, therefore, more likely to default on the loan, than a borrower using a normal amortizing loan."  Angelo Mozilo even acknowledged that "it isn't clear how successful borrowers ultimately will be in paying off their option ARMs."

134.    As discussed below, it is now clear that many borrowers will not only fail to pay off their option ARMs, but will lose equity in their homes and perhaps the ownership of their homes altogether.  The full breadth of the problem has yet to emerge, but the numbers show that borrowers are losing ground.  During the nine months ended September 30, 2007, 76% of borrowers elected to make less than full interest payments – much less than a payment that would cover any amount of the outstanding loan principal.  This represents a 10% increase over the number of borrowers making less than full interest payments during the same period in 2006.

135.    While attention is now focused on the meltdown in the subprime mortgage industry, option ARMs – which are classified as "prime" loan products – are ticking time bombs contained in lenders' prime loan portfolios and in securitized loan pools.  According to Moody's Economy.com, monthly payments on roughly $229 billion of option ARMs will recast to include market-rate interest and principal from 2009 to 2011.

1.      Countrywide Inappropriately Coupled its Volatile PayOption ARM Loan Product
        with Teaser Interest Rates, Prepayment Penalties, High LTVs and Reduced
        Documentation Underwriting

136.    The core features of an option ARM – multiple payment options, negative amortization

and automatic recasting of loan terms – make the product much riskier than traditional

mortgages.  But Countrywide typically did not sell its option ARM (typically called a PayOption

ARM) with just these three features.  Instead, it proceeded to layer the product with features that

made it exceptionally risky, placing borrowers at risk of losing equity in their homes or even

their homes.  These features include: illusory teaser interest rates, prepayment penalties, high

loan-to-value ratios and/or reduced documentation underwriting guidelines.  As one former

Countrywide loan originator explained, Countrywide's "options ARMs were built to fail."

137.    Countrywide frequently combined its PayOption ARMs with illusory "teaser" interest

rates.  These "teaser" interest rates could be as low as 1%, but were illusory in that they were

generally only valid for the first month or first three months of the loan.

138.    After the illusory teaser interest rate expired, the interest rate on the loan would adjust to

a true interest rate that typically had a cap of 9.95%.  After the initial interest rate adjustment, the

interest rate on the loan would continue to adjust each month.  Therefore, the borrower would

only have the benefit of the interest rate for one to three months of the 30 to 40 years of the life

of the loan.

139.    An interest rate that was only in effect for one month conferred no real benefit to a

borrower.  Thus, the marketing emphasis on the teaser interest rate of Countrywide's PayOption

ARM was inherently misleading.

140.    Interviews with former Countrywide employees and brokers and an examination of

Countrywide's advertisements confirmed that the teaser interest rate was used to mislead

37

borrowers and obfuscate the true interest rate of the loan. A former Countrywide Account Executive, who was assigned to work with brokers in selling Countrywide products, was encouraged to tell her brokers to sell the loan based on the low monthly payment. A former employee who worked at Countrywide's prime retail locations confirmed that loan originators sold the product by highlighting the low payment on the option ARM, although it was based on an illusory teaser interest rate.

141.    Countrywide's advertisements highlighted the teaser interest rate. For example, a television advertisement promoting the product emphasized "[a]nd 1 percent, you can't beat that. So pick up the phone, call Countrywide, or just visit your local branch today." Despite legal disclaimers, this emphasis on the teaser interest rate shows the company's intent to use the teaser to market the product.

142.    Countrywide also generally coupled its option ARM loans with a three year prepayment penalty. In order for a consumer to refinance an option ARM during the first three years of the loan, the consumer would be required to pay the equivalent of six months' interest on the loan. Consequently, even if borrowers became aware of the risky features of their mortgage, they were effectively trapped in a loan with a payment that could adjust upward and become unaffordable.

143.    Although prepayment penalties are touted by lenders as a bargaining tool for consumers, analysis has revealed that subprime borrowers generally received no appreciable benefit in exchange for accepting a loan with a prepayment penalty. At least one broker indicated that, although he was paid more for a loan with a prepayment penalty, there was no appreciable benefit to a prime consumer for taking a loan with a prepayment penalty. Therefore, the only point of this risky feature was to generate additional profit for Countrywide because investors would pay more for loans with prepayment penalties.

144.     Another risky feature that Countrywide layered onto its PayOption ARM allowed a

borrower to mortgage 90-95% of a home's value with a PayOption ARM first mortgage for the

bulk of the amount and a second mortgage for the remainder.

145.     According to a UBS survey conducted on behalf of The Wall Street Journal:

> Countrywide also allowed borrowers to put down as little as 5% of a home's price and
> offered "piggyback mortgages," which allow borrowers to finance more than 80% of a
> home's value without paying for private mortgage insurance. By 2006, nearly 29% of the
> option ARMs originated by Countrywide and packaged into mortgage securities had a
> combined loan-to-value of 90% or more, up from just 15% in 2004, according to UBS.

146.     Although higher loan-to-value ratios are inherently riskier than lower loan-to-value

ratios, that risk is compounded when the underlying mortgage product is an option ARM.  If a

borrower has an option ARM mortgage with a high loan-to-value ratio or during a time when the

housing market depreciates (or both), the borrower could easily end up owing more on a home

than it was worth because of the possibility of negative amortization on this product.

147.     Finally, the vast majority of the PayOption ARMs sold by Countrywide were

underwritten with reduced documentation requirements.  Prudent underwriting is how borrowers

are protected from the risk that they will be given a mortgage that they will not be able to repay.

In the case of a PayOption ARM, Countrywide purportedly mitigated the risk that borrowers

would not be able to repay their risky loans by requiring that its underwriters qualify borrowers

at the full principal and interest payment for the option ARM.  This process became a

meaningless protection, however, when Countrywide failed to require full documentation for its

underwriting.

148.     When Countrywide designed its mortgage products, it also determined what underwriting

documentation requirements it would attach to the product.  As discussed above, these

requirements could vary from full documentation to no documentation at all. Countrywide apparently decided that its underwriting for an option ARM did not require full documentation.

149.    This decision led to underwriting guidelines that allowed a borrower to mortgage 95% or more of the value of a home with a PayOption ARM underwritten with stated income and stated assets.

150.    Countrywide's decision to allow reduced documentation underwriting resulted in the vast majority of its PayOption ARMs being sold with less than full documentation. Of the option ARMs Countrywide sold in 2007, 82% were reduced documentation mortgages in which the borrower did not fully document income or assets.

151.    One former Countrywide manager noted that the loans were an easy sell because they could use stated income – presumably to ensure that the borrower's income (at least what was stated as the borrower's income) was sufficient to qualify for the mortgage.

152.    As discussed above, low or no documentation loans are likely to contain material misrepresentations and/or fraud that will result in increased default rates. Risk of default is compounded when a lessened underwriting standard is coupled with "nontraditional" mortgages such as option ARMs. Regulators and analysts have counseled against this type of risk layering.

> Banking regulators say that lenders are increasingly relying on unverified income to qualify borrowers for so-called nontraditional mortgage loans. Those products – such as pay-option adjustable-rate mortgages and interest-only loans – allow borrowers to defer payment of principal and sometimes interest. Many analysts see such a combination of nontraditional products and nontraditional underwriting processes as presenting another layer of risk to those who could be hurt by defaults, including consumers, shareholders in mortgage lenders and investors in securities backed by mortgage loans.

153.    Combining a PayOption ARM with any of the risk-layering features described above results in a product that is significantly increases a borrower's risk of loosing home equity or ending up in foreclosure.

154.    Delinquency reports support this conclusion.  Statistics show that consumers are

becoming increasingly delinquent on option ARMs.  Countrywide securitized roughly three

quarters of its option ARMs, but held the loans most likely to be high performing in its portfolio.

Of the option ARMs that Countrywide held in its bank portfolio, 9.4% of the option ARMs were

at least 90 days past due in April 2008, up from 5.7% at the end of December 2007 and 1% a

year earlier.  As this input likely includes many option ARMs that have not recast, these

delinquencies are particularly alarming as they show consumers are not even able to make the

minimum payment on these loans.  In other words, borrowers somehow received option ARMs

when they were unable to make even the minimum payments, much less the fully-amortizing

payment.

155.    These numbers show that option ARMs are failing at a troubling rate, but that has not led

Countrywide to stop layering the product with risky features.  In fact, an analysis of only those

option ARMs that Countrywide held in its own portfolios (i.e., the least risky option ARMs)

shows a steady decrease in loan quality.  For example, the loan-to-value ratio for the product

increased from 73% in 2004 to 76% in 2007.  The average credit score, a general indicator of

creditworthiness, dropped from 730 in December 2004 to 716 in September 2007.  Even though

external indicators should have provided Countrywide with ample notice that it needed to tighten

option ARM underwriting criteria, the company continued to relax its standards in selling

increasingly risky loans.

156.    Former Countrywide employees and brokers who sold Countrywide products have stated

that option ARMs are risky products.

157.    Some of Countrywide's own former employees found the product unsound for anyone.

Brokers who sold the product opined that it should never be paired with either a prepayment

penalty or reduced documentation underwriting due to the dramatic increase in risk to the borrowers. Another broker referred to the product as a "ticking timebomb" and another former Countrywide employee referred to it as "dangerous."

　　　　2.　　Countrywide Improperly Mass Marketed Its PayOption ARMs and Failed to Provide Borrowers with Adequate Disclosures About the Product's Risks

158.　　Despite the structural unfairness of the PayOption ARM described above, Countrywide marketed the product indiscriminately to all borrowers, pushed its employees and brokers who sold Countrywide loans to sell the product inappropriately and failed to provide disclosures to ameliorate borrowers' confusion about the mortgage they were obtaining.

159.　　With all of its risky features, the PayOption ARM should have been marketed cautiously – if at all. That was not, however, Countrywide's approach. For example, Countrywide sent direct mailers to consumers whose loans it serviced to market the product. In one such mailer, Countrywide advised the consumer that he had an "excellent payment record" and might now qualify for "our best 'A' level mortgage interest rates – such as our PayOption ARM."

160.　　Likewise, Countrywide sent direct mailers to consumers advising them to call Countrywide for a one year anniversary loan check-up. The direct mailer also touted Countrywide's option ARM product.

161.　　Countrywide provided its brokers with sample advertisements that they could use to entice borrowers to get option ARMs. One of these advertisement exemplars asks borrowers "[w]ho doesn't need more options?" The implication of the ad is that an option ARM is appropriate for anyone who would simply like "more options."

162.　　The disclosures that Countrywide gave borrowers provided little help in explaining their actual mortgages because they were the epitome of "information overload." For example, in 2007, one disclosure entitled the "Home Loan Application Disclosure Handbook" (Handbook)

was 123 pages long and had 63 pages concerning all of the available Countrywide loan products, not just the products in which borrowers were interested.

163.   Regardless of whether borrowers applied for loans through a broker or a retail division, Countrywide sent borrowers various disclosures, such as this handbook, prior to closing loans. Often acknowledgment forms accompanied the disclosures.  For some borrowers, Countrywide required consumers to sign acknowledgement forms prior to processing the loan application.  At this point, what types of loans they could even afford.  Without this information, it was difficult for borrowers to assess the various mortgage products and their options.  For other borrowers, Countrywide required borrowers to sign acknowledgment forms at closings, along with many other closing documents.

164.   For borrowers wanting to learn about PayOption ARMs, in the Handbook, there were eight pages about different PayOption ARMs buried in the middle of other disclosures.  Each of these had confusing titles such as "PayOption Adjustable Rate Mortgage Loan Program Disclosure Monthly Treasury Average ("MTA") Index-Payment Caps All States Except New York."

165.   Not only did this Handbook bury explanations of Countrywide PayOption ARMs and use confusing titles to describe them, it also failed to adequately warn borrowers about the possible pitfalls of negative amortization with option ARMs,  like depreciation of home values.   The Handbook defined negative amortization as ... "the interest shortage in a [consumer's] payment is automatically added to the loan balance and then interest may be charged on that amount). [The consumer] might therefore owe the lender more later in the loan…" It then stated, "However, an increase in the value of your home may make up for the increase in what you

owe." Yet, it never stated that if the market failed or the value of the homes depreciated, consumers would owe more than the value of their homes.

166.    By overloading borrowers with irrelevant information and using confusing language, Countrywide's disclosures hid the very information that they were supposed to disclose to consumers—the relevant details about their actual mortgages.

167.    Notably, a number of former Countrywide employees remarked that they did not feel comfortable selling the products because they either did not understand the product themselves or did not feel comfortable explaining it to someone else.

168.    Although Countrywide may have created training materials for the product, at least one former employee did not recall receiving any training on it at all – although she was authorized to sell option ARMs.  Brokers authorized to sell Countrywide products similarly recalled that the company failed to provide any training materials on option ARMs.

169.    With their risk and complexity, option ARMs should have been sold with discretion and only with proper disclosures of risks.  Countrywide knew from its own empirical evidence that its mass-marketing of this product would place many homeowners into unsustainable loans.

170.    When consumers made only the minimum payment, Countrywide carried the negative amortization that resulted on its books as uncollected "income."  In 2004, the accumulated negative amortization "income" was only $29 thousand.  For the year ending 2007, however, accumulated negative amortization from pay option ARMs that Countrywide was holding on its books had grown to $1.215 billion.  The negative amortization had steadily – and markedly – increased from $29 thousand to slightly over a billion dollars by rising to $74.7 million in 2005 and $654 million at year end 2006,.

171.   Despite all of these warning signs and the widespread acknowledgement among analysts and even its own former employees that this product is unsuitable for most borrowers, Countrywide is still promoting its option ARM products on its website to this day.

> **3.**   Countrywide Incentivized and Facilitated Improper Sales Techniques without Providing Adequate Guidelines for Selling its PayOption ARMs

172.   Countrywide further increased the risks associated with this product by incentivizing mortgage brokers to sell PayOption ARMs over more traditional mortgage products.   The company then failed to provide the brokers with sufficient parameters for selling the product, facilitated deceptive sales tactics and did not exercise sufficient oversight over brokers' conduct.

173.   As Angelo Mozilo stated during an April 26, 2005 investor conference call, the product was "a good product for both us, the lender, and for the mortgage broker."  Countrywide left consumers out of this analysis.

174.   As an initial matter, Countrywide provided financial incentives for brokers and its employees to inappropriately sell its PayOption ARMs.

175.   Brokers are compensated in two ways.  First, borrowers may compensate brokers directly through loan origination, underwriting, processing and other fees.  The second way that brokers are compensated, however, is through "yield spread premiums" ("YSPs").

176.   A yield spread premium is the cash rebate paid to a mortgage broker by a lender. Typically, the YSP is based on a broker selling a borrower a loan with an interest rate above the wholesale par rate.   The par rate is the actual interest rate a borrower qualifies for with a given lender.  For example, a mortgage broker could earn a YSP for selling a borrower a loan with an interest rate of 6.25% when the borrower's par rate is 6%. This fee is paid by the lender directly to the broker as a "rebate."  Although the consumer is not charged the fee directly, the consumer

pays the fee indirectly by paying a higher interest rate. The YSP is typically a percentage of the loan amount, therefore, the larger the loan, the larger the fee that the broker earns.

177.    Countrywide structured the YSP for option ARMs in a manner that virtually guaranteed that brokers who were more concerned with getting the highest YSP possible than getting their borrowers the best loan possible would steer borrowers into these risky loans. Plainly put, it was easier to obtain higher commissions for option ARMs as opposed to other traditional Countrywide mortgage products.

178.    Ordinarily a broker would need to increase the interest rate over a borrower's par rate on a loan in order to receive a higher YSP. A borrower would notice, of course, that a broker was offering a loan with a higher interest rate.

179.    With option ARMs, the YSP was based on three factors which helped obscure the true cost of the loan: the amount of the teaser interest rate, the amount of the margin that was used to calculate the product's interest rate, and the existence of a prepayment penalty.

180.    First, the teaser rate was so low, borrowers would not notice a material difference between 1%, for example, and 1.25%.

181.    Second, as far as the margin, borrowers were unlikely to notice what the margin was and realize that they were able to negotiate this term. Once the one-month teaser rate has expired, the PayOption ARM's interest rate is calculated each month by adding a margin—e.g. 4%—on top of on an index (such as the monthly United States Treasury average yield). The margin remains the same throughout the life of the loan, while the index changes monthly. The higher the margin, the higher the borrower's interest rate would be from month to month after the one-month teaser rate expired. Both the standard used for the index and the margin amount could be negotiated by the borrower. But because brokers sold the low monthly payment and the teaser

46

interest rate, the fact that there were other features that could be adjusted – to the borrower's detriment – often went unnoticed and was buried in the midst of the voluminous disclosures that borrowers received. Thus, borrowers would not typically notice if their broker increased their loan's margin to the maximum sold by Countrywide (around 4%) in order to increase his YSP.

182.    Finally, brokers often added a three-year prepayment penalty to the loan. As discussed above, borrowers frequently did not receive any benefit for accepting a loan with a prepayment penalty – if they were even aware the loan had a prepayment penalty.

183.    By slightly increasing an already low "teaser" rate, increasing the margin, and adding a three-year prepayment penalty, brokers could maximize the YSP Countrywide paid them.

184.    Notably, because PayOption ARMs were considered "prime" loan products, borrowers who qualified for the loan would also have qualified for fixed rate and adjustable rate mortgages with favorably low interest rates. The true interest rate on a PayOption ARM was typically higher than the rates on either of these products. In other words, borrowers paid a premium for a product that most of them did not understand and that did not provide them with any benefits in return for this premium.

185.    Therefore, Countrywide provided brokers with a financial incentive to sell option ARMs with a high margin and the worst prepayment penalty possible. Although the possible fraud that this financial incentive would motivate should have been clear, Countrywide then failed to institute appropriate checks on its sale or to adequately oversee its brokers.

186.    A mortgage broker's primary contact within Countrywide was its assigned Account Executive, a Countrywide employee. Account Executives gave brokers selling tips on option ARMs to emphasize the meaningless one-month teaser rate. One former Countrywide Account

Executive was encouraged to tell her brokers to sell the loan based on the low monthly payment, since rising property values would offset negative amortization.

187.    Countrywide also gave its Account Executives materials, like flyers, which they could use to promote certain loan products to brokers or that they could give brokers to use to promote Countrywide products to borrowers. Almost all of the flyers that Account Executives gave to brokers highlighted that reduced documentation could be used to qualify borrowers for the product and also emphasized the illusory teaser interest rate for the product.

188.    Not surprisingly, after receiving materials emphasizing the illusory teaser interest rate, brokers used the rate to obfuscate the true cost and interest rates of an option ARM.

189.    One broker, for example, placed a full-page advertisement in the Chicago-Sun Times for a closed-end line of credit of $235,000.00 for a monthly payment amount of $656.05. The advertisement does not disclose that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

190.    Another example is a direct mailing that a broker used to advertise an option ARM product. The broker solicited consumers through a direct mailing for a closed-end line of credit of $681,182.00 for a monthly payment amount of $1,898.54. Again, the direct mailing does not disclose, in readily understandable terms, that the interest rate upon which the payment is based is only applicable for the first month of the mortgage loan.

191.    Countrywide also failed to create any checks on who received a Countrywide option ARM. Due to the complexity of the product and the likelihood of severe negative consequences to the borrower – such as loss of home equity, this product was not appropriate for most borrowers. As described above, the option ARM was initially designed for sophisticated borrowers – people who were investing in or building homes or properties for resale.

Countrywide took this niche product and mass marketed it to the general public, often through mortgage brokers, without instituting any parameters for its sale.

192.    Based on the materials that Account Executives gave brokers regarding the product, it would seem that the product was appropriate for any borrower who wanted "options," regardless of their actual financial circumstances.  This lack of rules enabled Countrywide's brokers to misuse the product and to sell this Countrywide product to unsuspecting borrowers looking for a good, long-term, sustainable loan.

193.    Given Countrywide's critical reliance upon mortgage brokers to sell option ARMs, the complexity of the product, and huge potential for borrower harm, Countrywide should have developed, employed and facilitated proper – not deceptive – sales techniques.  Countrywide also should have instituted parameters on what borrowers could receive this product. Countrywide did not.

> 4.    Countrywide's Relationship with One Source Mortgage, Inc.

194.    Countrywide's use and abuse of the option ARM product is clearly illustrated by the relationship between the company and an Illinois broker who specialized in selling Countrywide PayOption ARM loans, One Source Mortgage, Inc. ("One Source").

195.    Countrywide should have been aware of potential issues with One Source Mortgage, Inc. when it first approved the broker to work as its business partner in Spring 2004.  At the time Charles Mangold, the owner of One Source, submitted the company's broker application to Countrywide, he had no fewer than five felony convictions in the State of Illinois.  Specifically, between 1989 and 2000, Mangold was convicted and sentenced to jail time for improperly communicating with a juror, multiple occurrences of felony possession and use of a weapon or firearm, and driving with a suspended or revoked license.

196.    In terms of actual conduct, One Source used the illusory one month teaser rate that

Countrywide coupled with its option ARM exactly as one would expect – to commit fraud.  For

example, when describing the PayOption ARM to consumers, One Source told consumers the

amount of only one payment – the minimum payment.  One Source also did not adequately

describe to consumers the distinctive characteristics of PayOption ARMS: the fact that the initial

low interest rate was merely a one month teaser rate or that negative amortization would occur if

the consumers pay only the minimum payment.

197.    One Source frequently did not disclose to consumers any interest rate for the mortgage

loan at all or described only the illusory teaser rate.

198.    One Source told a consumer that his minimum payment of $700 covered all the interest

on his loan.  In reality, the consumer would have had to pay $1816 a month to make even an

interest-only payment on his loan.

199.    To the extent that Countrywide or One Source provided disclosures to consumers, they

were ineffectual.  Consumers reported that they did not learn that One Source's representations

about their mortgage loans were false until they began to receive statements from Countrywide.

200.    Countrywide handsomely compensated One Source for its fraudulent conduct.  One

Source received YSPs from Countrywide ranging from $4185 to $11,310 per loan in the month

of March 2006.  During that one month, One Source received a total of at least $100,000 from

Countrywide in the form of yield spread premiums.

201.    One Source engaged in rampant fraud on borrowers' loan applications without the

consumers' knowledge, and which Countrywide then completely failed to detect.  Consumers

typically told One Source their monthly income and even provided pay stubs and tax returns to

verify their income.  On some consumers' loan applications, however, their monthly income was

increased to sometimes even double the correct amount. Because Countrywide coupled PayOption ARMs with reduced documentation underwriting, the company failed to discover this fraud.

202.    For example, One Source listed one consumer's monthly income as $8000 on his mortgage loan application. In fact, this consumer earned only approximately $3400 to $4000 a month and provided pay stubs and tax returns to One Source to verify his income. This consumer was unaware that One Source listed his income as $8000.

203.    Countrywide's purported fraud detection programs failed to catch any of these issues. Along with this failure, Countrywide repeatedly bent the rules for One Source Mortgage. Although it was supposedly against company policy, Charles Mangold treated three Countrywide employees (his primary underwriter, the manager of the branch he dealt with, and the closer on his loans) to flowers and expensive gifts, such as Coach handbags.

204.    In addition, Countrywide's stated general policy is that broker files are assigned to underwriters randomly. This policy was not followed in the case of One Source Mortgage. One underwriter who worked in Countrywide's Lisle office was often assigned to underwrite One Source files and, in 2006, this underwriter was designated as One Source's primary underwriter.

205.    This underwriter was disciplined time and again for errors in her underwriting. Prior to being assigned to One Source, the underwriter had been counseled several times for, among other things, quality of work. Eventually, Countrywide terminated the underwriter. Despite the documented problems with One Source's primary underwriter, Countrywide failed to detect the systemic fraud in the One Source loan files.

206.    Countrywide did nothing to curb the rampant abuses inflicted by this broker. In fact, Countrywide did not even terminate its relationship with the broker until December 2007 – after

the Attorney General's Office sued the broker for fraud and served Countrywide with a subpoena

seeking documents related to the broker's conduct.

207.   As the One Source example illustrates, Countrywide's inducements to brokers combined

with its lack of loan parameters or any real oversight resulted in brokers steering borrowers to

loans that were exceptionally risky and routinely qualifying borrowers for loans they could not

actually afford.

208.   As a result of Countrywide's inappropriate marketing, selling and risk layering of its

option ARM product, Illinois borrowers who thought they were refinancing into beneficial loan

product are now facing the possibility of losing all the equity they had built up in their homes or

losing their homes entirely.

B.      Countrywide Indiscriminately Sold Mortgages With High Loan-to-Value Ratios
        Regardless of the Loans' Risky Features

209.   In addition to risky products like option ARMs, Countrywide aggressively sold loans

with very high loan-to-value ratios. In recent years, the loan-to-value ratio on many Countrywide

loans – that is, the ratio of the home's appraised value to the amount of the loan – reached as

high as 100%.  Loans with 100% loan-to-value ("LTV") ratios were sold as a single loan, or

separated into two concurrent loans: a first-lien loan paired with a simultaneously originated

second-lien loan that, together, had a combined loan-to-value ratio of 100%.

210.   These simultaneous second-lien loans were often referred to as "piggyback" loans, and

the combination of a first- and second-lien loan with a 100% loan-to-value ratio was commonly

referred to as an "80/20" or "combo" loan.

211.   Countrywide regularly paired the first-lien loan in the 80/20 loans with a second-lien loan

in the form of a product type known as a Home Equity Line of Credit, or "HELOC."