212.   The HELOC second-lien loans were sold as open-end revolving lines of credit. But, in order to avoid exorbitant add-on charges, borrowers were generally required to draw down the principal amount of the HELOCs fully at the time both the first and second-lien loans were originated, and Countrywide required HELOC borrowers to maintain a "minimum" average daily balance for several years thereafter to keep the "minimum" balance intact.

213.   This loan structure could be comprised of a first-lien loan for 80% LTV piggybacked with a simultaneous second-lien HELOC for 20% LTV.

214.   Countrywide could also achieve this 100% LTV structure with a simultaneously written second-lien fixed-rate loan. Countrywide boasted to its brokers that it has a "Greater variety of high LTV, low doc options for more borrowers: Enhanced 80/20 Options."

215.   This conduct was profitable.  Countrywide applied a higher rate of interest to loans in the second lien position than the rate of interest applied to senior first-lien loans. This rate structure produced a correspondingly higher monthly payment (and income stream for investors) due to the higher interest rate applied to the outstanding principal balance on the junior second-lien loans.

216.   Countrywide's simultaneous second-lien HELOCs often came with some variation of an interest-only period.  Many of Countrywide's HELOCs had a five-year interest-only period that could be extended for another five years – this was called the "draw" period – even if the loan was already fully drawn.

217.   For the interest-only period, the required payment would only cover interest. As a result, a borrower would neither pay down any of the loan principal nor increase the amount of equity in the home during this time.  Even if the borrower stayed current on monthly payments in these loans, they could find themselves owing the entire original loan balance at the end of the interest-

only period of the loan term.  In fact, Countrywide even had HELOCs that were interest only for the entire term of the loan.

218.    The length of loan term of the second-lien HELOC loans was generally shorter than the length of the loan term on the first-lien loans.  Countrywide often paired junior second-lien HELOCs that contained abbreviated 15-25 year terms with senior first-lien loans containing 30-year terms.

219.    In these shorter-term HELOCs that had interest-only features, the loan "reset" after the interest-only period expired, five or ten years into the loan term.  The loan then began to amortize.  Because these loans also often had a balloon feature at the end of the loan term, however, they did not amortize fully. This meant that a borrower was set up to experience payment shock twice.  First, the borrower would experience payment shock due to the reset to a partially amortizing payment amount.  Next, the borrower would experience payment shock at the end of the loan term, when the balloon came due.  Consequently, at the end of the term, the borrower was faced with paying the total outstanding unpaid principal amount of the junior loan, which came due before the end of the term of the underlying first-lien senior loan.

220.    To the uninitiated borrower, this balloon payment would arrive deep into the term of the first-lien loan and could undermine the borrower's ability to maintain payments on the underlying first-lien loan. This set-up was typical of Countrywide's 30/15 Balloon mortgage loan. A "30/15 Balloon" was available on second loans with 100% financing.  Countrywide prompted its brokers to "Qualify more borrowers for 100% financing with our new 30/15 Balloon options on Seconds."

221.    All of these features of Countrywide HELOCs and piggyback loans, especially when paired with a loan with a combined LTV of 100%, had the potential to force borrowers into foreclosure or otherwise harm them.

222.    Loans with loan-to-value ratios of 100% combined with low introductory interest-only payments, or with a balloon feature, are very risky.  These features increase the risk that borrowers cannot afford the loan payments at all or will be unlikely to build any equity in their homes when faced with stagnant or a slight reduction in home value.  Such borrowers are at risk of losing their homes if they cannot make the increased payments or cannot refinance. In either case, borrowers will have little or no equity with which to work in order to refinance, and may have to pay out-of-pocket just to sell their homes.

223.    Not surprisingly, loans with piggyback second-lien loans are more likely to fail.  Defaults on the riskier, higher-rate second lien loans expose the entire mortgage structure, both first and second lien loans, to failure.  Standard & Poor's, the largest securities rating agency, analyzed over a half million first-lien mortgages sold with HELOCs or fixed rate seconds between 2002 and 2004 and found that borrowers were 43% more likely to default on those liens than comparable first mortgages without piggybacks.

224.    Lending at 100% LTV is particularly dangerous with subprime borrowers who, as demonstrated by their shaky credit history, are more likely to be without financial breathing room, with no budgetary margin of error or an adequate safety net to help them weather and get past even minor life events, like the need to replace a water heater or an unusually high energy bill.  If they begin to miss payments and, as a consequence, have servicing penalties and late fees added to their mortgage payments, they get turned "upside down" on the equity in their property and quickly owe more on the Countrywide mortgage than their home is worth.

225.    This risk is magnified when paired with reduced documentation underwriting or other features that further increase the likelihood that the borrower will be unable to afford the loan.

226.    In 2005, Countrywide qualified borrowers with credit scores as low as 580 for single loans with loan-to-value ratios of 100% and for 80/20 piggyback loans.  On the first-lien loan in an 80/20 piggyback loan combination, borrowers could be sold an interest-only option, whereby the borrower would make payments only on the interest for a certain period of time.  During the period in which the borrower was paying only the interest, the principal balance on first-lien loan would remain the same – at 80% of fair market value. In 2007, a non-prime stated self-employed or salaried borrower could qualify for an 80/20 loan for as much as $850,000 with a minimum credit score of 640 and could qualify for a loan up to $1 million with a minimum credit score of 680. As Countrywide told its brokers in an ad, "Countrywide®, America's Wholesale Lender®, Specialty Lending Group delivers more options to your Non-Prime Stated Income borrowers!"

227.    A self-employed borrower with a minimum credit score of 640 could get a "100% 'One Loan' Stated" for up to $700,000.  A stated wage earner with a minimum credit score of 640 could also mortgage 100% of a home's value with an 80/20 loan.

228.    Countrywide told borrowers that there was "GOOD NEWS!  Now you can qualify for up to 100% financing without a recent bankruptcy affecting your FICO score."  Countrywide proclaimed "Low credit scores allowed" and "Hard to prove income acceptable."

229.    Countrywide also had 80/20 loan programs that could be paired with a hybrid ARM— even a hybrid ARM with an interest-only feature.

230.    Countrywide loans made at 100% loan-to-value were imprudently made and were unsound as written because they were unsustainable and unaffordable for borrowers, even borrowers in a stable housing market.

### Countrywide Utilized Unfair and Deceptive Advertising and Sales Pitches to Push Mortgages, While Hiding Costs and Risks to Consumers

231.   To further its aggressive loan origination practices, Countrywide engaged in unfair and deceptive sales practices through telemarketing, direct mailings, newspaper advertisements, and television and radio commercials in Illinois.  Countrywide generally lead consumers to believe that they could offer consumers the best loan at the lowest price.  Countrywide's advertisements to consumers often hid or obscured the risks associated with different mortgage products and refinancing.

A.   Personalized Direct Mailings Pushed Consumers to Refinance into Risky Products

232.   Countrywide sent direct mailings to consumers in an effort to push certain mortgage products and to induce current Countrywide borrowers to refinance within a short period of time after finalizing their loan. Often, the direct mailing appeared to be a personalized letter or email, including information about consumers' present loans, which deceptively compared present loans with new offers, and instructed consumers to contact Countrywide quickly.

233.   For example, on or about April 15, 2005, Countrywide sent borrowers a direct mailing to refinance into a PayOption ARM and directed borrowers to contact Countrywide on Saturday, April 23, 2005.  Next to the consumer's name and address was a highlighted box which stated the "estimated initial payment savings" as $15,132 assuming the consumer refinanced into a PayOption ARM.

234.   This "estimated initial payment savings" was misleading because it was based on the consumer paying the initial rate of 1% for an entire year.  But with a PayOption ARM, after the first month, merely paying the initial rate of 1% would not have covered the principal and interest of the mortgage, resulting in negative amortization.  Thus, if a consumer opted to refinance into the advertised program, the consumer would not actually save any money on their

payments. To emphasize the "savings," Countrywide hid the method for calculating the estimated savings and the negative amortization that would result in a tiny font text after the signature of Countrywide's personal loan consultant at the bottom of the page.

235.    The text of the mailing touted to consumers the benefits of a PayOption ARMs, such as "free up cash…, paying off high interest credit card debt, invest in income property, saving cash for the purpose of a new home and afford a larger home." However the mailing failed to disclose clearly and conspicuously the many risks and negative ramifications of a PayOption ARM product.

236.    The promise of "afford a larger home" was deceptive because PayOption ARMs were not necessarily cheaper than fixed rate mortgages. While a consumer may have been able to obtain a larger mortgage with a PayOption ARM, it did not mean that she could afford to pay it off. An option ARM merely allowed a consumer to choose the amount of a monthly payment. Thus, some payments could be smaller than those with a fixed rate mortgage, but to prevent negative amortization, the consumer had to make much larger payments.

237.    Another direct mailing about refinancing into PayOption ARMs emphasized the amount the consumer could cash-out if he refinanced from a 30-year fixed rate loan to a PayOption ARM. Again, next to the consumer's name and address was a highlighted box with "Up to $65,380" and then under it, "Please Call Now, 1-800-598-1129."

238.    In the text, it promised that the consumer could access as much as $65,380 in home equity through refinancing into an option ARM with a 4.250% fully indexed interest rate. Further the mailer stated that this interest rate is lower than the rate of the borrower's current fixed-rate mortgage.

239.    This statement failed to clearly and conspicuously disclose the interest rate and how

Countrywide calculated the consumer's home equity, whether it was based on a computer

program or an actual appraisal.  Further, since the rate on this option ARM product would

fluctuate monthly after the one-month teaser interest rate expired, the interest rate and payment

could increase to more than the consumer's current mortgage rate and payment.  To sweeten the

offering, Countrywide offered, "Fasttrack Cash-out Refinancing" which promised to "cut down

on the amount of qualifying and application paperwork."

240.    Yet, this mailing did not clearly and conspicuously disclose the risks of refinancing into a

PayOption ARM.  At the bottom of the mailing, after the signature of the personal loan

consultant and in tiny font, the mailing made a reference to the introductory period.   It instructed

the consumer to see another footnote on the second page for an explanation of that footnote.  By

burying this information after the signature, using tiny font and referring the consumer to another

footnote for an explanation, Countrywide obscured the significant risks of refinancing into a

PayOption ARM.

B.      Emails Touting Complimentary Loan Reviews Deceptively Induced Consumers to
        Refinance

241.    Besides paper mailings, Countrywide also emailed personalized mailings to current

customers on their loan anniversaries, which offered "free" or "complimentary" loan reviews.

242.    For example, in 2006, Countrywide sent emails to current Full Spectrum Lending

Division  consumers with the subject line "It's Your Anniversary!"  In the heading with large

bold font, it stated "Happy Anniversary!  Enjoy your complimentary loan review" and then to the

immediate right it had printed Countrywide's telephone number and "Click Here to Get Started,"

which linked the consumer to an on-line loan application.

243.    By placing the telephone number and the link immediately after the complimentary loan review, the email led the consumer to believe that contacting Countrywide would result in an informational review, not a sales pitch for refinancing.

244.    After the heading, the email congratulated the consumer for being a current customer. Then it proclaimed that "many home values skyrocketed over the past year. That means that you may have thousands of dollars of home equity to borrow from—at rates much lower than most credit cards." This statement led the customer to believe that the value in her home skyrocketed to allow her "thousands of dollars of home equity." Yet, the email failed to clearly and conspicuously disclose how Countrywide calculated the consumer's equity in her home.

245.    Then the email offered an "exclusive interest rate discount of 1/2 %" because the consumer was a current customer. At the end of the email, it emphasized that Countrywide wanted to provide the "right" home financing situations to meet the consumer's needs and stated "Call us now at 1-866-253-2352 or Click Here."

246.    If the consumer did not respond to this email, Countrywide sent a follow up "Your Anniversary Review Reminder" which stated "If you haven't called for your free Anniversary Loan Review yet, there is still time." The follow up email created a false sense of urgency, in which the consumer had to act fast to avoid losing a supposedly great deal.

C.    Television and Radio Commercials: Deceptively Advertise No Closing Cost Refinancing

247.    Besides direct mailings and newspaper ads, Countrywide also used deceptive television and radio commercials to induce consumers to purchase loans and refinance their mortgages or obtain home equity lines of credit.

248.    For example, in November 2005, Countrywide ran a television commercial called "Guess What A" which offered a "no closing cost debt consolidation loan." During the commercial, a

man informed consumers to "act fast" to consolidate their high interest credit cards while mortgage interest rates were low.  Although a legal disclaimer disclosed that refinancing or taking a HELOC may increase the total number of payments and total amount paid, it did not disclose that consumers paid for the "no closing costs" through a higher interest rate.  Rather, it just referred consumers to Countrywide's website for information on closing costs.

249.    Similarly, in July 2007, Countrywide ran a television commercial which again offered a "refinance with no closing costs."  The man in the commercial stated "That's right. At closing you'll pay absolutely no closing costs. This means more cash for you."

250.    Again, the legal disclaimer obfuscated the truth that consumers paid for "no closing costs" through a higher interest rate.  Rather, it stated that "borrowers who choose to pay lender fees and closing costs upfront may qualify for a lower rate."

251.    Countrywide engaged in similar confusing and deceptive advertising in its "Dueling Announcers" radio commercial.  In that commercial, Countrywide offered a "no closing cost" refinance loan and again the legal disclaimer obfuscated the truth that consumers paid for no closing costs through a higher interest rate.  At the end of the commercial, it said that borrowers who choose to pay lender fees upfront may qualify for a lower rate.  Then it stated "recent trends show home values flattening or even declining in some areas."  The commercial urged consumers "[s]o tap into your home's available equity now."

252.    In addition, this commercial emphasized the benefits of refinancing such as: cash from the equity, a lower fixed rate, and paying credit card bills.  Yet, this commercial failed to disclose clearly and conspicuously the danger that by removing equity at a time when home values are stagnant or declining, consumers could owe more than the value of their homes.

D.    Countrywide Used Deceptive Sales Pitches to Push Risky Mortgages

253.    After receiving advertisements, many consumers contacted Countrywide account executives, who were trained to use deceptive sales scripts to originate mortgages for purchases and refinancing.

254.    According to an interview with a former account executive in Countrywide's retail division, Countrywide instructed employees to sell the "low" monthly payments of each product and to down play the total cost of the mortgage, the interest rate, adjustable rate, prepayment penalty or any other risks associated with the products.

255.    If consumers questioned the terms of the offered mortgage, account executives would offer to refinance consumers into better mortgages at later date, such as in loans with ARMs often before the rates adjusted.  It was a deceptive promise because the account executives could not predict consumers' ability to refinance, which often depended on whether housing values continued to appreciate.

256.    According to an interview with a former account executive in the Full Spectrum Lending Division (Countrywide's subprime retail division), Countrywide used scripted telemarketing to solicit both new borrowers and current Countrywide borrowers for subprime mortgages.

257.    These potential consumers, or sales "leads," included prime borrowers who mistakenly called Full Spectrum, consumers with prime mortgages serviced by Countrywide but who were late in their payments at least 30 days, consumers who called Countrywide's prime retail lending division and whose credit scores were below a certain level, and current Countrywide subprime borrowers whose loans had adjustable rate mortgages, balloons or other variable terms.

258.    Countrywide required employees to memorize sales scripts, prior to attending intensive sales training in Illinois or California.  Countrywide instructed account executives to use the

sales scripts for every conversation with consumers.  In fact, the scripts covered the entire loan

origination process, from intake to closing, for refinance, purchase and home equity mortgages.

259.    By using the sales scripts, Countrywide employees deceived and confused consumers so

that consumers would not understand the true costs associated with the new loans.

260.    As described in the New York Times' article, *Inside the Countrywide Lending Spree*,

Countrywide used a "seductive sales pitch" to convince consumers that Countrywide aspired to

provide consumers with "the best loan possible."  Rather than actually providing the best loan

possible, Countrywide led consumers into "high-cost and sometimes unfavorable loans that

resulted in richer commissions for Countrywide's smooth talking sales force."

261.    For example, according to one former Full Spectrum account executive, Countrywide's

subprime divisions did not offer FHA loans to consumers who could have qualified for them and

instead frequently offered costlier or riskier subprime loans.

262.    As compared to subprime loans, FHA loans have historically allowed lower income

consumers to borrow money for the purchase of homes.  FHA loans are insured by the Federal

Housing Authority for consumers with "less than perfect credit" histories and allow for down

payments as low as 3%.  The majority of FHA loans are 30-year fixed rate loans, rather than

ARMs.

263.    A former account executive provided the following comparison for a consumer with a

down payment of 5% (or 95% LTV) seeking a $100,000 loan.  With an FHA loan, the consumer

could have received a fixed interest rate of 6% for 30 years (with an additional insurance fee of

1½ %).  Yet, through Full Spectrum, the account executive sold the same consumer a subprime

loan with 8-10% interest rate and layered with additional risks, such as a prepayment penalty.

264.   The deception of providing the best loan for the consumer started right from the beginning of the sales script with the first telephone call.  In fact, according to an interview with a former Full Spectrum employee, the 2005 script prohibited employees who spoke with prime borrowers who were merely 30 days late from mentioning the purpose of their phone call, e.g., to refinance into more costly subprime mortgages.

265.   By misrepresenting the purpose of the call and obscuring consumers' possible weakened credit, Countrywide led consumers to believe that the call was to discuss servicing issues or even refinancing into a prime loan, rather than refinancing into a more expensive subprime mortgage.

266.   Even if consumers were uninterested in obtaining new mortgages, the sales script provided ways for sales representatives to persuade reluctant consumers.  For example, if a consumer stated that she had paid off a first mortgage, the script advised the account executive to ask about a home equity loan.  "Don't you want the equity in your home to work for you?  You can use your equity for your advantage and pay bills or cash out.  How does that sound?"

267.   Another method utilized in the scripts led consumers into believing that the account executives were their friends, interested in providing the best loans to consumers.  This method is exemplified by the Full Spectrum sales script that instructed account executives to build an emotional connection known as the "Oasis of Rapport" with consumers before discussing rates, points and fees.  The immediate objective was to get to know the consumer, "look for points of common interests, and to use first names to facilitate a friendly helpful tone."

268.   Countrywide also coached employees to ask questions about the consumer's financial situation, then lie that the account executive had another customer with the same problems and say that it was difficult for this other, similar, customer to get a loan from other lenders.

269.    By scripting an emotional connection with consumers, Countrywide led consumers to believe that account executives understood their financial situations and Countrywide would provide consumers with the best possible mortgages.  As a result, consumers were more likely to accept refinancing, fees, points, higher interest rates, adjustable rate mortgages, and very risky products, such as option ARMs.

### Countrywide Home Loans Servicing LP Utilizes Unfair and Deceptive Practices in the Servicing of Borrowers' Residential Mortgage Loans

270.    When consumers fall behind on their mortgage loan payments, they call Countrywide Home Loans Servicing LP ("Countrywide Servicing"), the Countrywide entity that services consumers' mortgages.  Consumers who ask what can be done to avoid foreclosure proceedings are often shuffled from person to person and even department to department before reaching someone who can actually address their concerns.

271.    Countrywide Servicing generally demands an initial payment from the consumers prior to even discussing whether anything can be done to keep the consumers in their homes.  Because Countrywide Servicing demands this payment prior to doing any analysis of the consumers' situations, this scheme often results in consumers paying money to Countrywide Servicing when there is no chance of negotiating a workable plan.  The money used for "initial payments" could have been used by consumers to pay for moving expenses or finding new housing in the event that foreclosure was inevitable.

272.    Countrywide Servicing also requires consumers to send their initial payments via certified checks.  If a consumer's check is not certified, Countrywide Servicing will refuse it without even attempting to verify whether there are sufficient funds to cover the check.  This needless bureaucracy has led to Countrywide Servicing rejecting initial payments made on consumers' behalf by non-profits and state agencies.

273.   For example, one consumer fell behind on her mortgage payments when she was being treated for breast cancer.  Trying to help the consumer, her church raised funds to make her delinquent payment.  A check, drawn on the church's account, was sent to Countrywide Servicing.  It was rejected.

274.   After receiving the initial payment, instead of doing an analysis on what would be necessary to allow consumers to stay in their homes, Countrywide Servicing's first offer to consumers is typically to put them on repayment plans.  These repayment plans require consumers both to remain current on their existing mortgage loan payments and also pay an additional amount to cover any past due payments and fees the consumers have incurred.

275.   A repayment plan is often an unworkable and unaffordable solution to most consumers' mortgage payment problems.  Plainly put, if consumers are having problems making their current payments, there is absolutely no reason to think that the consumers will be able to make even larger payments in the future.

276.   One consumer's experience illustrates the problem.  The consumer's monthly mortgage payment was $1600.  She fell behind and, in an attempt to salvage the situation, repeatedly called Countrywide Servicing to try to find a solution.  Although the consumer was already having difficulty making her $1600 monthly payment, Countrywide Servicing's solution was to increase the consumer's payment to $2500 to cover both the existing payment and the past due payments and fees.

277.   Predictably, the consumer was unable to keep up with the repayment plan and fell even further behind on her mortgage.  After trying to work with Countrywide Servicing for almost six months, the company demanded (and received) a payment of over $5000 from the consumer before it would complete an analysis and consider the file for loan modification.

278.    Even when Countrywide Servicing comes up with a loan modification plan, the company often fails to discuss the plan with the consumer to confirm it is affordable or to send timely documentation to the consumer regarding the specific details of the plan.

279.    For example, a consumer called Countrywide Servicing on five separate occasions seeking assistance with mortgage payments that she was having difficulty making.  The consumer had a loan with an initial teaser interest rate of 9.375% that had jumped to 12.625%. During the fifth call, the consumer learned that Countrywide Servicing had decided to reduce the interest rate on her loan back to the teaser interest rate for an additional five years.  Although Countrywide Servicing attempted to provide relief to the consumer, it failed to actually discuss with the consumer whether this plan would be affordable.  The consumer had sent Countrywide Servicing financial documents, so it should have known that the plan was unaffordable. Moreover, it took Countrywide Servicing an additional month to send the consumer documentation of her loan modification, resulting in the consumer making an incorrect mortgage payment based on what she had been told on the phone.

280.    Countrywide Servicing representatives have also been difficult to reach when consumers are trying to catch up on their mortgages.  For example, a consumer who fell behind in her mortgage sent Countrywide Servicing additional checks for 10 months with the designation that they were to be applied to her past due payments and fees.  When her statements did not appear to reflect the additional payments, the consumer repeatedly called Countrywide Servicing to deal with the problem.  She was put on hold and transferred from person to person when she called and was never able to talk to a Countrywide Servicing representative who could help her figure out the problems with her account.

281.   Consumers will sometimes try to refinance their Countrywide mortgages in an attempt to save their homes.  Consumers have complained that Countrywide Servicing fails to send them the payoff statements necessary to complete the refinance in a timely manner.  Because the refinance is delayed, the consumers end up falling even further behind on their Countrywide mortgages.

282.   On occasion, consumers who fall behind in their mortgages and other debt payments are forced to declare bankruptcy.  Countrywide Servicing has been sued by United States Bankruptcy Trustees in four states over its practices with consumers in bankruptcy.  These trustees allege, among other things, that Countrywide Servicing may have filed inaccurate proofs of claims, filed unwarranted motions for relief from the bankruptcy stay, inaccurately accounted for funds and made unfounded payment demands to consumers after the discharge of their bankruptcy.

283.   Countrywide Servicing has also acted illegally towards borrowers in foreclosure actions.  In a particularly egregious case, a consumer whose Countrywide mortgage was in foreclosure returned home to find that Countrywide Servicing had changed her locks and boarded her home.  At the time it boarded the owner-occupied property, Countrywide Servicing had filed a foreclosure complaint against the consumer, however, no judgment for foreclosure had been entered and no sale conducted.   The consumer's attorney made numerous attempts to contact Countrywide Servicing to rectify the situation.  It took a week and the intervention of the Attorney General's Office for the consumer to regain access to her home and possessions.

284.   There are also occasions when Countrywide Servicing acts inappropriately towards consumers who are not in foreclosure, but have a problem with the application of funds from an escrow account.

285.   In one situation, a consumer whose Countrywide mortgage included an escrow for real estate taxes mistakenly paid her tax bill herself, even though Countrywide Service also paid the bill. Once this error was discovered, the consumer's overpayment should have been refunded directly to her. Instead, Countrywide Servicing decided to keep a portion of the overpayment in the consumer's escrow account, purportedly as a "cushion." Countrywide Servicing had no authority to arbitrarily keep a portion of the consumer's overpayment and only returned the funds after mediation through the Attorney General's Office.

## STATUTORY PROVISIONS

286.   Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/2) provides that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon concealment, suppression or omission of such material fact, or the use of employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act," approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

287.   Section 7 of the Consumer Fraud Act, 815 ILCS 505/7, provides in relevant part:

> a.   Whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act or practice declared by the Act to be unlawful, and that proceedings would be in the public interest, he may bring an action in the name of the State against such person to restrain by preliminary or permanent injunction the use of such method, act or practice. The Court, in its discretion, may exercise all powers necessary, including but not limited to: injunction, revocation, forfeiture or suspension of any license, charter, franchise, certificate or other

69

evidence of authority of any person to do business in this State;
appointment of a receiver; dissolution of domestic corporations or
association suspension or termination of the right of foreign
corporations or associations to do business in this State; and
restitution.

b.      In addition to the remedies provided herein, the Attorney
General may request and this Court may impose a civil penalty in a
sum not to exceed $50,000 against any person found by the Court
to have engaged in any method, act or practice declared unlawful
under this Act.  In the event the court finds the method, act or
practice to have been entered into with intent to defraud, the court
has the authority to impose a civil penalty in a sum not to exceed
$50,000 per violation.

c.      In addition to any other civil penalty provided in this
Section, if a person is found by the court to have engaged in any
method, act, or practice declared unlawful under this Act, and the
violation was committed against a person 65 years of age or older,
the court may impose an additional civil penalty not to exceed
$10,000 for each violation.

288.   Section 10 of the Consumer Fraud Act, 815 ILCS 505/10, provides that "[i]n any action

brought under the provisions of this Act, the Attorney General is entitled to recover costs for the

use of this State."

289.   Section 2 of the Illinois Fairness in Lending Act, 815 ILCS 120/2, provides that

(a)     "Financial institution" means any bank, credit union, insurance company,
mortgage banking company, savings bank, savings and loan association,
or other residential mortgage lender which operates or has a place of
business in this State.

. . .

(d)     "Equity stripping" means to assist a person in obtaining a loan secured by
the persons' principal residence for the primary purpose of receiving fees
related to the financing when (i) the loan decreased the persons' equity in
the principal residence and (ii) at the time the loan is made, the financial
institution does not reasonably believe that the person will be able to make
the scheduled payments to repay the loan.  "Equity stripping" does not
include reverse mortgages as defined in Section 5a of the Illinois Banking
Act, Section 1-6a of the Illinois Savings and Loan Act of 1985, or
subsection (3) of Section 46 of the Illinois Credit Union Act.

290.   Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 provides in

relevant part that:

> No financial institution, in connection with or in contemplation of any loan to any
> person, may:
> ...
> (e)   Engage in equity stripping or loan flipping.

291.   Section 5 of the Illinois Fairness in Lending Act, 815 ILCS 120/5(c), provides in

relevant part that:

> An action to enjoin any person subject to this Act from engaging in activity in
> violation of this Act may be maintained in the name of the people of the State of
> Illinois by the Attorney General or by the State's Attorney of the county in which
> the action is brought. This remedy shall be in addition to other remedies provided
> for any violation of this Act.

## Count I

### Violations of Section 2 of the
### Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2

292.   The allegations contained in Paragraphs 1 through 291 of the Complaint are re-alleged

and incorporated herein by reference.

293.   As described above, Countrywide's conduct has contributed to the high number of

foreclosures in Illinois and caused significant harm to the public, the market, and scores of

Illinois borrowers and homeowners.

294.   Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage

loans to borrowers who did not have the ability to repay their loans through practices such as, but

not limited to:

> a.   Using reduced documentation underwriting guidelines to qualify borrowers who
>      did not have sufficient income or assets to afford the Countrywide loans they
>      were sold;

71

b.   Promoting the use of reduced documentation underwriting guidelines to qualify borrowers who did not have sufficient income and assets for the Countrywide loans they were sold;

c.   Inflating borrowers' income on loan applications to qualify the borrowers for Countrywide loans;

d.   During a certain period of time, qualifying subprime borrowers for hybrid ARM mortgage loans using less than the full- indexed rate;

e.   During a certain period of time, qualifying borrowers for mortgage loans that had an interest-only payment option using less than the fully-amortizing payment;

f.   Originating loans that were not designed for long term viability, but for short term refinancing, as employees and brokers frequently represented that borrowers could refinance the loan;

g.   Promoting serial refinancing without regard to the increased cost to the borrower or the affordability of the loan, and without disclosing that the ability to refinance relied on a perpetual increase in home valuation;

h.   Loosening certain underwriting guidelines over time, resulting in the sale of unaffordable loans;

i.   Originating loans with multiple layers of risk, resulting in the sale of unaffordable loans; and

j.   Allowing exceptions to underwriting guidelines, resulting in the sale of unaffordable loans.

295.    Countrywide engaged in unfair and/or deceptive acts or practices by originating mortgage loans that exposed borrowers to an unnecessarily high risk of foreclosure or loss of home equity through practices such as, but not limit to:

    a.  Originating option ARM mortgage loans with one or more of the following characteristics: illusory introductory teaser interest rates, prepayment penalties, high loan-to-value ratios, and reduced documentation underwriting;

    b.  Mass marketing and selling option ARM mortgage loans to the general public that were only beneficial to specific sophisticated segments of the borrower population;

    c.  Marketing and selling option ARM mortgage loans as a beneficial refinance loan product to current customers in good standing, when that was not the case; and

    d.  Originating mortgage loans with 100% loan-to-value or combined loan-to-value ratios that included other risky features.

296.    Countrywide engaged in unfair and/or deceptive acts or practices by originating unnecessarily more expensive mortgage loans to unknowing borrowers through practices such as, but not limited to:

    a.  Originating more expensive reduced documentation loans to borrowers who could have documented their income and assets, without informing borrowers of the increased cost; and

    b.  Attaching prepayment penalties to borrowers' loans, without ensuring that the borrowers actually received any benefit from the added risk of the penalty.

297.    Countrywide engaged in unfair and/or deceptive acts or practices by deceptively marketing and/or advertising its mortgage loans through practices such as, but not limited to:

a.  Leading consumers to believe that Countrywide would obtain for them the best possible loan terms, when, in fact, they did not;

b.  Avoiding discussing the interest rate or APR of a loan by shifting the focus to the monthly payment in an effort to confuse consumers about the true cost of the loan;

c.  Representing that refinancing into an option ARM could save the borrower money when, in fact, the claim of savings was false;

d.  Advertising the one-month teaser interest rates for an option ARM without clearly and conspicuously disclosing that the rate would increase dramatically the following month;

e.  Representing to consumers that option ARMs were beneficial for consumers in good standing on their current Countrywide loans when, in fact, refinancing into the product was not beneficial for most consumers;

f.  Failing to properly inform a borrower of the potential of owing more on his home than what it is worth due to negative amortization if the borrower's house did not continue appreciating or depreciated in value;

g.  Inflating borrowers' income information on their loan applications in order to qualify borrowers for Countrywide mortgages when their income would not have qualified them for the loan they received;

h.  Representing to borrowers that they should not worry about the interest rate of their Countrywide mortgage because the loans could be refinanced before they became unaffordable;

i.  During a certain period of time, failing to disclose to subprime borrowers that they were qualified at less than the fully-indexed rate for hybrid ARM mortgage loans and not at a rate sufficient to repay the loan in its entirety;

j.  During a certain period of time, failing to disclose to borrowers that they were qualified at less than a fully-amortizing payment for mortgage loans with an interest-only payment option and not at a rate sufficient to repay the loan in its entirety;

k.  Advertising that a Countrywide mortgage had "no closing costs" when the closing costs were incorporated in the features of the loan;

l.  Representing to current Countrywide borrowers that Countrywide offered "Complimentary" or "Free Loan" reviews when in fact, it was a sales pitch to refinance current subprime borrowers into other subprime mortgages;

m.  Hiding the purpose of subprime sales calls to prime borrowers with late payments, which was, in actuality, to refinance borrowers into subprime loans; and

n.  Advertising that because the housing market is stagnant or declining, borrowers should refinance their homes and take cash out or pay debts, without informing borrowers of the risk of owing more than the value of their homes.

298.  Countrywide engaged in unfair and/or deceptive acts or practices by implementing a compensation structure that incentivized broker and employee misconduct and failed to exercise sufficient oversight to ensure that such misconduct did not occur through practices such as, but not limited to:

a.  Implementing a compensation structure that incentivized employees to maximize

sales of loans without proper oversight, resulting in the sale of unaffordable

and/or unnecessarily expensive loans;

b.  Failing to provide adequate parameters for the sale of option ARMs, resulting in

the product being sold to inappropriate groups of borrowers;

c.  Failing to adequately supervise and/or underwrite brokers' use and sale of

reduced documentation loans resulting in the sale of unaffordable or unnecessarily

more expensive loans;

d.  Facilitating and/or instructing brokers' emphasis of the low teaser rate when

selling option ARMs;

e.  Rewarding brokers for selling loans with certain risky loan features such as

prepayment penalties without ensuring that borrowers received a benefit from the

risky features; and

f.  Structuring the compensation for option ARMs in such a way that brokers were

incentivized to sell a product that was riskier than necessary – to the exclusion of

other products – in order to obtain the maximum yield spread premium possible.

299.   Countrywide Home Loans Servicing, LP engaged in unfair and/or deceptive acts or

practices during the servicing of residential mortgage loans through practices such as, but not

limited to:

a.  Inducing borrowers to pay Countrywide Servicing monies under the premise that

Countrywide Servicing would be able to assist distressed borrowers, even though

Countrywide Servicing has not done any analysis to determine whether assistance

was feasible in light of the borrowers' particular factual circumstances;

    b.   Misleading borrowers into paying Countrywide Servicing additional monies under a repayment plan or loan modification plan that Countrywide Servicing knew or should have know was unaffordable; and

    c.   Recklessly facilitating the foreclosure of borrowers' homes by misleading borrowers or failing to respond to borrowers' requests for assistance.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.    A finding that Defendants have engaged in and are engaging in trade or commerce within the meaning of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

B.    A finding that Defendants have engaged in and are engaging in acts or practices that constitute violations of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2;

C.    An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Consumer Fraud and Deceptive Business Practices Act including, but not limited to, the unlawful acts and practices specified above;

D.    An order rescinding, reforming or modifying all mortgage loans between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

E.    An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans whose homes were lost due to foreclosure on their Countrywide mortgage loans;

F.      An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who refinanced their mortgage loans with Defendants or another residential mortgage lender;

G.      An order requiring Defendants to make restitution to all consumers who were affected by the use of the above-mentioned unlawful acts and practices in the origination of Countrywide residential mortgage loans who are unable to modify their Countrywide mortgages to a sustainable level and are forced to relinquish ownership of their homes;

H.      An order requiring Defendants to repurchase owner-occupied residential mortgage loans for all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices that have been sold, transferred or assigned to investors and then to rescind, reform or modify any such mortgage loans;

I.      An order enjoining Defendants from:

1)      further selling, transferring or assigning mortgage loans originated by Countrywide by the use of the above-mentioned unlawful acts and practices that are secured by owner-occupied residential properties in Illinois;

2)      further selling, transferring or assigning any legal obligations to service Illinois owner-occupied residential mortgage loans originated by the use of the above-mentioned unlawful acts and practices; and

3)      initiating or advancing a foreclosure, as an owner or servicer, on any owner-occupied residential mortgage loan originated by the use of the above-mentioned unlawful acts and practices and secured by an Illinois

78

property, without first providing the Attorney General a 90-day period to

review each such loan so that, upon the expiration of the 90 days, the

Attorney General may object to a foreclosure based upon unfair or

deceptive origination or servicing conduct by Countrywide and

Countrywide Home Loans Servicing, LP in order to provide the borrower

with a meaningful opportunity to avoid foreclosure.  In the event of the

Attorney General's objection, no foreclosure sale shall go forward absent

court approval.

J.      An order requiring Defendants to establish a "Distressed Property Reserve" to

cover costs incurred by municipalities due to vacant foreclosed properties that secured owner-

occupied residential mortgage loans originated by Countrywide;

K.      An order imposing a civil penalty in a sum not to exceed $50,000 against any

Defendant found by the Court to have engaged in any method, act or practice declared unlawful

under this the Illinois Consumer Fraud and Deceptive Business Practices Act;

L.      An order imposing a civil penalty in a sum not to exceed $50,000 against any

Defendant found by the Court to have engaged in any method, act or practice declared unlawful

under the Illinois Consumer Fraud and Deceptive Business Practices Act committed with the

intent to defraud;

M.      An order imposing an additional civil penalty not to exceed $10,000 for each

violation of the Illinois Consumer Fraud and Deceptive Business Practices Act committed

against a person 65 years of age or older, as provided in Section 7(c) of the Consumer Fraud and

Deceptive Business Practices Act, 815 ILCS 505/7(c);

N.     An order requiring Defendants to pay the costs of this action and any costs related to the 90-day Attorney General review period described above; and

O.     An order granting such further relief as this Court deems just, necessary, and equitable in the premises.

### Count II

### Violation of the Illinois Fairness in Lending Act, 815 ILCS 120/4

300.   The allegations contained in Paragraphs 1 through 299 of the Complaint are re-alleged and incorporated herein by reference.

301.   Countrywide violated Section 3 of the Illinois Fairness in Lending Act, 815 ILCS 120/3 by engaging in equity stripping when refinancing consumers into mortgage loan products that Countrywide knew or should have known were unaffordable and that decreased the borrowers' equity in their homes, with the primary purpose of receiving fees for the refinancing.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for the following relief:

A.     A finding that Defendants have violated the Illinois Fairness in Lending Act;

B.     An order preliminarily and permanently enjoining Defendants from the use of acts or practices that violate the Illinois Fairness in Lending Act including, but not limited to, the unlawful acts and practices specified above;

C.     An order requiring Defendants to make restitution to all consumers affected by the use of the above-mentioned unlawful acts and practices;

D.     An order rescinding or reforming all contracts, loan agreements, notes or other evidences of indebtedness between Defendants and all Illinois consumers who were affected by the use of the above-mentioned unlawful acts and practices;

E.    An order requiring Defendants to pay the costs of this action; and

F.    An order granting such further relief as this Court deems just, necessary, and

equitable in the premises.

Respectfully submitted,

LISA MADIGAN, IN HER OFFICIAL
CAPACITY AS ATTORNEY GENERAL OF
ILLINOIS,

JAMES D. KOLE
Bureau Chief, Consumer Fraud

LISA MADIGAN
Attorney General of Illinois

DEBORAH HAGAN, Chief
Consumer Protection Division

JAMES D. KOLE, Chief
Consumer Fraud Bureau

THOMAS JAMES
SUSAN N. ELLIS
VERONICA L. SPICER
SHANTANU SINGH
JENNIFER FRANKLIN
MICHELLE GARCIA
CECILIA ABUNDIS
Assistant Attorneys General
Telephone: 312-814-3000

100 W. Randolph St., 12th Floor
Chicago, IL 60601