UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X
                                                                    :
FOOTBRIDGE LIMITED TRUST and OHP OPPORTUNITY :
LIMITED TRUST,                                                      :
                                                                    :        09 CIV 4050 (PKC)
                                Plaintiffs,                         :
                                                                    :
                v.                                                  :
                                                                    :
COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE :
HOME LOANS SERVICING LP, COUNTRYWIDE               :
FINANCIAL CORP., COUNTRYWIDE SECURITIES            :
CORP., CWABS, INC., CWABS ASSET-BACKED             :
CERTIFICATES TRUST 2006-SPS1, CWABS ASSET-         :
BACKED CERTIFICATES TRUST 2006-SPS2, ANGELO R. :
MOZILO, DAVID SAMBOL, BANK OF AMERICA CORP., :
and BAC HOME LOANS SERVICING, LP,                   :
                                                                    :
                                Defendants.                         :
                                                                    :
-------------------------------------------------------------------------X

**DEFENDANTS' JOINT REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT
OF THEIR MOTION TO DISMISS THE SECOND
AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................... ii

PRELIMINARY STATEMENT ............................................................................ 1

ARGUMENT ........................................................................................................ 1

I.   THERE WAS NO FRAUD IN THE SALE OF THE TRUSTS' CERTIFICATES ..... 1

   A.  SAC's Deficient Allegations Should Be Struck .................................................... 1

   B.  The Offering Documents Contained No Material Misstatements......................... 4

      1.  The Percentage of Owner-Occupied Properties................................................. 4

      2.  Countrywide's Adherence to Its Underwriting Guidelines ............................ 6

      3.  The Processing of Supposedly Fraudulent Applications .................................. 10

      4.  The Alleged "Adverse Effect" on Investors' Interests ..................................... 11

      5.  The Servicing of Mortgage Loans ................................................................. 12

   C.  No Particularized Facts Giving Rise to a Strong Inference Of Scienter ............... 12

   D.  Plaintiffs Improperly Invent Torts Out of a Contract ........................................... 17

   E.  The SAC Fails to Allege Loss Causation .............................................................. 19

CONCLUSION...................................................................................................... 20

## TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

15 U.S.C. § 78u-4(b)(1)(B)..................................................................................    3

**Cases**

Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.,
394 F.3d 126 (3d Cir. 2004)................................................................................    3, 9

Catton v. Def. Tech. Sys., Inc.,
No. 05 Civ. 6954 (SAS), 2006 WL 27470 (S.D.N.Y. Jan. 3, 2006)....................    4

City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd.,
--- F. Supp. 2d ----, No. 07 Civ. 9921 (PKC),
2009 WL 1456846 (S.D.N.Y. May 20, 2009) ....................................................    6

Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry,
494 U.S. 558 (1990)...........................................................................................    19

Chill v. Gen. Elec. Co.,
101 F.3d 263 (2d Cir. 1996)................................................................................    15

Denny v. Barber,
576 F.2d 465 (2d Cir. 1978)................................................................................    5

ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,
553 F.3d 187 (2d Cir. 2009)................................................................................    12

Feasby v. Industri-Matematic Int'l Corp.,
No. 99 Civ. 8761 (HB), 2000 WL 977673 (S.D.N.Y. July 17, 2000) ...............    5

Fezzani v. Bear, Stearns & Co.,
592 F. Supp. 2d 410 (S.D.N.Y. 2008).................................................................    1

First Bank of Americas v. Motor Car Funding, Inc.,
257 A.D. 2d 287 (1st Dep't 1999) ......................................................................    18

First Nationwide Bank v. Gelt Funding Corp.,
27 F.3d 763 (2d Cir. 1994)..................................................................................    19

Fort Worth Employers' Ret. Fund v. Biovail Corp.,
615 F. Supp. 2d 218 (S.D.N.Y. 2009).................................................................    5-6

G-1 Holdings, Inc. v. Baron & Budd,
No. 01 Civ. 0216 (RWS), 2004 WL 1277870 (S.D.N.Y. June 10, 2004) .......................... 3

Geinko v. Padda,
No. 00 C 5070, 2002 WL 276236 (N.D. Ill Feb. 27, 2002)................................................ 2

Gotlin v. Lederman,
367 F. Supp. 2d 349 (E.D.N.Y. 2005) ............................................................................... 2

Graham v. Barriger,
No. 08 Civ. 9357 (PKC), 2009 WL 3852461 (S.D.N.Y. Nov. 17, 2009).......................... 6, 19

In re Bristol-Myers Squibb Sec. Litig.,
312 F. Supp. 2d 549 (S.D.N.Y. 2004)............................................................................... 2

In re Comverse Tech., Inc. Sec. Litig.,
543 F. Supp. 2d 134 (E.D.N.Y. 2008) .............................................................................. 15

In re Enron Corp.,
No. 04-1495, 2005 WL 356985 (S.D.N.Y. Feb. 15, 2005)................................................ 18

In re Gildan Activewear, Inc. Sec. Litig.,
636 F. Supp. 2d 261 (S.D.N.Y. 2009)............................................................................... 5

In re IPO Sec. Litig.,
241 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................... 2, 3-4

In re Merrill Lynch & Co. Research Reports Sec. Litig.,
218 F.R.D. 76 (S.D.N.Y. 2003) ........................................................................................ 2

In re Nokia Oyj (Nokia Corp.) Sec. Litig.,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)............................................................................... 13

In re NovaGold Res. Inc. Sec. Litig.,
629 F. Supp. 2d 272 (S.D.N.Y. 2009)............................................................................... 13-14

In re Optionable Sec. Litig.,
577 F. Supp. 2d 681 (S.D.N.Y. 2008)............................................................................... 2

In re Theragenics Corp. Sec. Litig.,
105 F. Supp. 2d 1342 (N.D. Ga. 2000) ............................................................................ 4

Inst. for Dev. of Earth Awareness v. People for Ethical Treatment of Animals,
No. 08 Civ. 6195 (PKC), 2009 WL 2850230 (S.D.N.Y. Aug. 28, 2009).......................... 5

Kinsey v. Cendant,
No. 04 Civ. 0582, 2005 WL 1907678 (S.D.N.Y. Aug. 10, 2005) ..................................... 13

Kramer v. Time Warner Inc.,
937 F.2d 767 (2d Cir. 1991)........................................................................... 16

Lattanzio v. Deloitte & Touche LLP,
476 F.3d 147 (2d Cir. 2007)........................................................................... 19

Ledford v. Rapid-American Corp.,
No. 86 Civ. 9116 (JFK), 1988 WL 3428 (S.D.N.Y. Jan. 8, 1988) ................... 2

Lentell v. Merrill Lynch & Co.,
396 F.3d 161 (2d Cir. 2005)........................................................................... 20

Lipsky v. Commonwealth United Corp.,
551 F.2d 887 (2d Cir. 1976)............................................................................ 2

Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC,
No. 3:08-CV-0261-L, 2008 WL 4449508 (N.D. Tex. Sept. 30, 2008)............. 17-19

Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co.,
--- F. Supp. 2d ----, No. 07-5423, 2009 WL 2590087 (E.D. Pa. Aug. 20, 2009) .............. 20

Mills v. Polar Molecular Corp.,
12 F.3d 1170 (2d Cir. 1993)........................................................................... 17

Novak v. Kasaks,
216 F.3d 300 (2d Cir. 2000)........................................................................... 15

Panther Partners, Inc. v. Ikanos Commc'ns, Inc.,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)............................................................. 6

Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.,
--- F. Supp. 2d ----, CA No. 08-10446-RGS,
2009 WL 3149775 (D. Mass. Sept. 30, 2009) ................................................. 6-8, 10

RDF Media Ltd. v. Fox Broad. Co.,
372 F. Supp. 2d 556 (C.D. Cal. 2005) ............................................................ 2

Rolf v. Blyth, Eastman Dillon & Co.,
570 F.2d 38 (2d Cir. 1978), overruled on other grounds by Central Bank of Denver,
N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994) ................ 14-15

Rombach v. Chang,
355 F.3d 164 (2d Cir. 2004)............................................................................ 8

RSM Prod. Corp. v. Fridman,
643 F. Supp. 2d 382 (S.D.N.Y. 2009).............................................................. 1-2

South Cherry Street, LLC v. Hennessee Group LLC,
573 F.3d 98 (2d Cir. 2009)............................................................................ 4, 14, 15

San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.,
75 F.3d 801 (2d Cir. 1996)............................................................................ 15

Shahzad v. H.J. Meyers & Co.,
No. 95 Civ. 6196 (DAB), 1997 WL 47817 (S.D.N.Y. Feb. 6, 1997) ............................... 2

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
551 U.S. 308 (2007)...................................................................................... 5-6

Three Crown Ltd. Partnership v. Caxton Corp.,
817 F. Supp. 1033 (S.D.N.Y. 1993).................................................................... 2

United Guaranty Mortg. Indem. v. Countrywide Fin. Corp.,
--- F. Supp. 2d ----, No. CV-09-1888-MRP,
2009 WL 3199844 (C.D. Cal. Oct. 5, 2009)........................................................... 8

Zerman v. Ball,
735 F.2d 15 (2d Cir. 1984).............................................................................. 10

## **Other Authorities**

Amy Hoak, *FICO Score Forgives Mishaps*, Wall St. J. (Aug. 23, 2009) .......................... 9

The remaining Defendants[1] submit this reply memorandum in response to Plaintiff's Opposition brief ("PB") and in further support of their motion to dismiss the SAC.

## PRELIMINARY STATEMENT

Plaintiffs are sophisticated hedge funds who purchased the riskiest tranches of risky MBS issued by two Trusts, holding only subordinated, second lien subprime mortgages made to credit-challenged borrowers. Their claims must be viewed in light of the specific warnings and detailed disclosures in the Offering Documents about the attendant risks of their investment decisions. When stripped of bootstrap and speculative conclusions, and assertions lifted (without attribution) from press stories or from other proceedings that do not concern the MBS Plaintiffs bought, the SAC must be dismissed as a matter of law.

## ARGUMENT

## I.    THERE WAS NO FRAUD IN THE SALE OF THE TRUSTS' CERTIFICATES

Whether under the federal securities laws or the common law[2] the SAC's failure to plead with particularity material misrepresentations, scienter, reasonable reliance or that Defendants' alleged actions were the proximate cause for Plaintiffs' losses is fatal to Plaintiffs' claims.

### A.    SAC's Deficient Allegations Should Be Struck

We first separate the wheat from the chaff, and most of the SAC is chaff. In this Circuit, "paragraphs in a complaint that are either based on, or rely on, complaints in other actions that have been dismissed, settled, or otherwise not resolved, are, as a matter of law, immaterial," and

---

[1]    All terms used herein are as defined in Defendants' Notice of Motion and accompanying brief ("DB"). Having been dismissed by stipulation, the Trust Defendants do not join in this submission.

[2]    Plaintiffs proclaim that Defendants "do not deny" that common law fraud has been adequately pleaded and accuse the defense of "glaz[ing] over the difference" between securities and common law fraud. DB 47. Neither assertion is fair. Plaintiffs identify no basis on which their common law claim survives, and as Defendants explained (and Plaintiffs ignore) the elements for securities fraud and common law fraud are "essentially the same." Fezzani v. Bear, Stearns & Co., 592 F. Supp. 2d 410, 423 (S.D.N.Y. 2008) (quoting Scone Invs., L.P. v. Am. Third Mkt. Corp., No. 97 Civ. 3802, 1998 WL 205338, at *10 (S.D.N.Y. April 28, 1998)). See also DB 5 n.8.

should be struck.  See RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 403 (S.D.N.Y. 2009).[3]

The same is true for allegations based on government investigations, DB 6 & n.10; note 3 supra,

and conclusory press stories.[4]  Plaintiffs ignore RSM and the wealth of cases on which it rests.[5]

The SAC is filled with a collection of legal conclusions and alleged facts copied from press

clippings, and assertions lifted from other actions that do not involve the MBS at issue here.  See

Annexes A & B.  They should be struck.  DB 5-6.

In response, the Opposition resorts to misdirection, coyly asserting that "the mere fact

that allegations in a pleading are also repeated in other complaints or news reports [does not]

---

[3]     See also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976) ("neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings"); Gotlin v. Lederman, 367 F. Supp. 2d 349, 363 (E.D.N.Y. 2005) (striking references to investigations); In re Merrill Lynch & Co. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003) (striking references to other complaints); Shahzad v. H.J. Meyers & Co., No. 95 Civ. 6196 (DAB), 1997 WL 47817, at *13-14 (S.D.N.Y. Feb. 6, 1997) (striking references to disciplinary actions by regulators); Ledford v. Rapid-American Corp., No. 86 Civ. 9116 (JFK), 1988 WL 3428, at *1-2 (S.D.N.Y. Jan. 8, 1988) (striking references to investigation).  Indeed, a motion to strike is particularly appropriate where, as here, the other proceedings relate to securities Plaintiffs "never held."  In re Merrill Lynch, 218 F.R.D. at 78.

[4]     There is ample authority for rejecting unsupported allegations and speculation from news articles.  See In re Optionable Sec. Litig., 577 F. Supp. 2d. 681, 690 (S.D.N.Y. 2008) ("Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel."); In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 563 (S.D.N.Y. 2004) ("conclusory allegations and opinions taken from a newspaper reporter's notebook cannot satisfy the strictures of Rule 9(b) or the PSLRA") (quotations omitted); RDF Media Ltd. v. Fox Broad. Co., 372 F. Supp. 2d 556, 567 (C.D. Cal 2005) (striking articles because "inclusion of the material lends artificial credence to the opinions contained in the articles, and gives the appearance that such opinions are legally relevant to the dispute") (quotations omitted).

[5]     While Plaintiffs mention Three Crown Ltd. Partnership v. Caxton Corp., 817 F. Supp. 1033 (S.D.N.Y. 1993), and Geinko v. Padda, No. 00 C 5070, 2002 WL 276236 (N.D. Ill Feb. 27, 2002), they ignore the balance of authorities cited by the defense (DB 6 & n.10).  Further, Plaintiffs "distinguish" Caxton and Geinko by ipse dixit pronouncements that the SAC is adequate (PB 75) and "ample."  PB 75 n.41.  Plaintiffs rely heavily on In re IPO Sec. Litig., 241 F. Supp. 2d 281, (S.D.N.Y. 2003) for the proposition that "media resources" can "form the basis for Plaintiff's beliefs."  PB 72.  But that case does not compare to this one.  The IPO plaintiffs had previously been directed to "identify which of their allegations were based on information and belief, and to identify for those allegations, the 'facts on which that belief [was] formed[,]'" and in response to that direction submitted a chart almost 1,000 pages in length.  Id. at 354-55.  Further, their fraud allegations were based on "many confidential sources who all sa[id] the same thing—that they were required to enter into [unlawful] agreements."  241 F. Supp. 2d at 358.  As a result, even without the information and belief assertions (and references to media reports), the IPO plaintiffs had met their burden of pleading with particularity sufficient "facts to support their beliefs."  Id. at 358.  In contrast, Judge Scheindlin observed, "[w]hen an allegation stems from only one or two sources, however, it is important that they be identified with absolute particularity."  Id. (emphasis added).  Here, the SAC generally relies on no sources, just press clippings and improper allegations lifted from other proceedings.

render that information less trustworthy," PB 74, as if the similarities between the SAC and other complaints and articles were coincidental and mutually confirming.  To the contrary, after the defense objected in their pre-motion letters to the plethora of references to conclusory press stories in the AC, and the Court's reference thereto in the ensuing conference, Plaintiffs simply dropped the <u>attributions</u> in the SAC, and kept the allegations—a ploy Plaintiffs do not deign to acknowledge, much less defend.  <u>See</u> DB 6 n.11.  Thus, the SAC remains replete with allegations unsupported by proper factual particularity, defying both Rule 9(b) and the PSLRA, both of which require Plaintiffs to "state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B); <u>see also</u> <u>Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.</u>, 394 F.3d 126, 155 (3d Cir. 2004) ("statements that are attributed to no source" are "undisputedly insufficient to satisfy the heightened pleading standard"); <u>G-1 Holdings, Inc. v. Baron & Budd</u>, No. 01 Civ. 0216 (RWS), 2004 WL 1277870, at *2 (S.D.N.Y. June 10, 2004) (citing "[n]umerous district courts" holding Rule 9(b) requires particularized facts demonstrating the sources supplying "information and belief" allegations).

Recognizing that "information and belief" allegations must rest on particularized facts, Plaintiffs use misdirection again, contending that only four paragraphs in the SAC are so based and baldly asserting "there is no such concept as an allegation made on 'implied' information and belief."  PB 10-11.  But <u>IPO</u>, which Plaintiffs quote at length (PB 73-74), rejects this very point.  There, Judge Scheindlin explained that allegations in a complaint are based upon either personal knowledge or information and belief, and that "no amount of investigation can transform information and belief—hearsay, essentially—into personal knowledge."  241 F. Supp.

2d at 356 n.91.[6]  The allegations identified in Annexes B and C therefore can only be based upon information and belief, and the SAC contains no particularized facts to support them.  See In re Theragenics, 105 F. Supp. 2d at 1356-57 (dismissing complaint; "Plaintiffs need to provide the Court with either the sources from which or whom they acquired this information, or the reasons why they believe the allegation is true").

Perhaps this is why Plaintiffs pick out 10 paragraphs from the SAC, pronounce that they "set forth ample facts to support their claims," and refer to those the defense challenges as secondary, merely "bolster[ing] and support[ing] the SAC's" allegations.  PB 73.  The latter are improper and should be struck, and the former wholly inadequate to state a fraud claim.

**B.    The Offering Documents Contained No Material Misstatements**

**1.    The Percentage of Owner-Occupied Properties**.  The Opposition does not contest that the "occupancy type" disclosures in the Offering Documents (1) were "[b]ased upon representations of the related borrowers at the time of origination," DB 7 and (2) accurately described what borrowers reported to Countrywide.  Id.  These points are dispositive.[7]

Ignoring them, the Opposition's defense of what the SAC calls "the most glaring example" of the fraud, SAC ¶ 67, rests on more ipse dixit and attempting to resurrect fraud by hindsight as an appropriate form of pleading.  First, recognizing that they must allege that statements were false "when made," the Opposition cites—solely—to an allegation that makes

---

[6]    See also Catton v. Def. Tech. Sys., Inc., No. 05 Civ. 6954 (SAS), 2006 WL 27470, at *8 (S.D.N.Y. Jan. 3, 2006) (allegations "not based on plaintiffs' own actions [] must thus be presumed to be based on information and belief"); In re Theragenics Corp. Sec. Litig., 105 F. Supp. 2d 1342, 1351 (N.D. Ga. 2000) (collecting cases).

[7]    Citing South Cherry Street, LLC v. Hennessey Group LLC, 573 F.3d 98, 109 (2d Cir. 2009) (PB 17), Plaintiffs assert that even if Defendants accurately described the information borrowers reported to Countrywide, their conduct would still be actionable if they knew or were "reckless in not knowing" that borrowers were lying. (PB 18 n.11).  But as Hennessee noted, there are "limits to the scope of liability for failure adequately to monitor the allegedly fraudulent behavior of others."  Id. at 110 (quotations omitted).  Where, as here, Defendants do not owe any fiduciary duties to Plaintiffs (who were MBS investors), Plaintiffs can only satisfy this Circuit's scienter standards by demonstrating the "non-fiduciary" acted with a level of recklessness that "approximate[d] an actual intent to aid in the fraud being perpetrated[.]"  Id. (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120-21 (2d Cir. 1982)).

this assertion, PB 12 (citing SAC ¶ 76), but no facts are alleged to support that conclusion.  See

Inst. for Dev. of Earth Awareness v. People for Ethical Treatment of Animals, No. 08 Civ. 6195

(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (legal conclusions unsupported by

factual allegations are "not entitled to the Court's assumption of truth").  Indeed, nowhere in the

SAC do Plaintiffs identify a single loan in the Trusts whose borrower any Defendant knew had

lied about their property's occupancy status.

        Second, the balance of the Opposition's defense rests on the assertion that in May 2007—

seven months after Plaintiffs' last MBS purchases—Countrywide learned that approximately

15% of the loans in the Trusts appeared to have been investment properties as opposed to owner-

occupied, and that borrowers had falsely stated otherwise on their applications.  SAC ¶¶ 73-79.

Plaintiffs then draw the conclusion that if Countrywide "knew in May 2007 . . . it is a fair

inference that Countrywide also knew these facts in March and September 2006."  PB 13.[8]  But

this Circuit rejected fraud by hindsight over 30 years ago.  See Denny v. Barber, 576 F.2d 465,

470 (2d Cir. 1978) (Friendly, J.).  With considerable chutzpah, Plaintiffs argue (PB 13-15) that

hindsight pleading was resurrected in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308,

322-23 (2007).  To the contrary, Tellabs quoted Denny with approval, 551 U.S. at 320, and fraud

by hindsight pleading remains as Judge Friendly described it:  unacceptable.[9]

---

[8]        Even though Plaintiffs concede that this allegation is built upon then-as-now inferences (PB 14
("Countrywide never explicitly said in these conversations 'we knew all this when you bought your securities'"),
they nonetheless contend that they made "particularized allegations" that Countrywide knew that its representations
in the Offering Documents about owner occupancy type were false at the time they were made.  But the "facts" cited
to support these allegations are just conclusions bereft of facts.  PB 14 (citing SAC ¶¶ 73 ("has since admitted"), 76
("knew…were false…because they are sophisticated loan originators"), 176 ("knew these truths at time loans
originated")).  Such allegations are insufficient under the PSLRA and Rule 9(b) no matter how many times they are
repeated.  See Feasby v. Industri-Matematic Int'l Corp., No. 99 Civ. 8761 (HB), 2000 WL 977673, at *7 (S.D.N.Y.
July 17, 2000) (rejecting argument that "the underlying adverse conditions must have been obvious to the
defendants" as "speculation" and "intuition" insufficient under Rule 9(b) and PSLRA).

[9]        See, e.g., In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 274 (S.D.N.Y. 2009) (allegation
that defendant "admitted two years after the acquisition that the transition did not run smoothly and had resulted in
missed sales" was insufficient because "scienter may not be established by hindsight"); Fort Worth Employers' Ret.

The Opposition closes (PB 15-18) with several ineffective swipes, but does not cite anything showing Defendants had foreknowledge that borrowers lied about occupancy status.

## 2. **Countrywide's Adherence to Its Underwriting Guidelines**. Again,

what the Opposition ignores is more telling than what it says. Plaintiffs offer no response to the following: that (1) the Offering Documents accurately detailed the metrics about the specific borrowers and loans held by each Trust, including FICO scores, loan-to-value amounts, principal balances, and interest rates, so that notwithstanding any criticism about underwriting standards, Plaintiffs—sophisticated hedge funds—knew precisely what the standards <u>as actually applied</u> to the mortgages deposited in the Trusts produced (DB 10); (2) the underlying loans were originated under "flexible" guidelines and that the Offering Documents made clear that "exceptions" to them would be "significant" (DB 11-12), so that the Trusts' loans "WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS" (DB 12); and (3) Plaintiffs failed to identify a single mortgage loan deposited in either Trust that would not have qualified under what Plaintiffs contend Countrywide's disclosed guidelines were, or that any alleged deviation from the disclosed guidelines made a material difference in the composition of the loans held by either Trust. DB 11-2. The failure to address any one of these points is fatal to Plaintiffs' allegations.

In addition, the disclosures about underwriting standards here are substantially identical to those just adjudged in <u>Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset</u>

---

<u>Fund v. Biovail Corp.</u>, 615 F. Supp. 2d 218, 226 (S.D.N.Y. 2009) (rejecting fraud by hindsight under <u>Tellabs</u>); <u>Panther Partners, Inc. v. Ikanos Commc'ns, Inc.</u>, 538 F. Supp. 2d 662, 669 (S.D.N.Y. 2008) (dismissing allegations that have "been craftily drafted to imply that what only became clear due to subsequent events was somehow known to [defendant] far earlier in time, well before the confirming event occurred or other evidence came to light"); <u>City of Sterling Heights Police & Fire Ret. Sys. v. Vodafone Group Pub. Ltd.</u>, --- F. Supp. 2d ----, No. 07 Civ. 9921 (PKC), 2009 WL 1456846, at *4 (S.D.N.Y. May 20, 2009) (Castel, J.) ("The securities laws do not provide a cause of action premised upon a hindsight review of faulty predictions as to business success."); <u>see also</u> <u>Graham v. Barriger</u>, No. 08 Civ. 9357 (PKC), 2009 WL 3852461, at *10 (S.D.N.Y. Nov. 17, 2009) (Castel, J.) (securities laws do not require "clairvoyance") (citations omitted).

Acceptance Corp., --- F. Supp. 2d ----, CA No. 08-10446-RGS, 2009 WL 3149775 (D. Mass. Sept. 30, 2009). In Nomura, sophisticated investors purchased MBS through offering documents materially identical to those here. The Nomura offering documents disclosed that while the underwriting guidelines applied were "primarily intended to evaluate the prospective borrower's credit standing and ability to repay the loan," and were "applied in a standard procedure that is intended to comply with federal and state laws and regulations," id. at *4, they warned with "deathless repetition" that the loans were underwritten to "non-conforming underwriting standards, which may result in losses or shortfalls," and cautioned further that "investors should note that changes in the values of the Mortgaged Properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience" of the loans in the pool as compared to loans originated in a more traditional manner. Id. at *5 n.6. Finally, the Nomura plaintiffs argued that the defendants "were hell bent on originating as many loans as possible with an eye to short-term profit without any regard to the ability of the borrowers to repay." Id. at *5. Thus, the facts and allegations at issue in Nomura are essentially identical to those alleged here.

Given the disclosures in the offering documents, Nomura held that "Plaintiffs' argument that they were unaware of the originator's 'soft' underwriting practices begs credulity" and found that the offering materials "abound[ ] with warnings of the potential perils." Id. at *6. Accordingly, the court dismissed the complaint with prejudice. Id. at *9. The same result should obtain here. Indeed, even more so here: the Nomura plaintiffs only alleged claims under the Securities Act of 1933 that did not sound in fraud, so their complaint did not have to allege reliance or comply with Rule 9(b) or the PSLRA.

Rather than address what the Offering Documents say, the Opposition attempts to cull out alleged underwriting deficiencies. PB 19-26. Not once, however, does the SAC or the

Opposition identify a single loan held by either Trust to which any of these alleged deficiencies applied. This is no minor failure.[10] Defendants heavily stressed this critical point in their opening papers (DB 9-13), and Plaintiffs offer no response whatsoever. In mortgage backed securities cases, allegations that fail to "tie the alleged conduct to the loans at issue in th[e] litigation" are inadequate as a matter of law. Nomura, 2009 WL 3149775 at *5 n.6 & *6. Indeed, to "permit a plaintiff, on such a skimpy foundation, to drag a defendant past the pleading threshold would be to invite litigation by hunch and to open [defendants] to the most unrestrained of fishing expeditions." Id. at 6 (quotation omitted). Instead of linking their charges to the securities they bought or the loans that underlie the Trusts in which they invested, Plaintiffs' allegations are lifted—improperly—from other proceedings (involving other securities covering other time periods) or are based on gross generalities they cannot—and in any event do not—demonstrate have any relevance to the loans at issue here. Asserting that allegations made elsewhere apply here is not simply implausible, or improbable, it is statistically untenable: Plaintiffs do not deny that the two Trusts constituted just 0.16% of CFC entities' 2006 production. See United Guaranty Mortg. Indem. v. Countrywide Fin. Corp., --- F. Supp. 2d ----, No. CV-09-1888-MRP, 2009 WL 3199844, at *17-*18 (C.D. Cal. Oct. 5, 2009) ("extolling's particulars go to Countrywide's general operating procedures—not to the class of loans ('subprime') in issue"; dismissing complaint).[11]

Plaintiffs' specific criticisms, untethered to any loan held by either Trust, nearly verbatim track those rejected by Nomura and merit limited further discussion. While contending that

---

[10]    See note 16 infra.

[11]    Cf. Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004) ("[I]t is wholly unclear why data relating to four facilities can be deemed representative of [defendant's] 115 other facilities, or material to the company's overall financial condition.").

Defendants ignored borrowers' ability to pay, PB 19-20, Plaintiffs offer not one word in response to the explicit disclosure they received of the borrowers' FICO scores (prepared not by Countrywide, but by a third party), which rate the borrower's ability to pay.  DB 12-3.[12]  Unable to proffer required particularized facts, Plaintiffs label Countrywide "a fraudulent organization" (PB 22) and argue that because of compensation policies and an "Exception Processing System," the Company had no individualized underwriting standards.  PB 20-23.  But criticizing a compensation policy is a legally inadequate basis for alleging scienter (DB 20 & n.22), not a factual allegation that standards were abandoned, and as Defendants have already explained (and Plaintiffs ignored), the Exception Processing System did not apply to the loans here.[13]

Moreover, Plaintiffs' allegations are not plausible:  underwriting was done on a "case by case basis" after considering "compensating factors," as shown by the uncontested fact that the FICO scores for loans in the Trusts originated under the Stated Income program were higher than the scores for loans originated under the Full Documentation program.  DB 13 n.20.  Since FICO scores are "widely used by lenders to evaluate [a borrower's] ability to repay a debt,"[14] Countrywide's origination of low documentation loans to borrowers with higher FICO scores is entirely consistent both with the borrower's ability to repay being a "primary" factor in

---

[12]     Instead, Plaintiffs quote from a complaint filed by a former Countrywide employee against the Company.  See SAC ¶ 122 (quoting complaint in Zachary v. Countrywide Fin. Corp., No. 4:08-CV-00214 (S.D. Tex. filed Jan. 17, 2008)); PB 19-20.  But even Plaintiffs cannot deny that lifting allegations from other proceedings is, as a matter of law, improper.  See Point I.A.  In any event, the assertion that a single employee witnessed a practice at one Texas office and complained to "regional management" fails to show that the supposed application fraud was widespread or affected the Trusts.  Cf. Chubb, 394 F.3d at 148-49 (discounting allegations regarding entire company made by employees that worked in branch offices).

[13]     The Offering Documents disclosed—and Plaintiffs concede—that loans in the Trusts would be underwritten by a specialized group of underwriters focused on credit blemished second lien loans and that a "significant number of the mortgage loans will have been originated based on an underwriting exception" to the already flexible underwriting standards for credit blemished borrowers.  DB 5, 11.

[14]     Amy Hoak, FICO Score Forgives Mishaps, Wall St. J. (Aug. 23, 2009); see also New York State Banking Web Site, available at http://www.banking.state.ny.us/brcw.htm ("If you have a high FICO score, a lender will generally see it as proof of your ability to repay a loan.").

Countrywide's underwriting analysis and with the point that compensating circumstances were employed on a case by case basis.[15]

       **3.**      **The Processing of Supposedly Fraudulent Applications**.  Plaintiffs' challenge to the verification of borrowers' employment and the reasonableness of income levels included in applications for Stated Income loans (PB 26) completely ignores the disclosure that a "borrower's income as stated on the application is not independently verified" for such loans. SPS-1 PS at S-34; SPS-2 at S-34.  The risks associated with this approach are obvious and, having made this disclosure, Countrywide was not required to say more.  DB 13-4; Zerman v. Ball, 735 F.2d 15, 21 (2d Cir. 1984) ("It is not a violation of any securities law to fail to disclose a result that is obvious even to a person with only an elementary understanding of the stock market.").  Further, as noted, Countrywide obtained FICO scores (generated by an independent third party) for each borrower—about which Plaintiffs say nothing.

      Plaintiffs also fail to present sufficiently particularized supporting allegations.  The allegations in this section of the SAC (¶¶ 116-22) rest solely on unsupported "information and belief" or legal conclusions.  DB 14 & Annex C.  In an effort to shore this up, Plaintiffs resort to truncated quotes from e-mail about loan-file documentation provided to HSBC (DB 13-14) that (as shown below) do not address documentation provided by borrowers and do not even mention the Stated Income program—on which Plaintiffs' claim rests.

---

[15]    Similarly, Plaintiffs' (1) challenge to appraisals (PB 23) is based on a single, wholly conclusory, allegation in the SAC (¶ 90) containing no facts, no source, no date, and not one example of an improper appraisal; (2) assertion that no quality control processes were used is more of the same—resting wholly on conclusory allegations or assertions in other proceedings that have no relationship to the MBS here, see PB 23-24 (citing SAC ¶¶ 48-55, 76, 97-98); and (3) charge that underwriting standards were not "proper and customary," PB 24-26, is also another rehash of the same chorus.  Plaintiffs' failure to link any of these purported "facts" to any of the loans in either Trust also make them all too generalized to state a claim.  Nomura at *6 (dismissing complaint that presented "nothing that suggests the [allegations] had any bearing on the two Trusts at issue").  Without plausible facts that link these general allegations about Countrywide's alleged practices to the loans actually originated here and if so, to a material degree, there can be no basis, other than Plaintiffs' own speculation, to support fraud claims.

       **4.**    **The Alleged "Adverse Effect" on Investors' Interests**.  Plaintiffs

challenge the general statement that the mortgage loans would not be selected "in a manner that

would adversely affect [their] interests."  According to Plaintiffs, they were "unsuspecting

investors" that were duped into purchasing MBS backed by loans made to borrowers who could

not afford to repay them.  PB 28-29.  But the Offering Documents disclosed the borrowers'

credit characteristics, and these hedge funds' alleged failure to understand the wholly self-

evident risk that credit-blemished borrowers could default on second lien loans if the economy

worsened does not state a claim for fraud.  DB 16-18.

      In lieu of facts, Plaintiffs rely on statements allegedly made by two Countrywide

employees.  PB 30.  First, Plaintiffs label as a "confession" Ms. Deliban's purported statement

that Countrywide originally sought to sell the mortgages in the securitizations as whole loans.

As the defense explained—and Plaintiffs ignore—even accepting the truth of this allegation,

there was no obligation to disclose that the loans had previously been offered for sale in another

form.  DB 17-18, 22 & nn. 27-28.  And even according to Plaintiffs, there were bids for the

mortgages as whole loans, PB 30; Ms. Deliban is simply alleged to have said that they were

perceived to be more valuable when packaged in a securitization.[16]

      Second, Plaintiffs point to a "memorandum" in which Mr. Petsoff allegedly concluded

that Countrywide had misled them.  PB 30.  As the defense explained in their opening brief (DB

21), "[t]here is no more detail than that—not *when* [the memorandum] was written, to *whom* it

was sent, or most critically *how* 'Countrywide misled the Plaintiffs.'" (emphasis in original).  We

---

[16]    Plaintiffs also charge that, based on monthly reports, an unquantified "certain" number of the loans were "seasoned," so that Countrywide knew that some loans were already defaulting when they were deposited in the Trusts.  Plaintiffs admit that they received those reports, too.  PB 29; DB 18 & n.30.  That nevertheless the SAC can point to no specifics about the supposed defects in the loans starkly underscores the utter failure of the SAC to meet Rule 9(b) and PSLRA standards.  Plaintiffs invested in 2006; they had almost two years' worth of monthly reports before filing their first pleading in this case.  If any characteristics of the loans were materially misdescribed in the Offering Documents, Plaintiffs had every opportunity to allege them with the required detail.

repeat this only because the Opposition fails even to acknowledge these basic Rule 9(b) failings, see DB 21 n.34, much less to rebut them.

       **5.**     **The Servicing of Mortgage Loans**.  Defendants demonstrated (DB 19) the fatal inadequacies in the SAC's servicing allegations (¶¶ 133-35) to which the Opposition offers no response.

       **C.**     **<u>No Particularized Facts Giving Rise to a Strong Inference of Scienter</u>**

       Having failed to demonstrate that any Defendant made an actionable misstatement in connection with Plaintiffs' purchase of MBS from either Trust, by definition Plaintiffs cannot show the necessary scienter to establish fraud in connection with a misstatement.

       *Motive and Opportunity.*  Plaintiffs do not defend the SAC's effort to establish scienter by resting on Countrywide's compensation policies or profit motive.  DB 20 & n.32.[17]  Unable to allege any legally recognized motive to defraud, Plaintiffs can only establish scienter by presenting strong circumstantial evidence of conscious misbehavior or recklessness, and therefore "the strength of the[ir] circumstantial allegations must be correspondingly greater[.]" <u>ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.</u>, 553 F.3d 187, 198-99 (2d Cir. 2009).  Plaintiffs do not meet this standard.

       *Allegations Unrelated to Trusts.*  Plaintiffs attempt to establish recklessness by pointing to several e-mails that the SAC does not—and in some cases could not—connect with the alleged misrepresentations in the Offering Documents.[18]  In this vein, Plaintiffs try to establish that Countrywide knew that the <u>fixed-rate loans</u> in the Trusts would suffer high levels of default

---

[17]     The closest they come is the half-hearted suggestion that Ms. Deliban's "confession" that it was more profitable to sell the loans in a securitization establishes scienter.  PB 39.  This is nothing more than another way of saying that Countrywide had a profit motive, an inadequate basis for showing scienter.

[18]     <u>See, e.g.</u>, ¶¶ 77 (inflated <u>incomes</u> for reduced-documentation loans); 77, 151-53, 155, 170-72 (concerns about pay-option <u>adjustable rate</u> mortgages); 150 (documentation provided to HSBC); 158-61 (matching strategy).

by pointing to concerns about potential "payment shock" on <u>adjustable rate mortgages</u> if, in the future, the economy contracted and interest rates rose, even though no loans held by either Trust had adjustable rates and only such adjustable rate mortgages could suffer payment shock from rising interest rates.  DB 8-9.  For the same reasons, arguing that Countrywide knew that borrowers lied about <u>owner occupancy</u> in their loan applications because of concerns about borrowers misstating their <u>incomes</u> to receive stated income loans is another apples to oranges comparison.[19]

Plaintiffs concede that they cannot plead any facts that connect these e-mails to the loans in the Trusts, and therefore fall back on conclusory allegations and speculation.  <u>See, e.g.</u>, PB 16 ("If the Company's officers knew that a significant percentage of borrowers were lying about their incomes, it certainly had grounds to suspect that those borrowers were lying about the nature of their property ownership [as] well."); 37 ("lax underwriting was a widespread problem").  But a strong inference of scienter is not created where—in hindsight—Plaintiffs speculate that a company "certainly had grounds to suspect" a problem.[20]  Instead, to satisfy their burden of presenting "correspondingly greater" circumstantial evidence of recklessness, Plaintiffs must plead particularized facts establishing "at the least, an <u>extreme</u> departure from the standards of ordinary care" or "an <u>egregious</u> refusal to see the obvious, or to investigate the

---

[19]     Similarly, Plaintiffs inexplicably place heavy reliance on e-mails predating by more than a year their MBS purchases here (PB 33-34, citing 2005 McMurray e-mails) that do not concern the loans in either Trust, but Countrywide's general strategies.

[20]     <u>See, e.g.</u>, <u>In re Nokia Oyj (Nokia Corp.) Sec. Litig.</u>, 423 F. Supp. 2d 364, 406 (S.D.N.Y. 2006) (rejecting "generalized allegations" of scienter that individual defendants "knew, or should have known, that they were misrepresenting material facts, based upon their senior positions in the company, and by holding themselves out as knowledgeable about [defendant's] products in presentations"); <u>Kinsey v. Cendant</u>, No. 04 Civ. 0582, 2005 WL 1907678, at *5 (S.D.N.Y. Aug. 10, 2005) (noting that "conclusory allegations that a corporate officer had 'access' to information that contradicted the alleged misstatements are insufficient to raise a strong inference of recklessness").

doubtful." In re NovaGold Res. Inc. Sec. Litig., 629 F. Supp. 2d 272, 297-98 (S.D.N.Y. 2009) (emphasis added). Plaintiffs' unsupported speculation falls well short of this standard.

Plaintiffs also regurgitate a variety of wholesale attacks against Countrywide's corporate culture, and contend that these assertions constitute "additional factual allegations" that support a strong inference of scienter. PB 37-39. Again, almost all of these allegations are unconnected to the challenged offerings.[21] For example, Plaintiffs argue that Internet postings about Countrywide's customer service somehow demonstrate that the company (and its subsidiaries) intended to defraud investors. PB 38-39. Not surprisingly, Plaintiffs do not cite any case for the proposition that a company's allegedly "unhelpful, unprofessional, and harassing bureaucracy" can create a strong inference that the company knowingly (or even recklessly) engaged in investor fraud.

Instead, Plaintiffs repeatedly assert that Countrywide "[a]t the very least, . . . failed to check information that it had a duty to monitor and investigate." PB 35. Tellingly, Plaintiffs assert that "Countrywide clearly had a duty to monitor and investigate borrower fraud," PB 17, but again are completely silent on what body of law creates this duty. Plaintiffs' theory ignores that they were only arms-length investors in MBS and that Countrywide therefore did not owe them any general fiduciary duty to monitor or investigate borrowers' activities. See Hennessee, 573 F.3d at 114-15 (finding no strong inference of scienter where plaintiffs alleged only that defendants had a contractual duty to conduct due diligence and there was "no claim that [defendants] owed [plaintiff] a fiduciary duty").[22]

---

[21]    See, e.g., ¶¶ 49 (inflated incomes for reduced-documentation loans); 51, 113, 190 (loans approved by Exception Processing System and Structured Loan Desk); 91 (predatory lending); 122 (flipping of applications); 135 (Internet postings about "neglectful" servicing practices); 188 (efforts to increase origination volume).

[22]    Indeed, the cases cited by Plaintiffs that find scienter based on a duty to investigate or the presence of "red flags" (PB 32) involved fiduciary relationships and/or explicitly recognized the limits of such duties to investigate in the non-fiduciary context as is the case here. See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir. 1978)

      *E-mails about Subprime Seconds.*  Plaintiffs also attempt to establish scienter by mischaracterizing e-mails about subprime, second-lien loans, which "constituted the vast majority of mortgage loans backing Plaintiffs' Securities."  PB 16-17.  In the primary e-mail, dated April 13, 2006,[23] which is repeatedly misconstrued in the SAC and throughout the Opposition (*e.g.*, ¶¶ 146, 148, and PB 2-3, 15, 19, 27-28, 33, 36, 54, 56), Mr. Mozilo highlighted two concerns about these types of loans, which were either disclosed in the Offering Documents or irrelevant to the Trusts.  First, he referred to certain subprime second-lien <u>whole loans</u> that had been sold to HSBC with insufficient loan file documentation (*i.e.*, the required documents in the file were not in order), which (in combination with Countrywide's "extraordinarily juvenile" negotiations with HSBC) allowed HSBC to require Countrywide to buy them back, so that HSBC could "kick back to [Countrywide] all losses while [HSBC] maintained all the gains."  SAC ¶¶ 148, 150; <u>see</u> Hou Supp. Decl., Ex. A.  Plaintiffs offer this e-mail and others as proof that "Countrywide's senior management was [] aware that Countrywide loan officers were participating in submitting fraudulent applications through the Company's reduced-documentation application programs."  PB 27.  But that is plainly not what the e-mail says.  Mr. Mozilo's ire is directed at the "HSBC transaction," and specifically that the negotiations with

---

(upholding aiding and abetting verdict against broker under § 10(b) because "we believe at the very least that fiduciaries have acted with scienter when they have been reckless"), <u>overruled on other grounds by</u> <u>Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.</u>, 511 U.S. 164 (1994); <u>Novak v. Kasaks</u>, 216 F.3d 300, 309, 312 (2d Cir. 2000) (finding scienter adequately pled against corporate defendants in shareholder action but noting that there "are limits to the scope of liability for failure to adequately monitor the allegedly fraudulent behavior of others"); <u>In re Comverse Tech., Inc. Sec. Litig.</u>, 543 F. Supp. 2d 134 (E.D.N.Y. 2008) (finding sufficient red flags for corporate director in shareholder action that also alleged breach of fiduciary duty).  The other cases Plaintiffs cite for this proposition did not find scienter under this (or any) theory.  <u>See</u> <u>Hennessee</u>, 573 F.3d at 110-11, 114 (distinguishing <u>Rolf</u> and <u>Novak</u> as cases involving fiduciary duties between parties); <u>Chill v. Gen. Elec. Co.</u>, 101 F.3d 263, 271 (2d Cir. 1996).

[23]      The e-mail is attached as Exhibit A to the Supplemental Declaration of Victor L. Hou (hereinafter "Hou Supp. Decl.").  The court may rely upon this document in considering the motion to dismiss since it is an integral part of the SAC and portions of it are quoted.  <u>See</u> <u>San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.</u>, 75 F.3d 801, 808-09 (2d Cir. 1996) (permissible to consider full text of documents partially quoted in complaint).

HSBC were "very flawed" because HSBC was able to foist "all losses" onto Countrywide and keep "all the gains," and the whole loans sold to HSBC "were originated through our channels with serious disregard for process, compliance with guidelines and irresponsible behavior relative to meeting timelines," which resulted in delivering loans to HSBC with "deficient documentation," compounded by failures to "respond timely in correcting these deficiencies." Moreover, far from establishing scienter, Mr. Mozilo's comments demonstrate the exact opposite, directing the company "to take all steps necessary to assure that our origination operation 'follows guidelines' for every product we originate." Hou Supp. Decl., Ex. A. Thus, Plaintiffs' statements that Defendants' arguments about the HSBC e-mail are "implausibl[e]" and "self-serving" are, to use Plaintiffs' formulation, "belied by the e-mail itself." PB 27-28.

Second, Mr. Mozilo referred to risks relating to subprime second-lien loans because they were subordinated to the first-lien loans, which were also subprime, and because they were provided to borrowers with low FICO scores. SAC ¶ 149; Hou Supp. Decl., Ex. A. But the Offering Documents clearly disclosed all of these facts and their accompanying risks. See SPS1 Pro. Supp. at S-2 ("The mortgage pool will consist of credit-blemished, closed-end, fixed rate loans that are secured by second liens"); S-14 ("JUNIOR LIEN PRIORITY COULD RESULT IN PAYMENT DELAY OR LOSS"); S-14 ("THE CERTIFICATES ARE BACKED BY MORTGAGE LOANS THAT WILL EXPERIENCE HIGHER RATES OF DELIQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN TO MORE TRADITIONAL STANDARDS"); A-6 (listing number, percentage and aggregate principal balance of loans by range of FICO score). Again, these disclosures of the concerns Mr. Mozilo identified negate any inference of scienter. See Kramer v. Time Warner Inc., 937 F.2d 767, 778 (2d Cir. 1991) (when facts are disclosed "there is no hint of any intent to deceive").

16

*Fraud by Hindsight.*  Plaintiffs finally point to many allegations that (even accepting

them as true) are alleged to have occurred well after Plaintiffs had made their investments.[24]  As

explained above, fraud by hindsight allegations remain inadequate as a matter of law.

### D.    Plaintiffs Improperly Invent Torts Out of a Contract

The SAC's allegations are predominantly based on alleged loan-level misrepresentations

governed by the Offering Documents' representations and warranties, specifically Section 2.03

of each PSA.  This case is therefore on all fours with Lone Star Fund V (U.S.), L.P. v. Barclays

Bank PLC, No. 3:08-CV-0261-L, 2008 WL 4449508, at *10 (N.D. Tex. Sept. 30, 2008), which

held that the structure of MBS offering documents (nearly identical to those here) established

that defendants "only represented that the loans are—or will be made—compliant" with the

representations and warranties contained in the accompanying PSA, as the defense previously

explained.  DB 23-24.  Beyond calling Lone Star an "outlier," in a footnote, the Opposition just

ignores it.  PB 44 n.23.  And for good reason:  under Lone Star and this Circuit's precedent,

Plaintiffs can only state a fraud claim if they plead facts that demonstrate Defendants never

intended to make the loans compliant with the PSA's representations and warranties, see Mills v.

Polar Molecular Corp., 12 F.3d 1170, 1176 (2d Cir. 1993), and they plead no such facts.

Having failed to allege that Countrywide ever refused to repurchase or substitute any

noncompliant loan in the Trusts (let alone that Countrywide knew it would not do so at the time

of the Offerings), Plaintiffs assert that they were not parties to—and therefore should not be

---

[24]      See, e.g., ¶¶ 73-75, 126, 174, 176-78 (May 2007 conference call and separate conversations); 94
(December 2007 memo); 156 (percentages of conforming loans originated by Countrywide in 2007); 160
(November 2006 e-mail); 161 (February 2007 e-ail); 164 (December 2006 memorandum); 194-96, 199, 201-05
(stock sales after November 2006).

bound by—the PSAs.[25]  PB 41.  Plaintiffs offer no answer to <u>Lone Star</u>'s rejection of this precise argument.  2008 WL 4449508, at *11 (finding repurchase or substitution remedy was part and parcel of the warranties and representations in the offering documents and holding "Plaintiffs, as buyers of Securities, are bound by the statements in the offering documents").  Here, as in <u>Lone Star</u>, Plaintiffs are sophisticated investors who understood the nature of the securities they bought, and therefore accepted the limited scope of the representations in the Offering Documents; they cannot pick and choose among the representations and warranties they accepted.[26]

Plaintiffs also argue the PSAs' provisions, as construed, violate anti-waiver statutes.  This too was directly addressed and rejected by <u>Lone Star</u>.  2008 WL 4449508, at *11 (defendants "have not offended the anti-waiver statutes of federal or state law because they have not made any misrepresentation").  As recognized by <u>Lone Star</u>, 2008 WL 4449508, at *9-*10, Plaintiffs have not waived any cause of action for fraud; they can state such a claim if they show that the representation actually made—again, that the loans were or would be made compliant with the representations and warranties in the PSAs—was false when made.

Finally, Plaintiffs' assertion that the contractual provisions in the Offering Documents would be "illusory" if Countrywide refused to cure or repurchase also fails.  Plaintiffs do not deny they are third party beneficiaries of the PSAs.  As investors in the Trusts, their claims are

---

[25]     Plaintiffs also assert that <u>some</u> of their claims are collateral to the PSAs.  PB 41-42.  But this does not mean that the representations that <u>were</u> included in the PSAs, as set forth in Annex D, should not be covered by the repurchase or substitution provision.

[26]     <u>First Bank of Americas v. Motor Car Funding, Inc.</u>, 257 A.D. 2d 287 (1st Dep't 1999), is inapposite because the representations there were materially different from those here and in <u>Lone Star</u>.  In <u>First Bank</u>, the representations were simply that the individual loans <u>had</u> certain characteristics that they did not have.  Here, but not in <u>First Bank</u>, there was a "promise of future performance"—that the loans would be made compliant—which the <u>First Bank</u> court itself highlighted as sounding in contract rather than fraud.  257 A.D.2d at 292.  <u>See</u> <u>In re Enron Corp.</u>, No. 04-1495, 2005 WL 356985, at *11 n.44 (S.D.N.Y. Feb. 15, 2005) (distinguishing <u>First Bank</u> on these grounds and dismissing fraudulent inducement claim).

18

necessarily derivative.  See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry, 494 U.S.

558, 567 (1990) ("In most cases, a trustee has the exclusive authority to sue third parties who

injure the beneficiaries' interest in the trust.")  And as sophisticated investors, Plaintiffs

purchased these securities pursuant to the representations and warranties set forth in the Offering

Documents, which they claim to have read and relied upon.[27]  There is no unfairness in holding

Plaintiffs to the terms of the bargain they struck.  Lone Star, 2008 WL 4449508, at *10.[28]

### E.      The SAC Fails to Allege Loss Causation

The SAC fails adequately to allege loss causation because it does not plead facts to show

that the alleged misstatements "proximately caused" Plaintiffs' loss, Graham v. Barriger, 2009

WL 3852461, at *12, nor does it plead facts that would allow a factfinder to disaggregate those

losses caused by the alleged misstatements from those attributable to "a marketwide

phenomenon causing comparable losses to other investors."  See Lattanzio v. Deloitte & Touche

LLP, 476 F.3d 147, 158 (2d Cir. 2007); First Nationwide Bank v. Gelt Funding Corp., 27 F.3d

763, 772 (2d Cir. 1994).

Plaintiffs skirt these failures by citing another decision involving Countrywide (dealing

with different securities, based on other allegations and decided under the law of another

Circuit), and by claiming that they need only allege—in a conclusory fashion—that Defendants'

---

[27]       Plaintiffs also speculate that systemic fraud or collective action barriers prevented their ability to exercise the PSA provisions.  PB 43.  This speculation is unfounded.  Countrywide was willing and able to fulfill its contractual obligations to repurchase or substitute loans as evidenced by filings the SAC cites.  For example, Countrywide disclosed its liability for repurchased mortgage loans with identified defects or indemnification requests from investors or insurers totaling $169.8 million at December 31, 2005 and $139.9 million at December 31, 2004.  2005 10-K at 93.  In addition, the April 13, 2006 e-mail (Hou Supp. Decl., Ex. A) about HSBC repurchases demonstrates that Countrywide made good on its repurchase obligations elsewhere.

[28]       Plaintiffs also assert that their fraud claims should stand because the PSAs distinguish between liability based on breaches of representations and warranties and liability based on willful misfeasance or bad faith.  See PB 42.  But this argument assumes the very fact that Plaintiffs must prove—that Countrywide acted with willful misfeasance or bad faith and never intended to make good on its repurchase obligations.  Plaintiffs have never alleged that Countrywide refused to perform its contractual obligations to cure, repurchase or substitute.

conduct was the proximate cause of their injuries.  PB 45.  But in this Circuit a plaintiff must

"adequately ple[a]d facts which, if proven, would show that its loss was caused by the alleged

misstatements" as opposed to an intervening "marketwide phenomenon."  Lentell v. Merrill

Lynch & Co., 396 F.3d 161, 174 (2d Cir. 2005) ("conclusions of law or unwarranted deductions

of fact are not admitted" when considering loss causation on a motion to dismiss) (emphasis

added).  Plaintiffs make no attempt to meet this burden.  Accordingly, their claims should be

dismissed.  See Luminent Mortgage Capital, Inc. v. Merrill Lynch & Co., --- F. Supp. 2d ----,

No. 07-5423, 2009 WL 2590087, at *14-16 (E.D. Pa. Aug. 20, 2009) (loss causation not pled by

MBS investors despite argument market dislocation occurred "months after" plaintiffs "noticed

irregularities" with underlying loans).

## CONCLUSION

For the foregoing reasons, and those stated previously, the SAC should be dismissed.


Dated:  December 4, 2009

Respectfully Submitted,


O'MELVENY & MYERS LLP

By:  /s/ Jonathan Rosenberg
    Bradley J. Butwin (bbutwin@omm.com)
    Jonathan Rosenberg
    (jrosenberg@omm.com)
    William Sushon (wsushon@omm.com)
    Times Square Tower
    7 Times Square
    New York, NY  10036
    Tel:  (212) 326-2000
    Fax:  (212) 326-2061

*Attorneys for Defendants Bank of America
Corporation and BAC Home Loans Servicing,
LP*

CLEARY GOTTLIEB STEEN & HAMILTON
LLP

By:  /s/ Mitchell A. Lowenthal
    Mitchell A. Lowenthal
    (mlowenthal@cgsh.com)
    Meredith Kotler (mkotler@cgsh.com)
    Victor L. Hou (vhou@cgsh.com)
    One Liberty Plaza
    New York, NY 10006
    Tel:  (212) 225-2000
    Fax:  (212) 225-3999

*Attorneys for Defendants Countrywide Home
Loans, Inc., Countrywide Home Loans Servicing
LP, Countrywide Financial Corp., Countrywide
Securities Corp., and CWABS, Inc.*

20

IRELL & MANELLA LLP

By:  /s/ David Siegel
    David Siegel (*pro hac vice*)
    (dsiegel@irell.com)
    A. Matthew Ashley (*pro hac vice*)
    (mashley@irell.com)
    Shaunt T. Arevian (*pro hac vice*)
    (sarevian@irell.com)
    Holly Gershow (*pro hac vice*)
    (hgershow@irell.com)
    1800 Avenue of the Stars
    Suite 900
    Los Angeles, CA 90067
    Tel:  (310) 277-1010
    Fax:  (310) 203-7199

*Attorneys for Defendant Angelo Mozilo*

SPEARS & IMES LLP

By:  /s/ David Spears
    David Spears (dspears@spearsimes.com)
    51 Madison Avenue
    New York, NY 10010
    Tel:  (212) 213-6996
    Fax:  (212) 213-0849

*Attorneys for Defendant Angelo Mozilo*

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  /s/ Lori Lynn Phillips
    Lori Lynn Phillips (*pro hac vice*)
    (lphillips@orrick.com)
    701 5th Avenue, Suite 5700
    Seattle, WA 98104-7097
    Tel: (206)-839-4300
    Fax: (206)-839-4301

    Michael D. Torpey (mtorpey@orrick.com)
    Penelope A. Graboys
    (pgraboysblair@orrick.com)
    405 Howard Street
    San Francisco, CA 94105-2669
    Tel:  (415) 773-5700
    Fax:  (415) 773-5759

*Attorneys for Defendant David Sambol*