UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
FOOTBRIDGE LIMITED TRUST AND OHP
OPPORTUNITY LIMITED TRUST,

Plaintiffs,

-against-

COUNTRYWIDE HOME LOANS, INC.,
COUNTRYWIDE HOME LOANS
SERVICING LP, COUNTRYWIDE
SECURITIES CORP., CWABS, INC.,
CWABS ASSET-BACKED CERTIFICATES
TRUST 2006-SPS1, CWABS ASSET-
BACKED CERTIFICATES TRUST 2006-
SPS2, ANGELO R. MOZILO, DAVID
SAMBOL, BANK OF AMERICA CORP.
AND BAC HOME LOANS SERVICING, LP,

Defendants.
-----------------------------------------------------------x

09 Civ. 4050 (PKC)

MEMORANDUM AND ORDER

```
┌──────────────────────────────────────┐
│ USDS SDNY                             │
│ DOCUMENT                              │
│ ELECTRONICALLY FILED                  │
│ DOC #: _____                │
│ DATE FILED: 9/28/2010                 │
└──────────────────────────────────────┘
```

P. KEVIN CASTEL, District Judge:

       Plaintiffs Footbridge Limited Trust and OHP Opportunity Limited Trust

(the "Funds") assert claims for violations of section 10(b) of the Securities Exchange Act

of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R.

§ 240.10b-5, and a state-law claim for common-law fraud. The claims arise out of

plaintiffs' purchase of mortgage-backed securities ("MBS") from Countrywide through

two public offerings (the "Securitizations"). Defendants move to strike certain portions

of the Second Amended Complaint (the "SAC"). Defendants also move to dismiss the

SAC under Rules 9(b) and 12(b)(6), Fed. R. Civ. P. For the reasons stated below,

defendants' motion to strike is granted in part and denied in part and the motion to

dismiss (Docket No. 37) is granted.

BACKGROUND

I.      Factual History

                The facts below are taken from the SAC.  Non-conclusory factual

allegations are taken as true for purposes of this motion.  See Ashcroft v. Iqbal, 129

S.Ct. 1937, 1949-50 (2009).

        1.      The Parties

                Plaintiff Footbridge Limited Trust ("Footbridge") is a Bermuda Trust with

a principal place of business in Connecticut.  (SAC ¶ 9.)  Plaintiff OHP Opportunity

Limited Trust ("OHP") is a Bermuda Trust with a principal place of business in

Connecticut.  (Id. ¶ 10.)  Plaintiffs are investment funds managed by Old Hill Partners,

Inc. ("Old Hill"), a Delaware corporation whose principal place of business is not

alleged.  (Id. ¶ 11.)  Old Hill acts as an investment manager for Footbridge and OHP and

makes investment decisions on their behalf.  (Id.)

                Defendant Countrywide Financial Corporation ("CFC") is a Delaware

corporation with its principal place of business in California.  (Id. ¶ 12.)  "CFC, itself or

through its subsidiaries, writes, sells, and services single-family home mortgages, home

equity loans, commercial mortgages, and subprime mortgages.  It also buys and sells

mortgages, offers asset management and brokerage services, and provides insurance

products."  (Id.)

                Defendant Countrywide Home Loans, Inc. ("CHL") is a wholly-owned

subsidiary of CFC and is a New York corporation with its principal place of business in

California.  (Id. ¶ 13.)  "CHL is engaged primarily in the mortgage banking business, and

as part of that business, it originates, purchases, sells, and services mortgage loans."  (Id.)

Defendant Countrywide Home Loans Servicing LP ("CHLS") is a wholly-owned subsidiary of CFC and is a limited partnership organized under the laws of Texas with its principal place of business in Texas.  (Id. ¶ 14.)  "CHLS services mortgage loans that are originated by CHL."  (Id.)

Defendant Countrywide Securities Corporation ("CSC") is a wholly-owned subsidiary of CFC and is a California corporation with its principal place of business in California.  (Id. ¶ 15.)  "CSC trades securities and underwrites offerings of mortgage-backed securities."  (Id.)

Defendant CWABS, Inc. ("CWABS") is a Delaware corporation and a limited-purpose finance subsidiary of CFC with its principal place of business in California.  (Id. ¶ 16.)  CWABS was the Depositor for the SPS1 and SPS2 Securitizations.  (Id.)

Defendants CWABS Asset-Backed Certificates Trust 2006-SPS1 (the "SPS1 Trust") and CWABS Asset-Backed Certificates Trust 2006-SPS2 (the "SPS2 Trust) are common-law trusts formed by CWABS under the laws of New York.  (Id. ¶¶ 17-18.)  The SPS1 Trust and the SPS2 Trust were the Issuing Entities for the SPS1 and SPS2 Securitizations, respectively.  (Id.)  All claims against the SPS1 Trust and the SPS2 Trust were dismissed without prejudice pursuant to a stipulation and order of voluntary dismissal entered on November 12, 2009.  (Docket No. 60.)

Defendant Angelo R. Mozilo is Countrywide's co-founder.  (SAC ¶ 19.) Mozilo served as Chairman of CFC's Board of Directors from March 1999 until July 1, 2008.  (Id.; Decl. of David Spears, Ex. A, Form DEF 14A for CFC dated Apr. 28, 2006 ("CFC Apr. 2006 Form DEF"), at 8.)  Mozilo also served as CEO of CFC from February

1998 until July 1, 2008.  (SAC ¶ 19; CFC Apr. 2006 Form DEF at 8.)  He was also President of CFC from March 2000 through December 2003 and has been a member of CFC's Board since the time it was founded in 1969.  (SAC ¶ 19; CFC Apr. 2006 Form DEF at 8.)  Mozilo also served in "other executive roles" until the time he left Countrywide on July 1, 2008.  (SAC ¶ 19.)

Defendant David Sambol "joined Countrywide" in 1985 and served as CFC's President and COO from September 2006 until his retirement in 2008.  (Id. ¶ 20.) Sambol also served as Chairman, CEO, and a member of the Board of Directors of CHL beginning in 2007.  (Id.)  Sambol held "numerous management positions in Countrywide companies," including his position as President and COO of CHL and Executive Managing Director for Business Segment Operations from 2004 until 2006.  (Id.)

The SAC collectively refers to CFC, CHL, CHLS, CSC, CWABS, the SPS1 Trust, the SPS2 Trust, Mozilo, and Sabol as "Countrywide" or "the Company" or the "Countrywide Defendants."  I employ plaintiffs' chosen terminology here.

Defendant Bank of America Corporation ("BofA") is a Delaware corporation with its principal place of business in North Carolina.  (Id. ¶ 21.)  According to the SAC, CFC "merged into a wholly-owned [BofA] subsidiary on July 1, 2008."  (Id. ¶ 259.)  BofA "is in the final stages of fully combining its business with that of the Countrywide Defendants."  (Id. ¶ 21.)

Defendant BAC Home Loans Servicing, LP ("BAC HLS") is a subsidiary of BofA and is "the continuation of CHLS."  (Id. ¶ 22.)

2.   <u>The Securitizations</u>

In June and October 2006, plaintiffs purchased over $43 million in residential mortgage-backed securities (the "Securities") from Countrywide through two public offerings (the "Securitizations").  (<u>Id.</u> ¶¶ 1-2.)  The Securitizations included CWABS Asset-Backed Certificates, Series 2006-SPS1 (the "SPS1 Securitization"), which plaintiffs purchased on June 27, 2006, and the CWABS Asset-Backed Certificates, Series 2006-SPS2 (the "SPS2 Securitization"), which plaintiffs purchased on August 29, 2006, September 12, 2006, and October 3, 2006.  (<u>Id.</u> ¶¶ 2 n.1, 58-60.)  The SPS1 and SPS2 Securitizations were "structured through a similar set of agreements."  (<u>Id.</u> ¶ 58.) "The mortgage loans underlying the Securities (the "Mortgage Loans") consisted of "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties."  (<u>Id.</u> ¶ 2.)

The Securities were sold in "Classes."  (<u>Id.</u> ¶ 61.)  "The majority of the Certificates in each Securitization were contained in the 'A' Class."  (<u>Id.</u> ¶ 62.)  The remaining Certificates were issued in the M-1 through M-9 Classes and the B Class, each of which carried lower ratings.  (<u>Id.</u>)  Plaintiffs purchased Securities in the M-3, M-4, M-5, M-6, and M-7 Classes for the SPS1 Securitizations and M-4, M-5, and M-7 Classes for the SPS2 Securitizations.  (<u>Id.</u> ¶¶ 59-60.)

Countrywide entities "acted in several capacities on the Securitizations." (<u>Id.</u> ¶ 61.)  Countrywide issued Mortgage Loans to individuals in connection with the purchase or refinance of residential properties.  (<u>Id.</u>)  CHL sold, transferred, or otherwise conveyed title to the Mortgage Loans to CWABS, acting as depositer.  (<u>Id.</u>)  CWABS then sold, transferred, or otherwise conveyed title to the Mortgage Loans to Bank of New

York ("BoNY"), acting as Trustee, which held the loans in the SPS1 and SPS2 Trusts for the benefit of Certificateholders.  (Id.)  The SPS1 and SPS2 Trusts acted as the Issuing Entities and sold the Certificates to investors, including plaintiffs.  (Id.)

Three offering documents were distributed to investors with respect to each of the Securitizations.  (Id. ¶ 63.)  The Pooling and Servicing Agreements (the "PSAs") were entered into by CWABS, CHL, CHLS, and BoNY.  (Id. ¶ 63.)  A Preliminary Term Sheet provided "summary information about the Securitizations, including a description of the parties, the Classes of Certificates and their credit ratings, the Certificates' credit enhancement provisions, and the characteristics of the pool of Mortgage Loans."  (Id. ¶ 64.)  The Prospectus and Prospectus Supplement "provided further detail about the Securitizations, including a detailed description of the Mortgage Loans, the Certificates, and the procedures for servicing the loans."  (Id.)  The Prospectuses were filed with the SEC and their Registration Statements were signed by three Countrywide executives, none of whom are named as defendants.  (See id.)

The SAC alleges that the defendants made five categories of material misrepresentations and omissions in the offering documents and other various public statements to plaintiffs.  First, plaintiffs allege that the offering documents contained misstatements regarding the percentage of loans that were related to owner-occupied properties included in the Securitizations.  Second, plaintiffs allege that defendants made material misrepresentations about the nature and quality of the underwriting guidelines employed by Countrywide in the origination of the Mortgage Loans.  Third, plaintiffs allege that defendants made material misrepresentations and omitted material facts regarding the reduced application programs under which some Countrywide borrowers

received loans.  Fourth, the SAC alleges that the offering documents misrepresented that the Mortgage Loans would not be selected "in a manner that would adversely affect the interests of Certificateholders."  (Id. ¶ 123.)  Finally, plaintiffs allege that defendants made misrepresentations regarding Countrywide's servicing of the Loans.

Plaintiffs allege that a "corrupt culture" at Countrywide, combined with defendants' "lust for high yields and high profits" motivated defendants to make fraudulent misrepresentations to plaintiffs in order to induce them to invest in the Securities.  (See, e.g., id. ¶¶ 40, 48.)  Plaintiffs assert that they relied upon the misrepresentations and that they would not have purchased the Securities had they known the truth.  (See id. ¶ 36.)

The Securities began to experience "high rates of delinquency and default."  (See id. ¶ 223.)  This caused a "drastic and rapid loss in [the] value" of plaintiffs' Securities.  (Id.)  The SAC alleges that the loss in value was "proximately caused by Countrywide's issuance of loans to borrowers who could not afford them."  (Id.)  Plaintiffs assert that they lost "tens of millions of dollars" as a result of their reliance on Countrywide's misrepresentations and omissions.  (Id. ¶ 222.)

I note at the outset that this is not a case where risky, subprime mortgage-backed securities were inserted into a structured investment product without adequate disclosure.  Plaintiffs acknowledge that they "knew, and do not deny, that the loans they purchased were risky."  (Pl. Opp. Mem. at 3.)  Plaintiffs do not dispute that they chose to invest in the Securitizations with knowledge that the loans underlying the Securities were "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties . . . ."  (SAC ¶¶ 2, 56.)  Plaintiffs allege that they

were misled because the level of risks they faced was higher than they perceived.

Plaintiffs assert that defendants made material misrepresentations and omissions

regarding the quality of the underlying loans and, more specifically the underwriting

guidelines used in the origination process and that those misrepresentations and

omissions caused plaintiffs to lose their investments.

II.     Procedural History

On April 23, 2009, plaintiffs filed the complaint asserting claims based on

federal securities laws and common law fraud.  (Docket No. 1.)  Plaintiffs amended the

complaint on June 2, 2009.  (Docket No. 3.)  By letter dated July 6, 2009, defendants

requested permission to file a motion to dismiss the amended complaint, setting forth the

bases for the proposed motion.  (See Docket No. 20; see also Docket Nos. 23, 29.)

Following a pre-motion conference held on July 14, 2009, plaintiffs further amended the

complaint in response to defendants' pre-motion letter.  (Docket No. 32.)  Defendants

then filed a motion to dismiss on September 18, 2009.  (Docket No. 37.)  Plaintiffs filed a

motion for leave to further amend the complaint on October 30, 2009.  (Docket No. 52.)

On November 12, 2009, the parties filed a stipulation of voluntary dismissal of the claims

against the SPS1 Trust and the SPS2 Trust on November 12, 2009.  (Docket No. 60.)  On

November 23, 2009, I denied plaintiffs' motion to amend to assert 1933 Act Claims.

(Docket No. 62.)  Thereafter, plaintiffs filed a separate action asserting claims under the

1933 Act, which I accepted as a related case.  See Footbridge Ltd. Trust v. Countrywide

Fin. Corp., 10 Civ. 367 (PKC) (S.D.N.Y. filed Jan. 15, 2010).

JURISDICTION AND VENUE

There is original jurisdiction over plaintiffs' federal securities claims brought pursuant to section 10(b) and Rule 10b-5.  28 U.S.C. § 1331.  There is also diversity jurisdiction because the citizenship of plaintiffs is diverse from that of defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.  See 28 U.S.C. § 1332.  Plaintiffs are citizens of Bermuda and defendants are citizens of Delaware, New York, Texas, and California.  (See SAC ¶ 25.)  I also have supplemental jurisdiction over plaintiffs' state law claims because they arise from the same set of facts as the federal securities claims.  See 28 U.S.C. § 1367(a).  Venue is proper because defendants transact business in this district.  15 U.S.C. § 78aa.

MOTION TO STRIKE

Defendants move to strike large portions of the SAC pursuant to Rule 12(f), Fed. R. Civ. P.  Rule 12(f) provides that "[t]he court may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  "Motions to strike are viewed with disfavor and [are] infrequently granted."  RSM Prod. Corp. v. Fridman, 643 F. Supp. 2d 382, 394 (S.D.N.Y. 2009).  The Second Circuit has instructed that, as a general proposition, "courts should not tamper with the pleadings unless there is a strong reason for doing so."  Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976).

Defendants first move to strike a series of paragraphs in the SAC that include allegations based on pleadings and settlements in other cases and government investigations.  Paragraphs in a complaint which are "based on, or rely on, complaints in

other actions that have been dismissed, settled, or otherwise not resolved are, as a matter

of law, immaterial within the meaning of Rule 12(f)."  RSM Prod., 643 F. Supp. 2d at

403; In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78

(S.D.N.Y. 2003); see also Lipsky, 551 F.2d at 893.  Therefore, defendants' motion to

strike is granted with respect to the allegations in paragraphs 5, 6, 19, 20, 49, 113, 214,

215, 216(a)-(i), 217, 219, 220, and 221 insofar as they are based on pleadings,

settlements, and government investigations in other cases.

   Defendants also complain that the SAC is riddled with conclusory

allegations relating to what plaintiffs characterize as Countrywide's "corrupt culture."

(E.g., id. ¶¶ 48, 55.)  Many of the allegations are taken from press reports relating to

charges against Countrywide that have no relation to the claims in this case.  For

example, although the Securitizations included only fixed-rate loans, the SAC includes

allegations relating to Countrywide's "non-traditional mortgage offerings, such as Pay

Option ARMs."  (Id. ¶ 50.)  The Securitizations included only "credit-blemished, closed-

end, fixed-rate loans that were secured by second liens on one- to four-family residential

properties."  (SAC ¶ 2.)  There are also allegations related to loans underlying other

transactions, such as a separate transaction with HSBC.  (See id. ¶ 150.)

   Plaintiffs claim that even those allegations that are not directly related to

the Securitizations provide some evidence in support of their allegations of scienter.

Defendants have failed to demonstrate that "no evidence in support of the[se]

allegation[s] would be admissible."  See Lipsky, 551 F.2d at 893 ("[O]rdinarily neither a

district court nor an appellate court should decide to strike a portion of the complaint—on

the grounds that the material could not possibly be relevant—on the sterile field of the

pleadings alone.").  Therefore, defendants' motion to strike paragraphs 30, 38-39, 48, 50,

52-55, 57, 76, 80, 82-83, 88, 90-93, 97-98, 101-03, 106-07, 109, 114-15, 117-20, 123,

128-30, 134-35, 139-42, 173-82, 184, 188, 190-91, 193-202, 204-06, 223-25, 243-44,

246-47, 253, 259, 266, and 273 is denied.


DISCUSSION

I.     Legal Standard

        Rule 8(a)(2), Fed. R. Civ. P., requires "'a short and plain statement of the

claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair

notice of what the . . . claim is and the grounds upon which it rests.'"  Bell Atlantic Corp.

v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47

(1957)) (ellipsis in original).  To survive a motion to dismiss under Rule 12(b)(6) "a

complaint must contain sufficient factual matter accepted as true, to 'state a claim to

relief that is plausible on its face.'"  Iqbal, 129 S.Ct. at 1949 (quoting Twombly, 550 U.S.

at 570); ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.,

553 F.3d 187, 196 (2d Cir. 2009) (quoting Ruotolo v. City of New York, 514 F.3d 184,

188 (2d Cir. 2008)).  "A pleading that offers 'labels and conclusions' or 'a formulaic

recitation of the elements of a cause of action will not do.'"  Iqbal, 129 S. Ct. at 1949

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007)).

When a complaint's allegations are "merely consistent" with liability, it falls short of

alleging a plausible claim for relief.  Id.  A complaint's legal conclusions are not afforded

the presumption of truth.  Id. at 1949-50.  Only nonconclusory factual allegations are to

be accepted as true.  S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 100 (2d

Cir. 2009).  "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."  Iqbal, 129 S. Ct. at 1949.  Plausibility is present "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.

Along with the standards of Rule 12(b)(6), "[a]ny complaint alleging securities fraud must satisfy the heightened pleading requirements of the PSLRA and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud."  ECA, Local 134, 553 F.3d at 196 (citing Tellabs Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)).

Rule 9(b) applies to claims of fraud and requires a party to "state with particularity the circumstances constituting fraud or mistake."  This pleading threshold gives a defendant notice of the plaintiff's claim, safeguards a defendant's reputation from "improvident" charges and protects against strike suits.  See ATSI Commc'ns, Inc. v. Shaar Funds, Ltd., 493 F.3d 87, 99 (2d Cir. 2007).  "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Id. at 99 (citing Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000)).  Allegations of fraud may be "too speculative even on a motion to dismiss," particularly when premised on "'distorted inferences and speculations.'"  Id. at 104 (quoting Segal v. Gordon, 467 F.2d 602, 606, 608 (2d Cir. 1972)).

The PSLRA, for its part, has "imposed heightened pleading requirements and a loss causation requirement upon 'any private action' arising from the Securities

Exchange Act." Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 165 (2008) (quoting 15 U.S.C. § 78u-4(b)).  It requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(l).

"The [PSLRA] insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)(1), (2)). As the Second Circuit has repeatedly required, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach v. Chang, 355 F.3d 164, 174 (2d Cir. 2004); accord ATSI, 493 F.3d at 99 ("A securities fraud complaint based on misstatements must . . . explain why the statements were fraudulent.  Allegations that are conclusory or unsupported by factual assertions are insufficient.") (citations omitted).

The PSLRA also "requires plaintiffs to state with particularity . . . the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" Tellabs, 551 U.S. at 313 (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976)).  To qualify as "strong," the "inference of scienter must be more than merely

plausible or reasonable—it must be cogent and at least as compelling as any opposing

inference of nonfraudulent intent." Id. at 314. [1]

In considering a motion to dismiss, a court may consider documents

annexed to the complaint or incorporated in the complaint by reference without

converting the motion to dismiss into a motion for summary judgment. Rombach, 355

F.3d at 169 (citing Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991)).

II.     The Plaintiffs' Claims Under Section 10(b) and Rule 10b-5 Are Dismissed.

        a.   The Complaint Fails to Allege Fraud with Particularity.

                Section 10(b) of the 1934 Act makes it unlawful to "use or employ, in

connection with the purchase or sale of any security . . . any manipulative or deceptive

device or contrivance in contravention of such rules and regulations as the Commission

may prescribe . . . ." 15 U.S.C. § 78j(b).  "The SEC rule implementing the statute, Rule

10b-5, prohibits 'mak[ing] any untrue statement of a material fact or [omitting] to state a

material fact necessary in order to make the statements made, in light of the circumstance

under which they were made, not misleading.'" ECA, Local 134, 553 F.3d at 197

(alterations in original) (quoting Rule 10b-5).  As Judge Cote has observed, "[s]ection

10(b) of the Exchange Act is designed to protect investors by serving as a 'catchall

provision' which creates a cause of action for manipulative practices by defendants acting

in bad faith." In re Openwave Sys. Sec. Litig., 528 F. Supp. 2d 236, 249 (S.D.N.Y. 2007)

---

[1] After the motion was fully submitted, plaintiffs sent a flurry of letters purporting to advise the Court of
recent decisions that are "directly relevant" to the issues raised in the motion.  Plaintiffs describe the cases
as "reflect[ing] a crystallizing view in this District that allegations of systematic abandonment of
underwriting guidelines made by holders of mortgage-backed securities satisfy the applicable pleading
requirements for falsity and materiality under the securities laws."  (Letter of Daniel L. Brockett dated
April 9, 2010).  The cases cited by plaintiffs involved claims under the 1933 Act that were decided under
the pleading standard in Rule 8(a), and therefore were not subject to the heightened pleading requirements
of Rule 9(b) and the PSLRA.  As such, the decisions cited by plaintiffs are distinguishable from the claims
asserted here.

(citing Ernst & Ernst, 425 U.S. at 206).  The PSLRA also requires, with respect to allegations of false statements or omissions, that the complaint specify the statements alleged to have been misleading, the reasons for the belief that the statements were misleading and, if the allegation is made upon information and belief, the complaint must state, with particularity, the facts upon which the belief is formed.  ATSI, 493 F.3d at 99.

"Statements that are opinions or predictions are not per se inactionable under the securities laws.  Statements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if they are worded as guarantees or are supported by specific statements of fact . . . ."  In re Int'l Bus. Mach. Corporate Sec. Litig., 163 F.3d 102, 107 (2d Cir. 1998) (emphasis added) (citations omitted); see also Novak, 216 F.3d at 315 ("Here, the complaint alleges that the defendants did more than just offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true.").

The defendants argue that the SAC fails to allege with particularity that the Fund's statements and omissions amounted to acts of fraud.  Plaintiffs' opposition asserts that the SAC alleges five categories of material misstatements and omissions which amounted to fraud.  I address each category of alleged misrepresentations in turn.

        i.   False Statements and Omissions.

           1.  Misrepresentations Regarding the Percentage of Owner-Occupied Properties in the Securitizations.

Plaintiffs allege that the Preliminary Term Sheets included a "Detailed Report" which "presented an overview of certain statistics regarding the initial pool of Mortgage Loans to be included in the SPS1 and SPS2 Securitizations."  (Id. ¶ 68.)  The SPS1 Detailed Report stated that 99.88 percent of the mortgaged properties to be

included in the SPS1 Securitization were owner-occupied, with the remaining .12 percent related to secondary residences.  (Id. ¶ 69.)  The SPS2 Detailed Report stated that 99.53 percent of the mortgaged properties to be included in the SPS2 Securitization were owner-occupied properties, with 0.27 percent related to secondary residences and 0.21 percent related to investment properties.  (Id. ¶ 70.)  The Prospectus Supplements also contained these representations.  (Id. ¶ 72.)

The SAC alleges that "Countrywide meant to bolster the perceived quality of the Securities by emphasizing the overwhelming rate of owner occupancy" when it made the representations in the Detailed Reports.  Plaintiffs believed that "homeowners who reside in mortgaged properties are more likely to make principal and interest payments than owners who purchase the homes as investments and live elsewhere."  (Id. ¶ 71.)  Plaintiffs allege that the statements regarding owner occupancy levels were false because the number of owner-occupied properties was lower than defendants represented. (See id. ¶¶ 67-83.)

Plaintiffs omit critical language from their citation of statements in the offering documents.  The statements in the Detailed Reports include additional limiting language that explains that the percentages reported are "[b]ased upon representations of the related borrowers at the time of origination."  (SPSI Term Sheet at 15; SPS2 Term Sheet at A-5.)  The SPS1 and SPS2 Pooling and Servicing Agreements stated that

> [o]n the basis of representations made by the Mortgagors in their loan applications, no more than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans, respectively, are secured by investor properties, and no less than approximately the percentage specified in the Collateral Schedule of the Initial Mortgage Loans respectively, are secured by owner-occupied Mortgaged Properties that are primary residences.

(SPS1 PSA § 2.03(b)(36); SPS2 PSA § 2.03(b)(36) (emphasis added).)  The SAC does not allege that the percentages reported in the Detailed Reports or the Prospectus Supplements are inaccurate representations of the data received from borrowers.  Instead, the SAC alleges in conclusory fashion that because "Countrywide is a sophisticated loan originator, . . . [i]t was not blindsided and misled by speculators who allegedly lied on their loan applications" and therefore "it knew that its representations regarding owner occupancy were false and misleading at the time the representations were made."  (SAC ¶ 76.)  Such an allegation is insufficient to allege a misrepresentation under the heightened pleading requirements of Rule 9(b) and the PSLRA.

Furthermore, even if the statement could be read without the limiting language and, thus, deemed a misstatement, the SAC does not allege with any particularity how many properties were not actually owner-occupied.  Plaintiffs contend that defendants "admitted" that these statements were false because Countrywide later estimated that "approximately 15 percent of" the Mortgage Loans in the Securitizations were applied to investment properties."  (See id. ¶¶ 73-80, 177.)  Plaintiffs further allege that, "[u]pon information and belief, Countrywide's estimate that 15 percent of the Mortgage Loans were applied to investor properties still vastly understated the actual percentage of such properties in the Securitizations."  (Id. ¶ 80.)  Plaintiffs do not allege with particularity what this belief is based upon other than to say that "real estate speculators" were the "primary driver of the defaults."  (Id.)  Plaintiffs do not identify any loans that defendants represented as being related to owner-occupied properties that were not actually occupied by the owners.  Such an allegation fails to meet the heightened pleading requirements under Rule 9(b) and the PSLRA.

   2.   Misrepresentations Regarding Countrywide's Adherence to Its
        Underwriting Guidelines.

        a.   General Compliance with the Guidelines.

The SAC alleges that Countrywide made misrepresentations in the offering documents and in communications with plaintiffs regarding its underwriting guidelines.  (Id. ¶ 84.)  Specifically, plaintiffs point to a statement in the PSAs in which Countrywide represented that its "origination, underwriting, servicing and collection practices with respect to each Mortgage Loan ha[d] been in all respects legal, proper, prudent and customary in the mortgage lending services business."  (Id. ¶ 85.)  Plaintiffs allege that this statement was materially false and misleading because "Countrywide abandoned its loan-origination guidelines and prudent guidelines of the industry in order to maximize its revenue from the origination, servicing, and securitization of mortgage loans."  (Id.)

The SAC alleges that the SPS1 and SPS2 Prospectus Supplements contained misrepresentations in which

> Countrywide emphasized the meticulous underwriting guidelines it applied to assess the creditworthiness of potential borrowers before issuing loans to them. Countrywide told investors that it thoroughly researched borrowers' credit histories; obtained information about applicants' assets, liabilities, income and employment history; obtained an independent credit bureau report on each applicant; and used a debt-to-income ratio to help determine whether the buyer would be able to afford the mortgage loan.

(Id. ¶ 41.)  The SAC goes on to allege that "Countrywide made many other representations in the Prospectus Supplements about its underwriting guidelines, which were intended to induce Plaintiffs and other investors to invest in the Securitizations."

(<u>Id.</u> ¶ 42.)  Specifically, "Countrywide represented that its underwriting standards were applied in accordance with applicable federal and state laws and regulations, that mortgaged properties were appraised both by Countrywide and by third parties, and that in most cases, Countrywide would not write loans on properties that were in below-average condition."  (<u>Id.</u>)

       The SAC acknowledges that "[i]n the offering documents for the SPS1 and SPS2 Securitizations, Countrywide noted that the credit-blemished, second-lien Mortgage Loans that were pooled together in the Securitizations posed a greater credit risk than first-lien conventional mortgage loans."  (<u>Id.</u> ¶ 56.)  Plaintiffs further acknowledge that "Countrywide also noted that its underwriting standards for credit-blemished second-lien loans were 'more flexible than the standards generally used by banks for borrowers with non-blemished credit histories.'"  (<u>Id.</u>; <u>see also</u> SPS1 PS at S-14; SPS2 PS at S-14.)  Plaintiffs argue, however, that "credit enhancement mechanisms—subordination, overcollateralization, and excess cashflow—appeared to mitigate the Securitizations' risks."  (<u>Id.</u>)  The SAC does not allege that defendants misrepresented that the Securitizations' risks were mitigated, but rather that they "appeared to" be mitigated by these other factors.  (<u>Id.</u>)  In fact, the offering documents warned investors that they should consider the potential risks of investing in subordinated securities.  (<u>See</u> SPS1 PS at S-16; SPS2 PS at S-15 ("You should fully consider the risks of investing in a subordinated certificate, including the risk that you may not fully recover your initial investment as a result of realized losses.").)

       Defendants also disclosed that there were risks associated with an investment in the Securitizations, but plaintiffs assert that they were "reassured [that] the

credit enhancement mechanisms, including subordination, overcollateralization, and excess cash flow" would "protect them against the risk of loss."  (Id. ¶ 111.)  Plaintiffs argue that they believed that the subordination structure would protect them from losses, but that this was an incorrect perception because "the collateral underlying the Securitizations was extremely risky and low quality."  (Id. ¶ 112.)  Plaintiffs do not allege that defendants made inaccurate representations about the structure of the Securitizations.

Plaintiffs also acknowledge that the Prospectuses and Prospectus Supplements state that Countrywide would use "more flexible" loan-origination standards for loans underlying the Securitizations.  (Id. ¶ 86.)  Plaintiffs claim that, despite this disclosure, the statements regarding Countrywide's underwriting guidelines were false and misleading because Countrywide also represented that "Countrywide Home Loans' underwriting guidelines still place primary reliance on a borrower's ability to repay."  (Id. ¶ 93.)  The SAC alleges that "Countrywide's underwriting standards actually ignored a borrower's ability to repay.  Countrywide's focus, instead, was on profit and market share gained from the origination of large volumes of risky loans, regardless of a borrower's ability to repay."  (Id. (emphasis in original).)  The SAC does not allege particular facts in support of this allegation.

The SAC also alleges that "Countrywide deviated from the loan-origination practices that it represented in the offering documents, effectively abandoning rather than loosening its loan-origination standards."  (Id. ¶ 57.)  The SAC does not allege which "practices" Countrywide represented that it would use or which practices were "effectively abandoned," nor does it describe the extent to which such practices were "effectively abandoned."  (Id.)

The SAC also fails to allege which statements were made about the "more flexible" underwriting guidelines or the standards that were supposed to be used, who made the statements, that any specific standards under the "more flexible" guidelines were violated, the frequency of departures from the flexible guidelines, or that any loan not conforming with the "more flexible" guidelines was actually included in the Securitizations.

In essence, plaintiffs allege that they were told that the loans would be issued under a "more flexible" set of underwriting guidelines, but that defendants were too flexible in the underwriting decisions.  Without more, such allegations are insufficient to set forth a plausible claim of fraud based on the heightened pleading requirements of Rule 9(b) and the PSLRA.  The plausibility standard requires "more than a sheer possibility that [a] defendant has acted unlawfully."  Iqbal, 129 S. Ct. at 1949.  The SAC, read in the light most favorable to plaintiffs, fails to allege facts sufficient to support plaintiffs' claims that Countrywide did not use the underwriting guidelines that it represented it would use in originating the Mortgage Loans.

        b.   Verification of Application Information and
              Underwriting Exceptions.

The SAC alleges that the Prospectus Supplements contain a misrepresentation regarding the procedures that Countrywide used to verify applicants' information:

> Countrywide Home Loans verifies the loan applicant's sources and amounts of income (except under the Stated Income Program where the amount of income is not verified), calculates the amount of income from all sources indicated on the loan application, reviews the credit history of the applicant, calculates the debt-to-income ratio to determine the applicant's ability to repay the loan, and

> reviews the appraisal of the mortgaged property for
> compliance with Countrywide Home Loans' underwriting
> standards.

(Id. ¶ 105.)  Plaintiffs allege that this statement was false and misleading because "[i]n

reality, Countrywide abandoned those guidelines and issued the Mortgage Loans with

little or no consideration for borrowers' ability to repay."  (Id. ¶ 106.)  Plaintiffs do not

allege that Countrywide did not collect information about borrowers' assets, liabilities,

income, and employment history.  The SAC alleges that this statement is false and

misleading because "Countrywide abandoned those guidelines and issued Mortgage

Loans with little or no consideration for borrowers' ability to repay."  (Id. ¶ 106.)  This

allegation is insufficient to plead a fraud claim under Rule 9(b) and the PSLRA.

Plaintiffs acknowledge that the Prospectus Supplements explained that

CHL would grant underwriting exceptions on a "case by case basis" to "prospective

borrower[s] not strictly qualifying under the underwriting risk category guidelines"

outlined therein.  (Id. ¶ 96.)  Plaintiffs allege that this statement was false and misleading

because it "incorrectly implied" that the exceptions would be made on a "limited ('case

by case') basis, and with careful consideration of the 'compensating factors' of each

case" when "[i]n reality" the "exceptions were granted abundantly and without restraint."

(Id. ¶¶ 96-97.)  Again, plaintiffs do not tie the general allegations that Countrywide

granted "abundant" exceptions under its underwriting guidelines to the Securitizations,

nor do they allege the misstatement with requisite particularity under the PSLRA because

they do not allege facts to explain the extent to which exceptions could be granted, other

than to generally allege that they understood the documents to say that exceptions would

be granted on a "limited basis."  (Id.)

Plaintiffs point to no language in the offering documents that limits defendants' ability to grant the underwriting exceptions, so long as each was considered on a "case by case" basis.  Indeed, the Prospectus Supplements disclosed that "[i]t is expected that a <u>significant</u> number of mortgage loans will have been originated based on underwriting exceptions of these types."  (SPS1 PS at S-14; SPS2 PS at S-14.)  Plaintiffs do not point to any language in the offering documents in support of their contention that "a <u>significant</u> number" of exceptions granted on a "case by case basis" "incorrectly implied" that the underwriting exceptions would be granted "on a <u>limited</u> basis."

The offering documents stated that Countrywide required a credit history for each applicant to be undertaken by an independent credit bureau and that Countrywide would gather information about an applicant's "assets, liabilities, income, and employment history" in order to calculate the debt-to-income ratio which would be used to determine whether the prospective borrower would be able to afford the required payments of principal and interest on the Mortgage Loan.  (<u>Id.</u> ¶ 104.)

c. <u>Independent Appraisals.</u>

Countrywide also represented that "it required independent appraisals of the properties on which the Mortgage Loans were issued."  (<u>Id.</u> ¶ 89.)  Plaintiffs allege that this statement was false and misleading because "Countrywide regularly pressured appraisers to give inflated assessments of property values, threatening to blacklist them if they did not do so."  (<u>Id.</u> ¶ 90.)  Again, the SAC does not link this allegation to the Securitizations at issue here.  The SAC also does not allege that Countrywide pressured appraisers to give inflated assessments of property underlying any Mortgage Loans in the Securizations or that any appraiser actually inflated an assessment of property underlying

the Mortgage Loans.  The SAC contains no facts in support of the conclusion that

Countrywide "regularly" pressured appraisers and it does not identify the source of the

information for this allegation.  Rule 9(b) and the PSLRA require that the plaintiffs do

more than make a conclusory allegation of this nature.

d.   <u>"In Accordance with Law."</u>

Finally, plaintiffs allege that Countrywide's statement in the offering

documents that its underwriting standards would be "applied in accordance with

applicable federal and state laws and regulations" was false because Countrywide

"regularly engaged in predatory lending practices in violation of federal or state laws and

regulations."  (<u>Id.</u> ¶ 91.)  Plaintiffs allege that Countrywide "regularly steered borrowers

to more expensive mortgage products in order to increase its profits." (<u>Id.</u> ¶ 92.)  The

SAC does not contain allegations that the loans included in the Securitizations suffered

from this problem; rather, it makes general allegations about Countrywide's overall

commercial practices.  As explained above, such allegations are insufficient to plead a

claim under the heightened pleading requirements of Rule 9(b) and the PSLRA.

3.   Omissions of Material Facts Regarding Reduced-<br><u>Documentation Application Programs.</u>

Some of the Mortgage Loans were originated pursuant to Reduced-

Documentation Programs.  The offering documents explain that, for those loans

originated pursuant to the Stated Income loan program, "the borrower's income as stated

on the application [i]s not independently verified."  (<u>See</u> SPS1 PS at S-34; SPS2 PS at S-

34.)  Plaintiffs allege that, elsewhere, the Prospectuses state that "employment

verification is obtained from an independent source (typically the borrower's employer)

which verification reports, among other things, the length of employment with that

24

organization and the borrower's current salary."  (Id. ¶ 118.)  The SAC alleges that

Countrywide represented in the Prospectuses that this was true for "most cases" but that,

"[o]n information and belief, Countrywide failed to obtain independent verification of

borrowers' income at a far greater rate than it represented."  (Id.)

       The SAC does not allege facts to support this allegation, such as the "rate"

Countrywide represented exceptions would be granted or the "rate" at which exceptions

were actually granted.  Under the heightened pleading requirements of the PSLRA,

plaintiffs must "do more" than allege that, on information and belief that exceptions were

granted "at a greater rate than it represented."  (See id.)

       The SAC also alleges that the Prospectus Supplements falsely state that

"[t]he borrower's income as stated [in the applications under the Stated Income Program]

must be reasonable for the related occupation and the determination as to reasonableness

is subject to the loan underwriter's discretion."  (Id. ¶ 119.)  The SAC alleges that the

"underwriters abused their discretion by abandoning [the] loan-origination

standards . . . ."  (Id.)  While the SAC alleges that underwriters "failed to exercise proper

discretion in judging borrower's statements," it does not allege that the representation

that the underwriters would use their discretion in reviewing loan applications was a false

statement.  Nor does it allege particularized facts in support of its conclusion that loan

underwriters failed to exercise proper discretion.

       Finally, the SAC alleges that "Countrywide failed to take sufficient, if any,

action to correct borrowers' suspicious statements [regarding reported employment

income]," (id. ¶ 120), and failed to disclose the results of "studies which showed that

loans with lower documentation were more likely to default."  (Id. ¶ 52.)  Again, the SAC

does not allege that any borrower who received a loan that was included in the
Securitizations falsely reported his income.  Plaintiffs acknowledge that the offering
documents disclosed that loan officers did not independently verify certain information
and that borrowers qualified under the program were "excused" from the "general
requirement of submitting documentation to confirm their income and assets."  (SAC
¶ 116; see also SPS1 PS at S-34.)

Furthermore, the SAC fails to allege a fiduciary duty that would obligate
defendants to disclose that borrowers who received loans originated pursuant to lower
documentation programs had an increased likelihood of default.  Although not specific to
the Mortgage Loans originated in the reduced documentation programs, the offering
documents contained a general disclosure that "THE CERTIFICATES ARE BACKED
BY MORTGAGE LOANS THAT WILL EXPERIENCE HIGHER RATES OF
DELINQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN TO
MORE TRADITIONAL STANDARDS."  (SPS1 Prospectus Supplement at S-14; SPS2
Prospectus Supplement at S-14.)  As the Third Circuit noted, "the federal securities laws
. . . do not compel [defendants] to state the obvious."  In re Donald Trump Casino Sec.
Litig., 7 F.3d 357, 377 (3d Cir. 1993).

4.   Misrepresentations Regarding Adverse Effects on Investors'
Interests.

The SAC alleges that "Countrywide represented in the PSAs and
Prospectus Supplements that the Mortgage Loans in the Securitizations were not selected
'in a manner that would adversely affect the interests of Certificateholders.'"  (Id. ¶ 123.)
Plaintiffs assert that this statement was fraudulent because "Countywide knew that by
issuing unnecessarily risky and expensive loans to borrowers with poor credit histories

and low incomes, the Company increased the likelihood that borrowers would default on their loans, thereby creating an adverse effect on Plaintiffs."  (Id.)  Again, plaintiffs acknowledge that they knew that the Securitizations were comprised of only "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties." (Id. ¶ 2.)

The SAC alleges that Countrywide failed to disclose that it had attempted to "sell the Mortgage Loans as whole loans," but was unable to do so successfully.  (Id. ¶ 124.)  Countrywide was able to sell the loans in the form of mortgage-backed securities "because the securitization process made the loans more attractive investments."  (Id. ¶ 125.)  Plaintiffs do not allege that defendants had any duty to inform plaintiffs that the loans had originally been marketed as whole loans.

Plaintiffs also allege that Countrywide knew that some of the Mortgage Loans were already experiencing defaults when the Securitizations were created.  (Id. ¶ 129.)  Defendants argue that plaintiffs do not "identify a material number (or any number of loans for that matter) that were allegedly in default or at a special risk of default."  (Def. Mem. In Support at 17 n.27.)  Defendants also argue that, in any event, when read as a whole, the offering documents actually represent that "[n]o Mortgage Loan is one payment or more delinquent as of the applicable Cut-off Date," but in the event that Mortgage Loans are delinquent as of that date, Countrywide promised to "cure" or "remove . . . and substitute" or "repurchase" the delinquent loans.  (See SPS1 and SPS2 PSAs at § 2.03(b)(9), (f).)  Defendants argue that plaintiffs' failure to allege that Countrywide refused to cure any deficiency or that Countrywide never intended to fulfill this promise is fatal to their fraud claims.

27

When read in context, the offering documents covenant that there ought not be any Mortgage Loans in default at the time of the Securitizations, but acknowledge the possibility that there could be delinquent loans and, in that event, Countrywide would cure the delinquent loan in one manner or another. "[T]he prospectuses must be read 'as a whole.'" Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5 (2d Cir. 1996). As the Fifth Circuit recently noted, such provisions

> are sensible given the difficulties of investigating the underlying residential mortgages. Even the best due diligence may overlook problems. A mortgage may become delinquent from a single missed payment. Some of the loans might fall into delinquency during the pendency of the transactions leading to an investor's purchases. Because mistakes are inevitable, both seller and purchaser are protected by a promise that the mortgage pools will be free from later-discovered delinquent mortgages.

Lone Star Fund V (U.S.) L.P. v. Barclays Bank PLC, 594 F.3d 383, 389 (5th Cir. 2010).

In opposition to defendants' motion, plaintiffs argue that such a result would violate the anti-waiver provisions of the Securities Exchange Act of 1934 because it would effectively allow a defendant to contract around federal securities laws. See 15 U.S.C. § 78cc(a) ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of [the Act] . . . shall be void."). As the Fifth Circuit held,

> [r]ather than waive [plaintiffs'] right to pursue claims of fraud, the 'repurchase or substitute' clauses change the nature of [Countrywide's] representation. If [plaintiffs] had alleged that [Countrywide] falsely represented to prospective investors that it would repurchase or substitute delinquent mortgages, they might have stated a case of fraud under the pertinent agreements. This is not their claim.

Lone Star Fund, 594 F.3d at 390.

Furthermore, as discussed below, even if the statement in the offering documents were a misstatement, the SAC does not allege any facts which support plaintiffs' conclusory allegation that defendants had knowledge that some of the loans were defaulting when the Securitization pools were created.  (See SAC ¶ 129.)

     5.   Misrepresentations Regarding Countrywide's Loan Servicing.

The SAC alleges that "Countrywide's servicing of its mortgage loans lagged behind the standards of the industry, contrary to its representations" that it would "service and administer the Mortgage Loans in accordance with customary and usual standards of practice of prudent mortgage loan lenders . . . ."  (Id. ¶¶ 133-34.)  The SAC does not tie this allegation to any of the Mortgage Loans included in the Securitizations, but complains that Countrywide was generally "unhelpful in resolving customers' problems."  (Id. ¶ 135.)  Plaintiffs point to "[d]ozens of Countrywide customers" who "posted stories on the internet regarding their dealings with the Company's unhelpful, unprofessional, and harassing bureaucracy."  (Id.)

The SAC does not allege that any of the Mortgage Loans in the Securitizations were inadequately serviced.  Plaintiffs' broad allegations of poor customer service on the part of the Company as a whole are not supported by particularized facts and are insufficient to support a fraud claim.  Plaintiffs do not address these deficiencies in their opposition to the motion to dismiss.

     b.   The Complaint Fails to Raise a Strong Inference of Scienter.

As explained above, the SAC fails to allege that defendants made any material misstatements or omissions with sufficient particularity to survive the heightened pleading requirements of Rule 9(b) and the PSLRA.  This deficiency alone is

sufficient to compel dismissal; however, even if the allegations in the SAC alleged a

material misrepresentation or omission, the SAC fails to allege that the defendants made

the statements with the requisite scienter.

   The PSLRA requires a plaintiff to "state with particularity facts giving rise

to a strong inference that the defendant acted with the required state of mind."  15 U.S.C.

§ 78u-4(b)(2).  The statute "unequivocally raise[d] the bar for pleading scienter."

Tellabs, 551 U.S. at 321 (alteration in original; quotation marks omitted).  In scrutinizing

a complaint's allegations of scienter, a court is to consider "whether all of the facts

alleged, taken collectively, give rise to a strong inference of scienter, not whether any

individual allegation, scrutinized in isolation, meets that standard."  Id. at 323 (emphasis

in original).  A court also "must take into account plausible opposing inferences."  Id. at

323.  This requires close scrutiny of the factual allegations:

> The strength of an inference cannot be decided in a vacuum.  The inquiry is inherently comparative:  How likely is it that one conclusion, as compared to others, follows from the underlying facts?  To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]  . . .  Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

Id. at 323-24.  Defendants' pecuniary motive is a relevant consideration, although an

absence of motive is not alone dispositive.  Id. at 325.  Personal financial gain on the part

of a defendant weighs in favor of a scienter inference.  Id.  If a complaint contains
ambiguities or omissions, those weigh against inferring scienter.  Id. at 326.

In the Second Circuit, scienter may be pleaded by "alleging facts
(1) showing that the defendants had both motive and opportunity to commit the fraud or
(2) constituting strong circumstantial evidence of conscious misbehavior or
recklessness."  ATSI, 493 F.3d at 99.  Circumstantial evidence may go toward showing
"deliberate illegal behavior," or "conduct which is highly unreasonable and which
represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at
308 (quotation marks omitted).  "Intentional misconduct is easily identified since it
encompasses deliberate illegal behavior, such as securities trading by insiders privy to
undisclosed and material information, or knowing sale of a company's stock at an
unwarranted discount."  Id. at 308 (internal citation omitted).  As to recklessness,
"allegations that defendants should have anticipated future events and made certain
disclosures earlier than they actually did do not suffice to make out a claim of securities
fraud."  Id. at 309.

Here, the SAC's allegations do not support a strong inference of scienter.
The SAC does not raise an inference that the defendants intended to defraud the
plaintiffs.  The plaintiffs have set forth only a conclusory allegation that defendants
intended to deceive the plaintiffs in order to "maximize [their] own profits and market
share."  (See, e.g., SAC ¶ 2.)  "Motives that are common to most corporate officers, such
as the desire for the corporation to appear profitable and the desire to keep the stock
prices high to increase officer compensation, do not constitute 'motive' for purposes of [a
scienter] inquiry."  ECA, 553 F.3d at 198.

The Complaint elsewhere asserts that defendants engaged in recklessness and conscious "misbehavior" for inadequately disclosing the extent that Countywide relaxed its underwriting guidelines and the potential that borrower fraud was occurring in the reduced documentation programs.  (See id. ¶¶ 84-122.)

In opposition to the defendants' motion, plaintiffs have cited the following allegations which are discussed below as indicative of scienter.  I address each of them in turn, and note at the outset that, neither individually nor collectively do they raise a strong inference of scienter.  Tellabs, 551 U.S. at 322.

i.  Scienter with Respect to Statements Regarding Owner Occupancy.

The SAC alleges that, during a conference call in May 2007, Countrywide "'admitted' that the Mortgage Loans were defaulting at an 'incredibly high' rate" and "sought to blame the high default rates on real-estate speculators, alleging that the 'biggest driver' of losses had been a large number of borrowers who 'are participating in the real estate flipping market.'"  (Id. ¶ 75.)  The SAC asserts that "Countrywide claimed that these speculators had represented to the Company that they would occupy the mortgaged properties, when in reality [the borrowers] hoped to quickly resell the properties for a profit without ever living in them."  (Id.)  Plaintiffs allege that, because "Countrywide is a sophisticated loan originator, . . . [i]t was not blindsided and misled by speculators who allegedly lied on their loan applications."  (Id. ¶ 76.)

The SAC contains no facts which, when read in the light most favorable to plaintiffs, plausibly allege that Countrywide was aware, at the time that it made the statements in the offering documents, that the borrowers' statements about owner-occupancy were false.  Instead, the SAC contains conclusory assertions regarding a

"corrupt culture" at Countrywide where "Countrywide facilitated and furthered borrowers' fraud by turning a blind eye to it, failing to enforce its underwriting standards, failing to exercise proper oversight or loan origination, and/or by other means."  (Id.)

Plaintiffs also cite to internal email communications between Countrywide officers regarding concerns about borrower fraud with respect to other types of loans, such as Pay-Option ARMs, and other borrower information, such as the accuracy of stated-income amounts reported by borrowers.  (Id. ¶ 77.)  As explained above, plaintiffs do not tie the allegations about officers' concerns with other types of loan products or other transactions to the statements made with respect to the Securitizations at issue here.

The SAC does not allege that defendants knew that loans included in the Securitizations were related to properties that were not actually owner-occupied at the time that the statements were made.  The SAC, read in the light most favorable to plaintiffs, alleges generally that defendants knew that borrowers, at times, lied on loan applications.  However, the SAC does not allege that defendants knew that borrowers lied about their owner-occupied status, or that any of the loans contained in the Securitizations were related to fraudulent applications.

Also, the SAC's allegations regarding Countrywide's "admissions" during an investor call in May 2007 do not support plaintiffs' allegation that the statements amounted to fraud because plaintiffs do not allege facts to plausibly support their allegation that Countrywide knew that the statements were false at the time they were made, i.e. June and August of 2006.  (See SAC ¶ 67 (alleging that "Countrywide's subsequent admission underscores the fact that it knew or should have known at the time it made the representations about owner occupancy . . . that such representations were

incorrect").)  Allegations of fraud by hindsight are insufficient as a matter of law.  See

Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994).

The SAC's allegation that Countrywide later estimated that approximately

15 percent of the Mortgage Loans in the Securitizations were applied to investment

properties is likewise deficient because plaintiffs do not allege facts to plausibly support

their conclusory allegation that Countrywide knew or should have known this

information at the time the statements about owner-occupancy were made.  (See SAC

¶ 79-80.)

ii.   Scienter with Respect to Statements Relating to Underwriting
Guidelines.

The SAC also fails to allege scienter with respect to the alleged

misstatements regarding the underwriting standards used for the loans included in the

Securitizations.  The SAC generally alleges that Countrywide's "senior management"

was aware that borrowers were submitting fraudulent loan applications, but there is no

allegation that loans relating to fraudulent applications were packaged as part of the

Securitizations, nor that Countrywide knew that any fraudulent loan applications related

to loans in the Securitizations.

There is also no allegation that Countrywide officials acted with scienter

when they made the statement that the loans in the Securitizations would be subject to

"more flexible" underwriting standards.  General allegations that loan officers—who are

not alleged to be senior corporate officials—were "participating in submitting fraudulent

loan applications" for approval or that loan officers engaged in "flipping" a loan

application from full documentation to reduced documentation in order to increase the

chance for approval, are insufficient under the PSLRA.  (See id. ¶¶ 121-22.)  The SAC

fails to allege any facts which tie this allegation about loan officer practices to the Securitizations at issue here and does not allege with particularity facts that support the allegation.

        The SAC also includes blanket statements about Countrywide's motives for lowering its underwriting standards as a general matter.  For example, the SAC alleges that "[t]he inevitable result of Countywide's quest for increased market share, and specifically its hunger for increased production of risky loans, was a steep decline in the creditworthiness of its borrowers and its own underwriting standards."  (Id. ¶ 53.)  Plaintiffs do not tie the allegations about a general "corrupt corporate culture" to the Securitizations at issue in this case or the misrepresentations that plaintiffs assert constituted the fraud they claim here.  As explained above, alone, a general allegation that defendants wanted to originate as many loans as possible in order to increase profits and market share, without more, is insufficient to set forth a strong inference of scienter.

        The SAC also alleges that Countrywide "made representations about its rigorous underwriting standards directly to plaintiffs" during a May 2007 conference call.  (Id. ¶ 99.)  Because plaintiffs purchased the Securities during the period between June and August 2006, plaintiffs could not have relied on the statements made during the May 2007 conference call with respect to those purchases.  Plaintiffs do not identify how such statements would demonstrate intent relating to statements made more than a year earlier.

        The SAC fails to allege facts demonstrating that at the time the plaintiffs purchased the Certificates, defendants acted with scienter in making misstatements about the underwriting guidelines used in the origination of the Mortgage Loans.  Indeed, the offering documents contained explicit warnings which disclosed that "[i]t is expected that

a significant number of the mortgage loans will have been originated based on underwriting exceptions . . . ."  (SPS1 PS at S-14; SPS2 PS at S-14.)  The offering documents also contained a warning that the Certificates were backed by mortgage loans that "WILL EXPERIENCE HIGHER RATES OF DELINQUENCY AND LOSS THAN MORTGAGE LOANS UNDERWRITTEN BY MORE TRADITIONAL STANDARDS."  (SPS1 PS at S-14; SPS2 PS at S-14) (all capitals in originals). Defendants' disclosures about the risk inherent in the investment in the "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties," SAC ¶ 2, and the flexibility of the underwriting guidelines employed for originations of the Mortgage Loans are inconsistent with a state of mind going toward "deliberate illegal behavior" or "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care."  Novak, 216 F.3d at 308.

Plaintiffs have failed to raise a "strong inference" of scienter with respect to statements regarding the "more flexible" set of underwriting guidelines that defendants represented they used during the origination process for the Mortgage Loans underlying the Securitizations.

iii.  Scienter with Respect to Statements Regarding Reduced Documentation Programs.

The SAC alleges that "Countrywide's senior management was aware that Countrywide loan officers were participating in submitting fraudulent applications through the Company's reduced documentation application programs, as evidence by internal Countrywide emails."  (SAC ¶ 121.)  The emails cited, however, are not alleged to be related to the Securitizations.

Plaintiffs quote from an email from defendant Mozilo regarding his perception that a deal with HSBC raised concerns about "a serious lack of compliance within our origination system as it relates to documentation and generally, a deterioration in the quality of loans originated versus the pricing of those loan[s]."  (Id.; Supplemental Decl. of Victor Hou, Ex. A.)  Plaintiffs do not link the allegations regarding Mozilo's concern with the origination of loans originated in the HSBC transaction to the Securitizations here.  Indeed, there is no allegation that Mozilo had any role in plaintiffs' purchase or that the "more flexible" guidelines at issue here were involved in other transactions.

The SAC also alleges that a former Countrywide executive, Mark Zachary "complained to Countrywide's regional management" about "a practice known within Countrywide as 'flipping' an application" in which applications that were unable to get approval via the full-documentation program were "flipped" for consideration under a reduced-documentation program.  (SAC ¶ 122.)  Plaintiffs do not allege that any of the Mortgage Loans in the Securitizations were "flipped" or that applications that were submitted for approval in the reduced-documentation program did not meet the underwriting guidelines required for that program, the risks of which were disclosed to plaintiffs in the offering materials.  Such allegations do not raise an inference of scienter with respect to the alleged misrepresentations regarding the reduced-documentation program because any alleged knowledge about the "flipping" of applications is not tied to any allegations about the Mortgage Loans here.

iv.  Scienter with Respect to Statements Regarding Avoidance of Adverse
Effects on Investors' Interests.

Plaintiffs assert that Countrywide knew "that the loans were likely to

perform poorly" because it "had payment histories on <u>some</u> of the Mortgage Loans that it

added to the Securitizations' pools, in its role as servicer of the Loans, so it knew that

certain Loans were already defaulting when the pools were created."  (SAC ¶ 129

(emphasis added).)

The SAC does not allege facts that support the conclusory allegation that

Countrywide knew that some of the Mortgage Loans were defaulting at the time when the

Securitization pools were created.  Plaintiffs do not identify which persons or entities had

access to such information.  Furthermore, the SAC does not allege facts that demonstrate

that Countrywide had the motive and opportunity necessary for scienter with respect to

this alleged misrepresentation.  Pursuant to the PSAs, Countrywide was required to

"cure," "remove . . . and substitute" or "repurchase" any noncompliant loans.  (SPS1 PSA

§ 2.03(f); SPS2 PSA § 203(f).)  The SAC does not allege that defendants did not intend

to fulfill this obligation.  Plaintiffs do not identify a motive that leads to an inference of

scienter that is compelling in light of defendants' obligation to cure any noncompliant

loan.  Collectively, these allegations fail to raise a strong inference of scienter.  <u>See</u>

<u>Tellabs</u>, 551 U.S. at 322.

Plaintiffs also complain that based on information about other, similar

mortgage loans' payment histories, Countrywide should have known that the SPS1 and

SPS2 Mortgage Loans "were likely to experience high rates of default."  (<u>Id.</u> ¶ 130.)  As

explained above, the offering documents disclosed this precise risk.  (<u>See</u> SPS1

Prospectus Supplement at S-14; SPS2 Prospectus Supplement at S-14.)  Again, such a

disclosure is inconsistent with the state of mind required to state a claim for securities fraud.  See Novak, 216 F.3d at 308.

        c.   Loss Causation

        I need not reach the issue of whether the SAC alleges loss causation because the SAC fails to allege a misstatement or that defendants acted with scienter.  I note, however, that there is a serious issue as to whether plaintiffs have plead loss causation because the SAC does not allege when, how, and to what extent the losses plaintiffs suffered were attributable to the alleged misstatements.  As the Second Circuit explained in Lentell v. Merrill Lynch & Co., where a "plaintiff's loss coincides with a marketwide phenomenon causing comparable losses to other investors . . . a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements as opposed to intervening events."  396 F.3d 161, 174 (2d Cir. 2005) (internal quotation marks and citation omitted).

        The SAC alleges in conclusory fashion that "[t]he loss in value was not due to the recent decline in the American housing market and the mortgage-backed securities markets . . . ."  (SAC ¶ 223 (emphasis in original).)  The SAC goes on to allege that "[t]hose broader market declines occurred long after the Securities began to experience high rates of delinquency and default."  (Id.)  The SAC does not, however, identify when the Securities began to experience "high rates of delinquency and default," when the "broader market declines" began, or the extent that plaintiffs' investments were affected by the delinquency and default.  The SAC does not include facts which, if proven, would show that the loss in value of plaintiffs' Securities was caused by the alleged misstatements as opposed to the "broader market declines."

III.     Plaintiffs' Section 10(b) and Rule 10b-5 Claims Against Mozilo and Sambol are
         Dismissed.

Because they are based on a slightly different theory of liability, I

separately address the securities fraud claims against Mozilo and Sambol.  As explained

more fully below, the claims against Mozilo and Sambol are dismissed because the SAC

fails to plausibly state a claim against them under the heightened pleading requirements

of Rule 9(b) and the PSLRA.

a.   Mozilo.

i.   The SAC Fails to Allege That Mozilo Made a Material Misstatement
     or Omission.

The SAC does not allege that Mozilo had any personal involvement with

plaintiffs' investment in the Securitizations.  The SAC also does not allege any statement

made by Mozilo in connection with plaintiffs' purchase of securities.  Instead, the SAC

alleges that Mozilo is liable for misrepresentations in the offering documents as well as

general statements that he made about Countrywide's business.

1.   The Group Pleading Doctrine.

First, plaintiffs argue that Mozilo is liable for statements in the offering

documents under the group pleading doctrine.  The group pleading doctrine allows

plaintiffs, "for pleading purposes only, to 'rely on a presumption that . . . press releases,

or other group-published information, are the collective work of those individuals with

direct involvement in the everyday business of the company.  This allows plaintiffs, to a

limited extent, to circumvent the general pleading rule that fraudulent statements must be

linked directly to the party accused of the fraudulent intent.'"  In re BISYS Sec. Litig.,

397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005) (quoting In re NTL, Inc. Sec. Litig., 347 F.

Supp. 2d 15, 22 n.26 (S.D.N.Y. 2004)).  The group pleading doctrine is only available

against a defendant if the plaintiff has "alleged facts indicating that the defendant was a

corporate insider or affiliate with direct involvement in the daily affairs of the company."

Id. at 440-41.[2]

    As explained above, the SAC fails to plausibly allege that the offering

documents contained material misrepresentations.  Furthermore, plaintiffs fail to

plausibly allege that Mozilo's position as a "corporate insider" at the parent corporation,

CFC, made him a "corporate insider or affiliate with direct involvement" in the various

subsidiaries' actions related to the Securitizations.  As other courts in this district have

noted, "even if the group pleading doctrine applied to the statements at issue, it would not

link . . . the corporate parent . . . to statements attributable to [its subsidiary].  The

defendants must be directly involved in the daily business of the company responsible for

the statements for the exception to apply."  See, e.g., Defer L.P. v. Raymond James Fin.,

Inc., 654 F. Supp. 2d 204, 214 (S.D.N.Y. 2009); Yung v. Lee, 2002 WL 31008970, at *3

(S.D.N.Y. Sept. 5, 2002), aff'd, 160 Fed. App'x 37, 42 (2d Cir. 2005) (allegation that

defendant "owns and controls [subsidiaries] . . . is insufficient to plead [defendant's]

participation in the securities offer at issue, even under the group pleading doctrine").

    Therefore, plaintiffs' claim against Mozilo based on alleged

misrepresentations in the offering documents is dismissed.

---

[2] I recognize that whether the PSLRA has abrogated the group pleading doctrine is an open question in this Circuit, and that some courts, including the Fifth Circuit, have held that it has.  Southland Sec. Corp. v. INSpire Ins. Solutions Inc., 365 F.3d 353 (5th Cir. 2004).  The majority of judges in this district who have addressed the issue have concluded that the group pleading doctrine has survived the PSLRA.  In re BISYS Sec. Litig., 397 F. Supp. 2d at 439 n. 42 (collecting cases).  For the purposes of this motion, I accept the conclusion that the group pleading doctrine has some continued viability.  See, e.g., In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641-42 (S.D.N.Y. 2007) (stating that there is no "apparent contradiction between the idea that each defendant's role must be pled with particularity and the fact that corporate officers may work as a group to produce particular document[s]").

ii. <u>Mozilo's Statements.</u>

In opposition to the motion to dismiss, plaintiffs' also argue that the SAC

identifies six misrepresentations that Mozilo "made directly."  (Pl. Opp. Mem. at 51.)

The SAC alleges that Mozilo represented that Countrywide

> (i)  "manage[d]  credit  risk  through  credit  policy,
> underwriting,  quality  control  and  surveillance  activities;"
> (ii) engaged  in  "prudent  underwriting  guidelines;"
> (iii) would not "compromise [its underwriting standards] as
> we grow market share;" (iv) under "no circumstances will
> . . . ever sacrifice sound lending and margins for the sake of
> getting  to  that  30  percent  market  share;"  (v) had  not
> experienced  any  loosening  of  underwriting  standards  that
> create[d] less of a quality of loan than [Countrywide] did in
> the past;" and (vi) kept "loan quality . . . extremely high."

(<u>Id.</u> (alterations in original)); SAC ¶¶ 33, 35, 38, 44, 169, 186.)

As explained above, the SAC does not allege facts that link these

statements to the Securitizations at issue here.  The statements include comments on

Countrywide's business as a whole; they do not relate to the Certificates plaintiffs

purchased.  As explained more fully above, plaintiffs "must do more than say that the

statements . . . were false and misleading; they must demonstrate with specificity why

and how that is so."  <u>Rombach v. Chang</u>, 355 F.3d 164, 174 (2d Cir. 2004).  Plaintiffs'

failure to allege how and why the statements above were misleading <u>with respect to the</u>

<u>Securitizations they purchased</u> is fatal to their claim.

b. <u>Sambol.</u>

    i. The SAC Fails to Allege that Sambol Made a Material Misstatement or Omission.

As explained above, Sambol was President and COO of CHL from 2004 to 2006 and President and COO of CFC from September 2006 until mid-2008.  (<u>See</u> SAC ¶ 20.)

1. <u>The Group Pleading Doctrine.</u>

Plaintiffs do not point to any statements that were made by Sambol in connection with the Securitizations.  The SAC acknowledges that Sambol was not a signatory to the prospectuses or registration.  (<u>Id.</u> ¶ 64.)  The SAC does not allege that Sambol had a role in Securitizations by virtue of his work for Countrywide, nor does it allege that Sambol had a role related to the Securitizations at issue here.  As with their allegations against Mozilo, plaintiffs rely on the Group Pleading Doctrine in support of their assertion that Sambol is liable for misrepresentations in the offering documents.  Because the plaintiffs have failed to allege that the offering documents contained a material misstatement, the group pleading doctrine does not save their claims against Sambol.

2. <u>Sambol's Statements.</u>

The SAC also alleges that Sambol made three direct misrepresentations, but does not allege that the misstatements were made with respect to the Securitizations here.  First, plaintiffs allege that Sambol stated that "we have an intense and ongoing focus on share growth while at the same time maintaining a very strong internal control environment and what we believe is a best-of-class governance . . . .  [O]ur culture is also

characterized by a very high degree of ethics and integrity in everything we do." (SAC ¶ 35.)

Statements about corporate culture and integrity are typically considered to be inactionable puffery. See In re JP Morgan Chase sec. Litig., 2007 WL 950132, at *4, 12 (S.D.N.Y. Mar. 29, 2007), aff'd sub nom. ECA Local 134 IBEW Joint Pension Trust of Chi v. JP Morgan Chase, 553 F.3d 187 (2d Cir. 2009) (holding that statements regarding "integrity," "fiscal discipline" and "risk management" are "precisely the type of puffery that this and other circuits have consistently held to be inactionable"). Furthermore, the SAC does not allege facts that link this general statement about corporate culture to the Securitizations purchased by plaintiffs.

The SAC also alleges that Sambol stated that "Countrywide required 'higher credit scores or lower loan to value ratios' as a condition to approving riskier adjustable-rate mortgages, in order to counter the increased risk." (SAC ¶ 172.)  As explained above, statements about guidelines and practices relating to adjustable-rate mortgages are immaterial to the claims here because the Securitizations included only "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties." (Id. ¶ 2 (emphasis added).)  The SAC does not contain any factual allegations which explain how Sambol's statement regarding adjustable-rate mortgage originations relates to the "fixed-rate loans" in the Securitizations.

Finally, the SAC alleges that, in September 2006, Sambol stated that Countrywide was "on the sidelines" of the subprime market. (Id. ¶ 172.)  The full statement made by Sambol was: "[W]e remain committed to having a subprime

presence.  But there are no particular plans to accelerate growth.  And, I think, that would characterize our current position as remaining on the sidelines . . . ."  (Phillips Decl. Ex. D at 19.)  Plaintiffs do not allege that this statement was false or how Sambol's characterization of Countrywide's overall business strategy were relevant to their purchase of the Securities.  The percentage of Countrywide's business that related to subprime loans is immaterial with respect to the Securitizations because, as plaintiffs acknowledge, all of the loans included in the Securitizations were "credit-blemished, closed-end, fixed-rate loans that were secured by second liens on one- to four-family residential properties."  (Id. ¶ 2.)  Plaintiffs do not contend that they were unaware of the number of subprime loans included in the Securitizations.

IV.     The Plaintiffs' Section 20(a) Claim is Dismissed.

        To state a claim of control person liability under Section 20(a), a plaintiff must allege (1) primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) meaningful culpable participation in the controlled person's acts of fraud.  ATSI, 493 F.3d at 108.  Because the Complaint fails to state a primary violation, the plaintiffs' section 20(a) claim is dismissed.

        The plaintiffs' section 20(a) claims are dismissed.

V.      The Plaintiffs' Claims for Successor Liability Against BofA Are Dismissed.

        The SAC alleges a claim against BofA and BAC HLS based on a theory of successor liability.  (See SAC ¶¶ 257-74.)  Because the SAC fails to state a claim against the Countrywide defendants, there is no basis for a claim based on successor liability against BofA and BAC HLS.

VI.     The Plaintiffs' Claims of Common-Law Fraud Are Dismissed.

To state a claim for fraud under New York law, a plaintiff must allege "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." See May Dep't Stores Co. v. Int'l Leasing Corp., Inc., 1 F.3d 138, 141 (2d Cir.1993). As explained above, the SAC fails to allege a material, false representation or that defendants made such statements with an intent to defraud the plaintiffs. Therefore, for substantially the same reasons explained above, plaintiffs' claims against the Countrywide defendants for common-law fraud are dismissed. See Rule 9(b).


CONCLUSION

The defendants' motion to dismiss the SAC is GRANTED. (Docket No. 37.)

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       September 28, 2010

46